No. 24-1121

# United States Court of Appeals for the Federal Circuit

NXP USA, INC., NXP B.V.,
*Plaintiffs-Appellants*,

*v.*

IMPINJ, INC.,
*Defendant-Appellee.*

Appeal from the United States District Court for the Western District of Washington in No. 2:20-cv-01503-JHC, The Honorable John H. Chun

## PLAINTIFFS-APPELLANTS' NON-CONFIDENTIAL OPENING BRIEF

Jennifer L. Swize
Courtney A. Bolin
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939
jswize@jonesday.com
cbolin@jonesday.com

Lisa L. Furby
JONES DAY
110 North Wacker Drive
Suite 4800
Chicago, IL 60606
lfurby@jonesday.com

Tharan Gregory Lanier
Michael C. Hendershot
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
(650) 739-3939
glanier@jonesday.com
mhendershot@jonesday.com

H. Albert Liou
JONES DAY
717 Texas Suite 3300
Houston, TX 77002
aliou@jonesday.com

*Counsel for Plaintiffs-Appellants NXP USA, Inc. and NXP B.V.*

# CLAIMS AT ISSUE

There are three patents at issue in this appeal; representative claims are set forth below.

U.S. Patent No. 7,257,092

1. A method of communicating between a communication station (1) and at least one data carrier (2 (DC)), which data carrier (2 (DC)) comprises a characteristic identification data block (IDB) and useful data (UD), by said method an inventorization procedure is carried out, the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB) of the at least one data carrier (2 (DC)) is known in the communication station (1), and by which method a transmission of specific useful data (n×UDB) is carried out from the at least one data carrier (2 (DC)) to the communication station (1) such that during the implementation of the inventorization procedure at least one part of a block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (1) and, in addition, said specific useful data (n×UDB) are transmitted from the at least one data carrier (2 (DC)) to the communication station (1).

15. A data carrier (2 (DC)) for communicating with a communication station (1), in said data carrier (2 (DC)) a characteristic identification block (IDB) and useful data (UD) are stored, and said data carrier (2 (DC)) is designed for carrying out an inventorization procedure, the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB), included in the data carrier (2 (DC)) after the at least one part of the identification data block's storage, of the data carrier (2 (DC)) is known in the communication station (1), and which data carrier (2 (DC)) comprises output means (40, 34, 32, 25) for outputting to the communication station (1) specific useful data (n×UDB) included in the data carrier (2 (DC)) after the specific useful data's storage, wherein the data carrier (2 (DC)) is designed for outputting at least one part of a block region (NKP-IDB), not yet known in the communication station (1) of the identification data block (IDB) of the data carrier (2 (DC)) included in the data carrier (2 (DC)) after the identification data block's (IDB) storage, in addition, specific useful data (n×UDB) of the data carrier (2 (DC)) included in the data carrier (2(DCC)) after the specific useful data's (n×UDB) storage.

U.S. Patent No. 7,795,951

1. A voltage multiplier comprising:

a first clocked multiplier stage having an input and an output;

a second clocked multiplier stage having an input and an output;

an input level regulator having an input coupled to receive a supply voltage, a control input, and an output coupled to the input of the first multiplier stage; and

a feedback bias control circuit coupled to the control input of the input level regulator, wherein the feedback bias control circuit is further coupled to receive the output of the second multiplier stage, and wherein the feedback bias control circuit generates a feedback signal for regulating an output voltage at the output of the input level regulator to a continuous range of voltage levels based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage.

U.S. Patent No. 7,374,097

1. A data carrier that is arranged to receive a signal in a non-contacting manner and that has an electrical circuit, to which circuit the signal can be fed and which circuit is arranged, by using the signal, to generate a supply voltage for parts of the circuit, which circuit comprises storage means that are arranged to store information capacitively, the information being represented by a value of an information voltage arising at the storage means, and which circuit comprises information-voltage generating means that are arranged to receive a control signal, which control signal is of a voltage value that is at most equal to the value of the supply voltage, and that are arranged to generate the information voltage by using the control signal, characterized in that the information-voltage generating means have voltage-raising means that are arranged to raise the voltage value of the control signal.

# CERTIFICATE OF INTEREST

**Case Number:** 24-1121
**Short Case Caption:** NXP USA, Inc. v. Impinj, Inc.
**Filing Party:** Plaintiffs-Appellants NXP USA, Inc. and NXP B.V.

Counsel for NXP USA, Inc. and NXP B.V. certifies the following information is accurate and complete:

The full name of every party represented by me is:

NXP USA, Inc. and NXP B.V.

The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are:

**For Plaintiff-Appellant NXP USA, Inc.:** NXP Semiconductors N.V.; NXP B.V.; and Freescale Semiconductor Holdings V, Inc.; and

**For Plaintiff-Appellant NXP B.V.:** NXP Semiconductors N.V.

The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

**Jones Day:** T. Kaitlin Crowder, Timothy J. Heverin, Yury Kalish, John M. Michalik, Thomas W. Ritchie, Jonathan M. Smith, Tracy A. Stitt, David L. Witcoff;

**Harrigan Leyh Farmer & Thomsen LLP:** Tyler L. Farmer, Chelsey L. Mam, Bryn R. Pallesen; and

**Richards, Layton & Finger, PA:** Kelly E. Farnan.

Appeals from the originating trial court action was previously before this or any other appellate court:

None.

Information relating to organizational victims and bankruptcy cases:

Not applicable.


Date:  March 8, 2024                          /s/ *Jennifer L. Swize*
                                               Jennifer L. Swize
                                               JONES DAY
                                               51 Louisiana Avenue, N.W.
                                               Washington, DC  20001

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................................... i

TABLE OF AUTHORITIES ............................................................................ vi

TABLE OF ABBREVIATIONS ........................................................................ xi

STATEMENT OF RELATED CASES .............................................................. xii

JURISDICTIONAL STATEMENT ................................................................. xiii

INTRODUCTION ............................................................................................. 1

STATEMENT OF THE ISSUES ...................................................................... 4

STATEMENT OF THE CASE .......................................................................... 5

      A.   RFID Technology ...................................................................... 5

      B.   NXP's Lawsuit ......................................................................... 6

      C.   '092 Patent .............................................................................. 7

            1.   "Output Means" Found Indefinite .................................. 9

            2.   "Identification Data Block" Construction And Summary Judgment ...................................................... 9

      D.   '951 Patent ............................................................................ 12

            1.   Claim Construction ...................................................... 13

            2.   Summary Judgment ...................................................... 13

      E.   '097 Patent ............................................................................ 14

            1.   Claim Construction ...................................................... 15

            2.   Denial Of Summary Judgment Of Non-Infringement ................................................................ 16

            3.   Trial And NXP's Post-Trial Motion ............................ 17

SUMMARY OF ARGUMENT ....................................................................... 18

    I.   '092 PATENT ........................................................................ 18

    II.   '951 PATENT ........................................................................ 20

    III.   '097 PATENT ........................................................................ 20

STANDARDS OF REVIEW ........................................................................... 21

**TABLE OF CONTENTS**
**(continued)**

Page

ARGUMENT ...........................................................................................21

I.     '092 PATENT:  THE DISTRICT COURT ERRED IN
       FINDING CERTAIN CLAIMS INDEFINITE AND
       GRANTING SUMMARY JUDGMENT ON THE REST ...............21

       A.     The Indefiniteness Ruling Cannot Be Sustained .....................21

              1.     The Patentee Sensibly Used Reference Numbers
                     To Comply With Means-Plus-Function Claiming
                     Requirements ...............................................................22

                     a.     The Patent Clearly Links The
                            Corresponding Structures To The Claimed
                            Function Using Reference Numbers And
                            Supporting Written Description ..........................23

                     b.     To The Extent The Court Provided An
                            Evidentiary Basis For Its Holding, It
                            Mistakenly Relied On An Irrelevant
                            Statement In An Unrelated Patent Rather
                            Than Find Proof By Clear And Convincing
                            Evidence ...........................................................25

              2.     The District Court's New "Bright-Line Rule"
                     Should Be Rejected, At Least For Means-Plus-
                     Function Claims...........................................................27

       B.     The District Court Erred In Abandoning Its Refined
              Construction And Granting Summary Judgment ....................30

              1.     The Court Erred In Abandoning Its Refined
                     Construction Of "Identification Data Block"...............30

              2.     Under Either Construction, The Court Erred In
                     Granting Summary Judgment Of Claims 1-14..............34

II.    '951 PATENT:  THE DISTRICT COURT ERRED IN
       GRANTING SUMMARY JUDGMENT...........................................38

iv

# TABLE OF CONTENTS
## (continued)

Page

A.   The District Court's Construction Of "Proportional" Violated Claim Construction Principles ...................................39

B.   Under Either Claim Construction, The Court Erred In Granting Summary Judgment ..................................................44

III.   '097 PATENT:  THE DISTRICT COURT ERRED IN UPHOLDING THE VERDICT ........................................................47

A.   Impinj Used Narrowed Constructions To Argue Non-Infringement..........................................................................48

B.   The District Court Erred In Denying Post-Trial Relief...........58

1.   The Court Erred In Denying JMOL Of Infringement .................................................................59

2.   The Court Erred In Denying A New Trial....................63

CONCLUSION .......................................................................................64

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 50 depicts a technical schematic for which the configuration of components is proprietary.

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Acumed LLC v. Stryker Corp.*,
   483 F.3d 800 (Fed. Cir. 2007) ..................................................................41

*Airlines for Am. v. City & Cnty. of S.F.*,
   78 F.4th 1146 (9th Cir. 2023) ..................................................................21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................37

*Atmel Corp. v. Info. Storage Devices, Inc.*,
   198 F.3d 1374 (Fed. Cir. 1999) ..............................................................27

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017) ..............................................................21

*Biomedino, LLC v. Waters Techs. Corp.*,
   490 F.3d 946 (Fed. Cir. 2007) ................................................................22

*Broadcom Corp. v. Emulex Corp.*,
   732 F.3d 1325 (Fed. Cir. 2013) ..............................................................47

*Budde v. Harley-Davidson, Inc.*,
   250 F.3d 1369 (Fed. Cir. 2001) ..............................................................26

*Catalina Lighting, Inc. v. Lamps Plus Inc.*,
   295 F.3d 1277 (Fed. Cir. 2002) ..............................................................55

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*,
   725 F.3d 1341 (Fed. Cir. 2013) ..............................................................43

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   No. 2:14-CV-0911-JRG-RSP, 2015 WL 6956722 (E.D. Tex. Nov.
   9, 2015) ....................................................................................................29

## TABLE OF AUTHORITIES
### (continued)

**Page**

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
   424 F.3d 1168 (Fed. Cir. 2005) ...........................................................55

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
   575 F.3d 1312 (Fed. Cir. 2009) ...........................................................55

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)......................................................................27, 28

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
   423 F.3d 1343 (Fed. Cir. 2005) ...........................................................42

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
   340 F.3d 1314 (Fed. Cir. 2003) ...........................................................60

*Hyatt v. U.S. Pat. & Trademark Off.*,
   48 F.4th 1347 (Fed. Cir. 2022) ...........................................................28

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008) ...........................................................42

*Ironworks Pats. LLC v. Samsung Elecs. Co.*,
   798 F. App'x 621 (Fed. Cir. 2020) ......................................................29

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002) ...........................................................30

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ...........................................................61

*KEG Kanalreinigungstechnick  GmbH v. Laimer*,
   No. 1:11-cv-1948-JEC, 2013 WL 8719444 (N.D. Ga. Jan. 11,
   2013), *R. & R. adopted*, No. 1:11-cv-1948-JEC, 2013 WL
   11904722 (N.D. Ga. Feb. 21, 2013) ....................................................28

vii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lakeside-Scott v. Multnomah Cnty.*,
  556 F.3d 797 (9th Cir. 2009) ..............................................................21

*Linear Tech. Corp. v. ITC*,
  566 F.3d 1049 (Fed. Cir. 2009) ..........................................................62

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)............23, 43

*Millipore Corp. v. W.L. Gore Associates, Inc.*,
  No., 11-1453-ES, 2012 WL 5250386 (D.N.J. Oct. 24, 2012)...........................29

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ........................................................21, 58

*Omega Pats., LLC v. CalAmp Corp.*,
  920 F.3d 1337 (Fed. Cir. 2019) ..........................................................58

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................passim

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) ............................................................23

*Relume Corp. v. Dialight Corp.*,
  63 F. Supp. 2d 788 (E.D. Mich. 1999) ........................................28, 29

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ..........................................................43

*Searfoss v. Pioneer Consol. Corp.*,
  374 F.3d 1142 (Fed. Cir. 2004) ..........................................................40

## TABLE OF AUTHORITIES
### (continued)

**Page**

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) ..........................................................55

*Superior Fireplace Co. v. Majestic Prods. Co.*,
  270 F.3d 1358 (Fed. Cir. 2001) ..........................................................29

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ..........................................................36

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015)..........................................................................21

*Trs. of Columbia Univ. in the City of N.Y. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016) ..................................................26, 43

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ..........................................................37

*United States v. 4.0 Acres of Land*,
  175 F.3d 1133 (9th Cir. 1999) ............................................................58

*Va. Panel Corp. v. MAC Panel Co.*,
  133 F.3d 860 (Fed. Cir. 1997) ............................................................43

*Wi-LAN, Inc. v. Apple, Inc.*,
  811 F.3d 455 (Fed. Cir. 2016) ............................................................60

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) (en banc) ....................................22, 23

*Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*,
  19 F.3d 1418 (Fed. Cir. 1994) ............................................................55

# TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

35 U.S.C. § 112, ¶ 6 .......................................................................19, 22, 28

**OTHER AUTHORITIES**

*Definition of Proportional*, MERRIAM-WEBSTER DICTIONARY,
    https://www.merriamwebster.com/dictionary/proportional ..............................41

MPEP § 608.1(m) ......................................................................................28

# TABLE OF ABBREVIATIONS

This brief incorporates a number of abbreviations, which are summarized for the Court's convenience below.

| Abbreviation | Term |
|---|---|
| '092 patent | U.S. Patent No. 7,257,092 |
| '097 patent | U.S. Patent No. 7,374,097 |
| '951 patent | U.S. Patent No. 7,795,951 |
| '769 patent | U.S. Patent No. 8,415,769 |
| Appx ___ | Appendix at page(s) ___ |
| Appx__ (__:__) | Appendix at page __ at (column___: line(s)___) |
| Court | United States Court of Appeals for the Federal Circuit |
| district court, or court | United States District Court for the Western District of Washington |
| Gen2 | GS1 EPCGLOBAL INC., EPC™ RADIO-FREQUENCY IDENTITY PROTOCOLS GENERATION-2 UHF RFID (version 2.0.1) (2004) |
| IC | integrated circuit |
| Impinj | Impinj, Inc. |
| ISO standard | INT'L STANDARDS ORG., ISO/IEC 15693-3 (version 1.0) (2000) |
| NXP | NXP USA, Inc. and NXP B.V. |
| RFID | radio frequency identification |
| UHF | ultra-high frequency |

Also, all emphasis is added unless otherwise noted, and all internal quotation marks and citations are omitted unless otherwise indicated.

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are not aware of any appeal in or from the district court that was previously before this or any other appellate court within the meaning of Fed. Cir. R. 47.5 that will directly affect the Court's decision in this appeal or that could be affected by the Court's decision.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338, entered judgment on June 27, 2023, and denied NXP's post-judgment motion on August 31, 2023.  This appeal, noticed September 29, 2023, is timely.  This Court has jurisdiction under 28 U.S.C. § 1295.

# INTRODUCTION

For the three patents at issue, the district court found certain claims indefinite (two of the '092 patent claims), granted summary judgment of non-infringement for other claims (the other '092 patent claims and the '951 patent claims), and upheld the jury's non-infringement verdict on the claims that were tried (the '097 patent claims). Each of these outcomes was wrong.

Throughout the case, the court acknowledged its newness to patent law; this was its inaugural patent case, and it was assigned the case mid-proceedings. The court endeavored to get its decisions right and frequently revisited prior decisions it had made. In certain circumstances, where the parties refined their disputes and the court became more familiar with the law and the facts, it properly revisited issues of claim construction and summary judgment. But on some issues, including its early-stage claim constructions, and second-guessing its summary judgment decisions one too many times, the court erred. And ultimately, even where the court came to the correct construction, it did not hold Impinj to that meaning, resulting in the wrong jury verdict.

As relevant to two independent claims of the '092 patent, the court developed its own "bright-line rule" that reference numbers expressly recited in claims have no relevance to claim construction—even in means-plus-function claims when used to link a claimed function to its corresponding structure, one of their most natural uses.

That rule does not comport with means-plus-function claiming, nor with longstanding claim construction principles and the Supreme Court's directives against such absolute rules.

For other claims of the '092 patent, the court took a useful step forward by refining its *Markman*-stage construction of "information data block" at summary judgment, when the parties' dispute required further construction.  Based on its refined construction, the court properly denied summary judgment of non-infringement.  But the court then took two steps back, not only reverting to its *Markman*-stage construction but divorcing the term from the patent's context.  Based on that erroneous construction, the court ultimately granted summary judgment of non-infringement.  That was further error.  Indeed, the court originally denied summary judgment of non-infringement under its *Markman*-stage construction, recognizing there were factual disputes for the jury.  Only after Impinj moved for reconsideration—within two weeks of trial, when the court needed to promptly settle the trial's scope—did the court grant summary judgment.  But its later-provided reasoning showed that it resolved fact disputes.

For the '951 patent, the court granted summary judgment based on its *Markman*-stage construction of "proportional."   But the court reached this construction in exactly the wrong way:  It discarded the POSITA's perspective for a

layperson's, it started with dictionary definitions rather than give primacy to the intrinsic evidence, and it disregarded intrinsic evidence.

Finally, for the '097 patent, which went to trial, the court erred in upholding the verdict of non-infringement. Prior to trial, the court had properly revisited its *Markman*-stage construction of "voltage-raising means." And at trial it adhered to the revised construction and to the ordinary meaning of another term, "voltage-limiting means." Impinj, though, did not. And after trial, the court failed to enforce its constructions, instead engaging in improper post-trial construction that added limitations not required by the court's constructions or the claims.

The court's attentive consideration and management of this complex case was undone by these errors. Early in the case, it developed a flawed new "bright-line" rule that resulted in finding clearly described means-plus-function claims ('092 patent) indefinite, and it adopted certain claim constructions—for "identification data block" ('092 patent), "proportional" ('951 patent), and "voltage-raising means" ('097 patent)—that were wrong or later became inadequate for resolving the parties' dispute. And while it appropriately corrected its constructions of "identification data block" and "voltage-raising means" as the case progressed, it later undid its good work, second-guessing its refined "identification data block" construction at summary judgment and engaging in post-trial reconstruction for "voltage-raising"

means." This Court should correct these errors, and accordingly the indefiniteness and non-infringement determinations should be reversed.

## STATEMENT OF THE ISSUES

**'092 patent:**

1.    Claims 15 and 19:  Did the court err in construing the means-plus-function "output means" terms as indefinite under its new "bright-line rule" that "[r]eference numbers in claims do not affect the construction or scope of a claim"?

2.    Claims 1-14:  Did the court err in reverting to its *Markman*-stage construction of "identification data block," which inadequately addressed the parties' evolved dispute concerning this limitation, and further disassociating the term from the context of the intrinsic evidence, and then granting summary judgment of non-infringement on fact questions?

**'951 patent:**

3.    Did the court err in narrowly construing "proportional" to require a linear, constant ratio, contrary to the term's plain and ordinary meaning in the context of the intrinsic evidence?

4.    Under either the correct construction or the court's construction, did the court err in granting summary judgment of non-infringement?

**'097 patent:**

5.    Did the court err in denying JMOL, or alternatively a new trial, where

the evidence would compel a reasonable jury to find infringement, and where Impinj's non-infringement position relied on arguments inconsistent with the court's interpretation of "voltage-raising means" and "voltage-limiting means"?

## STATEMENT OF THE CASE

### A.     RFID Technology

NXP and Impinj compete in the "UHF RFID" market; both sell UHF RFID integrated circuits ("ICs" or "chips" or "tag chips").   RFID ("radio frequency identification") is a type of contactless communication that uses electromagnetic frequencies to transmit data.   Appx5381.   UHF ("ultra-high frequency") RFID systems are well-suited for high-volume inventory management.   Appx17033-Appx17034 (124:23-125:8).

An RFID system includes: (1) tags, typically attached to inventory items, and (2) readers, which transmit and receive the radio frequency signals to communicate with tags.   Appx5384.   Tags, which are about the size of a grain of sand, contain two key parts: a chip and an antenna.   Appx5385.   The interaction of RFID devices is depicted below:



Appx5384.

## B.     NXP's Lawsuit

NXP is a long-time industry leader in semiconductor technology, including the integrated circuits used in RFID technology.  As a result of its extensive research and development, NXP owns hundreds of patents.

In October 2019, NXP filed this lawsuit on its '097, '092, and '951 patents (and others not relevant on appeal), alleging Impinj chips and readers infringe various claims.  Appx300-306; Appx308-310.  Originally filed in Delaware, the case was transferred to the Western District of Washington in September 2020.  Appx717. In May 2022, on the eve of claim construction, the case was reassigned to a newly appointed Judge for all further proceedings.  Appx251.

The patents were resolved at largely different junctures.  In its November 2022 *Markman* order, the court held certain claims of the '092 patent invalid as indefinite.

Appx20-26.  The court addressed the remaining '092 patent claims in protracted summary judgment proceedings, originally denying summary judgment in March 2023 and again in May 2023, but ultimately granting summary judgment of non-infringement eight days later, on the eve of trial, based on its *Markman*-stage construction of "identification data block"; it provided "the balance" of its reasoning a couple months afterward.    Appx78-86;  Appx15095-15108;  Appx98-100; Appx153-171.  For the '951 patent, the court granted summary judgment of non-infringement in its March 2023 order, based on its *Markman*-stage construction of "proportional."  Appx86-90.  And for the '097 patent, after the court twice denied summary judgment of non-infringement, that patent proceeded to trial in June 2023. Appx91-96; Appx15851-15859.  The jury found the '097 patent not invalid and not infringed.  Appx145-150.

We summarize the proceedings on each patent.

### C.    '092 Patent

The  '092  patent,  entitled  "Method  of  Communicating  Between  a Communication Station and at Least One Data Carrier," issued in 2007.  NXP asserted all claims of the '092 patent.  Claims 1, 15, and 19 are representative.

Claim 1, with relevant language emphasized, recites:

1. A method of communicating between a communication station (1) and at least one data carrier (2 (DC)), which data carrier (2 (DC)) comprises ***a characteristic identification data block (IDB) and useful data (UD)***, by said method an inventorization procedure is carried out,

7

the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB) of the at least one data carrier (2 (DC)) is known in the communication station (1), and by which method a transmission of specific useful data (n×UDB) is carried out from the at least one data carrier (2 (DC)) to the communication station (1) such that *during the implementation of the inventorization procedure at least one part of a block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (1) and, in addition, said specific useful data (n×UDB) are transmitted from the at least one data carrier (2 (DC)) to the communication station (1)*.

Appx207 (17:47-65).

Claims 15 and 19 are similar to method claim 1, with claims 15 and 19 directed to a "data carrier" (i.e., a tag) and "data carrier circuit" (i.e., a chip), respectively, that are configured to carry out the claimed inventorization procedure and include an "output means" for outputting the specific useful data.  Claim 15 (the tag claim) specifies "output means (40, 34, 32, 25)."  Appx208 (20:3).  Claim 19 (the chip claim) specifies "output means (40, 34, 32)."  Appx208 (20:52-53).  In the specification, reference number 40 is "the data processing means," 34 is "the coding means," 32 is "the modulation means," and 25 (relevant only to claim 15) is "the data carrier transmission means," i.e., an antenna to convert a chip into a tag.  *E.g.*, Appx202-203 (10:48-56, 8:54-57).  Figure 2 illustrates the claimed reference number elements in a data carrier that further includes a transmission means connected to a data carrier circuit.  Appx194 (Fig. 2); Appx202 (8:54–60).  The claimed "output means" terms reflect this well-known structural distinction between

8

a data carrier and a data carrier circuit. A data carrier (claim 15) necessarily includes a transmission means; a data carrier circuit (claim 19), from which a data carrier is made by attaching an antenna, does not.

Prior to the '092 patent, a reader would first "carry out an inventorization procedure" to collect "identification data," and then perform an "interrogation command" to collect other "useful data" from an inventoried tag. Appx199 (1:20-47). The '092 patent teaches an improved inventorization procedure that can communicate "identification data" and "useful data" together—the claimed invention collapses the "inventorization procedure" and "interrogation command" into a single step, shortening the time a reader needs to obtain tag data. *E.g.*, Appx199 (1:20-2:7).

### 1. "Output Means" Found Indefinite

For the "output means" terms (claims 15 and 19), the court determined at *Markman* that they are indefinite for lack of corresponding structure. The court relied on its new "bright-line rule" that claimed reference numbers are irrelevant to claim construction, even though, as the court noted, the claimed numbers here "refer to elements described in the specification." Appx20-26.

### 2. "Identification Data Block" Construction And Summary Judgment

The court itself described the proceedings on the remaining claims of the '092 patent as "long and circuitous." Appx158. In total, the court issued four relevant

9

decisions:  Two decisions denied summary judgment of non-infringement, the third reversed course and granted summary judgment, and the fourth set forth the court's reasoning.  The court's reversal rested largely on its changing construction of "identification data block."

The court ultimately construed "identification data block" as "identification data stored in memory"—the construction it first adopted at the *Markman*-stage, where the issue was whether the term is limited to serial numbers, as Impinj argued and the court rejected.  Appx12-16.  At summary judgment, the court recognized the term needed further construction because the parties' dispute largely turned on their different understandings of "identification data block."  Appx80-81.  Also by then, the court had a "deeper understanding of the technology at issue and the Federal Circuit case law."  Appx92.

The dispute concerned whether Impinj's products communicate "identification data" and "specific useful data" simultaneously, as claimed.  NXP accused the "EPC" as the identification data and the "TID" as the useful data.  The parties agreed the EPC was part of the "identification data block," so infringement hinged on whether the TID was "specific useful data," as NXP argued, or additional "identification data," as Impinj argued.  Appx80.

Addressing the evolved construction dispute in its first summary judgment order, the court concluded "NXP has the better argument" reflecting "the most

10

natural reading of the claims": the "identification data block" is data "used for identifying a tag during an inventorization-like procedure." Appx81-83; *see also* Appx12707-12710; Appx15098. In other words, "identification data" is data that would have been transmitted during "step one of the prior-art method," i.e., the "inventorization procedure." Appx81-83; Appx199 (1:20-2:7). By contrast, "useful data" would have been communicated during "[s]tep two of the prior art method," i.e., the "interrogation command." Appx81-83; Appx199 (1:20-2:7). The court explained that its modification reflected how "a POSITA would interpret the phrase 'identification data block' to refer only to data used to identify the tag during an inventorization-like procedure, not any data used to identify in an abstract sense." Appx83. Based on its modified construction, the court denied summary judgment of non-infringement because a reasonable jury could find the accused TID is "specific useful data" rather than "identification data block." Appx84.

Impinj renewed its motion. In its second order, again denying summary judgment, the court deserted its modified construction of "identification data block" that accounted for the claimed "inventorization procedure" and reverted back to its *Markman*-stage construction: "identification data stored in memory." Appx15102-15105 (viewing its modification as going "too far").

In late May 2023, in the days leading up to trial, Impinj again moved for summary judgment. Four days later, the court granted Impinj's motion in its third

order, which was short. Appx98-100. The court reserved its "complete reasoning" for an order it issued in July. Appx98-100. In that fourth order, the court explained it had proceeded in this manner "given [its] busy docket at the time," including other pending Impinj motions and the "looming trial date." Appx160. For its substantive reasoning, the court recognized the issue "presents a factual question," and granted summary judgment based on evidence it found "suggest[ive]" or "compelling." Appx161-170.

## D.   '951 Patent

The '951 patent, entitled "High-Dynamic Range Low Ripple Voltage Multiplier," issued in 2010. NXP asserted all claims of the '951 patent. Claim 1 is representative, with relevant language emphasized:

1. A voltage multiplier comprising:

a first clocked multiplier stage having an input and an output;

a second clocked multiplier stage having an input and an output;

an input level regulator having an input coupled to receive a supply voltage, a control input, and an output coupled to the input of the first multiplier stage; and

a feedback bias control circuit coupled to the control input of the input level regulator, wherein the feedback bias control circuit is further coupled to receive the output of the second multiplier stage, and wherein the feedback bias control circuit *generates a feedback signal for regulating an output voltage at the output of the input level regulator to a continuous range of voltage levels based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage*.

12

Appx227 (10:42-59).

The '951 patent discloses an improved voltage multiplier that can both increase and decrease the supply voltage, which reduces the number of components required to manage a tag chip's internal voltages and thereby improves the chip's efficiency and performance.  Appx223 (1:49-63).  The generated voltages have "relatively small ripple," or variations in voltage over time, by using a feedback signal to regulate the current going through voltage multiplier.  Appx223 (1:64-2:8).

### 1.    Claim Construction

As relevant here, the parties disputed "proportional," as used in the limitation that "the feedback bias control circuit generates a feedback signal for regulating an output voltage at the output of the input level regulator to a continuous range of voltage levels based on a comparison between *a voltage proportional to a voltage at the output of the second clocked multiplier stage* and a reference voltage." Appx227 (10:42-59).  The court construed "proportional" to mean "a constant ratio to another value that can be adjusted at different times."  Appx46-49.  The court stated this reflected the "common-sense understanding," "without any context" from the intrinsic record.  Appx47 (citing dictionaries); Appx5663 (141:20-25).

### 2.    Summary Judgment

At summary judgment, the "central dispute" was "whether the feedback circuitry within Impinj's products rely on a 'proportional' voltage to generate the

feedback signal." Appx87. Applying a further gloss that "momentary periods" of proportionality are insufficient, the court granted summary judgment of non-infringement. Appx89-90.

**E.     '097 Patent**

The '097 patent, entitled "Data Carrier for Storing Information Represented by an Information Voltage," issued in 2008. NXP asserted claims 1 and 4. Appx15970. Claim 1 is directed towards a "data carrier" (i.e., a tag), and claim 4 is directed towards a "circuit for a data carrier" (i.e., a chip); NXP asserted induced infringement of claim 1 and direct infringement of claim 4 (based on tags that incorporate Impinj's chips). Appx15970.

Claim 1 is representative, with relevant terms emphasized:

> 1. A data carrier that is arranged to receive a signal in a non-contacting manner and that has an electrical circuit, to which circuit the signal can be fed and which circuit is arranged, by using the signal, to generate a supply voltage for parts of the circuit, which circuit comprises storage means that are arranged to store information capacitively, the information being represented by a value of an information voltage arising at the storage means, and which circuit comprises ***information-voltage generating means that are arranged to receive a control signal***, which control signal is of a voltage value that is at most equal to the value of the supply voltage, and that are arranged to generate the information voltage by using the control signal, characterized in that the information-voltage generating means have ***voltage-raising means that are arranged to raise the voltage value of the control signal***.

Appx216-217 (8:58-9:6).

The '097 patent discloses chips and tags with improved information storage

14

where the disclosed "information-voltage generating means" includes a "voltage-raising means" that raises the control voltage and enables the storage means to provide an adequate information voltage for a "substantially longer period of time during which the stored information can be ascertained with high reliability." Appx213 (2:13-42). For example, the patent teaches a way to maintain "information voltage," which the industry sometimes calls "flag" information (e.g., information that indicates a tag should stop responding to a reader's queries after being inventoried by that reader), for a certain period of time if the tag loses power. Appx213 (2:13-42); Appx17040-17041 (131:10-132:14). Prior to the patent, flag information was frequently lost "after only a short period of time" due to "unavoidable leakage currents." Appx213 (1:62-2:7).

### 1.    Claim Construction

Two terms are at issue: "voltage-raising means" and "voltage-limiting means."

At *Markman*, the court construed "<u>voltage-raising means</u>" as a means-plus-function term, as Impinj argued. Appx33-39. In conjunction with the summary judgment proceedings, however, the court *sua sponte* revised its construction to instead adopt NXP's position that the term is not a means-plus-function term. Appx50-61. As the court explained, "with the benefit of a deeper understanding of the technology at issue, additional insight about the way a POSITA would discuss

15

circuit components, and an improved grasp of Federal Circuit case law," it recognized the term refers "to the class of circuit components (tangible structure) used to raise the voltage within a circuit." Appx58; Appx60. The court thus construed "voltage-raising means" as "a circuit that raises the voltage value of the control signal." Appx60.

"Voltage-limiting means" is part of the corresponding structure for the means-plus-function term "information-voltage generating means" (and is expressly recited in dependent claims 3 and 6).[1] The court gave "voltage-limiting means" its ordinary meaning. Appx181.

## 2.    Denial Of Summary Judgment Of Non-Infringement

Impinj moved for summary judgment of non-infringement, arguing that its products do not have a "voltage-raising means." Appx8618-8621. The court disagreed; a reasonable jury could find Impinj's "level shifter" is a "voltage-raising means" under the court's *sua sponte* revised construction. Appx95-96.

Impinj renewed its motion, arguing that its level shifter does not "raise the voltage value of the control signal above the supply voltage" and is not a "voltage-raising circuit" under the court's revised construction. Appx14157. Again, the court

---

[1] The function is "generating an information voltage by receiving and using a control signal that is of a voltage value that is at most equal to the value of the supply voltage," and there are three corresponding structures (and equivalents thereof): "a charging-current generating stage, voltage-raising means, and a voltage-limiting means." Appx31-33.

denied summary judgment, explaining the claims do not require the voltage-raising means to "always be capable of raising the voltage above the supply voltage," and repeating that a reasonable jury could find Impinj's level shifter is a "voltage-raising means" under the court's revised construction.  Appx15854-15856.

### 3.    Trial And NXP's Post-Trial Motion

The court maintained its constructions of "voltage-raising means" and "voltage-limiting means" at trial.  Appx117; Appx 123.  The jury found Impinj did not infringe.  Appx145-150.

In its post-trial motion, NXP explained a reasonable jury would be compelled to find infringement, and that Impinj's non-infringement arguments: (1) improperly required the jury to compare the accused products to specific embodiments rather than the claims, and (2) deviated from the court's constructions.  Appx16812-16816. For instance, Impinj argued that its products did not infringe because they used a level shifter rather than Figure 2's "charge pump" embodiment of a voltage-raising means.  *E.g.*, Appx17058-17064 (149:15-155:3); Appx17077-17089 (9:18-21:19); Appx17093-17096 (25:14-28:22); Appx17154-17156 (86:14-88:13); Appx17255-17256 (187:22-188:12); Appx17259-17260 (191:19-200:20).    Impinj's expert, Dr. Kenney, testified that his non-infringement opinion required the jury to compare level shifters to Figure 2.  Appx17499-17500 (189:23-190:2); *see also* Appx17474-17475 (164:20-165:22).

The court denied relief, holding "[a] reasonable jury could have found that the accused level shifter does not 'raise' the control signal's voltage within the word's conventional meaning," and could have "found that the level shifter simply toggles between different logic states or switches between different currents, rather than boosting, amplifying, multiplying, adding voltage to, or *raising* a particular signal." Appx178-180 (the court's emphasis).  The court also held "a reasonable jury could have found that the accused 'clamping circuit' does not satisfy the 'voltage-limiting means' limitation," based on an additional, new requirement that the limiter must act directly on the control signal.  Appx180.

Alternatively, NXP sought a new trial because the clear weight of the evidence—i.e., discounting Impinj's off-point arguments—showed infringement. Appx16807-16819.   NXP also explained that Impinj improperly elicited expert testimony on claim scope from a lay witness, Ron Oliver.  Appx16818-16819; *see also* Appx18430 (211:11-20) (Impinj representing to the jury it presented five "experts" at trial, including Mr. Oliver).  The court denied a new trial, for reasons similar to its JMOL ruling.  Appx187-190.

## SUMMARY OF ARGUMENT

### I.     '092 PATENT

*Claims 15 and 19*:  The court erred in holding "output means (40, 34, 32, 25)" (claim 15) and "output means (40, 34, 32)" (claim 19) indefinite for lack of

corresponding structure.  The dispositive issue was whether claimed reference numbers can be used to satisfy the requirement in 35 U.S.C. § 112, ¶ 6 (now § 112(f)) that a patentee must clearly link disclosed structure to the claimed function. The court held they could not, under its new "bright-line rule" that claimed reference numbers are wholly irrelevant to claim construction (whether means-plus-function or not).  That rule is wrong, at least for identifying corresponding structure for means-plus-function claims.  Reference numbers are a natural way for a patentee to link disclosed structure to the claimed function.  In fact, the claimed reference numbers here point directly to disclosed structures in the specification that perform the claimed outputting function.  The court's ill-advised rule should be rejected, and its indefiniteness ruling should be reversed.

*Claims 1-14*:  The court erred in abandoning its refined construction of "identification data block" and not only reverting to its early-stage construction that had been surpassed by the developments in the case, but further constricting the term to disassociate it from the patent's context.  "Identification data" for purposes of the '092 patent is data for identifying a tag for inventorization.

Under the proper construction—or even under the court's construction— summary judgment was improper.  There remained at least a fact question as to whether the accused TID is "identification data" or "useful data."

## II.    '951 PATENT

The court erred in construing "proportional."  The court's "common-sense" understanding applied a layperson's perspective and relied on dictionary definitions, rather than give primacy to intrinsic evidence as understood by the POSITA.  Under the correct constructional analysis, "proportional" does not require a linear, constant ratio; it encompasses two values that are functionally related.

Under the correct construction—or even under the court's construction—summary judgment was improper.  Partially applying its own construction, the court granted summary judgment because Impinj's products do not constantly infringe.  This holding is contrary to infringement law, which provides that a product that infringes sometimes, infringes.

## III.    '097 PATENT

The court erred in denying JMOL of infringement, or at least a new trial.  Impinj confused the jury by comparing its products to a specific embodiment rather than the construed claims and by arguing claim construction.  Though a reasonable jury would have been compelled to find infringement, the jury in this case was distracted from a proper infringement analysis.  The court, in ruling on NXP's post-trial motion, acknowledged problematic aspects of Impinj's trial presentation, but the court did not fix those errors.  Instead, the court added to them, engaging in post-trial construction.  The verdict cannot be sustained.

## STANDARDS OF REVIEW

This Court reviews the district court's summary judgment and JMOL rulings de novo, and its new trial denial for an abuse of discretion. *Airlines for Am. v. City & Cnty. of S.F.*, 78 F.4th 1146, 1151 (9th Cir. 2023) (summary judgment); *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (JMOL); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 728 (9th Cir. 2007) (new trial).

This Court reviews claim constructions de novo. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015). Indefiniteness is reviewed de novo. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). To the extent the district court made underlying findings of fact based on extrinsic evidence (relating to construction or indefiniteness), this Court reviews those for clear error. *Id*.

## ARGUMENT

I.  **'092 PATENT: THE DISTRICT COURT ERRED IN FINDING CERTAIN CLAIMS INDEFINITE AND GRANTING SUMMARY JUDGMENT ON THE REST**

### A.  The Indefiniteness Ruling Cannot Be Sustained

The parties agree that the "output means" terms of claims 15 and 19 are means-plus-function terms with the claimed function of "outputting to the communication station specific useful data." Appx20. The only dispute was whether the '092 patent provides corresponding structure. Appx20. The court held it did not and thus found these claims indefinite in its *Markman* order. Appx20-26.

In particular, the court devised a new "bright-line rule" that reference numbers in claims have "no role" in construction, including means-plus-function construction. Appx25-26. The court thus gave the claimed reference numbers—"output means (40, 34, 32, 25)" for claim 15 and "output means (40, 34, 32)" for claim 19—"no weight" in construing the claims, even though those numbers "refer to elements described in the specification." Appx20-21. This was legal error: There is no defensible basis for disregarding claimed reference numbers in means-plus-function claims when evaluating whether the patent discloses and adequately associates structure with the claimed function.

### 1. The Patentee Sensibly Used Reference Numbers To Comply With Means-Plus-Function Claiming Requirements

"While the specification must contain structure linked to claimed means, this is not a high bar: all one needs to do in order to obtain the benefit of Section 112, ¶ 6 is to recite some structure corresponding to the means in the specification, as the statute states, so that one can readily ascertain what the claim means and comply with the particularity requirement of Section 112, ¶ 2." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). "Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015) (en banc). The claims are an important source of intrinsic evidence; "they are part of a fully integrated written

instrument." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc); *see also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc) (The claims "are a part of" the specification.), *aff'd*, 517 U.S. 370 (1996). The inquiry is thus whether the POSITA, evaluating the intrinsic record, would "recognize the structure in the specification and associate it with the corresponding function in the claim." *Williamson*, 792 F.3d at 1352.

> **a.    The Patent Clearly Links The Corresponding Structures To The Claimed Function Using Reference Numbers And Supporting Written Description**

The '092 patentee did exactly what the law required:  The claimed reference numbers, depicted and described in the specification, clearly and deliberately link structures to the claimed function.  Figure 2 shows a data carrier circuit (i.e., chip) with components 40 (processing means), 34 (coding means), and 32 (modulation means) to output "n×UDB" (i.e., specific useful data).  *E.g.*, Appx194 (Fig. 2); Appx202-203  (8:54-10:57);  Appx4648-4649;  *see also Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005) (Corresponding structure can be disclosed by text or by "the drawings.").  Figure 2 also illustrates that a data carrier (i.e., a tag) includes 25 (transmission means) for the purpose of transmitting specific useful data to the communication station. *E.g.*, Appx194 (Fig. 2); Appx202-203 (8:54-60); Appx4648-4649.   The yellow annotations show the structures for claim 15's "output means" (for a chip), and the purple annotation shows the

additional structure for claim 19's "output means" (for a tag):



Appx194 (annotated). Supplementing these disclosures are the specification's explanations that a tag's specific useful data is output using the chip's "data processing means 40," "coding means 34," and "modulation means 32," and "transmit[tted]" using "transmission means 25." *E.g.*, Appx202-203 (8:54-65, 10:43-57).

A POSITA would immediately recognize that these exemplary structures correspond to the claimed outputting function. As the court itself acknowledged, the patentee "plausibl[y]" used reference numbers "to conveniently refer back to the specification and 'clearly link' the claimed function to the corresponding structure

using reference numbers." Appx20-23 (also observing that the "reference numbers" are "reasonably specific clues about what corresponding structures fulfill the outputting function," and that "[a]t various points" the specification uses the claimed reference numbers to describe the "processing means 40, coding means 34, modulation means 32, and transmission means 25"); *see also* Appx4686-4694 (Dr. Madisetti opining: "A POSITA would understand from the specification that these structural elements are components of the data carrier's output means structure that processes, encodes, and modulates the specific useful data (n×UDB) that is output to the communication station.").[2]

When the means-plus-function terms are properly construed from the perspective of a POSITA viewing the intrinsic evidence as a whole, the patent leaves no doubt what the corresponding structures are. The claims are not indefinite.

> **b.**   **To The Extent The Court Provided An Evidentiary Basis For Its Holding, It Mistakenly Relied On An Irrelevant Statement In An Unrelated Patent Rather Than Find Proof By Clear And Convincing Evidence**

The only evidentiary basis for the court's indefiniteness holding was evidence extrinsic—and irrelevant—to the '092 patent. The court believed the patent

---

[2] Impinj did not put on rebuttal evidence regarding the '092 patent disclosures, nor any contradictory expert opinion. Impinj merely urged the court to adopt an inapt legal rule that "it is improper for the Court to consider the reference numbers when construing the claims." Appx21. Impinj's evidentiary shortcomings are fatal to the indefiniteness finding, as discussed below in Parts I.A.1.b and I.A.2.

"expressly states" that, "[i]n the claims, any reference signs placed in parentheses shall not be construed as limiting the claims," and the court cited "'092 Patent, 7:39-41." Appx25 (emphasis omitted). But that statement is *not* in the '092 patent, nor is any similar statement. Rather, the court appears to have been referring to an entirely different patent in the case—the '769 patent. Appx2660 (7:39-41). The '769 and '092 patents are from unrelated patent families, have different named inventors, are directed to different technologies, and were filed nearly a decade apart. The '769 patent cannot be used to contradict the intrinsic evidence that, as shown above, provides clearly linked structure. Indeed, extrinsic evidence from a different, unrelated patent is particularly inapt. *See Trs. of Columbia Univ. in the City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) (declining to import meaning from patents from "different families," filed "years apart," relating to "different inventions" with only "one inventor in common").

Moreover, "[f]or a court to hold that a claim containing a means-plus-function limitation" indefinite for lack of corresponding structure, the facts to support that holding "must be proved by clear and convincing evidence." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77 (Fed. Cir. 2001). At no point here did the court identify any clear and convincing evidence to support indefiniteness. To the contrary, the court recognized that, if the claimed reference numbers are considered, those numbers "conveniently refer back to the specification and 'clearly link' the

26

claimed function to the corresponding structure using reference numbers." Appx22-23.  But instead of taking those reference numbers into consideration, the court overlooked this salient intrinsic evidence and Dr. Madisetti's unrebutted expert testimony in favor of adopting its unsound "bright-line rule."  *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374 (Fed. Cir. 1999) (reversing indefiniteness holding where intrinsic evidence and unrebutted expert testimony provided corresponding structure).  Summary judgment of indefiniteness was improper.

### 2.    The District Court's New "Bright-Line Rule" Should Be Rejected, At Least For Means-Plus-Function Claims

The court principally relied on a newly created "bright-line rule" that "[r]eference numbers in claims do not affect the construction or scope of a claim," including means-plus-function claims.  Appx23.  That rule is wrong.  Reading reference numerals out of claims is contrary to means-plus-function claiming and longstanding claim construction principles.  The court's rule nonsensically eliminates a natural way to clearly link structure.  As the court itself acknowledged, means-plus-function claiming involves "a degree of interaction between the claims and the specification."  Appx23.  Using claimed reference numerals for guidance comports naturally with that interaction.

The Supreme Court's directive against judicially made "bright-line rules" in patent law is also instructive.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739 (2002) (advising against "bright-line rule[s]" in patent cases).

Even if claimed reference numbers generally should not be used to "limit" claim scope, a rule that renders them wholly irrelevant for guiding the POSITA to corresponding structure in the specification goes too far. Nor can the court justify its rule with the view that "patent law would appear to be best served by" the certainty of its rule. Appx24. Rather than serve patent law, the court's rule destroys the legitimate expectations of inventors, like the '092 inventor, regarding patents they duly obtained in conformity with Section 112, ¶ 6. *See Festo*, 535 U.S. at 739 ("Fundamental alterations in [patent] rules risk destroying the legitimate expectations of inventors in their property.").

Moreover, the court relied on an ill-suited MPEP provision and other authorities. Appx22-23. Besides the fact that "the MPEP does not have the force of law," *Hyatt v. U.S. Pat. & Trademark Off.*, 48 F.4th 1347, 1351-52 (Fed. Cir. 2022), and the court's case citations are also non-binding, none of the cited authorities is on point for answering the narrow issue presented: Whether claimed reference numbers can be considered for purposes of Section 112, ¶ 6's requirement that a patentee must clearly link disclosed structure to the claimed function.

Neither MPEP § 608.1(m) nor the portions *KEG* and *Relume* cited by the court concern reference numbers in means-plus-function claiming. Appx22-23 (citing *KEG Kanalreinigungstechnick GmbH v. Laimer*, No. 1:11-cv-1948-JEC, 2013 WL 8719444, at *30 (N.D. Ga. Jan. 11, 2013), *R. & R. adopted*, No. 1:11-cv-1948-

28

JEC, 2013 WL 11904722 (N.D. Ga. Feb. 21, 2013); *Relume Corp. v. Dialight Corp.*, 63 F. Supp. 2d 788, 796 n.6 (E.D. Mich. 1999)).   Although the court did cite *Millipore* and *Core Wireless* for their means-plus-function analysis, neither addressed the question here of identifying corresponding structure in the specification.   The *Millipore* claims themselves recited structure.   *See Millipore Corp. v. W.L.  Gore Associates, Inc.*, No., 11-1453-ES, 2012 WL 5250386, at \*3 (D.N.J. Oct. 24, 2012).   And *Core Wireless* declined to consider a claimed reference number for purposes of construing the claimed *function*.   *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-0911-JRG-RSP, 2015 WL 6956722, at \*7 (E.D. Tex. Nov. 9, 2015).   Elsewhere, when that court had to define the corresponding *structure*, the court adopted constructions that included the reference numbers that were claimed and repeated in the specification, and the court held those claims were not indefinite.   *Id.*  None of these authorities support the rule the court adopted here—that reference numbers cannot "carry any substantive weight," even for evaluating corresponding structure for means-plus-function claims.   Appx25.[3]

The court's rule should be rejected, at least in the means-plus-function

---

[3] Besides relying on ill-fitting authority, the court misunderstood the value of other authorities on the relevance of reference numbers in claim construction.  Appx22 n.7 (disposing of *Ironworks Pats. LLC v. Samsung Elecs. Co.*, 798 F. App'x 621 (Fed. Cir. 2020), and *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358 (Fed. Cir. 2001)).

context, and these claims should be remanded for further proceedings, with the corresponding structures defined as NXP proposed.

## B. The District Court Erred In Abandoning Its Refined Construction And Granting Summary Judgment

The court issued four decisions relating to Impinj's requests for summary judgment of non-infringement of the '092 patent. Appx62-97; Appx15095-15108; Appx98-100; Appx153-171. In its first order, the court refined its *Markman*-stage construction for "identification data block" to align with the intrinsic evidence and denied summary judgment of non-infringement. Appx80-86. In its second order, the court reverted to its *Markman*-stage construction, and again denied summary judgment. Appx15100-15106. In its third order, the court reversed course and granted summary judgment—explaining, in its view, the issue "boils down to one of claim construction." Appx99-100. In its fourth order, which provided the balance of its reasoning, the court resolved fact issues. Appx161-170. The court erred—first by abandoning its refined construction, and second by granting summary judgment.

### 1. The Court Erred In Abandoning Its Refined Construction Of "Identification Data Block"

Consistent with its authority to "engage in a rolling claim construction . . . as its understanding of the technology" and the parties' disputes evolve, *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002), the court

refined its *Markman*-stage construction of "identification data block." Appx80-86. That refinement was needed and correct.

At *Markman*, Impinj argued that "identification data block" was limited to serial numbers. Appx12. The court properly rejected that restrictive construction in favor of NXP's proposal, "identification data stored in memory." Appx12-16. At summary judgment, though, the parties' dispute turned on whether the TID was "identification data," which presented a more specific question of that term's meaning. Appx80. The court adopted NXP's position and refined its construction of "identification data" to more specifically mean "identifying data used to uniquely identify the tag to the reader during the inventorization-like procedure." Appx83.

The court's refinement was correct. The court recognized, in the context of the parties' summary judgment dispute, that "the most natural reading of the claims is that the identification data described within refers to the same identification data used during step one" of the known method, Appx82, i.e., during the "inventorization procedure" prior to the "interrogation command.," *e.g.*, Appx199 (1:20-2:7); Appx204 (11:7-17). The court reasoned that if the claimed "identification data block" were not so limited, then "the typology developed by the ['092] patentee would make little sense," Appx82, because the patent teaches an improved inventorization procedure that shortens the amount of time it takes for a reader to obtain identification data (shared during the known "inventorization

31

procedure," i.e., step one) and useful data (shared in response to a subsequent "interrogation command," i.e., step two) by communicating both types of data together, Appx199-200 (1:5-2:7, 3:42-59); Appx204 (11:7-17)).

Because the patent emphasizes that its improved "inventorization procedure" avoids the successive "interrogation commands" of the known two-step procedure, the court properly brought its construction in line with how "a POSITA would interpret" the term as referring "only to the data used to identify the tag during an inventorization-like procedure, not any data used to identify in an abstract sense." Appx82-83 (the court also explaining its construction is "*the most natural*" construction in view of the written description); *Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and *most naturally aligns* with the patent's description of the invention will be, in the end, the correct construction."). An "inventor's words," as "used to describe the invention," provide context as to how a POSITA would understand a claim term. *Phillips*, 415 F.3d at 1314. The court properly recognized that "identification data block" takes its definition from the streamlined inventorization process claimed and the backdrop of the known two-step process that the patent collapsed into one step.

Later, in abandoning its refined construction and reverting back to its earlier "identification data stored in memory" construction of "identification data block," the court erred. Indeed, the court did more than just revert to its original

construction. It siloed the term from the remainder of the claim, affirmatively disconnecting its meaning from the surrounding claim context and the guidance in the specification. In the court's view, its refined construction "strayed too far from the text of the claim" and should not have taken into account the "context" of the specification including the patented improvement over the prior art. Appx15102-15103. That is precisely backwards. Claims must be construed "in the context of the entire patent." *Phillips*, 415 F.3d at 1313. Likewise, prior art from which the patent departs—like the known two-step process here—can provide relevant context. *Id.* at 1325.

In second-guessing its refined construction, the court drew a distinction between "use[]" and "known," expressing concern that it had injected a "use[]" requirement whereas the patent recites that the identification data is "known." Appx15103-15105. The court unnecessarily drew this distinction. In the context of the claims and specification, "identification data" is "known" to the reader in order to provide inventory information. *E.g.*, Appx199 (1:58-2:32); Appx207 (17:47-65). While the claims do not require any particular "use" of the identification data, the claims do require that the identification data is for inventorization, i.e., it is made "known" to the reader for the purpose of "carr[ying] out" the "implementation of the [claimed] inventorization procedure"—exactly like the EPC's role for inventorization in Impinj's products. *E.g.*, Appx207 (17:47-65); Appx199 (1:58-

33

2:7).    The court erred in reverting to its *Markman*-stage construction and disassociating the term from the context of the intrinsic evidence.

### 2.    Under Either Construction, The Court Erred In Granting Summary Judgment Of Claims 1-14

Had the court maintained its refined construction of "identification data block," summary judgment of non-infringement would have been inappropriate.    In its first and second orders, the court recognized this.    Both times, applying its refined construction, it held a reasonable jury could find the TID is "specific useful data," rather than "identification data."    Appx84-86; Appx15105-15106.

Impinj's own documents explain that Gen2's default procedure requires tags first send their EPC during the inventorization-like procedure and later, in response to a subsequent command, send their TID; this corresponds to the known two-step procedure of sending first the identification data and subsequently other useful data. As Impinj's documents describe, the accused products are configured to improve on the Gen2 default via Impinj's FastID feature that "short-cycle[s] the process of getting the TID" by transmitting EPC and TID data together.    Appx7275.

For example, in Impinj's figures annotated below, Impinj showed how Gen2's default two-step procedure (left) is shortened with Impinj's FastID procedure (right):



Appx7289 (annotated); *see also* Appx199 (1:20-2:7). In the default Gen2 procedure, the steps above the dashed line correlate with the known "inventorization procedure" used to collect "identification data," and the steps below the dashed line correlate with the known "interrogation command" used to collect "useful data."

Gen2's default procedure requires the reader to send "a sequence of [additional] commands" after receiving a tag's EPC to "open" the tag before being able to obtain the tag's TID. Appx7289. What Impinj's FastID feature changed was transmitting the EPC and TID simultaneously: "EPC + TID." Appx7289 (Impinj stating "[t]here is no need to 'open' the tag to get the TID anymore!" and that its FastID products improve Gen2's inventory procedure because they do not require additional "commands to get the TID" "once a tag has been singulated," i.e., transmits its EPC); Appx7275; *see, e.g.*, Appx199-200 (1:5-8, 1:10-47, 3:51-59);

35

Appx204 (11:7-17); *see also* Appx14260-14264 (citing Appx14294-14301 (¶¶ 18-31); Appx14303-14309 (¶¶ 37-40); Appx14318-14323 (¶¶ 58-63); Appx14326-14330 (¶¶ 69-75)). That is just like the improved inventorization procedure the '092 patent claims. Under the correct construction, summary judgment is improper, and the claims should be remanded for trial under that construction.

But even under the court's reverted-to construction, summary judgment was improper. The court's analysis did not compare the claims with the accused products, and the court usurped the jury's fact-finding role.

The court compared the TID to the ISO standard discussed in the patent, which used "both a 'unique identifier' (UID) and more general 'VICC memory.'" Appx163-164 (citing Appx7541; Appx7545)). But the claims do not specify those terms or features, and the infringement inquiry must compare the accused products to the claims. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002) (To determine infringement, "the properly construed claims are compared to the allegedly infringing device . . . .").

Moreover, the court engaged in fact-finding. Although the court's third and fourth orders cited the proposition that infringement can be addressed at summary judgment when the dispute concerns claim construction, Appx15099; Appx161, the court's construction did not change in those orders. Instead, the court maintained its construction from its first and second orders. Appx160 n1. What changed was the

36

court's engagement in fact-finding. Indeed, the court itself noted that it "continues to believe that this inquiry presents a factual question." Appx165. The court's resolution of that fact inquiry itself, and without construing the evidence in the light most favorable to NXP as the non-moving party, cannot sustain summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301-02 (Fed. Cir. 2011) (explaining that whether the accused characteristics meet the construed claim is a question of fact).

For instance, the court relied on evidence that "suggest[ed]" what type of data TID is. Appx163-164. The court similarly identified evidence it found "compelling" or "tough to ignore." Appx165. It is the role of the jury—not a court on summary judgment—to make such factual findings.

The court similarly waded into fact disputes when it determined that the TID's "Security (S) indicator" and "File (F) indicator," both of which indicate whether a tag supports certain commands, could not constitute "useful data" and instead had to be considered part of the "identification data block" (under the court's view that the TID contains "identification data" under its reverted-to construction). In its third order, the court correctly recognized a jury could find that these bits are "specific useful data." Appx15106-15107. But the court's fourth order is chockful of factual findings. The court weighed the evidence to determine that these indicators aligned more closely with the claimed "identification data" because TID should be evaluated

37

as a whole. *Compare* Appx166-170 *with* Appx15105-15107. Expressing its view "that the infringement inquiry should [not] be undertaken on a bit-by-bit, atom-by-atom basis," the court found that the S and F bits "are, at minimum, ancillary to identification." Appx168. These are quintessential fact questions—the court failed to find any support for disposing of the issue as a matter of law, nor did it view the evidence presented in the light most favorable to NXP.

Nor can the court's decision be justified as one involving claim construction for "identification data *block*." Appx167 (the court's emphasis). While the claims recite a "block," the court's treatment of the TID memory "as a block" that must consider "identification data" "*as a whole*" (Appx167 (the court's emphasis)) invaded the jury's province. Even considering the TID "as a whole," a jury could find the TID is "specific useful data." Appx12710-12711; Appx13040-13042. Summary judgment was improper, and the claims should be remanded for trial.

## II.    '951 PATENT:   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT

In granting summary judgment of non-infringement of the '951 patent, the court relied on its erroneously narrow *Markman*-stage construction of "proportional." The claims recite a relationship between two voltages, where one voltage is "proportional to a voltage at the output of the second clocked multiplier stage":

> wherein the feedback bias control circuit generates a feedback signal for regulating an output voltage at the output of the input level regulator to a continuous range of voltage levels based on a comparison between ***a voltage proportional to a voltage at the output of the second clocked multiplier stage*** and a reference voltage.

Appx227 (10:53-59).  The court construed "proportional" as "a constant ratio to another value that can be adjusted at different times," i.e., a "linear and constant" relationship.  Appx47.

The intrinsic evidence is to the contrary.  Even the court acknowledged that the ratio can change rapidly, directly undermining its narrow "constant" construction.  This Court should give "proportional" its plain meaning.  And because, under either the court's or the proper construction, a reasonable jury could find infringement, summary judgment was improper.  This Court should vacate the summary judgment and remand for trial.

### A.    The District Court's Construction Of "Proportional" Violated Claim Construction Principles

"Proportional" is well-understood in the context of the '951 patent and should be given its plain and ordinary meaning.  In the patent, a "proportional" relationship between two voltages simply means there is a *functional* relationship between the change of the first voltage and the change of the second voltage (e.g., if there is an increase in the first voltage, there is an increase in the second voltage).  Nothing in the patent requires linear proportionality such that there is a "constant ratio" between the two values.  In adopting its overly narrow construction, the court violated

fundamental claim construction principles.

*First*, the court applied a layperson's perspective, rather than the POSITA's. For instance, at the *Markman* hearing, the court, "imagining [it]self as a juror" interpreting the term, stated it was approaching the issue "*without any context.*" Appx5663 (141:20-25). Likewise, in its *Markman* order, the court relied on the purported "common-sense understanding," "common definition," and "common usage" of "proportional"—without evaluating the term from the POSITA's perspective. Appx47-48. Indeed, unlike for other terms, the court's discussion of "proportional" never once referenced the POSITA. *Compare, e.g.*, Appx7, Appx13, Appx15 *with* Appx46-49. But a lay juror's "common-sense understanding" of a term contradicts claim construction law. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a [POSITA] at the time of the invention." *Phillips*, 415 F.3d at 1313. "[W]hat the claim terms would mean to laymen is irrelevant." *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1149 (Fed. Cir. 2004).

*Second*, the court relied on dictionary definitions. Appx47 (citing Merriam-Webster and Cambridge online dictionaries for the proposition that "'[p]roportional' is a common word that carries a common definition"). And the court gave primacy to this extrinsic evidence, consulting dictionaries first and afterward evaluating whether the patent "suggests *deviation*." Appx48 (also faulting NXP for not

providing "any source (like a dictionary)" to support its proposed construction).

The law is well past such heavy, principal reliance on dictionaries. As *Phillips* instructs, "giv[ing] greater emphasis to dictionary definitions of claim terms" while "assign[ing] a less prominent role to the specification and the prosecution history . . . improperly restricts the role of the specification in claim construction." 415 F.3d at 1319-20. A methodology that "elevat[es] the dictionary to such prominence" erroneously "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

Moreover, to the extent it is appropriate to consult dictionaries here, the court erred in multiple respects. It relied on general-purpose dictionaries, even though technical dictionaries are generally more reliable for technical terms. *See id.* at 1318. Further, it relied on present-day dictionaries—not dictionaries in existence at the time of invention (2007). *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 812 (Fed. Cir. 2007) (Moore, J., dissenting) (criticizing court's reliance on dictionary "published ten years after" the patent-at-issue). Further still, the court relied on a secondary definition (i.e., Merriam-Webster's definition 1(b)), overlooking that dictionary's first, broader definition—"corresponding in size, degree, or intensity"—that is consistent with the intrinsic evidence that the two voltages are not limited to a linear, directly proportional relationship. *See Definition of Proportional*,

MERRIAM-WEBSTER DICTIONARY, https://www.merriamwebster.com/dictionary/ proportional. Yet, the court did not acknowledge that definition, much less explain why it should not apply. *See* Appx47. Where other definitions are available, it is "error" to rely on a single definition without explanation. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371 (Fed. Cir. 2008) ("Abbott's reliance on a single dictionary definition without explanation—especially where 'as' has multiple meanings—commits the very error of construction that we warned against in *Phillips*."). Instead, "where reference to dictionaries is appropriate" and the dictionaries provide multiple definitions, "the task is to scrutinize the intrinsic evidence in order to determine the most appropriate definition." *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1349 (Fed. Cir. 2005). And the court asked whether the patent "suggests *deviation*" from the dictionary definitions, Appx48, but *Phillips* "reject[ed] the view that dictionary definitions govern unless contradicted by intrinsic evidence." *Free Motion Fitness*, 423 F.3d at 1349.

*Third*, in resting on a layperson's perspective and dictionaries, the court committed another fundamental error: As with its *Markman*-stage construction of "identification data block" for the '092 patent, the court disregarded intrinsic evidence in favor of extrinsic evidence, which is "less significant than the intrinsic record." *See Phillips*, 415 F.3d at 1317. "[T]he [POSITA] is deemed to read the claim term . . . in the context of the entire patent, including the specification." *Id.* at

42

1313. Claim language "do[es] not stand alone"—the specification "is always highly relevant" and usually dispositive. *Id.* at 1315; *see also Trs. of Columbia Univ.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("The only meaning that matters in claim construction is the meaning in the context of the patent.").  Indeed, a patent's specification acts "as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979.

Under these foundational claim construction principles, "proportional" does not require a linear and constant ratio.  The meaning should encompass at least when two values are functionally related.

The claims use "proportional" without modification, but the court improperly "add[ed] a narrowing modifier before an otherwise general" and "unmodified" claim term. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248-50 (Fed. Cir. 1998).  The specification likewise does not narrow proportionality to a linear, constant relationship—to the contrary, just like the claims, the specification speaks broadly of one voltage "proportional" to another voltage, and each time it refers to a "proportional" relationship between two voltages, it declines to qualify or limit that term. *E.g.*, Appx226-227 (8:8-13, 8:27-38, 8:53-57, 9:9-20, 9:36-42, 9:47-59); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 865-66 (Fed. Cir. 1997) (declining to limit claim term to "linear motion" where the patent did not "use[] or impl[y] a special definition"); *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725

F.3d 1341, 1350 (Fed. Cir. 2013) (discouraging constructions that are "too restrictive" or "unduly limiting," and affirming construction where "horizontally disposed axes" permitted an incline because it was used in a comparative sense). Even the court acknowledged that "proportional" includes "where the ratio changes quickly or even constantly." Appx49 (also noting that "dynamically," as used in the patent, "suggests that the ratio can change extremely quickly").

**B.    Under Either Claim Construction, The Court Erred In Granting Summary Judgment**

Whether "proportional" is given the correct construction, or the court's narrow construction, a reasonable jury could find Impinj's products rely on a "proportional" voltage to generate the feedback signal, and thus infringe the '951 patent.

The crux of the issue, under any construction of "proportional," is narrow. It is undisputed that Impinj's products have a "ramping" phase, where the voltage generated by the charge pump of the accused circuit increases to a desired voltage, followed by a regular "steady state" phase. Appx7234 (191:7-12). There is no question which voltages in Impinj's products are relevant for evaluating whether they are "proportional"—both parties' experts agree these are the fbdiv voltage and the fbd voltage (i.e., the claimed "output of the second clocked multiplier stage"). *E.g.*, Appx7220-7223 (¶¶ 91-102) (Madisetti); Appx7098-7108 (¶¶ 276-290) (Kenney); Appx6984-6991. The only dispute is whether the fbdiv voltage is

44

"proportional" to the fbd voltage. *E.g.*, Appx13406 (16:5-14) (NXP); Appx13421 (31:3-4) (Impinj); *see also* Appx87; Appx6987-6991.

Like the '951 patent, which keeps ripple low by using a feedback signal to regulate the current going into the multiplier, Appx223 (1:64-2:8), Impinj's products utilize a feedback signal to regulate the current input into their charge pump, Appx7216-7218 (¶¶ 79-87); Appx12712-12716; Appx13042-13043. During steady state operation, capacitor C1 and capacitor C2 in the accused circuit form a capacitive ratio that create a proportional voltage for generating the feedback signal. Appx7220-7223. Impinj's documentation confirms this, stating that capacitor C2 "acts to set [a] feedback ratio . . . and so affects stability" of the accused circuit. Appx7300. Likewise, Impinj's expert agreed that the fbdiv is functionally related to the fbd voltage. *See* Appx7235-7236 (192:22-193:5) (When asked, "in steady state, if the voltage at the output of the charge pump which is connected to fbdiv or fbd were to change, there would be at least a little bit of current drawn through Capacitor C1," Dr. Kenney responded: "If hypothetically the output voltage from the charge pump changed, and assuming for the moment that fbdiv didn't change, there would be the differential across the capacitor causing current to flow."). In plainer English, Impinj's expert agreed that, at steady state, if the fbdiv voltage is increased, the fbd voltage would similarly increase. Thus, under the proper construction (*see* Part II.A above), Impinj's products infringe.

But even under the court's construction, summary judgment of non-infringement was improper.  In the accused circuit, a "switched capacitor network" portion is switched in and out periodically, initially rapidly during the ramping phase, and then at a lesser frequency during steady state.  Appx7103-7106 (¶¶ 283-285); Appx7108 (¶ 288); Appx7114 (¶ 313); Appx7232-7233 (186:20-187:8).  Impinj's expert admitted that "if the switched capacitor network . . . was not part of the circuit, "capacitors C1 and C2 would form a capacitor divider to set the voltage at fbdiv *proportional to* fbd."  Appx7107-7108 (¶ 290).  The periodic switching out of the switched capacitor network does exactly that—it is not part of the circuit.  Indeed, Impinj's data sheets show that, during steady state operation, there are time periods where the voltages of fbdiv (1 volt) and fbd (8 volts) have a constant ratio.  Appx13043-13045 (citing Appx7303).  The court acknowledged this, finding "the two values may temporarily form a 'proportion' or ratio at steady state . . . ."  Appx89.  Nonetheless, the court found that, "even if there are momentary periods during which the fbd and fbdiv form a proportional relationship," "such fleeting proportionality would not seem to satisfy the function of the proportional voltage in the '951 Patent."  Appx90.  But in determining that such "momentary periods" cannot, as a matter of law, constitute infringement, the court ignored that "an accused device that sometimes, but not always, embodies a claim nonetheless

infringes." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013).

The court's "momentary periods" analysis also contradicted its determination that its construction should not be "read to exclude an embodiment in which the ratio changes quickly or even constantly." Appx49.  In granting summary judgment, the court excluded just that—it took the view that, even if there are moments of a proportional relationship, the voltages were not proportional for long enough. Appx89-91.  That added a new gloss onto its construction that is not supported by the specification, requiring a certain (yet unspecified) time duration for "proportionality."  Not only is there no support for this in the intrinsic evidence, but it is too vague to provide meaning to a POSITA. *See Phillips*, 415 F.3d at 1314 (a construction must provide meaning understandable to a POSITA).  This gloss cannot support non-infringement.

This Court should vacate summary judgment and remand for trial under the correct construction.  At a minimum, even under the court's construction, its judgment should be reversed and the case likewise remanded.

## III.   **'097 PATENT:   THE DISTRICT COURT ERRED IN UPHOLDING THE VERDICT**

For the '097 patent, the court again misunderstood claim construction—in particular, its critical role in an infringement analysis.  Although the technology of the '097 patent and Impinj's products may be complicated, the relevant facts for

47

evaluating infringement are straightforward.  Indeed, there is no dispute about how the accused products operate.  And on those undisputed facts, there can only be one reasonable conclusion:  Impinj infringes.

Impinj, however, injected significant confusion, sidetracking the jury from its task.  Instead of comparing its products to the claims as construed by the court, Impinj made off-point arguments, often directly inviting the jury to apply constructions other than the court's, or to erroneously compare the products to a specific embodiment in the patent.  Impinj compounded this prejudice by invoking layperson testimony about claim meaning.

In denying NXP's post-trial motion, the court overlooked Impinj's errors. This Court should not.  When the relevant evidence is considered, an infringement finding is compelled.  At the very least, there can be no confidence in the verdict, and a new trial, properly constrained by the claim constructions and the rules governing lay testimony, should be held.

## A.    Impinj Used Narrowed Constructions To Argue Non-Infringement

The two terms at issue—"voltage-raising means" and "voltage-limiting means"—are well-understood in the context of the '097 patent, as the court found. Appx174-175; Appx178-182; Appx16842-16850 (Impinj not disputing any other limitations, nor disputing inducement if direct infringement is found).

For "voltage-raising means" (in full, "voltage-raising means that are arranged

to raise the voltage value of the control signal"), at the *Markman*-stage the court misunderstood it as a means-plus-function term (as Impinj had argued); at summary judgment, "[w]ith the benefit of additional briefing about circuit technology, greater understanding of the way a POSITA would discuss the relevant circuit components, and increased familiarity with Federal Circuit case law," the court agreed with NXP that the term "refer[s] to a sufficiently definite class of structures: circuit components that raise a voltage." Appx57; *see also* Appx92-93. Accordingly, the court adopted a construction in line with its plain meaning: "voltage-raising means" is "a circuit that raises the voltage value of the control signal." Appx60; Appx117.

The court rejected Impinj's attempt to limit "voltage-raising means" to Figure 2's "charge pump." As the court explained, the patent makes clear a "charge pump" is merely exemplary. Appx59; *see, e.g.*, Appx214 (3:3-6, 4:29-32) (Figure 2's voltage-raising means "implemented in the form of a charge pump" is merely "one embodiment."); Appx211 (Fig. 2). While a POSITA would understand "a charge pump or a voltage multiplier" as examples, "other voltage-raising components exist, too." Appx59 ("[T]here are known circuit components that a POSITA might colloquially call 'voltage raisers' or 'voltage-raising' components.").

Similarly, with respect to "voltage-limiting means," the court applied the ordinary meaning of that structure. Appx181 (citing Appx117). "Voltage-limiting means" and its equivalents are one of the corresponding structures for the means-

**CONFIDENTIAL MATERIAL REDACTED**

plus-function term "information-voltage generating means." Appx26. Impinj itself proposed "voltage-limiting means" as a corresponding structure without further construction. Appx32-33.

Applying these meanings, NXP showed infringement. NXP's expert, Dr. Madisetti, explained that Impinj's products directly infringe claim 4 and Impinj induces infringement of claim 1. Appx17185-17244 (117:7-176:7).

Impinj's schematics, annotated below, show Impinj's products read directly on the "voltage-raising means" and "voltage-limiting means" requirements:



Technical Schematic (Proprietary Configuration)

Appx20256 & Appx22612 (cropped and annotated); Appx17213 (145:7-21); Appx17234-17235 (166:21-167:8); Appx17237-17241 (169:11-173:11).

As shown, Impinj's products have a WEN input that Impinj itself calls a "control signal." Appx17409 (99:13-20) (WEN controls the S1 flag.); Appx20256;

*see also* Appx21279.  The control signal has either a 1/high or 0/low logical value carried at a low voltage level (VDD_REG).  Appx17216 (148:9-15); Appx17816 (67:21-24).  As the bronze highlighting depicts, that signal flows from the input source all the way to the level shifter (blue box).  Appx17275 (207:22-25); Appx17279 (211:13-18).  As such, the control signal at the input is the same signal that is received and used by the level shifter.  Appx17217-17218 (149:17-150:5); Appx17818-17819 (69:17-70:2).  The level shifter raises the control signal's voltage value to a higher level depicted in gold (VDD_RAMP).  Appx17216-17217 (148:22-149:7); Appx17733-17734 (190:22-191:3); Appx17816-17820 (67:6-71:14).  And a clamp circuit limits that raised voltage such that it is at most equal to the voltage value of the supply voltage.   Appx17213 (145:13-21);  Appx17214 (146:4-16); Appx17733 (190:8-14).

Thus, because the level shifter raises the control signal (i.e., WEN, whose logical value is always 1/high when the circuit wants to store a charge) by increasing the VDD_REG voltage (i.e., DTD) to a higher VDD_RAMP voltage (i.e., DTG), Impinj's products have a "voltage-raising means."  Appx17216-17222 (148:13-150:10, 151:7-13, 153:13-154:3); Appx17239-12740 (171:25-172:6).  Put another way, when storing a charge (i.e., generating an "information voltage"), the 1/high logical value of WEN is the same 1/high logical value that is both the input and the output of the level shifter (i.e., the voltage-raising means), and the level shifter raises

its voltage value.  Finally, because the clamp circuit limits the voltage value of VDD_RAMP, Impinj's products have a "voltage-limiting means" or equivalent thereof.  Appx17213-17214 (145:13-19, 146:2-16).

Impinj witnesses reinforced NXP's case.  Impinj technical fellow Ron Oliver testified that "WEN is a control signal."  Appx17743 (200:7-10); *see also* Appx17409 (99:13-20) (Diorio).

Regarding the "voltage-raising means," Impinj technical fellow Theron Stanford testified that Impinj's level shifter "takes a VDD_REG input signal and it outputs, you know, that logic level at a *higher level* on VDD_RAMP as applied to DTG."  Appx17817 (68:8-10).  It does the same for DFG—if the circuit follows the lower path in the diagram, its voltage will be "at the higher VDD_RAMP voltage."  Appx17820 (71:10-13).  Thus, "if WEN is a 1 [in digital logic], either DTG or DFG"—the output depending on which path is taken—"is going to be a 1 at a higher voltage level."  Appx17818-17819 (69:23-70:2); *see also* Appx17511 (201:2-11) & Appx17520 (210:10-22) (Kenney).

As for "voltage-limiting means," Dr. Kenney admitted Impinj's clamp circuit is a "voltage limiter," Appx17477 (167:14), and Mr. Oliver admitted the clamp limits the voltage to a maximum difference between RAMP to VDD_RECT and VDD_RECT to ground, Appx17762 (12:7-24), limiting VDD_RAMP to a maximum voltage above ground and satisfying the plain meaning of "voltage-

limiting means." In short, the record shows that the level shifter, quite literally, raises the voltage value of the control signal and likewise that the clamp circuit limits the voltage value to be not higher than the value of the supply voltage.

At trial, though, Impinj injected substantial confusion and distraction by failing to adhere to the court's constructions and repeatedly sidestepping the proper infringement analysis. Impinj's expert even told the jury that, to adopt his non-infringement opinion, it "*need[ed]*" to compare Impinj's products to an exemplary embodiment, Appx17499-17500 (189:23-190:2)—the wrong inquiry.

For "<u>voltage-raising means</u>," Impinj invited the jury to treat this as limited to Figure 2's "charge pump." *See* Appx211 (Fig. 2); Appx214 (4:30-31). As a result of Impinj's persistence, Figure 2 was referenced to the jury over 100 times. For instance, when Impinj asked Dr. Kenney whether the patent "mention[s] a level shifter," he answered "No" and compared level shifters to charge pumps. Appx17474 (164:16-24); *see also* Appx17519 (209:19-24). He further opined that a POSITA "wouldn't equate a level shifter to a charge pump." Appx17474 (164:22-23). Likewise, when asked to "remind the jury of what that voltage raising means is" in the patent, he referred to "a charge pump" as depicted in Figure 2. Appx17474 (164:10-15). Dr. Kenney even testified that, to adopt his non-infringement opinion, the jury "*need[ed]* to look at *both*" the claims *and Figure 2*. Appx17499-17500 (189:23-190:2); *see also* Appx17474-17475 (164:6-165:15) (testifying about Figure

2, "a floating supply," and "a charge pump," which the claims do not require); Appx17443-17450 (133:8-140:8); Appx17460-17462 (150:1-152:25); Appx17474-17479 (164:6-167:3, 168:11-169:2).   At closing argument, Impinj summed up that it "doesn't have a charge pump."  Appx18402 (183:9-13).

Impinj took the same approach with other witnesses.   Impinj elicited testimony from its founder and CEO, Dr. Diorio, that "[t]here is no charge pump" in Impinj's products; instead, they have "a level shifter."  Appx17384-17385 (74:25-75:4).  Likewise, Impinj asked Mr. Stanford:  "[I]s there any charge pump depicted" in its schematic, and he answered:  "There is no charge pump in this circuit diagram." Appx17812 (63:7-8).  Impinj similarly asked Mr. Oliver: "What does the patent call that voltage raising means," and he answered:  "In the patent, it's described as a charge pump."  Appx17804 (55:3-5).   Impinj also repeatedly asked NXP witnesses to focus on Figure 2.  *See, e.g.*, Appx17058-17064 (149:15-155:3), Appx17077-17089 (9:18-21:20), & Appx17092-17096 (25:14-28:22) (Bergler); Appx17154-17156   (86:14-88:12)   (Amtmann);   Appx17255-17256   (187:22-188:12)   & Appx17259-17268 (191:19-200:20) (Madisetti).

Impinj's strategy appeared to be that, because a charge pump "adds" or "boosts" voltage and a level shifter translates the signal to a high voltage level from an external supply, the latter could not be a voltage-raising means.  For instance, Dr. Kenney focused on whether the level shifter "adds" voltage the way a charge

pump does.  Appx17474-17475 (164:13-165:5).  Mr. Stanford similarly answered "No" when asked if Impinj's chips have a voltage that "is boosted or has voltage added to it."  Appx17812 (63:9-12).  And in closing, Impinj argued that, "unlike a charge pump, a level shifter does not add voltage to any signal.  It can't add voltage." Appx18406 (187:9-15).

This was misleading.  It is well-established that an infringement inquiry compares the accused products to the properly construed claims—not to a figure or other embodiment.  *See Catalina Lighting, Inc. v. Lamps Plus Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002); *Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).  Likewise, a court's construction is a "legal determination [that] governs for purposes of trial.  No party may contradict the court's construction to a jury." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) (reversing verdict where a party's trial arguments contradicted the governing construction).  Construction arguments at trial present a "high" "risk of confusing the jury," particularly "when experts opine" on construction. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172-73 (Fed. Cir. 2005).  The proper comparison here is between the level shifter and a circuit that raises the voltage value of the control signal—not a level shifter and the particular way a charge pump operates, as Impinj and its witnesses suggested.

Impinj also created confusion with its position that WEN and DTG are not "the same signal," to further argue that its products do not have a "voltage-raising means." Appx17814-17815 (65:12-66:23). For instance, at closing Impinj argued its product "isn't raising any specific signal's voltage." Appx18402 (183:9-10). To the same end, Impinj suggested that WEN had to be depicted as "a direct input" into the level shifter in order for the level shifter to be a "voltage-raising means." Appx17805 (56:6-8) (Oliver answering "No" when asked whether "the WEN signal [is] even a direct input into the level shifter"). Impinj likewise suggested that the WEN signal is not fed into the level shifter, because it flips from 1 to 0, and then again from 0 to 1, and because current cannot flow through transistors, which sit between the input and the level shifter. Appx17380-17381 (70:18-71:4) (Diorio); Appx17460-17461 (150:1-151:8) (Kenney).

But Impinj's argument is a red herring—the claims are not limited or evaded by labeling. Indeed, Dr. Kenney testified it "doesn't matter what" a label says Appx17522-17523 (212:25-213:3). Similarly, the claims are agnostic to components situated between the input and the level shifter—their presence does not affect an infringement read. Moreover, Impinj's witness admitted that signals "flow through" the transistors, even if the current does not. Appx17408 (98:18-19) (Diorio). And Impinj witnesses admitted that signals can be represented by their voltages and not necessarily by currents. Appx17513 (203:12-23) (Kenney);

56

Appx17722 (179:17-24) (Oliver).   What matters is the undisputable path *of the control signal* from the input to the level shifter, whose voltage (not current) is raised, just as claimed.   Although this jury was sidetracked by Impinj's arguments, a reasonable jury would appreciate that the control signal at the output has its voltage value raised by the level shifter, which is all that is needed to meet the "voltage-raising means" limitation.

Likewise, for "voltage-limiting means," Impinj repeatedly argued based on a narrower than ordinary meaning.   For instance, Impinj argued about the order in which the limiting and the raising is done, even though the claims and the court's construction do not require any specific order.   Again contrary to the court's construction—Impinj suggested to the jury that "voltage-limiting means" is limited to a "diode configuration" discussed in the patent.  Appx18418 (199:7-9); *see also* Appx15690 (Impinj asking the court to instruct the jury that "voltage-limiting means" is a means-plus-function term with corresponding structure of the "diode configuration as described in 4:48-52").

Each time Impinj argued its off-point non-infringement positions based on "voltage-raising means" and "voltage-limiting means," both prior to and during trial, the court properly rejected Impinj's positions. *E.g.*, Appx95-96; Appx15853-15855; Appx16335-16336; Appx117.  For similar reasons, no reasonable jury could accept Impinj's positions.  With those distractions set aside the record is clear: A reasonable

jury would be compelled to find infringement.

Alternatively, a new trial is required. Even assuming there is substantial evidence to support the verdict (there is not), courts have a "duty" to "set aside" a verdict that, "even though supported by substantial evidence," "is contrary to the clear weight of the evidence," *Molski*, 481 F.3d at 729, or "to prevent . . . a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999). This is true where a party departs from the "proper claim construction" such that it is impossible to "discern if the jury found infringement of the claims at issue based upon a theory of infringement inconsistent with the proper construction." *Omega Pats., LLC v. CalAmp Corp.*, 920 F.3d 1337, 1347 (Fed. Cir. 2019). It is impossible to discern if the jury found infringement based on Impinj's confused presentation and the compounded harm of its presentation of expert testimony via a lay witness. At minimum, a new trial should be held.

### B.    The District Court Erred In Denying Post-Trial Relief

The court acknowledged problematic aspects of Impinj's trial presentation. The court recognized that "[t]estimony by Impinj's witnesses toed the line" and "perhaps plac[ed] undue emphasis on figure 2 of the patent and on the 'charge pump' disclosed in the specification" rather than comparing the accused products to the claims, and that Impinj questioned Mr. Oliver in a manner resembling expert examination; he testified about the scope and meaning of the '097 patent and asserted

claims, including the patent's description of "a charge pump." Appx182; Appx189. But the court let these errors go and sought to fix the problems through post-trial claim construction. That was further error.

### 1. The Court Erred In Denying JMOL Of Infringement

Just like Impinj, the court made inapt comparisons and evaluated the record based on recharacterization of the claims rather than enforce its own constructions.

Regarding "<u>voltage-raising means</u>," the court sustained the verdict based on its reasoning that this component must raise the voltage in the same manner that a charge pump does, Appx178-182, even though it previously found voltage-raising components *other than* a charge pump can be a "voltage-raising means." Appx57-59.[4] The court took precisely this position vis-à-vis Impinj's level shifter, denying summary judgment of non-infringement because "a reasonable jury could find that the accused products do, in fact, contain a 'voltage-raising means'" based on their level shifter having "the function of raising the voltage value of the control signal," i.e., "translat[ing]" between two logic values and "switching" to a higher voltage. Appx95-96; *see also* Appx15851-15859 (denying Impinj's renewed motion);

---

[4] Indeed, the inventor had "designed a circuit that implemented [his] invention using a level shifter as the voltage raising means." Appx17111 (43:23-25); *see also* Appx17138-17140 (70:20-72:4) (testifying that an NXP product uses a level shifter to raise voltage, a "common use of a level shifter"). Like a charge pump, a level shifter "tak[es] an input and rais[es] the voltage as the output." Appx17220-17221 (152:20-153:8) (Madisetti).

Appx16335-16336.  As the court then recognized, Impinj was pressing a narrower meaning rather than the court's construction.  *See* Appx15851-15859.

In upholding the verdict, the court read out of the claims exactly what it had said *could* support infringement.  According to the court post-trial, because "the level shifter simply toggles between different logic states or switches between different currents, rather than boosting, amplifying, multiplying, adding voltage to, or raising a particular signal," the jury could reasonably find the "voltage-raising means" was not met.  Appx178-180 (emphasis omitted) (also stating that a level shifter "operates much differently than the voltage-raising circuit described in the patent").  Similarly, the court stated that a jury could find the WEN signal "was not really *raised*" because, "while the WEN signal is an input to the level shifter, the level shifter outputs a different signal:  DTG," and that it "did not further instruct—and NXP did not request—that the jury be told what it means to 'raise' the voltage value of the control signal."  Appx178-179 (the court's emphasis).

But courts cannot engage in post-trial construction.  "[I]t is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation."  *Wi-LAN, Inc. v. Apple, Inc.*, 811 F.3d 455, 465 (Fed. Cir. 2016).  "The verdict must be tested by the charge actually given . . . ."  *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003) (A "more detailed" construction at JMOL is

improper.).

In stating post-trial that "[a] reasonable jury could have found that the accused level shifter does not 'raise' the control signal's voltage within the word's conventional meaning," Appx178, the court imbued the word "raising" with newfound meaning, and in a manner contrary to its own construction. That cannot stand. The court's construction did not limit "voltage-raising means" to a charge pump's functionality, nor exclude switching, translating, or transforming a high voltage into a higher voltage. Appx178-179. All that is required is "a circuit that raises the voltage value of the control signal." Appx60; Appx117. The court's "metaphysical analysis" of "raising" at JMOL was improper. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999) ("[C]laim construction is not philosophy," it "is firmly anchored in reality by the understanding of those of ordinary skill in the art."). Whether the court's reasoning is viewed as a post-trial revised construction, or misapplication of its construction, the court erred.

Regarding "voltage-limiting means," the court's post-trial analysis evaluated whether a jury could find that the clamp does not "act[ ] *directly* on the raised control signal." Appx181. On that basis, the court held "a reasonable jury could have found that the accused 'clamping circuit' does not satisfy the 'voltage-limiting means' limitation." Appx180.

But "acting[] directly on the raised control signal" was not part of the court's

ordinary-meaning construction.  Indeed, the claims do not recite a direct application, and "direct" never appears in the patent.  *See, e.g.*, *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1062 (Fed. Cir. 2009) ("direct" transmission not required where the patent "neither require[d] direct causation nor preclude[d] the use of intermediary signals or components").  And as the court itself observed, Mr. Oliver conceded that the clamp circuit "c[an] have an *indirect* effect on DTG because the VDD_RAMP supply voltage—on which the clamping circuit operates—can affect the DTG signal."  Appx182 (the court's emphasis).  Put more simply, the clamp limits the higher (gold) voltage to which the control signal is raised.  That it may also do so for other voltages in other portions of the circuit is irrelevant to infringement.

Again, regardless of whether the court was adopting a new construction or misapplying its construction, the court erred.  Its view that there were "factual questions that the jury could have resolved in favor of Impinj" as to "how the products work and whether the two signals are the same," Appx180, turned on a new "direct" limitation not presented at trial.  It thus could not support the verdict.

Finally, while the court stated that, "in the alternative, Impinj would be entitled to judgment in its favor if either of two alternative constructions were adopted," Appx183, and that Impinj's constructions might be "plausible," "ha[ve] appeal," or present "a difficult question," Appx183; Appx185-186, those statements are irrelevant.  The court did not adopt Impinj's constructions, even in the

alternative, so the predicate to Impinj being "entitled to judgment" under those constructions is absent. Indeed, multiple times as the case had progressed, and with careful reasoning, the court expressly *rejected* Impinj's constructions. Appx13669-13674 (denying Impinj's motion to reconsider construction of "voltage-raising means"); Appx15855-15856 (rejecting Impinj's proposal that "voltage-raising means" requires raising the control signal above the supply voltage, or "rais[ing] the voltage of the *control signal*") (the court's emphasis); Appx18243-18244 (24:12-25:14); Appx15679; Appx15687-15690; Appx117. Instead, as the court determined, "voltage-raising means" and "voltage-limiting means" are well-known structures. *See* Part III.A, *supra*.

### 2.    The Court Erred In Denying A New Trial

The court abused its discretion in denying a new trial.

*First*, in finding the verdict not contrary to the clear weight of the evidence, the court repeated its errors from its JMOL analysis. *See* Appx188. As discussed in Part III.B.1 above, the court's narrowed meaning of "raise" and its statement that the voltage-limiting means must "directly limit the control signal" are contrary to and fail to apply its own constructions.

*Second*, the court's view that Mr. Oliver testified only as to "a question of fact within [his] personal knowledge" and did not "contradict[] the Court's construction," Appx188-189, cannot withstand scrutiny. As discussed above in Part

III.A, Mr. Oliver engaged in expert testimony in describing what the '097 patent teaches and claims. The court itself recognized Mr. Oliver testified as though an expert. Appx189. And Impinj effectively admitted this, too—counting Mr. Oliver as one of its "experts" in summarizing its case to the jury. Appx18430 (211:17-20). That was itself prejudicial, but his testimony about what Impinj's products allegedly lack compared to the patent is doubly prejudicial. As discussed above, the confusion Impinj injected—including with a fact witness not qualified to provide expert opinion—rendered the trial unfair and prejudiced NXP. At minimum, a new trial on infringement should be held.

## CONCLUSION

This Court should:

- vacate the indefiniteness finding for '092 patent claims 15 and 19, vacate summary judgment on that patent's remaining claims, and remand for trial or other proceedings;

- vacate summary judgment on the '951 patent and remand for trial; and

- reverse the denial of NXP's post-trial motion on the '097 patent and grant JMOL of non-infringement or, at minimum, a new trial.

Date:  March 8, 2024                    Respectfully submitted,

                                        /s/ *Jennifer L. Swize*
                                        Jennifer L. Swize
                                        Courtney A. Bolin
                                        JONES DAY
                                        51 Louisiana Avenue N.W.
                                        Washington, DC 20001
                                        (202) 879-3939
                                        jswize@jonesday.com
                                        cbolin@jonesday.com

                                        Tharan Gregory Lanier
                                        Michael C. Hendershot
                                        JONES DAY
                                        1755 Embarcadero Road
                                        Palo Alto, CA 94303
                                        (650) 739-3939
                                        glanier@jonesday.com
                                        mhendershot@jonesday.com

                                        Lisa L. Furby
                                        JONES DAY
                                        110 North Wacker Drive
                                        Suite 4800
                                        Chicago, IL 60606
                                        lfurby@jonesday.com

                                        Albert Liou
                                        JONES DAY
                                        717 Texas Suite 3300
                                        Houston, TX 77002
                                        aliou@jonesday.com

**ADDENDUM**

## NON-CONFIDENTIAL ADDENDUM TABLE OF CONTENTS

| Date | Description | Appx Pages |
|---|---|---|
| 11/04/2022 | Claim Construction Order | Appx1-49 |
| 03/06/2023 | Order Modifying Claim Construction Of The "Voltage-Raising Means" Term Of The '097 Patent | Appx50-61 |
| 03/28/2023 | Redacted Order re Parties' Sealed Cross-Motions for Summary Judgment | Appx62-97 |
| 05/27/2023 | Order Granting Defendant's Motion For Reconsideration And Summary Judgment As To The '092 Patent | Appx98-100 |
| 06/27/2023 | Final Judgment | Appx151-152 |
| 08/31/2023 | Memorandum Opinion Regarding Summary Judgment Of The '092 Patent | Appx153-171 |
| 08/31/2023 | Order Denying Plaintiff's Motion For Judgment As A Matter Of Law Or, In The Alternative, A New Trial | Appx172-191 |
|  | '092 Patent | Appx192-209 |
|  | '097 Patent | Appx210-217 |
|  | '951 Patent | Appx218-228 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NXP USA, INC., and NXP B.V.,

                  Plaintiffs,

      v.

IMPINJ, INC.,

                  Defendant.

CASE NO. 2:20-cv-01503-JHC

CLAIM CONSTRUCTION ORDER

## I.

### INTRODUCTION

     Plaintiffs NXP USA, Inc. and NXP B.V. (collectively, "NXP") brought this patent-infringement action against Defendant Impinj, Inc., alleging infringement of a group of patents relating to radio frequency identification ("RFID") technology. The parties have asked the Court to construe certain claim terms within those patents. The Court hereby enters this order.

CLAIM CONSTRUCTION ORDER - 1

1

**II.**

2

**BACKGROUND**

3

A.     Technology Background

4          RFID is a type of contactless wireless communication that uses electromagnetic

5     frequencies to transmit identification information.  *See generally* Dkt. # 220 (technology

6     tutorial).  RFID systems are used, for example, in retail stores for tracking merchandise and in

7     warehouses for tracking inventory.  *Id.* at 6.  They are even used in U.S. passports and in various

8     medical technologies.  *Id.*  RFID systems typically include a "data carrier" (or "tag"), which can

9     attach to an object, and a "communication station" (or "reader"), which receives information

10    from the data carrier through radio waves.  The data carrier wirelessly transmits data to the

11    communication station, which the reader uses to identify the object.  *Id.* at 7.  The data carrier

12    often contains circuitry and a transmission means like an antenna.  *Id.* at 8.  Data carriers also

13    typically have some form of memory that stores information.  *Id.*  And while some data carriers

14    rely on a battery or other independence source for power, other tags are powered exclusively by

15    the radio waves transmitted from the communication station.  *Id.* at 9.

16    B.     The Patents

17          NXP alleged in its complaint that Impinj infringed eight patents related to RFID

18    technology.  *See* Dkt. # 1.  The parties later narrowed their dispute to six patents.  *See* Dkt.

19    # 176 at 2 & n.1.

20          The parties refer to three of these patents as the "wafer patents."  The three wafer patents

21    are United States Patent Numbers 7,456,489 ("the '489 Patent"), 7,538,444 ("the '444 Patent")

22    and 8,415,769 ("the '769 Patent").  These patents are directed to semiconductor "wafers" on

23    which integrated circuits are formed.

24

CLAIM CONSTRUCTION ORDER - 2

1    The parties refer to the remaining three patents as the "circuit patents."  The three circuit

2  patents are United States Patent Numbers 7,257,092 ("the '092 Patent"), 7,347,097 ("the '097

3  Patent"), and 7,795,951 ("the '951 Patent").  These patents are generally directed to components

4  or elements within the integrated circuits themselves.

5    In accordance with Local Patent Rule 132(c), the parties submitted a list of ten terms for

6  claim construction.  Dkt. # 128.  Impinj later moved for leave to brief five additional claim

7  terms.  Dkt. # 146.  The Court granted that motion in part, providing leave to brief three

8  additional claim terms.  Dkt. # 186.  These 13 terms for construction appear in the three circuit

9  patents (the '092 Patent, '097 Patent, and '951 Patent) and one wafer patent (the '769 Patent).

10    But of the 13 terms identified and briefed by the parties, only 9 are still at issue.  First, the

11  Court granted Impinj's motion for partial summary judgment as to the three wafer patents (the

12  '489 Patent, the '444 Patent, and the '769 Patent).  *See* Dkt. # 87 (Impinj's partial summary

13  judgment motion); Dkt. # 242 (sealed order granting the motion).  Therefore, the Court need not

14  construe any terms from the wafer patents, including the three terms identified in the '769

15  Patent.

16    Second, the parties have informed the Court that one term relating to the '092 Patent—

17  "processing means (10, 11) for processing specific useful data (n×UDB)"—is no longer in

18  dispute.  Impinj's supplemental brief states that "Impinj hereby agrees to adopt NXP's proposed

19  construction" and that "this term is no longer in dispute."  *See* Dkt. # 191 at 12.

20    Therefore, the Court must construe nine terms that appear in the '092 Patent, the '097

21  Patent, and the '951 Patent.

22    1.    The '092 Patent

23    The '092 patent describes techniques for communicating between a "communication

24  station" and a "data carrier."  '092 Patent at 1:5–8.  Prior art methods used a two-step process for

CLAIM CONSTRUCTION ORDER - 3

communication between the data carrier and the communication station.  The communication
station would first conduct an "inventorization procedure" during which the communication
station would identify all the data carriers within its range.  *Id.* at 1:10–38.  After the
inventorization procedure, the data carrier would transmit "useful data" to the communication
station upon request.  *Id.* at 1:38–47.  The "disadvantage" of this two-step method was that "it
[took] a relatively long time" for the "useful data" to become usable by the communication
station.  *Id.* at 1:42–44.

     The '092 Patent claims to improve upon the prior art by using an inventorization
procedure in which the "identification data block" and the "useful data" are transmitted
simultaneously.  *Id.* at 11:7–17 ("[T]he invention is distinguished in that not only are parts of the
identification data blocks IDB transmitted into the communication station 1 in the course of
carrying out an inventorization procedure, but that during the inventorization procedure the
specific useful data n×UDB desired and/or required in the communication station 1 are also
simultaneously transmitted."); Dkt. # 135 at 14.  This simultaneous transmission shortens the
time it takes for the communication station to obtain the "useful data" stored in the data carriers.
'092 Patent, 3:51–59.

     2.    The '097 Patent

     Many data carriers contain storage systems used to store information temporarily.  These
carriers can, for example, temporarily store an indication of successful communication with a
communication station.  Dkt. # 137 at 21.  The information is stored and represented "by a value
of an information voltage that arises at the capacitor."  '097 Patent, 1:45–47.  The '097 Patent
identifies a problem in the prior art: The information voltage would continuously decline due to
"unavoidable leakage currents in the circuit."  *Id.* at 1:62–2:1.  This decline in voltage would

CLAIM CONSTRUCTION ORDER - 4

1    lead to an "unsatisfactory situation" because the information was "no longer able to be evaluated

2    after only a short period of time." *Id.* at 2:2–7.

3        The '097 Patent describes an invention that purports to solve this problem. The invention

4    described by the '097 Patent provides "a substantially longer period of time during which the

5    stored information can be ascertained with high reliability." *Id.* at 2:34–36. This also allows the

6    information to remain accessible if a brief supply-voltage failure occurs. *Id.* at 2:35–42. The

7    patent achieves this in part by adding a "voltage-raising means" to the "information-voltage

8    generating means." *Id.* at 2:13–23; *see also* Dkt. # 135 at 17.

9        The specification describes the invention in more detail. It states that the carrier first

10   receives a wireless signal, which is used to form a supply voltage. '097 Patent, 3:27–35. The

11   circuit produces a "control signal CS" that is "at most equal to the value of the supply voltage."

12   *Id.* at 3:62–63. The circuit contains "information-voltage generating means" that receive the

13   control signal CS and uses the control signal CS to produce an "information voltage UI." *Id.* at

14   3:63–66. The information-voltage generating means further consist of "voltage-raising means,"

15   "voltage-limiting means," and a "charging-current generating stage." *Id.* at 4:15–29.

16       3.    The '951 Patent

17       Some circuits found within RFID tags operate with relatively little power because they

18   receive power only through the wireless signal transmitted to them (known as the "supply

19   voltage"). *See* Dkt. # 220 at 13. Some of the circuit components, however, benefit from higher

20   voltages, while others benefit from lower voltages. *Id.*; '951 Patent, 1:10–24. Therefore, many

21   circuits contain "voltage multiplier circuits" to modify the voltage. Dkt. # 220 at 13. The

22   purpose of the voltage multiplier is to increase or decrease a supply voltage to a desired level.

23   Dkt. # 149 at 13.

24

CLAIM CONSTRUCTION ORDER - 5

The '951 Patent describes a particular voltage multiplier circuit that "advantageously" enables multiplication of the voltage to a range of different voltages, including voltages both above and below the supply voltage. '951 Patent, 1:11–24, 1:49–63. The invention "control[s]" the generated voltage amplitude, producing a "regulated" voltage as it moves through the circuit components. *Id.* at 2:2–6.

As described in the specification, the voltage multiplier identified in the '951 Patent has two or more "multiplier stages." *Id.* at 2:16–17. The voltage multiplier also includes a "feedback bias control circuit" that is coupled to receive the output of the voltage multiplier stages. *Id.* at 4:17–44, 6:1–33, Abstract. The feedback bias control circuit helps control or regulate the actions of the voltage multiplier by providing a "feedback bias control signal," which is then fed to "regulated clocks" and to an "input level regulator." *Id.* at 3:60–61 ("regulated clock" with "an input for receiving a feedback bias control signal"), 3:23 ("input level regulator" with "a feedback bias control input"). The regulated clocks then provide a signal to each multiplier stage. *Id.* at 2:40–43, 3:46–55, 3:59–4:1. The input level regulator outputs a signal to the first multiplier stage. *Id.* at 3:22–32. The input level regulator "advantageously enables regulation of a voltage to a range of voltage levels" including voltages equal to or lower than the supply voltage. *Id.* at 3:24–28.

C.    Procedural History

The parties filed initial claim construction briefs in September 2021. Dkt. ## 135, 149 (Impinj's briefs); Dkt. ## 137, 150 (NXP's briefs). This case was reassigned to the undersigned judge in May 2022. Dkt. # 175. The parties filed supplemental claim construction briefs during the summer of 2022 addressing three additional terms in the '092 Patent.[1] Dkt. # 191 (Impinj's

---

[1] As discussed above, the parties no longer dispute one of the terms in the '092 Patent.

1    supplemental brief); Dkt. # 195 (NXP's supplemental brief).  The parties argued their proposed

2    claim constructions at a *Markman* hearing on October 4, 2022.  Dkt. # 237.  On October 20,

3    2022, the Court granted Impinj's motion for partial summary judgment as to the three wafer

4    patents, eliminating the need for construction of three terms in the '769 Patent.  *See* Dkt. # 87

5    (Impinj's partial summary judgment motion); Dkt. # 242 (sealed order granting the motion).

**III.**

**LEGAL PRINCIPLES**

A.    General Claim Construction Principles

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention

to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303,

1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,

Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90

F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define

the scope of the patented invention.").

When construing a patent claim, the words of the claim "are generally given their

ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quoting *Vitronics*, 90 F.3d at

1582).  The "ordinary and customary meaning" of a term is the meaning of the words as

understood by a person of ordinary skill in the art ("POSITA") at the time of the invention.  *Id.* at

1313.  Although words in a claim are generally given their ordinary meaning, the Federal Circuit

has recognized "two exceptions to this general rule: 1) when a patentee sets out a definition and

acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term

either in the specification or during prosecution." *Thorner v. Sony Comput.  Ent. Am. LLC*, 669

F.3d 1362, 1365 (Fed. Cir. 2012).  For the patentee's unique definition to govern, the patentee

must "clearly set forth a definition of the disputed claim term other than its plain and ordinary

meaning. *Id.* (internal quotation marks and citation omitted). The "standard for disavowal of claim scope is similarly exacting." *Id.* at 1366. "Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed.Cir.2004).

To determine the meaning of a disputed term, courts mainly rely on "intrinsic" evidence: the claim language, the written description in the specification, and the patent's prosecution history. *Phillips*, 415 F.3d at 1311–17. A court's analysis begins with the language in the claims. *See id.* at 1314; *Innova/Pure Water*, 381 F.3d at 1116 ("[C]laim construction analysis must begin and remain centered on the claim language itself."). But claim terms are not to be read in a vacuum. Rather, claims "are part of a fully integrated written instrument . . . consisting principally of a specification that concludes with the claims." *Phillips*, 415 F.3d at 1315 (citation and internal quotation marks omitted); *see also id.* at 1313. The specification is particularly important to claim construction and is often "the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). This is because the specification "aids in ascertaining the scope and meaning of the claims." *Id.* (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)). Thus, courts "rely heavily" on the specification. *Id.* at 1317.

Courts often struggle when using the specification to guide the claim construction inquiry. *Id.* at 1323. On the one hand, courts rely on the specification to help determine the meaning of a disputed term. *Id.* On the other hand, the Federal Circuit has repeatedly warned that a court may not read limitations from the specification into the claim. *Id.*; *see also Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) (noting that it is a "well-established principle that a court may not import limitations from the written description into the claims"); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir.

1    2001) (observing that one of the "cardinal sins of patent law" is "reading a limitation from the

2    written description into the claims").  The "distinction between using the specification to

3    interpret the meaning of a claim and importing limitations from the specification into the claim

4    can be a difficult one to apply in practice." *Phillips*, 415 F.3d at 1323.  But the Federal Circuit

5    has explained that "the line between construing terms and importing limitations can be discerned

6    with reasonable certainty and predictability if the court's focus remains on understanding how a

7    person of ordinary skill in the art would understand the claim terms." *Id.*

8        In addition to considering intrinsic evidence (like the claim language and specification),

9    courts may also rely on "extrinsic" evidence.  Extrinsic evidence "consists of all evidence

10   external to the patent and prosecution history, including expert and inventor testimony,

11   dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980

12   (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, (1996) (citation omitted).  While extrinsic evidence may be

13   useful, it is generally given less weight than intrinsic evidence.  *Phillips*, 415 F.3d at 1317.

14       The construction of a patent's claims is a question of law to be decided by the court.

15   *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015); *Markman v.*

16   *Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996).

17   B.    Principles for Means-Plus-Function Claims

18       Under 35 U.S.C.§ 112, ¶ 6 (now codified at 35 U.S.C. § 112(f)),[2] claims may be drafted

19   in a "means-plus-function" format in which the claim "recites a function to be performed rather

20   than definite structure or materials for performing that function." *Lockheed Martin Corp. v.*

21

22       [2] The America Invents Act ("AIA") amended and reorganized section 112, moving 35 U.S.C.
23   112, ¶ 6 to 35 U.S.C. § 112(f).  But the AIA did not substantively change the means-plus-function portion
     of the statute.  Because the patents at issue were filed before the AIA took effect, this order refers to the
24   pre-AIA version of Section 112.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1343 n.2 (Fed.
     Cir. 2015) (en banc).

CLAIM CONSTRUCTION ORDER - 9

*Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003) (citing 35 U.S.C. § 112, ¶ 6).  By allowing inventors to draft claims in this manner,

> Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc).

Interpreting a means-plus-function limitation is a multi-step process.  A court must first determine whether the term is drafted in a means-plus-function format such that § 112, ¶ 6 applies.  *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1344 (Fed. Cir. 2019); *Williamson*, 792 F.3d at 1348.  The presence of the word "means" in a claim creates a rebuttable presumption that the claim is governed by § 112, ¶ 6.  *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1372 (Fed. Cir. 2020) ("We presume that claim terms with the word 'means' invoke § 112(f)"); *Williamson*, 792 F.3d at 1348.  But courts must not reflexively "evaluate[] form over substance when evaluating whether a claim limitation invokes § 112, para. 6." *Williamson*, 792 F.3d at 1348. The Federal Circuit has explained:

> In making the assessment of whether the limitation in question is a means-plus-function term subject to the strictures of § 112, para. 6, our cases have emphasized that the essential inquiry is not merely the presence or absence of the word "means" but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.

*Id.* (citation omitted); *see also MTD Prods.*, 933 F.3d at 1344 ("As part of this step, we consider whether the claim limitation connotes 'sufficiently definite structure' to a person of ordinary skill in the art.").  "To determine whether a claim recites sufficient structure, it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the

CLAIM CONSTRUCTION ORDER - 10

1    structures by their function." *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir.

2    2017) (citation and quotation marks omitted); *see also MTD Prods.*, 933 F.3d at 1344; *Dyfan,*

3    *LLC v. Target Corp.*, 28 F.4th 1360, 1365–66 (Fed. Cir. 2022).

4         Once a court has determined that § 112, ¶ 6 applies, the court must "identify the claimed

5    function." *Williamson*, 792 F.3d at 1351. And once a court has identified the claimed function,

6    the court "must determine what structure, if any, disclosed in the specification corresponds to the

7    claimed function." *Id.*; *see also MTD Prods.*, 933 F.3d at 1344. This is necessary because a

8    means-plus-function claim subject § 112, ¶ 6 covers only the corresponding structure(s)

9    disclosed in the specification along with any equivalents thereof.

10        "Structure disclosed in the specification qualifies as 'corresponding structure' if the

11   intrinsic evidence *clearly links or associates* that structure to the function recited in the claim."

12   *Williamson*, 792 F.3d at 1352 (emphasis added) (citation omitted). "Even if the specification

13   discloses corresponding structure, the disclosure must be of 'adequate' corresponding structure

14   to achieve the claimed function." *Id.* (citation omitted). "The inquiry is whether one of skill in

15   the art would understand the specification itself to disclose a structure, not simply whether that

16   person would be capable of implementing a structure." *Biomedino, LLC v. Waters Techs. Corp.*,

17   490 F.3d 946, 951 (Fed. Cir. 2007).

18        But "[i]f the patentee fails to disclose adequate corresponding structure, the claim is

19   indefinite," and is therefore invalid. *Williamson*, 792 F.3d at 1352. When "a person of ordinary

20   skill in the art would be unable to recognize the structure in the specification and associate it

21   with the corresponding function in the claim, a means-plus-function clause is indefinite." *Id.*;

22   *see also Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) (The

23   structure "must be disclosed in the written description in such a manner that one skilled in the art

24   will know and understand what structure corresponds to the means limitation."). If the patentee

CLAIM CONSTRUCTION ORDER - 11

1  "fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point

2  out and distinctly claim the invention as required by [the statute]."  *Noah Sys., Inc. v. Intuit Inc.*,

3  675 F.3d 1302, 1311–12 (Fed. Cir. 2012) (citation omitted).  This renders the term indefinite.  *Id.*

4  <div align="center">**IV.**</div>

5  <div align="center">**DISCUSSION**</div>

6  A.    The '092 Patent

7      1.    "characteristic identification data block (IDB)"

8      The '092 Patent describes an RFID system in which identification data and "useful data"

9  are simultaneously transmitted from the data carrier to the communication station.  The patent

10  describes the identification data stored within the data carrier as the "characteristic identification

11  data block (IDB)."  For example, claim 1 of the '092 Patent discusses a "data carrier" that

12  "comprises a characteristic identification block (IDB)."  '092 Patent, 17:48–55.  The term is used

13  in the same manner in independent claims 1, 6, 7, 11, 15, and 19, as well as several dependent

14  claims.  The parties dispute the meaning of the term "characteristic identification data block

15  (IDB)."

16      Impinj construes the term to mean "a serial number."  Dkt. # 135 at 14.  This, Impinj

17  says, is because the specification defines the term "characteristic identification data block (IDB)"

18  as a "serial number."  *See Phillips*, 415 F.3d at 1321 ("[T]he specification acts as a dictionary

19  when it expressly defines terms used in the claims or when it defines terms by implication."

20  (internal quotation marks and citation omitted)); *id.* at 1316 ("[T]he specification may reveal a

21  special definition given to a claim term by the patentee that differs from the meaning it would

22  otherwise possess. In such cases, the inventor's lexicography governs.").

23      NXP construes the term to mean "identification data stored in memory," or otherwise

24  asks the Court to construe the term according to its plain and ordinary meaning.   Dkt. # 137 at

CLAIM CONSTRUCTION ORDER - 12

18.  NXP argues that the term refers to any identification data stored in memory, whether that data take the form of a serial number or something else.  *Id.* at 18–19.  NXP responds to Impinj's construction by observing that when the specification uses the term "serial number," it does so only to provide an example; the use of "serial number" in the specification was not intended to limit the scope of the claim term.  *Id.* at 19.

The Court agrees with NXP and adopts the construction of "identification data stored in memory."  Neither the claim terms nor the specification limit "identification data block" to any particular format like a serial number.  When broken down, the term refers to (1) a block (2) of data (3) used for identification, without limiting the format of that data block.  This is the "ordinary and customary meaning" of the words to a POSITA.

Impinj responds that the specification "defines" "identification data block" as a serial number.  Dkt. # 135 at 14–15.  As evidence, Impinj points to a portion of the specification that describes prior art in which

> the first step is to carry out an inventorization procedure, which usually consists of a plurality of procedure runs and in which so many procedure runs are carried out until the identification data blocks stored in the data carriers, *also denoted serial numbers*, of all data carriers present in a communication region of the communication station are known in the communication station.

'092 Patent, 1:22–29 (emphasis added).  Impinj says that the patentee defined "identification data block" as "a serial number" because the term "serial number" is preceded by the word "denote," which is often used to designate meaning or definition.  Dkt. # 135 at 15 n.6.

To be sure, an inventor may "act[ ] as his own lexicographer" by clearly setting forth in the specification a different definition of the claim term in question.  *Thorner*, 669 F.3d at 1365.  When the inventor provides a "special definition" for a given claim term, "the inventor's lexicography governs."  *Phillips*, 415 F.3d at 1316.

1    But "a claim term is only given a special definition different from the term's plain and

2 ordinary meaning if the 'patentee . . . clearly set[s] forth a definition of the disputed claim term

3 other than its plain and ordinary meaning.'" *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805

4 F.3d 1368, 1375 (Fed. Cir. 2015) (alterations in original) (quoting *Thorner*, 669 F.3d at 1365).

5 While a definition provided in a specification need not be "express" or "explicit" to control the

6 scope of the term, it must still be clear. *See Phillips*, 415 F.3d at 1321.  The patentee must

7 "clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotation

8 marks and citation omitted).

9    The language to which Impinj points is anything but a "clear[]" statement sufficient to

10 redefine the term. *Akamai*, 805 F.3d at 1375 (citation omitted).  The patent references "serial

11 number" twice.  "Identification data block" appears more than 130 times in the specification

12 alone. Dkt. # 244 at 52.  It would be odd to focus on the two "serial number" references to

13 conclude that the patentee intended to restrict the scope of the disputed term.

14    This is particularly true when it is unclear whether the patent's use of the word "denoted"

15 was meant to redefine the term "identification data block."  Even ignoring the awkward phrasing

16 of the passage, "denote" does not necessarily create an exclusive definition.  Using the same

17 dictionary cited by Impinj, the word also means "to serve as an indication of," suggesting that

18 "serial number" could be an example of (or indicative of) the identification data block.

19 "Denote," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/denote.

20 Moreover, NXP observes that the '092 Patent tends to use "i.e." as a signal when defining a term.

21 *See, e.g.*, '092 Patent, 1:32–33 ("inventorized, i.e. identified").  The Federal Circuit has declined

22 to find a statement to be "definitional" when it did not "accord with the linguistic formula used

23 by the patentee to signal" other definitions. *Med. Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed.

24 Cir. 2017).

CLAIM CONSTRUCTION ORDER - 14

**Appx14**

Perhaps more importantly, Impinj's proposed construction would conflict with other portions of the specification. First, the other instance of the term "serial number" in the patent undermines Impinj's construction. The specification describes an embodiment in which communication occurs using "the first four (4) bits of its identification data block IDB, thus by its serial number." '092 Patent, 11:60–61. A plausible reading of this passage suggests that in this embodiment, the patentee thought of the serial number as only the first four bits of the identification data block, not the entire thing. And "where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1311 (Fed. Cir. 2014) (citation omitted).

Second, the patent discloses an embodiment in which "special data" that is "useful or absolutely necessary for other applications" may be included within the identification data block. '092 Patent, 17:10–18. To be sure, the patent does not explain the meaning of "special data." But this embodiment would suggest to a POSITA that the phrase "identification data block" encompasses identification data that may be broader than a mere serial number. *See GE Lighting*, 750 F.3d at 1311.

Third, NXP points to industry materials that use a similar term—"Unique identifier (UID)"—to include more than a serial number. The ISO/IEC15693-3 standard discloses a 64-bit "Unique identifier (UID)" that encompasses a 48-bit "serial number," an 8-bit manufacturer code, and 8 bits of other data. Dkt. # 137 at 19. A POSITA that is familiar with this industry standard would thus understand the similar term "identification data block" to refer to a broader class of data than just a "serial number."

Impinj's proposed construction would impermissibly import limitations from the specification into the claims. *See SciMed*, 242 F.3d at 1340. And because the patentee did not

CLAIM CONSTRUCTION ORDER - 15

clearly re-define the term "characteristic identification data block (IDB)" to mean "a serial number," the patentee is entitled to the full scope of the term's ordinary meaning.  Accordingly, the Court construes the term "characteristic identification data block (IDB)" as "identification data stored in memory."

2.    "specific useful data (n×UDB)"

Claim 1 of the '092 Patent describes a communication method by which "specific useful data (n×UDB)" is transmitted from a data carrier to a communication station. *See, e.g.*, '092 Patent, 17:56–59.  The term appears in nearly every claim and is used in the same way as in claim 1.  The parties dispute the term's meaning.

As an initial matter, the parties agree that "specific useful data (n×UDB)" refers to a subset of all available "useful data." *See* Dkt. ## 137 at 20–21; 135 at 15; *see also* '092 Patent at 10:13–19.  As Impinj states, "[t]he parties agree that the term means something less than all useful data ('some' or a 'portion of')." Dkt. # 135 at 15.  But the parties dispute whether the term refers to any subset of useful data or whether the term is limited to a particular subset of useful data.  NXP argues that the term refers to any subset of useful data and proposes a construction of "some, but not all, useful data (UD)." Dkt. # 137 at 20.  Impinj argues that the term is limited to a particular subset of useful data.  Dkt. # 135 at 15.  In particular, Impinj construes the term to mean "a portion of useful data (UD), where the portion is specified in a request from the communication station that indicates a useful data start block and a specific number n of useful data blocks." *Id.*  The Court adopts NXP's proposed construction and construes the term "specific useful data (n×UDB)" to mean "some, but not all, useful data (UD)." *Id.*

To start, nothing in the claim language suggests an intent to limit "specific useful data (n×UDB)" to that which has been requested by the communication station. *See Williamson*, 792

1    F.3d at 1346 ("[I]t is the *claims,* not the written description, which define the scope of the patent

2    right." (internal quotation marks and citation omitted)).

3         The Court next considers the specification to guide its construction of the term.  *Phillips*,

4    415 F.3d at 1315 (noting that "the specification 'is always highly relevant to the claim

5    construction analysis'" (quoting *Vitronics*, 90 F.3d at 1582)).  The specification discloses at least

6    two embodiments relevant to the construction of this term.  First, the specification primarily

7    focuses on an embodiment in which a data carrier transmits specific useful data n×UDB in

8    response to a "request" from the communication station.  *See, e.g.,* '092 Patent, 16:22–28.

9    Second, the specification discloses—albeit in a more cursory fashion—an embodiment[3] in which

10   a data carrier "automatically" transmits "a specific selection of useful data blocks."  *Id.* at 16:22–

11   34.  As to that second embodiment, the specification teaches that "it is also possible to select a

12   design in which no request for useful data is made by the communication station 1, but in which

13   . . . *automatically a specific selection of useful data blocks UDB are transmitted* from each data

14   carrier 2 (DC) to the communication station 1."  '092 Patent at 16:22–34 (emphasis added).

15   Impinj's proposed construction—which limits the term to specific useful data transmitted in

16   response to a *request*—would improperly exclude this second, "automatic" embodiment.  *See GE*

17   *Lighting*, 750 F.3d at 1311 ("[W]here claims can reasonably [be] interpreted to include a specific

18   embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative

19   evidence on the contrary." (citation omitted)).

20        Impinj's main argument focuses on the parenthetical "(n×UDB)," which follows each

21   instance of the phrase "specific useful data" within the claims.  *See* Dkt. ## 135 at 15–16; 149 at

22

---

23        [3] At the *Markman* hearing, the parties agreed that the '092 Patent's discussion of automatically
     transmitted specific data constitutes an "embodiment" despite its cursory treatment in the specification.
24   Dkt. # 244 at 66, 69.

CLAIM CONSTRUCTION ORDER - 17

9.  Impinj argues that NXP's proposed construction reads the parenthetical out of the claim language, violating the principle that "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005).  According to Impinj, the specification defines "n×UDB" in a manner more consistent with its construction:

> The *useful data start block included in a request data block* RDB and the *number n* of useful data blocks are detected by the block detection means 38, the result being that the block detection means 38 ensure that, beginning with the determined start block, *a total of n useful data blocks UDB, i.e. n×UDB are read out as specific useful data . . . .*

'092 Patent at 10:9–15 (emphasis added); Dkt. # 135 at 16.  Impinj argues that "n×UDB"— "defined" using the phrase "i.e."[4] in a paragraph that discusses transmission based on a request— refers to specific useful data transmitted in response to a request, not specific useful data that is automatically transmitted.  Moreover, Impinj notes that when the specification discusses automatic transmission of data, it omits the term "n×UDB."  *See* '092 Patent, 16:28–33 ("[I]t is also possible to select a design in which no request for useful data is made by the communication station 1, but in which . . . automatically *a specific selection of useful data blocks UDB* are transmitted from each data carrier." (emphasis added)).  According to Impinj, this suggests that the inclusion of "(n×UDB)" in the claims refers only to specific useful data transmitted in response to a request.

But Impinj's argument does not persuade the Court.  First, it is unclear whether the patent defines "n×UDB" to refer only to requested data.  While the phrase "i.e. n×UDB" appears in a sentence that otherwise discusses data transmitted in response to a request, it does not necessarily follow that "i.e. n×UDB" refers only to requested data.  The pertinent portion of the sentence

---

[4] NXP's brief expressly states (though in the context of a different term) that the '092 Patent uses "i.e." to introduce a definition.  Dkt. # 150 at 11.

states: ". . . a total of n useful data blocks UDB, i.e. n×UDB are read out as specific useful data

. . . ." '092 Patent, 10:13–15.  The most natural reading of the clause beginning with "i.e.

n×UDB" is that it modifies the immediately antecedent phrase, "a total of n useful data blocks

UDB."  Read in this way, "n×UDB" simply refers to a number (n) of "useful data blocks"

(UDB), whether or not the "n" number of data blocks are transmitted automatically or in

response to a request.

      Second, "n×UDB" is used inconsistently throughout the '092 Patent.  While the term

often accompanies the words "specific useful data" in the specification, it does not always do

so.[5]  For example, while one sentence in the specification describes a method by which

"transmission of specific useful data is carried out from the at least one data carrier," '092 Patent,

1:67–2:1 (lacking reference to "n×UDB"), another nearly identical sentence in the specification

includes "n×UDB," stating that "the specific useful data (n×UDB) are transmitted from the at

least one data carrier," *id*. at 3:66–4:1.  The parenthetical is even used inconsistently within a

single paragraph that indisputably refers to the same "specific useful data."  *Id.* at 4:18–30

(explaining that it is advantageous for the "specific useful data (n×UDB) [to be] transmitted in

time after the data (NKP IDB) from the identification data block," but later stating that "it is also

possible for the specific useful data to be transmitted . . . before the data from the identification

data block.")

      The Court can discern no logic for the sporadic inclusion or omission of the parenthetical.

Given this inconsistent drafting, Impinj's observation that the specification does not use

"n×UDB" when describing automatic data transmission does not carry much explanatory power.

The Court is skeptical that a POSITA reading the patent would place so much weight on the

---

[5]  While the term "n×UDB" appears inconsistently throughout the specification, the claims consistently use the parenthetical "(n×UDB)" after every use of the words "specific useful data."

CLAIM CONSTRUCTION ORDER - 19

presence or absence of the parenthetical; a POSITA is more likely to think that "specific useful data" refers to the same thing throughout the patent, whether or not it is succeeded by the "(n×UDB)" parenthetical.  And because neither the claim language nor the specification limit "specific useful data" to any particular subset of data, the Court construes the term "specific useful data (n×UDB)" to mean "some, but not all, useful data (UD)."

> 3.    "output means (40, 34, 32, 25) for outputting to the communication station (1) specific useful data (n×UDB)"

Claim 15 of the '092 Patent describes a data carrier that contains "output means (40, 34, 32, 25) for outputting to the communication station (1) specific useful data (n×UDB)."  '092 Patent, 20:2–5.  The reference numbers in parentheses—40, 34, 32, and 25—refer to elements described in the specification.  At various points, the specification describes "processing means 40," "coding means 34," "modulation means 32," and "transmission means 25."  Dkt. # 195 at 8, 10–11.

The parties agree that the term "output means (40, 34, 32, 25) for outputting to the communication station (1) specific useful data (n×UDB)" is a means-plus-function limitation subject to § 112, ¶ 6.  Dkt. ## 191 at 7; 195 at 10.  The parties also agree the claimed function is "outputting to the communication station specific useful data (n×UDB)."  Dkt. ## 191 at 7; 195 at 10.

The parties dispute, however, the corresponding structure.  NXP says that the corresponding structure is "processing means 40, coding means 34, modulation means 32, transmission means 25, and equivalents."  Dkt. # 195 at 10.  NXP argues that the four parenthetical reference numbers—40, 34, 32, and 25—guide the patent reader to the four corresponding components in the specification bearing those same reference numbers, "clearly link[ing]" the outputting function with those four components.  *Williamson*, 792 F.3d at 1352.

1    Impinj argues that it is improper for the Court to consider the reference numbers when

2    construing the claim. Dkt. # 191 at 6–7. But if the Court does consider the reference numbers,

3    Impinj argues that the patent discloses no corresponding structure for "output means" and that

4    the claim therefore invalid for indefiniteness.[6] *Id.* at 9–11. In the alternative, Impinj says that

5    the corresponding structure for "output means . . ." is an "antenna element" and its equivalents.

6    *Id.* at 8.

7         A claim that employs a means-plus-function form must disclose adequate "corresponding

8    structure" in the specification; if it does not, it is invalid as indefinite. *Williamson*, 792 F.3d at

9    1352. "Structure disclosed in the specification qualifies as 'corresponding structure' if the

10   intrinsic evidence clearly links or associates that structure to the function recited in the claim."

11   *Id.* (citation omitted). "Even if the specification discloses corresponding structure, the disclosure

12   must be of 'adequate' corresponding structure to achieve the claimed function." *Id.* (citation

13   omitted). "The inquiry is whether one of skill in the art would understand the specification itself

14   to disclose a structure, not simply whether that person would be capable of implementing a

15   structure." *Biomedino*, 490 F.3d at 951.

16        The parties first dispute the role that reference numbers play in claim construction. This

17   issue is dispositive of this term. If the Court gives the reference numbers no weight, then

18   construction of this term is straightforward: The four reference numbers serve as the only

19   reasonably specific clues about what corresponding structures fulfill the outputting function.

20   The specification discusses "output means" only twice. Neither use of the term conveys

21   anything close to corresponding structure; each instance discusses "output means" in purely

22

23        [6] Impinj's brief seems to focus only on the lack of structure disclosed for "modulation means"
24   and "coding means," and does not focus on "transmission means" or "processing means." *See* Dkt. # 191
     at 9–11.

CLAIM CONSTRUCTION ORDER - 21

functional terms.  '092 Patent, 3:5, 3:31.  Nor does the specification "clearly link[]" any other corresponding structure to the outputting function.  *Williamson*, 792 F.3d at 1352.

Addressing this apparent question of first impression, the Court concludes that the reference numbers in the claim cannot alone indicate "corresponding structure" for this means-plus-function claim.  The general rule is that reference numbers used in the claims of a patent carry no meaning; they do not limit or alter the scope of the term in any way.  The Manual of Patent Examination and Procedure states that "[g]enerally, the presence or absence of such reference characters does not affect the scope of a claim."  *See Manual of Patent Examination and Procedure* ("MPEP"), § 608.01(m) (9th ed., 2019).

And while the Federal Circuit does not appear to have addressed the question,[7] district courts have come to the same conclusion.  *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-0911-JRG-RSP, 2015 WL 6956722, at *7 (E.D. Tex. Nov. 9, 2015) ("Courts that have considered the implications of the use of reference numbers in a claim have followed the general rule that reference numbers do not limit the claims."); *id.* ("[T]he rationale for excluding such numbers is equally applicable to means-plus-function terms."); *Millipore Corp. v. W.L. Gore Assocs., Inc.*, No. CIV.A. 11-1453 ES, 2012 WL 5250386, at *4 (D.N.J. Oct. 24, 2012) ("[T]he parties agree that the reference characters have no special effect on claim scope."); *KEG Kanalreinigungstechnick GmbH v. Laimer*, No. 1:11-CV-1948-JEC, 2013 WL 8719444, at *30 (N.D. Ga. Jan. 11, 2013*), report and recommendation adopted*, No. 1:11-CV-1948-JEC, 2013 WL 11904722 (N.D. Ga. Feb. 21, 2013) (observing that the MPEP "provides that reference

---

[7] NXP cites several cases in which the Federal Circuit relied on reference numbers to determine claim meaning.  *See Ironworks Patents LLC v. Samsung Elecs. Co*, 798 Fed. App'x 621, 625–26 (Fed. Cir. 2020); *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1374 (Fed. Cir. 2001); Dkt. # 195 at 6–7.  But those cases involved reference numbers in the written description; neither involved reference numbers in the claims themselves.

CLAIM CONSTRUCTION ORDER - 22

numerals *may*, as an option, be used in claims, but doing so has *no effect on the scope of the claims*" (second emphasis added)); *Relume Corp. v. Dialight Corp. et al.*, 63 F. Supp. 2d 788, 796, n.6 (E.D. Mich. 1999) ("A reference numeral is simply a convenient tool for directing the reader to an example of the element the patentee has claimed.  Had the drafter wanted to incorporate the limitations of the preferred embodiment into the language of claim 1, he or she could have done so quite easily with words.").

NXP does not dispute this general rule.  NXP instead argues that the reference numbers in the claim at issue are not used to limit the claim or alter the claim scope.  Dkt. # 195 at 6–7.  In the context of this means-plus-function claim, NXP says, the reference numbers merely guide the reader to structures in the specification that qualify as corresponding structure; they do not otherwise alter the scope of the term itself.

The Court recognizes that NXP presents a plausible argument.  Means-plus-function claims are unique in patent law: While most of patent law forbids the importation of limitations from the specification into the claims, *see SciMed*, 242 F.3d at 1340, means-plus-function claims require the court to look to the specification to determine the metes and bounds of the claim.  A means-plus-function claim is limited to the corresponding structure disclosed in the specification, requiring a degree of interaction between the claims and the specification.  This might justify an exception to the general rule, allowing the patentee to conveniently refer back to the specification and "clearly link[]" the claimed function to the corresponding structure using reference numbers.

But the Court concludes that patent law would appear to be better served by a bright-line rule: Reference numbers in claims do not affect the construction or scope of a claim.  With a bright-line rule, patentees are on notice that they cannot rely on reference numbers to convey

CLAIM CONSTRUCTION ORDER - 23

1    substantive meaning in the claims, whether those reference numbers are found in a means-plus-

2    function claim or not.

3            Carving out an exception to this general rule could create uncertainty and odd results.  If

4    reference numbers in claims affect construction of means-plus-function claims but not other

5    claims, there would be two parallel sets of interpretative rules: one for means-plus-function

6    claims, and another for all other claims.  *Cf. MTD Prods.*, 933 F.3d at 1342 (applying the same

7    interpretative canon—that claims must be interpreted in light of the written description—

8    regardless of whether those claims are drafted in means-plus-function form).  This dichotomy is

9    particularly troublesome because it is often unclear whether a term *is*, in fact, a means-plus-

10   function claim.  A patentee may not know *ex ante*, then, whether their inclusion of reference

11   numbers will be treated as entirely irrelevant or whether (as here) a court may one day interpret

12   them to carry dispositive meaning.

13           Moreover, a bifurcated interpretative rule could complicate the corresponding-structure

14   analysis.  For example, it could be ambiguous whether the patentee intended for the list of

15   reference numbers to be exhaustive of all other potential corresponding structure.  Even the

16   position of the reference numbers within a sentence could lead to interpretative challenges.

17   Thus, patent law would appear to be best served by a bright-line rule that gives reference

18   numbers in a claim no role in determining the substantive scope of the claim.

19           NXP argues that reliance on reference numbers to indicate corresponding structure is

20   different than using reference numbers to "limit" the scope of the claim.  Instead, NXP says, a

21   reference number "is simply a convenient tool for directing the reader to an example of the

22   element the patentee has claimed."  *Relume*, 63 F. Supp. 2d at 796, n.6 (but ultimately

23   concluding that the reference numbers play no role in a claim's scope).  But when a court

24   determines the corresponding structure of a means-plus-function claim, the court is essentially

CLAIM CONSTRUCTION ORDER - 24

"limiting" the claim term.  The court takes what is otherwise a broad, indefinite claim drafted in functional form and limits it in some fashion based on the structure disclosed in the specification. *Cf. Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("The point of the [corresponding-structure] requirement that the patentee disclose particular structure in the specification and that the *scope of the patent claims be limited to that structure* and its equivalents is to avoid pure functional claiming." (emphasis added)); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) ("[M]eans-plus-function elements . . . are statutorily *limited* to the 'corresponding structure, material, or acts described in the specification and equivalents thereof.'" (emphasis added) (citing 35 U.S.C. § 112, ¶ 6)).

And in this case, the '092 Patent expressly states that reference numbers in the claims do not affect the scope of the claim.  The specification states: "In the claims, *any reference signs placed in parentheses shall not be construed as limiting the claims*."  '092 Patent, 7:39–41 (emphasis added).  This statement strongly implies that the patentee did not intend for the reference numbers in the claims to carry any substantive weight.

The Court thus declines to rely exclusively on reference numbers in the claims to signal corresponding structure.  And without resorting to the reference numbers, no structure is "clearly link[ed]" to the "output means" function.  *Williamson*, 792 F.3d at 1352.  As NXP's briefing concedes, an "antenna" alone does not suffice to carry out the outputting function.  Dkt. # 195 at 13 ("[A]n antenna alone, as proposed by Impinj, is not capable of outputting any data at all, and cannot perform the claimed function.").  Accordingly, the term is invalid for indefiniteness.

4.    "output means (40, 34, 32) for outputting specific useful data (n×UDB), included in the data carrier circuit (28) after the specific useful data's (n×UDB) storage, to the communication station"

Claim 19 of the '092 Patent includes a term that is nearly identical to the term construed in claim 15 just above.  Both are "output means" terms that attempt to designate structure by

CLAIM CONSTRUCTION ORDER - 25

relying on reference numbers.  The only difference is that claim 19 contains a parenthetical with three reference numbers—"(40, 34, 32)"—whereas the parenthetical in claim 15 also includes reference number 25.

This term is indefinite for the same reasons discussed for the prior term.  Because the Court declines to rely exclusively on reference numbers in a claim to indicate corresponding structure, this limitation is indefinite because the specification lacks corresponding structure.

B.    The '097 Patent

    1.    "information-voltage generating means that are arranged to receive a control signal . . . and that are arranged to generate the information voltage by using the control signal"

The '097 Patent describes a data carrier that temporarily stores information capacitively. '097 Patent, 1:1–18.  The information is represented by the value of an "information voltage," which is produced by "information-voltage generating means."  *Id.*  The specification describes an embodiment in which the "information-voltage generating means" receive a "control signal" and are further comprised of a charging-current generating stage, a voltage-raising means, and a voltage-limiting means.  *Id.* at 3:60–4:14.

Claim 1 of the '097 Patent exemplifies the patent's use of the term.  Claim 1 describes a data carrier containing "information-voltage generating means that are arranged to receive a control signal . . . and that are arranged to generate the information voltage by using the control signal."  *Id.* at 8:66–9:3.  Claim 1 further states that the data carrier is "characterized in that the information-voltage generating means have voltage-raising means that are arranged to raise the voltage value of the control signal."  *Id.* at 9:3–5.  The term "information-voltage generating means" also appears in terms 3, 4, and 6.

The parties dispute the meaning of the term "information-voltage generating means that are arranged to receive a control signal . . . and that are arranged to generate the information

CLAIM CONSTRUCTION ORDER - 26

voltage by using the control signal."  The parties first dispute whether this is a means-plus-function claim subject to the strictures of § 112, ¶ 6.  Impinj insists that this is a means-plus-function limitation subject to § 112, ¶ 6.  Dkt. # 135 at 18.  NXP disagrees.  Dkt. # 137 at 22.  Instead, NXP believes that the term should be given its plain and ordinary meaning, or "a circuit that receives a control signal and generates the information voltage by using the control signal." *Id.*  And if the Court construes the term to be a means-plus-function claim, the parties dispute which structure(s) would qualify as corresponding structure.

The term uses the word "means."  There is thus a presumption that the claim contains a means-plus-function limitation subject to § 112, ¶ 6.  *Egenera*, 972 F.3d at 1372 ("We presume that claim terms with the word 'means' invoke § 112(f).").  But the Federal Circuit has cautioned that "the essential inquiry is not merely the presence or absence of the word 'means.'" *Williamson*, 792 F.3d at 1348.  Rather, the "essential inquiry" is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* (citation omitted).  "To determine whether a claim recites sufficient structure, it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Skky*, 859 F.3d at 1019 (citation and quotation marks omitted).

The Court concludes that the "means" presumption has not been rebutted and that the term is a means-plus-function limitation subject to § 112, ¶ 6.  There is no evidence that the term "information-voltage generating means" or similar terms are used "in common parlance or by persons of skill in the pertinent art to designate structure." *Id.* (citation and quotation marks omitted).  Nor is there any evidence that the term serves as "the name of a sufficiently definite structure" or that "the words of the claim are understood by persons of ordinary skill in the art to

CLAIM CONSTRUCTION ORDER - 27

1   have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1349,

2   1351.  Rather, the claim language is predominantly functional, not structural.  The claim seeks to

3   capture virtually any means that can perform the function of "generat[ing] the information

4   voltage by using the control signal."  Impinj summarizes it well: "[T]he claim language does not

5   set forth what structure in the claimed circuit performs this function.  It recites only what it

6   *does*."  Dkt. # 135 at 19.  Thus, the claim is a means-plus-function claim subject to § 112, ¶ 6.

7       NXP responds that the claim term—read as a whole—conveys adequate structure.  For

8   example, in addition to the claim's functional language, claim 1 also describes the information-

9   voltage generating means as "receiv[ing] a control signal" and containing within it a "voltage-

10  raising means."  '097 Patent at 8:66–9:6.  By describing the input and at least one element of the

11  information-voltage generating means, NXP says that the term is not governed by § 112, ¶ 6.

12      But this language does not convey adequate structure.  To be sure, the language *partially*

13  describes the structure and operation of the information-voltage generating means; it explains

14  one element (voltage-raising means) and an input (a control signal).  But a circuit component that

15  intakes a control voltage and applies "voltage-raising means" is insufficient to perform the

16  function of "generating" an "information voltage."  *See TriMed, Inc. v. Stryker Corp.*, 514 F.3d

17  1256, 1259 (Fed. Cir. 2008) ("If, in addition to the word 'means' and the functional language,

18  the claim recites sufficient structure for performing the described functions *in their entirety*, the

19  presumption of § 112 ¶ 6 is overcome" (emphasis added)); *Micro Chem., Inc. v. Great Plains*

20  *Chem. Co.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999) (rebuttal of the means-based presumption

21  requires the claim to provide "sufficient structure . . . to *perform the claimed function*" (emphasis

22  added)); *MTD Products*, 933 at 1343 (noting that while a portion of the claim language discussed

23  structure, another portion was written in functional terms, which "tends to favor [the] position

24  that  § 112, ¶ 6 applies").  Such a component would be nothing more than "voltage-raising

CLAIM CONSTRUCTION ORDER - 28

means." If the "information-voltage generating means" were merely "voltage-raising means" that receive a certain input, the patent would have no need to describe an "information-voltage raising means" at all. And as described in the specification, other features are necessary to generate an information voltage, including a charging-current generating stage and some form of voltage-limiting means. '097 Patent, 3:60–4:29. Even though the claim "describe[s] certain inputs and outputs at a very high level," the claim language does not sufficiently "inform the structural character of the limitation-in-question or otherwise impart structure." *Williamson*, 792 F.3d at 1351.

NXP also points to the declaration of its expert witness, Dr. Madisetti, to support its conclusion that § 112 ¶ 6 does not apply. Dr. Madisetti opined that "this term is used in common parlance by persons of skill in pertinent art to describe a structure (not a function) because information-voltage generating structures were well known by POSITAs at the time of the invention." Dkt. # 137-4 at 38. He also opined that circuits that generate an information voltage were "well-known in the art." *Id.*

Dr. Madisetti's declaration does not rebut the means-based presumption. First, Dr. Madisetti's declaration identifies the wrong inquiry. It is not enough that information-voltage generating circuits were "well-known in the art" or that a POSITA could devise such a circuit. *Cf. Blackboard*, 574 F.3d at 1384–85 (in the context of determining corresponding structure, observing that it was not enough that "a person of skill in the art could devise some means to carry out the recited function"). Rather, the relevant inquiry is whether the language in the claim conveys sufficiently definite structure or otherwise serves as the name for structure or a class of structures. *TriMed*, 514 F.3d at 1259–60 ("Sufficient structure exists when the claim language specifies the exact structure that performs the functions in question."); *Skky*, 859 F.3d at 1019; *Williamson*, 792 F.3d at 1349–51.

CLAIM CONSTRUCTION ORDER - 29

1      Second, Dr. Madisetti's statement that the "term is used in common parlance by persons

2   of skill in the pertinent art to describe a structure (not a function)" is conclusory.  *See* Dkt. # 137-

3   4 at 38.  Dr. Madisetti does not cite any evidence or provide any explanatory basis for his

4   conclusion.  He does not, for example, point to other instances when the term was used by

5   members of the scientific community.  Nor does he provide examples of the types of structures

6   that a POSITA would understand to be disclosed by the term.  Because Dr. Madisetti provides no

7   basis or reasoning to support his opinion, the Court concludes that his conclusory statements do

8   not suffice to overcome the means-based presumption.  *See Diebold Nixdorf, Inc. v. Int'l Trade

9   Comm'n*, 899 F.3d 1291, 1300–01 (Fed. Cir. 2018) (disregarding conclusory expert opinion that

10   a term would convey structure to a POSITA when the opinion was not supported by extrinsic or

11   other evidence); *cf. Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1184 (Fed. Cir.

12   2009) (in the context of a summary judgment motion for infringement, concluding that

13   "[a]n expert's unsupported conclusion on the ultimate issue of infringement will not alone create

14   a genuine issue of material fact"); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316,

15   1329 (Fed. Cir. 2001) ("Broad conclusory statements offered by Telemac's experts are not

16   evidence and are not sufficient to establish a genuine issue of material fact.").  As the Federal

17   Circuit explained in *Phillips*, "conclusory, unsupported assertions by experts as to the definition

18   of a claim term are not useful to a court."  415 F.3d at 1318.  There is no reason that this

19   principle should not apply equally to an expert's unsupported statement that a POSITA would

20   understand the term in question to convey structure.[8]  Accordingly, the Court concludes that the

21   term "information-voltage generating means . . ." invokes § 112, ¶ 6.

22

23          [8] The Court notes, however, that Impinj did not submit its own expert declaration as to this patent
24   term.  But because Dr. Madisetti's declaration is conclusory, the Court does not believe that this is
    dispositive.

CLAIM CONSTRUCTION ORDER - 30

The Court must next determine the claimed function of the term. *Williamson*, 792 F.3d at 1351. Impinj proposes the following function: "generat[ing] the information voltage by using the control signal, by e.g. receiving a control signal CS of a voltage at most equal to the supply voltage." Dkt. # 135 at 18. NXP does not propose a function, but criticizes Impinj's construction for failing to adhere to the claim language. Dkt. # 150 at 13. While the Court does not see any meaningful substantive difference between the claim language and Impinj's proposed function, the Court agrees that the function could be drafted in a manner that tracks the claim language more closely and reads more naturally. Therefore, the Court determines that the function is: "generating an information voltage by receiving and using a control signal that is of a voltage value that is at most equal to the value of the supply voltage." *See* '097 Patent, 8:65–9:6 (using similar language in the patent claims).

Once a court has determined that § 112, ¶ 6 applies and determines the claimed function, then "the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351. "Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Id.* at 1352 (citation omitted).

Impinj proposes the following as corresponding structure: "'a charging-current generating stage 7 implemented in the form of an n-channel field effect transistor connected to storage capacitor 5A, voltage raising means 8, and voltage-limiting means 9,' as described in Fig. 2 elements 6, 7, 8, and 9, 3:60–4:51." Dkt. # 135 at 18. NXP rejects Impinj's proposed structure because it "improperly identifies structure that is unnecessary to perform the claimed function." Dkt. # 150 at 13. This, NXP says, is impermissible because a court may not incorporate "structure from the written description beyond that necessary to perform the claimed

1    function." *Micro Chem.*, 194 F.3d at 1258.  Instead, NXP says that claims 1 and 4 expressly

2    limit the necessary structure to "voltage-raising means."

3        The Court rejects NXP's proposed structure and rejects Impinj's proposed structure in

4    part.  NXP's proposed corresponding structure—"voltage-raising means"—does not suffice to

5    carry out the function of "generating" an "information voltage."  As discussed above, if an

6    information voltage could be generated using only "voltage-raising means," then the term

7    "information-voltage generating means" would be superfluous; it would be nothing more than a

8    synonym for "voltage-raising means."  And as described in the specification, generating an

9    information voltage requires more than just a means for raising the voltage.  '097 Patent, 3:60–

10   4:29.

11       The Court agrees with portions of Impinj's proposed structure.  The Court agrees with

12   Impinj that the specification describes an "information-voltage generating means" with three

13   basic components: (1) a "charging-current generating stage," (2) voltage-raising means, and (3)

14   voltage-limiting means."  *See* '097 Patent, 3:60–4:29.  But Impinj says that the "charging-current

15   generating stage" must be of a particular form: "an n-channel field effect transistor connected to

16   storage capacitor."  The Court rejects this as excessively narrow.  The specification discloses the

17   corresponding structure of a "charging-current generating stage" before describing a particular

18   form that can "implement[]" that structure (the "n-channel field effect transistor").  Impinj has

19   not explained why the patentee is not entitled to the broader structure of "charging-current

20   generating stage."  This broader structure is clearly linked to the claim term.  The specification

21   states that the information-voltage generating means "*have* a charging-current generation stage."

22   *Id.* at 3:66–67 (emphasis added); *cf. Micro Chem.*, 194 F.3d at 1258 ("When multiple

23   embodiments in the specification correspond to the claimed function, proper application of

24   § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments.").

CLAIM CONSTRUCTION ORDER - 32

1  Accordingly, the Court determines that the corresponding structure is: "a charging-current

2  generating stage, voltage-raising means, and voltage-limiting means" and equivalents thereof.[9]

3       In conclusion, the Court construes this term to be a means-plus-function limitation

4  subject to § 112, ¶ 6.  The Court concludes that the function is "generating an information

5  voltage by receiving and using a control signal that is of a voltage value that is at most equal to

6  the value of the supply voltage."  The Court concludes that the corresponding structure disclosed

7  in the specification is "a charging-current generating stage, voltage-raising means, and voltage-

8  limiting means" and equivalents thereof.

9       2.    "voltage-raising means that are arranged to raise the voltage value of the control
             signal"

10       According to the '097 Patent, the "information-voltage generating means" contain

11  "voltage-raising means."  The term "voltage-raising means" appears in independent claims 1 and

12  4, as well as dependent claims 2 and 5.  For example, claim 1 describes "information-voltage

13  generating means . . . that are arranged to generate the information voltage by using the control

14  signal, characterized in that the information-voltage generating means have *voltage-raising*

15  *means* that are arranged to raise the voltage value of the control signal."  '097 Patent, 8:66–9:5

16  (emphasis added).

17       The parties dispute whether this is a means-plus-function term subject to § 112, ¶ 6.

18  Impinj says that the term is governed by § 112, ¶ 6.  Dkt. # 135 at 21.  NXP disagrees, instead

19  arguing that the term be given its plain and ordinary meaning, which it interprets to be "a circuit

20  that raises the voltage value of the control signal."  Dkt. # 137 at 24.  And if the Court construes

21

22

23      [9] As explained in the following section, the Court concludes that the term "voltage-raising
  means" as used in the '097 Patent refers to "a charge pump or the float-based structure described at 2:43–
24  48 of the '097 Patent."

CLAIM CONSTRUCTION ORDER - 33

the term to be a means-plus-function limitation, the parties further dispute what structure(s) in

the specification qualify as corresponding structure.

    The Court construes the "voltage-raising means . . ." term to be a means-plus-function

limitation subject to § 112, ¶ 6.  The claim uses the word "means."  This creates a presumption

that the limitation is a means-plus-function claim subject to § 112, ¶ 6.  *Egenera*, 972 F.3d at

1372.  When patentees use the term "means," courts presume that they did so deliberately.  *See*

*Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999) ("[T]his court has

presumed an applicant *advisedly* used the word 'means' to invoke the statutory mandates for

means-plus-function clauses." (emphasis added)).  This presumption has not been rebutted.

    The claim language itself conveys no structure; it instead describes any device capable of

performing the function of "rais[ing] the voltage of the control signal."  While the Federal

Circuit has held that certain introductory phrases preceding the word "means" can help rebut the

presumption, *see, e.g.*, *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir.

2000) (holding that "baffle means" adequately conveyed the structure of "baffle"), the

introductory language used here—"voltage-raising"—does not convey structure.  Rather, the

introductory "voltage-raising" phrase is purely functional, merely repeating the function of

"rais[ing] the voltage" that comes after the word "means."   In other words, the claim does not

meaningfully differ from a claim that omits the introductory phrase "voltage-raising" and instead

reads: a "means . . . arranged to raise the voltage value of the control signal."  When rephrased in

this manner, it becomes clearer that the term is functional, not structural.

    As with the prior term, NXP relies heavily on the declaration of its expert witness, Dr.

Madisetti, who opined:

        A POSITA would understand that such a voltage-raising means are "a circuit that
        raises the voltage value of the control signal."  Such circuits were well-known in
        the art.  For example, a POSITA would have understood that voltage values could

CLAIM CONSTRUCTION ORDER - 34

**Appx34**

be raised using a charge pump or a voltage multiplier that was well known in the art.

Dkt. # 137-4 at 41. But the Court finds Dr. Madisetti's opinion insufficient for the same reasons identified for the "information-voltage raising means" term. First, a term does not convey structure—and thus avoid § 112, ¶ 6—merely because a POSITA could think of some device that can perform the voltage-raising function. The fact that a POSITA could identify two such structures (a charge pump and a voltage multiplier) that can perform the claimed function does not prove that the claim term is structural or serves as the name for a class of structures. *See TriMed*, 514 F.3d at 1259–60 ("Sufficient structure exists when the claim language specifies the exact structure that performs the functions in question."); *cf. Blackboard*, 574 F.3d at 1384–85 (in the context of determining corresponding structure, observing that it was not enough that "a person of skill in the art could devise some means to carry out the recited function"). Second, Dr. Madisetti provided no explanation or basis for his opinion, rendering it conclusory. *See Diebold*, 899 F.3d at 1300–01 (disregarding conclusory expert opinion that a term would convey structure to a POSITA when the opinion was not supported by extrinsic or other evidence).[10]

NXP also cites the Federal Circuit's decision in *Lighting Ballast Control LLC v. Philips Electronics North Am. Corp.* 790 F.3d 1329 (Fed. Cir. 2015). In that case, the Federal Circuit held that the district court did not clearly err when it concluded that the term "voltage source means" was not a means-plus-function limitation. *Id.* at 1336, 1338–39. To be sure, that term bears at least some facial similarity to the "voltage-raising means" term at issue here. But *Lighting Ballast* is distinguishable on at least two grounds.

---

[10] The Court notes that Impinj did not submit its own expert declaration as to this term, either. But as with the prior term, Dr. Madisetti's declaration is conclusory. Thus, the Court does not believe that this is dispositive.

CLAIM CONSTRUCTION ORDER - 35

First, the court pointed to unrebutted testimony that the term referred to one particular type of device: a "rectifier." *Id.* at 1338–39. By contrast, Dr. Madisetti did not state that a POSITA would understand the term to mean a particular, definite structure or class of structures. Rather, he stated only that a POSITA might know of several different means of raising the voltage, like a charge pump or voltage multiplier.[11] And there are apparently more means of raising voltage: As NXP identifies, the specification explains that the voltage can be raised by allowing the voltage source to "float in relation to a reference potential," which allows the control voltage to "be raised by a desired amount." '097 Patent, 2:44–48. The variety of means by which to raise the control voltage distinguishes this term from the term in *Lighting Ballast*.

Second, the claim in *Lighting Ballast* contained additional language that conveyed structure. The claim stated that the voltage source means "provid[ed] a constant or variable magnitude DC voltage between the DC input terminals." The court accepted the district court's conclusion that a POSITA would understand that a rectifier was the "only structure that would provide 'a constant or variable magnitude DC voltage.'" *Id.* at 1339. By contrast, there is no additional claim language here that would convey structure to a POSITA.

Accordingly, the Court concludes that the "voltage-raising means . . ." limitation is a means-plus-function term subject to § 112, ¶ 6. *Cf. Atmel* 198 F.3d at 1376 (neither party appealing the district court's conclusion that "high voltage generating means" is a means plus function claim); *Lufthansa Technik AG v. Astronics Advanced Elec. Sys. Corp.*, No. C14-1821RSM, 2016 WL 1626687, at *5 (W.D. Wash. Apr. 25, 2016) (noting that the parties agreed

---

[11] At the *Markman* hearing, Impinj observed that the '951 Patent—another patent at issue in this case—expressly equates a "charge pump" with a "voltage multiplier." *See* '951 Patent, 1:15–17; Dkt. # 244 at 116. As stated below, the Court determines that the corresponding structure includes a "charge pump." Therefore, to the extent that a voltage multiplier is equivalent to a charge pump, the Court's construction captures *all* of the structures identified by Dr. Madisetti.

CLAIM CONSTRUCTION ORDER - 36

1  that "means for supplying supply voltage . . . arranged for" was a means-plus-function term);

2  *Agere Sys., Inc. v. Broadcom Corp.*, No. CIV.A.03-3138, 2004 WL 1658530, at *30 (E.D. Pa.

3  July 20, 2004) (holding that "voltage clamping means" is a means-plus-function term).

4        Once a court has determined that § 112, ¶ 6 applies, it must then determine the claimed

5  function. *Williamson*, 792 F.3d at 1351.  The claimed function is straightforward: "raising the

6  voltage value of the control signal."

7        Finally, the court must identify the corresponding structure.  *Id.*  Impinj suggests the

8  following corresponding structure:

9        A charge pump which has: a charge-pump capacitor 11 connected between the
       Supply Voltage V and the reference potential GND as a result of which the
10       voltage applied to the charge-pump capacitor 11 assumes the value of the supply
       voltage V; a first switch 12 and a second switch 13 implemented in the form of
11       field effect transistors, arranged to switch over from their rest state to an active
       state, as is indicated in FIG. 2 by broken lines if control signal CS is received," as
12       described in Fig. 2, element 8, 4:30–48.

13  Dkt. # 135 at 17.  NXP responds that Impinj's proposed structure omits at least one other

14  corresponding structure.  Dkt. ## 137 at 25; 150 at 14–15.

15        The Court agrees with NXP that Impinj's proposed corresponding structure is too narrow.

16  First, the specification discloses a charge pump in general; it does not disclose only the specific

17  charge pump described by Impinj.  The specification states, for example, that "it has . . . proved

18  particularly advantageous if the voltage raising means are implemented in the form of a charge

19  pump."  '097 Patent, 2:48–50.  This passage and others like it "clearly link[]" a particular

20  structure—a generic charge pump—to the voltage-raising function.  *Williamson*, 792 F.3d at

21  1352 (citation omitted).  Moreover, dependent claims 2 and 5 both describe voltage-raising

22  means that "are implemented *in the form of a charge pump* that is arranged to raise the voltage

23  value of the control signal by the value of the supply voltage."  '097 Patent, at 9:8–10 (emphasis

24  added); 10:11–13.  While this claim language does modestly limit the type of charge pump (by

CLAIM CONSTRUCTION ORDER - 37

stating that the charge pump must be "arranged to raise the voltage value of the control signal by

the value of the supply voltage"), Impinj has presented no reason to believe that the very

particular charge pump described in part of the specification is the only charge pump that can

complete the claimed function.  Thus, it would be improper to interpret the independent claim as

limited to a particular form of charge pump when the dependent claims undeniably include

definite structure in the form of a generic charge pump.  While an independent claim containing

a means-plus-function limitation need not be interpreted as *broader* than a dependent claim, *see*

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001), it

would be odd to conclude that the independent claim is *narrower* than the dependent claim

containing definite structure.  The presence of claims 2 and 5 clearly link the term "voltage-

raising means" to a generic charge pump that is capable of raising the control voltage.

Second, NXP points to a reference in the specification to another method for voltage

raising.  The specification states:

> In the case of the solutions according to the invention, provision may for example
> be made for the voltage-raising means to be formed by a voltage source that can
> be operated to float in relation to a reference potential of the circuit by which the
> value of the control-signal voltage can be raised by a desired amount.

'097 Patent at 2:43–48; Dkt. # 150 at 14–15.  Impinj's reply brief does not respond to NXP's

argument.  At the *Markman* hearing, Impinj's counsel indicated that he was not sure that

Impinj's proposed construction excluded this float-based method. Dkt. # 244 at 117–18.  To

avoid any doubt, the Court agrees that this sentence clearly links or associates a float-based

structure to "voltage-raising means."  Accordingly, the Court construes the corresponding

structure as "a charge pump or the float-based structure described at 2:43–48 of the '097 Patent."

In conclusion, the Court construes this term to be a means-plus-function limitation

subject to § 112, ¶ 6.  The Court concludes that the function is "raising the voltage value of the

CLAIM CONSTRUCTION ORDER - 38

control signal." The Court concludes that the corresponding structure disclosed in the specification is "a charge pump or the float-based structure described at 2:43–48 of the '097 Patent" and equivalents thereof.

C.    The '951 Patent

1.    "regulating an output voltage at the output of the input level regulator to a continuous range of voltage levels"

The '951 Patent describes a voltage multiplier circuit in which the voltage is "regulated." As described above, one such source of regulation in the voltage multiplier circuit is the "input level regulator," which receives an input from "a feedback bias control circuit" and outputs a signal to the first of several voltage multiplier stages. '951 Patent, 3:22–32. The parties dispute the construction of claim language related to this input level regulator. In claim 1, for example, the '951 Patent states that "the feedback bias control circuit generates a feedback signal for regulating an output of the input level regulator to a continuous range of voltage levels based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage." *Id.* at 10:53–59. The parties dispute the meaning of the term "regulating an output of the input level regulator to a continuous range of voltage levels," which also appears in similar form in claims 9 and 16.

NXP argues that no construction is necessary, and that the term should be given its plain and ordinary meaning. Dkt. # 137 at 26. Impinj proposes a construction of "an output voltage capable of being commanded to transition directly between any two distinct voltage levels in the range." Dkt. ## 135 at 24–25; 149 at 13–14. While the Court finds that construction is necessary because the term could confuse a jury, the Court also rejects Impinj's proposed construction. The Court interprets a slightly broader term—"a feedback signal for regulating an output of the input level regulator to a continuous range of voltage levels"—to mean "a feedback

CLAIM CONSTRUCTION ORDER - 39

1    signal that is fed into an input level regulator, which then uses the feedback signal to regulate a

2    voltage that varies within a continuous range of voltage levels."

3         As described in the specification, a feedback bias control circuit produces a "feedback

4    bias control signal" or "feedback signal." '951 Patent, 4:17–28.  This feedback signal is then fed

5    into other components of the voltage multiplier, such as the input level regulator.  *See id.* at

6    3:22–32 (input level regulator having a "feedback bias control input").  Based on the feedback

7    signal, the input level regulator outputs a voltage value, which is then fed into the first voltage

8    stage.  *Id.* at 3:29–32 (producing a "regulated voltage on signal line 34 in response to . . . the

9    feedback bias control signal"), 5:26–36. Importantly, the input level regulator does not merely

10   output a voltage to two discrete voltages, say 0V or 1V.  Rather, the claims of the patent

11   emphasize that the input level regulator can output a voltage to a "continuous range" of voltages.

12   *See, e.g.*, *id.* at 10:56.

13        Impinj seeks a construction that the output voltage of the input level regulator transitions

14   "between any two distinct voltage levels in the range."  Theoretically, it may be true that the

15   voltage transitions "between any two distinct voltage levels" in some embodiment of the

16   invention—it might change from .5V to .7V, for example.  But such a construction draws

17   attention away from the inventive element of the '951 Patent: the ability to produce a voltage

18   within a *continuous range* of voltages.  Dkt. # 150 at 16.  Impinj seems not to dispute that the

19   '951 Patent can produce a voltage across a range of voltages.  *See* Dkt. # 149 at 13 ("The parties

20   agree that the input level regulator of the recited voltage multiplier can regulate its own output

21   voltage across all voltage levels within a range.").  In light of that concession, it is unclear why

22   Impinj believes that the term should be construed to emphasize that the voltage transitions

23   "between two distinct voltages."  Impinj identifies nothing in the specification or claims to

24   support such a construction.

CLAIM CONSTRUCTION ORDER - 40

1      Impinj cites prosecution history to support its argument.  *See Phillips*, 415 F.3d at 1317

2   (permitting consideration of prosecution history during claim construction).  But the prosecution

3   history does not provide any support for Impinj's use of the phrase "between two distinct

4   voltages."  During patent prosecution, the patentee distinguished the '951 Patent from prior art

5   by observing that the prior art did not contain an input level regulator that regulates an output

6   voltage to a "range of voltage levels," and that the first stage of the prior art enabled only a

7   binary output (i.e., "on" or "off").  Dkt. ## 136-3 at 7–8; 136-6 at 15.  The patent examiner

8   agreed, stating that "'regulating an output voltage . . . to a continuous range of voltage levels' is

9   to be interpreted as an output voltage being regulated to a value within a continuous range of

10  voltage levels, wherein the continuous range of voltage levels comprises all voltage levels within

11  the end points of said continuous range."  Dkt. # 137-2 at 3.  As NXP states, it was the *prior art*

12  that "was limited to two values, not the claimed invention, which explicitly applies to a range."

13  Dkt. # 150 at 16.  The patent prosecution makes clear that any construction of the term should

14  highlight the ability of the input level regulator to produce a range of different voltage outputs

15  and should not focus on "two distinct voltages."

16      Impinj also argues that the output voltage is "commanded" to transition between various

17  voltages.  NXP correctly observes in its briefing that the term "commanded" does not appear in

18  the '951 Patent.  Dkt. # 137 at 27.  At the *Markman* hearing, Impinj agreed that the term

19  "commanded" is an awkward fit for this term, but that its construction sought to capture the

20  notion that the output voltage is determined by the feedback signal, which is an input to the input

21  level regulator.  Dkt. # 244 at 128.  It is not clear that NXP disputes this point (though it believes

22  that "commanded" is ambiguous).  NXP stated at the *Markman* hearing that "there's a feedback

23  circuit that sends . . . some signal back based on what the load is at the output that gets taken into

24  account by the input level regulator, which then outputs that 34 signal to the first stage."  *Id.* at

CLAIM CONSTRUCTION ORDER - 41

120; *see also* Dkt. # 150 at 16 ("the input level regulator has two inputs . . . which regulate the voltage at the output of the input level regulator").

To the extent that there is any disagreement, the Court recognizes Impinj's general point. The claim discusses a "feedback signal" that is used "for regulating an output voltage" of the "input level regulator." '951 Patent, 10:54–56.  In this context, the feedback signal "regulate[s]" the output voltage by affecting it in some way.  Based on this claim language, the input level regulator receives a feedback signal and uses that feedback signal to help determine the voltage (within a continuous range of voltages) to be outputted.  The Court also agrees that the term "commanded" makes for an awkward fit.  The Court's construction takes these considerations into account by observing that the feedback signal "is fed into an input level regulator" and that the input level regulator "uses the feedback signal to produce a voltage that varies within a continuous range of voltage levels."

Accordingly, the Court construes "a feedback signal for regulating an output of the input level regulator to a continuous range of voltage levels" to mean "a feedback signal that is fed into an input level regulator, which then uses the feedback signal to regulate a voltage that varies within a continuous range of voltage levels."

2.    "regulated clock"

The parties dispute the meaning of the term "regulated clock" as used in claims 9 and 16 of the '951 Patent.  The claims describe a series of "regulated clock[s]" that are coupled to each multiplier stage.  '951 Patent, 11:35–42, 12:32–35.  In one embodiment, the regulated clock operates in response to a clock input signal, a supply voltage, and the feedback signal produced by the feedback bias control circuit. '951 Patent, 5:26–35; Dkt. # 137 at 27–28.

NXP argues that no construction is necessary, and that the term should be given its plain and ordinary meaning.  Dkt. # 137 at 27.  Impinj argues that the term should be construed as "a

CLAIM CONSTRUCTION ORDER - 42

1    clock signal with a signal amplitude determined by the feedback from the voltage multiplier

2    circuit."  Dkt. # 135 at 25.  Because the Court is construing the noun "regulated clock," the Court

3    interprets Impinj's proposed construction as "*a clock that produces a* signal with a signal

4    amplitude determined by the feedback from the voltage multiplier circuit."  The Court construes

5    the term "regulated clock" to mean "a clock that is regulated based on feedback from the voltage

6    multiplier circuit."

7         The term "regulated clock" must mean something more than a basic "clock."  This is

8    because "claim constructions [should ideally] give meaning to all of a claim's terms."  *Apple,*

9    *Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016).  The plain meaning of "regulated

10   clock" is a clock that is *regulated* in some manner.  And for a clock to be regulated, something

11   must provide the regulation or do the regulating.  Here, the thing that regulates (that is, adjusts or

12   controls) the output of the clock is feedback from other components in the voltage multiplier

13   circuit.  For example, the specification describes one embodiment in which the "[r]egulated

14   clock circuit 20 operates in response to the clock (CLK), the supply voltage (V*SUPPLY*), and the

15   feedback bias control signal 58 for outputting the regulated clock output on signal line 38."  '951

16   Patent, 5:32–34.  The claims track the description.  Claim 9, for example, describes a "first

17   regulated clock" in which the regulated clock is coupled with the feedback bias control circuit

18   "such that the feedback signal affects an output voltage of the first regulated clock."  *Id.* at

19   11:35–36, 11:52–55.

20        From the specification and claim language, it is clear that feedback from the voltage

21   multiplier circuit regulates the clock.  This aligns with NXP's presentation during the *Markman*

22   hearing in which counsel stated that "'[r]egulated' generally means there's some sort of

23   feedback," and that "when something's regulated, it takes in feedback, and so what it's

24   outputting is affected by that feedback."  Dkt. # 244 at 132.  Importantly, however, the claims

CLAIM CONSTRUCTION ORDER - 43

1    describe slightly different arrangements for the regulated clock.  Claim 9 states that the regulated

2    clock is coupled to the feedback bias control circuit, *see* '951 Patent, 11:53–54, while claim 16

3    lacks this limitation (which instead appears in dependent claim 17), *see id.* at 12:25–52.

4    Therefore, the Court's construction recognizes that the claims do not consistently identify the

5    source of the regulation; they instead suggest only that feedback from the voltage multiplier

6    circuit as a whole regulates the clock in some manner.  A narrower construction would

7    impermissibly import the specification's limits into the claims and would ignore differences

8    between the claims.  *See SciMed*, 242 F.3d at 1340; *Phillips*, 415 F.3d at 1314.

9          It is unclear whether NXP's "plain and ordinary meaning" construction captures this

10   concept.  NXP says that the Court need not construe this term because claim 9 includes a

11   limitation in which the "feedback signal affects an output voltage of the [] regulated clock."  Dkt.

12   # 150 at 17.  But in its briefing, NXP says that a "regulated clock" is a "clock circuit that *may* be

13   regulated."  Dkt. # 137 at 22–23 (emphasis added).  A regulated clock *must* be regulated in some

14   manner.  And claim 16—unlike claim 9—lacks specificity about how the clock is regulated or

15   the input source(s) of the clock.  To avoid any ambiguity, the Court finds that construction is

16   necessary to emphasize that the clock must be regulated in some manner.

17         Impinj asks the Court to go further.  It suggests that the proper construction of the term

18   "regulated clock" emphasizes that feedback from the voltage multiplier circuit affects the "signal

19   amplitude" of the clock's output.  Dkt. # 135 at 26–27.  Impinj's argument is based on

20   prosecution history.  In its appeal brief to the U.S. Patent and Trademark Office, the patentee

21   attempted to distinguish the '951 Patent from a prior patent filed by Ragone et al.  The patentee

22   stated that:

23         Ragone et al. does not show or suggest "wherein the feedback bias control circuit
           is further coupled to the [first/second/third/fourth] regulated clock, such that the
24         feedback signal affects an output voltage of the [first/second/third/fourth]

CLAIM CONSTRUCTION ORDER - 44

**Appx44**

1  regulated clock . . . ."  Ragone et al. only switches the clock on and off to the
2  pump stages.   Ragone et al. does not affect the magnitude of the clock as claimed
   in claim 9.

3  Dkt. # 136-6 at 16 (quoting '951 Patent, claim 9).

4       By distinguishing the Ragone et al. patent on the grounds that it does not "affect the

5  magnitude of the clock as claimed in claim 9," Impinj asserts that the patentee limited the scope

6  of the term to forms of regulation that alter the clock's "signal amplitude."

7       A patentee's statements during patent prosecution can serve as a disclaimer of the scope

8  of the patent, "precluding patentees from recapturing through claim interpretation specific

9  meanings disclaimed during prosecution."  *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314,

10  1323 (Fed. Cir. 2003).  But courts "decline[] to apply the doctrine of prosecution disclaimer

11  where the alleged disavowal of claim scope is ambiguous."  *Id.*;  *see also Thorner*, 669 F.3d at

12  1366 (observing that "[t]he standard for disavowal of claim scope is . . . exacting").  "Absent a

13  clear disavowal in the specification or the prosecution history, the patentee is entitled to the full

14  scope of its claim language."  *Home Diagnostics*, 381 F.3d at 1358.

15       The prosecution history cited by Impinj does not rise to a "clear disavowal" of any clock

16  that does not affect the magnitude or amplitude of the output.  First, it is unclear what feature of

17  the '951 Patent was being distinguished from Ragone et al.  The prosecution history states that

18  "Ragone et al. does not show or suggest 'wherein the feedback bias control circuit is further

19  coupled to the first regulated clock, such that the feedback signal affects an output voltage of the

20  first regulated clock."  Dkt. # 136-6 at 16 (quoting '951 Patent, claim 9).  From this, it is unclear

21  whether the patentee was trying to distinguish Ragone et al. from a generic "regulated clock," or

22  whether the patentee was trying to say that Ragone et al. lacked a regulated clock *with a*

23  *feedback signal that affects the output of the regulated clock*.  If the patentee intended to do only

24  the latter, examination of the claims reveals the flaw in Impinj's interpretation.  While claim 9

CLAIM CONSTRUCTION ORDER - 45

1  describes a regulated clock with an "output voltage" that is "affect[ed]" based on a feedback

2  signal, claim 16 lacks such a limitation, describing instead a generic "regulated clock."  The

3  limitation involving a feedback signal appears in claim 17, which is a dependent claim of claim

4  16.  Thus, while claim 16 requires that the clock be regulated in some fashion, it does not

5  necessarily require regulation of the output voltage magnitude.  *See AK Steel*, 344 F.3d at 1242

6  ("[D]ependent claims are presumed to be of narrower scope than the independent claims from

7  which they depend.").  The ambiguity of the prosecution history is exacerbated by the fact that

8  the patentee only made this statement about claim 9; the statement does not involve claim 16

9  (which, again, contains different language than claim 9).

10        Second, it is at least plausible that the patentee only meant to suggest one possible

11  manner by which the clocks in the '951 Patent could be regulated, contrasting that method of

12  regulation with the on/off clocks described by Ragone, et al.  Because the prosecution history is

13  ambiguous, the Court concludes that it does not amount to clear disavowal of patent scope.

14  "When the alleged disclaimer is ambiguous or amenable to multiple reasonable interpretations,

15  [the court] decline[s] to find prosecution disclaimer.*"  Core Wireless Licensing S.A.R.L. v. LG

16  Elecs., Inc.*, 880 F.3d 1356, 1367 (Fed. Cir. 2018).

17        Accordingly, the Court construes the term "regulated clock" to mean "a clock that is

18  regulated based on feedback from the voltage multiplier circuit."

19        3.    "proportional"

20        The parties dispute the meaning of the term "proportional" as the term appears in at least

21  claims 1, 9, and 16.  An exemplary use of the term appears in claim 1 of the '951 patent, which

22  describes a "feedback bias control circuit" that "generates a feedback signal . . . based on a

23  comparison between a voltage *proportional* to a voltage at the output of the second clocked

24  multiplier stage and a reference voltage."  '951 Patent, 10:53–59 (emphasis added).  The

CLAIM CONSTRUCTION ORDER - 46

1    specification describes a feedback bias control circuit that produces a control signal that is based

2    on a comparison between (1) a voltage "proportional" to the output voltage (VOUT) that arrives

3    at the feedback bias control circuit from the last multiplier stage and (2) a reference voltage

4    (VREF). *Id.* at 8:9–13, 4:17–28, 6:1–20. This value informs the control signal, which is

5    outputted to other components of the circuit.

6          NXP argues that the term does not require construction and should be given its plain and

7    ordinary meaning. Dkt. # 137 at 28. Impinj's position has shifted throughout the claim

8    construction process. Impinj initially proposed a construction of "a fixed or constant ratio to

9    another value." Dkt. # 135 at 27. But in its briefing and at the *Markman* hearing, Impinj appears

10   to advocate for a construction that includes an element of time, such as is a ratio that is "fixed or

11   constant *over a period of time.*" Dkt. # 135 at 27 (emphasis added); *see also* Dkt. # 244 at 140.

12   And in Impinj's reply brief, Impinj stated that it *agrees* with NXP that "the ratio can be adjusted

13   at different times," further confusing its position. Dkt. # 149 at 15. The Court construes the term

14   "proportional" to mean "a constant ratio to another value that can be adjusted at different times."

15         "Proportional" is a common word that carries a common definition: "having the same or

16   a constant ratio." "Proportional," *Merriam-Webster Dictionary*, https://www.merriam-

17   webster.com/dictionary/proportional; *see also* "proportional," *Cambridge Dictionary*,

18   https://dictionary.cambridge.org/us/dictionary/english/proportional ("If two amounts are

19   proportional, they change at the same rate so that the relationship between them does not

20   change."). The key to this common-sense understanding is that the relationship between the two

21   variables is linear and constant. That ratio could be 1:1, 2:1, or 10:1. But the word connotes a

22   linear relationship between two variables.

23         At the *Markman* hearing, however, NXP clarified that its "plain and ordinary meaning"

24   construction is *not* limited to a linear relationship between variables. Dkt. # 244 at 137. Rather,

CLAIM CONSTRUCTION ORDER - 47

1  NXP believes the term "proportional" captures, for example, logarithmic relationships and

2  exponential relationships, too.  *Id.*  Such a construction defies the common usage of the word

3  "proportional."  Nothing in the patent suggests deviation from this common definition of the

4  term.  Moreover, NXP did not make this argument in its briefing, nor did it provide any source

5  (like a dictionary) suggesting that the ordinary meaning of "proportional" covers such concepts.

6  Thus, the first part of the Court's construction—"a constant ratio to another value"—captures the

7  common definition of the word "proportional."

8      The second portion of the Court's construction—that the ratio "can be adjusted at

9  different times"—is necessary in light of the particular nature of the '951 Patent.  While

10 "proportionality" conveys a constant or linear ratio—say, 2:1 or 5:1—a proportion can change

11 over time.  And indeed, the '951 Patent allows the ratio to change.  In one embodiment, for

12 example, the voltage is modified to be "proportional" to the output voltage by sending the output

13 voltage through a series of resistor dividers.  '951 Patent, 4:17–28, 6:1–20.  Depending on

14 whether those resistor dividers are opened or closed, the ratio between the output voltage and the

15 "proportional" voltage can change.  The Court's construction conveys this feature of the '951

16 Patent.[12]

17     NXP argues that Impinj's construction ignores language in the patent that allows for the

18 voltage to "dynamically change."  The patent describes a feedback bias control circuit that

19 includes a "switched resistor-divider" or a "switched capacitor-divider" that can be "configured

20 to *dynamically change* a value of the voltage proportional to the voltage at the output of the

21 second clocked multiplier stage." *Id.* at 9:9–20 (emphasis added); *see also id.* at 8:31–38.  The

22

23     [12] Because the patent describes an invention in which the ratio changes over time, the Court
24 rejects Impinj's modified construction that proportionality refers to a "fixed ratio *over time*."  Dkt. # 149
    at 15.  Such a construction would confuse a jury by implying that the ratio is permanent or semi-
    permanent, when in fact the ratio can change.

CLAIM CONSTRUCTION ORDER - 48

patent discusses this feature in dependent claims 6 and 12. *See id.* at 11:15–17 ("dynamically

change a value of the voltage proportional to the voltage at the output"), 12:11–14 (same). The

Court's construction incorporates this feature of the patent by allowing the ratio to change or be

adjusted over time. It seems that Impinj agrees: its brief concedes that the "proportional" ratio

"can be adjusted at different times." Dkt. # 149 at 15; *see also* Dkt. # 136-2 at 22 (Impinj's

expert stating that the "constant ratio based on the output voltage that can be switched based on

the resistive divider network"). To be sure, "dynamically" suggests that the ratio can change

extremely quickly. But nothing in the Court's construction should be read to exclude an

embodiment in which the ratio changes quickly or even constantly.

    Accordingly, the Court construes the term "proportional" to mean "a constant ratio to

another value that can be adjusted at different times."

<div align="center">

**V.**

**CONCLUSION**

</div>

    The Court construes the disputed claim terms as described in this order.

    Dated this 4th day of November, 2022.

                                    *John H. Chun*
                                    _____
                                    John H. Chun
                                    United States District Judge

CLAIM CONSTRUCTION ORDER - 49

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NXP USA, INC., and NXP B.V., <br><br> Plaintiffs, <br><br> v. <br><br> IMPINJ, INC., <br><br> Defendant. | CASE NO. 2:20-cv-01503-JHC <br><br> ORDER MODIFYING CLAIM CONSTRUCTION |

**I.**

**INTRODUCTION**

This matter comes before the Court sua sponte.  On November 4, 2022, the Court issued a claim construction order.  *See* Dkt. # 247.  The Court construed several terms in U.S. Patent Number 7,347,097 ("the '097 Patent").  Among those was the term "voltage-raising means that are arranged to raise the voltage value of the control signal."  The Court construed the term to be a means-plus-function term.  Dkt. # 247 at 33–39.  The Court stated that the function was "raising the voltage value of the control signal," and the corresponding structure was "a charge pump or the float-based structure described at 2:43–48 of the '097 Patent" and equivalents thereof.  *Id.*

ORDER MODIFYING CLAIM
CONSTRUCTION - 1

1   After developing a deeper understanding of the technology at issue and Federal Circuit

2   case law, the Court finds it necessary to modify that construction.   The Court concludes that the

3   "voltage-raising means" term is not a means-plus-function term, and that it should be construed

4   as "a circuit that raises the voltage value of the control signal."

5                                                 **II.**

6                                   **LEGAL PRINCIPLES**

7   A.      General Claim Construction Principles

8           "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention

9   to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303,

10  1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,*

11  *Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90

12  F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define

13  the scope of the patented invention.").

14          When construing a patent claim, the words of the claim "are generally given their

15  ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quoting *Vitronics*, 90 F.3d at

16  1582).  The "ordinary and customary meaning" of a term is the meaning of the words as

17  understood by a person of ordinary skill in the art ("POSITA") at the time of the invention.  *Id.* at

18  1313.  Although words in a claim are generally given their ordinary meaning, the Federal Circuit

19  has recognized "two exceptions to this general rule: 1) when a patentee sets out a definition and

20  acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term

21  either in the specification or during prosecution." *Thorner v. Sony Comput.  Ent. Am. LLC*, 669

22  F.3d 1362, 1365 (Fed. Cir. 2012).  For the patentee's unique definition to govern, the patentee

23  must "clearly set forth a definition of the disputed claim term other than its plain and ordinary

24  meaning.  *Id.* (internal quotation marks and citation omitted).  The "standard for disavowal of

ORDER MODIFYING CLAIM
CONSTRUCTION - 2

1    claim scope is similarly exacting." *Id.* at 1366.  "Absent a clear disavowal in the specification or

2    the prosecution history, the patentee is entitled to the full scope of its claim language." *Home*

3    *Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed.Cir.2004).

4         To determine the meaning of a disputed term, courts mainly rely on "intrinsic" evidence:

5    the claim language, the written description in the specification, and the patent's prosecution

6    history.  *Phillips*, 415 F.3d at 1311–17.  A court's analysis begins with the language in the

7    claims. *See id.* at 1314; *Innova/Pure Water*, 381 F.3d at 1116 ("[C]laim construction analysis

8    must begin and remain centered on the claim language itself.").  But claim terms are not to be

9    read in a vacuum.  Rather, claims "are part of a fully integrated written instrument . . . consisting

10   principally of a specification that concludes with the claims." *Phillips*, 415 F.3d at 1315 (citation

11   and internal quotation marks omitted); *see also id.* at 1313.  The specification is particularly

12   important to claim construction and is often "the single best guide to the meaning of a disputed

13   term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  This is because the specification "aids

14   in ascertaining the scope and meaning of the claims." *Id.* (quoting *Standard Oil Co. v. Am.*

15   *Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)).  Thus, courts "rely heavily" on the

16   specification. *Id.* at 1317.

17        Courts often struggle when using the specification to guide the claim construction

18   inquiry. *Id.* at 1323.  On the one hand, courts rely on the specification to help determine the

19   meaning of a disputed term. *Id.*  On the other hand, the Federal Circuit has repeatedly warned

20   that a court may not read limitations from the specification into the claim. *Id.*; *see also Laitram*

21   *Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) (noting that it is a "well-established

22   principle that a court may not import limitations from the written description into the claims");

23   *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir.

24   2001) (observing that one of the "cardinal sins of patent law" is "reading a limitation from the

ORDER MODIFYING CLAIM
CONSTRUCTION - 3

1   written description into the claims").  The "distinction between using the specification to

2   interpret the meaning of a claim and importing limitations from the specification into the claim

3   can be a difficult one to apply in practice." *Phillips*, 415 F.3d at 1323.  But the Federal Circuit

4   has explained that "the line between construing terms and importing limitations can be discerned

5   with reasonable certainty and predictability if the court's focus remains on understanding how a

6   person of ordinary skill in the art would understand the claim terms." *Id.*

7         In addition to considering intrinsic evidence (like the claim language and specification),

8   courts may also rely on "extrinsic" evidence.  Extrinsic evidence "consists of all evidence

9   external to the patent and prosecution history, including expert and inventor testimony,

10   dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980

11   (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, (1996) (citation omitted).  While extrinsic evidence may be

12   useful, it is generally given less weight than intrinsic evidence.  *Phillips*, 415 F.3d at 1317.

13         The construction of a patent's claims is a question of law to be decided by the court.

14   *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015); *Markman v.*

15   *Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996).

16   B.     Principles for Means-Plus-Function Claims

17         Under 35 U.S.C. § 112, ¶ 6 (now codified at 35 U.S.C. § 112(f)),[1] claims may be drafted

18   in a "means-plus-function" format in which the claim "recites a function to be performed rather

19   than definite structure or materials for performing that function." *Lockheed Martin Corp. v.*

20

21

---

22        [1] The America Invents Act ("AIA") amended and reorganized section 112, moving 35 U.S.C.

23   112, ¶ 6 to 35 U.S.C. § 112(f).  But the AIA did not substantively change the means-plus-function portion of the statute.  Because the patents at issue were filed before the AIA took effect, this order refers to the pre-AIA version of Section 112.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1343 n.2 (Fed.

24   Cir. 2015) (en banc).

ORDER MODIFYING CLAIM
CONSTRUCTION - 4

*Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003) (citing 35 U.S.C. § 112, ¶ 6).  By

allowing inventors to draft claims in this manner,

> Congress struck a balance in allowing patentees to express a claim limitation by
> reciting a function to be performed rather than by reciting structure for performing
> that function, while placing specific constraints on how such a limitation is to be
> construed, namely, by restricting the scope of coverage to only the structure,
> materials, or acts described in the specification as corresponding to the claimed
> function and equivalents thereof.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc).

Interpreting a means-plus-function limitation is a multi-step process.  A court must first

determine whether the term is drafted in a means-plus-function format such that § 112, ¶ 6

applies.  *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1344 (Fed. Cir. 2019); *Williamson*, 792 F.3d

at 1348.  The presence of the word "means" in a claim creates a rebuttable presumption that the

claim is governed by § 112, ¶ 6.  *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1372 (Fed.

Cir. 2020) ("We presume that claim terms with the word 'means' invoke § 112(f)"); *Williamson*,

792 F.3d at 1348.  But courts must not reflexively "evaluate[] form over substance when

evaluating whether a claim limitation invokes § 112, para. 6." *Williamson*, 792 F.3d at 1348.

The Federal Circuit has explained:

> In making the assessment of whether the limitation in question is a means-plus-
> function term subject to the strictures of § 112, para. 6, our cases have emphasized
> that the essential inquiry is not merely the presence or absence of the word
> "means" but whether the words of the claim are understood by persons of ordinary
> skill in the art to have a sufficiently definite meaning as the name for structure.

*Id.* (citation omitted); *see also MTD Prods.*, 933 F.3d at 1344 ("As part of this step, we consider

whether the claim limitation connotes 'sufficiently definite structure' to a person of ordinary skill

in the art.").  "To determine whether a claim recites sufficient structure, it is sufficient if the

claim term is used in common parlance or by persons of skill in the pertinent art to designate

structure, even if the term covers a broad class of structures and even if the term identifies the

ORDER MODIFYING CLAIM
CONSTRUCTION - 5

structures by their function." *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir.

2017) (citation and quotation marks omitted); *see also MTD Prods.*, 933 F.3d at 1344; *Dyfan,*

*LLC v. Target Corp.*, 28 F.4th 1360, 1365–66 (Fed. Cir. 2022).

<div align="center">

**III.**

**DISCUSSION**

</div>

A.    Background on the '097 Patent

Many data carriers contain storage systems used to store information temporarily.  These

carriers can, for example, temporarily store an indication of successful communication with a

communication station.  Dkt. # 137 at 21.  The information is stored and represented "by a value

of an information voltage that arises at the capacitor."  '097 Patent, 1:45–47.  The '097 Patent

identifies a problem in the prior art: The information voltage would continuously decline due to

"unavoidable leakage currents in the circuit."  *Id.* at 1:62–2:1.  This decline in voltage would

lead to an "unsatisfactory situation" because the information was "no longer able to be evaluated

after only a short period of time."  *Id.* at 2:2–7.

The '097 Patent describes an invention that purports to solve this problem.  The invention

described by the '097 Patent provides "a substantially longer period of time during which the

stored information can be ascertained with high reliability."  *Id.* at 2:34–36.  This also allows the

information to remain accessible if a brief supply-voltage failure occurs.  *Id.* at 2:35–42.  The

patent achieves this in part by adding a "voltage-raising means" to the "information-voltage

generating means."  *Id.* at 2:13–23; *see also* Dkt. # 135 at 17.

The '097 Patent describes a data carrier that temporarily stores information capacitively.

'097 Patent, 1:1–18.  The information is represented by the value of an "information voltage,"

which is produced by "information-voltage generating means."  *Id.*  The specification describes

an embodiment in which the "information-voltage generating means" receive a "control signal"

ORDER MODIFYING CLAIM
CONSTRUCTION - 6

<div align="center">

**Appx55**

</div>

1    and are further comprised of a "charging-current generating stage," a "voltage-raising means,"

2    and a voltage-limiting means. *Id.* at 3:60–4:14.

3        Claim 1 of the '097 Patent exemplifies the patent's use of the "voltage-raising means"

4    term. That claim describes "information-voltage generating means . . . that are arranged to

5    generate the information voltage by using the control signal, characterized in that the

6    information-voltage generating means have *voltage-raising means that are arranged to raise the*

7    *voltage value of the control signal*." '097 Patent, 8:66–9:5 (emphasis added).

8        The parties asked the Court to construe the term "voltage-raising means that are arranged

9    to raise the voltage value of the control signal."  In its initial claim construction order, the Court

10   construed the term to be a means-plus-function term. Dkt. # 247 at 33–39.  The Court stated that

11   the function was "raising the voltage value of the control signal," and the corresponding structure

12   was "a charge pump or the float-based structure described at 2:43–48 of the '097 Patent" and

13   equivalents thereof. *Id.*

14   B.    Modification of a Court's Construction

15        The Court finds it appropriate to revisit its prior construction.  The Federal Circuit

16   permits courts to modify claim construction throughout litigation: "[Courts] may engage in a

17   rolling claim construction, in which the court revisits and alters its interpretation of the claim

18   terms as its understanding of the technology evolves.  This is particularly true where issues

19   involved are complex, either due to the nature of the technology or because the meaning of the

20   claims is unclear from the intrinsic evidence."  *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,

21   302 F.3d 1352, 1361 (Fed. Cir. 2002) (citation omitted); *see also Conoco, Inc. v. Energy & Env't*

22   *Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[A] district court may engage in claim

23   construction during various phases of litigation, not just in a *Markman* order.").  The Federal

24   Circuit has affirmed a district court's sua sponte modification of a claim construction decision in

ORDER MODIFYING CLAIM
CONSTRUCTION - 7

1    a summary judgment order.  *See Level Sleep LLC v. Sleep No. Corp.*, No. 2020-1718, 2021 WL

2    2934816, at *3 (Fed. Cir. July 13, 2021)  ("[A] district court may (and sometimes must) revisit,

3    alter, or supplement its claim constructions . . . to the extent necessary to ensure that final

4    constructions serve their purpose of genuinely clarifying the scope of claims for the finder of

5    fact." (quoting *In re Papst Licensing Digit. Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir.

6    2015)); *id.* ("[T]he district court was well within its power to clarify, supplement, and even alter

7    its construction").

8            With the benefit of additional briefing about circuit technology, greater understanding of

9    the way a POSITA would discuss the relevant circuit components, and increased familiarity with

10   Federal Circuit case law, the Court concludes that modification of its claim construction is

11   appropriate and necessary.  The Court no longer believes that this term is a means-plus-function

12   term governed by § 112, ¶ 6.  And while the Court initially believed that the "voltage-raising

13   means" term should be construed similarly to the "information-voltage generating means" term

14   (another term in the '097 Patent that the Court construed as a means-plus-function limitation),

15   the Court now understands that the "voltage-raising means" term conveys structure in a way that

16   "information-voltage generating means" does not.  As explained below, the Court understands

17   the "voltage-raising means" term to refer to a sufficiently definite class of structures: circuit

18   components that raise a voltage.

19   C.      Revised Construction of the "voltage-raising means" Term

20           During claim construction, the parties disputed the meaning of the term "voltage-raising

21   mean that are arranged to raise the voltage value of the control signal."  The parties disagreed

22   about whether it was a means-plus-function term subject to § 112, ¶ 6.  Impinj said that the term

23   is governed by § 112, ¶ 6. Dkt. # 135 at 21.  NXP disagreed, arguing that the term be given its

24   plain and ordinary meaning, which it interpreted to be "a circuit that raises the voltage value of

ORDER MODIFYING CLAIM
CONSTRUCTION - 8

the control signal." Dkt. # 137 at 24. While the Court initially sided with Impinj on this question, it now believes NXP has the better argument. Accordingly, the Court now holds that the term is not subject to § 112, ¶ 6, and construes the term to mean "a circuit that raises the voltage value of the control signal."

The term includes the word "means," which creates a presumption that the limitation is a means-plus-function claim subject to § 112, ¶ 6. *Egenera*, 972 F.3d at 1372. But the Federal Circuit has cautioned that courts must not reflexively "evaluate[] form over substance when evaluating whether a claim limitation invokes § 112, para. 6." *Williamson*, 792 F.3d at 1348. The Federal Circuit has explained:

> In making the assessment of whether the limitation in question is a means-plus-function term subject to the strictures of § 112, para. 6, our cases have emphasized that the essential inquiry is not merely the presence or absence of the word "means" but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.

*Id.* (citation omitted).

And importantly, "[t]o determine whether a claim recites sufficient structure, it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, *even if the term covers a broad class of structures and even if the term identifies the structures by their function*." *Skky*, 859 F.3d at 1019 (emphasis added) (citation and quotation marks omitted). That is, "a claim term 'need not connote a single, specific structure,' and may instead 'describe a class of structures' and still recite 'sufficiently definite structure' to not invoke § 112 ¶ 6." *Dyfan*, 28 F.4th at 1365–66.

The Court concludes that a POSITA would understand the "voltage-raising means" term as referring to sufficiently definite structure. The term refers to the class of *circuit components* (tangible structure) used to raise the voltage within a circuit. *Cf. Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1358 (Fed. Cir. 2011) ("In past cases, we have

ORDER MODIFYING CLAIM
CONSTRUCTION - 9

1  concluded that a claimed 'circuit,' coupled with a description of the circuit's operation in the

2  claims, connoted sufficiently definite structure to skilled artisans to avoid the application of §

3  112, ¶ 6." (*overruled on other grounds by Williamson*, 792 F.3d 1339)); *Apex Inc. v. Raritan*

4  *Comput., Inc.*, 325 F.3d 1364, 1373–74 (Fed. Cir. 2003) (holding that even the term "circuit"

5  "itself connotes some structure").  The language in the claim not only limits the types of circuits

6  that qualify (only circuit components that raise a voltage), but also provides some rudimentary

7  explanation of the way these voltage-raising components interface with the rest of the circuit

8  (connected in some way to the control signal).

9          As Dr. Madisetti explained, "a POSITA would have understood," for example, "that

10  voltage values could be raised using a charge pump or a voltage multiplier that was well known

11  in the art" Dkt. # 137-4 at 41.[2]  No doubt, other voltage-raising components exist, too, as the

12  Court has learned throughout this litigation.  But a term can convey adequate structure even if it

13  covers a "class of structures."  *Skky,* 859 F.3d at 1019 (citation omitted).  Here, the term does not

14  describe an infinitely malleable and open-ended category of any device or apparatus, however

15  conceived, that could raise a voltage.  Rather, the term connotes a finite list of possible

16  structures, limited only to certain *circuit components* (like a charge pump or voltage multiplier).

17  Simply put, there are known circuit components that a POSITA might colloquially call "voltage

18  raisers" or "voltage-raising" components.  This is enough to convey structure because it serves as

19  a *name* for a type of structure.  *Williamson*, 792 F.3d at 1349 ("The standard is whether the

20  words of the claim are understood by persons of ordinary skill in the art to have a sufficiently

21  definite meaning as the name for structure.").

---

23  [2] Impinj did not submit a competing expert declaration.  While the Court initially gave Dr.
    Madisetti's statements limited weight because they were somewhat conclusory, his explanation accords
24  with the Court's improved understanding of circuit design and the language used by persons skilled in
    this field.  Therefore, the Court gives Dr. Madisetti's testimony some weight in evaluating the claim term.

ORDER MODIFYING CLAIM
CONSTRUCTION - 10

1    And it does not matter that this structure is conveyed, in part, by functional language.

2  Many structures derive their names from the functions they serve.  *See Greenberg v. Ethicon*

3  *Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("Many devices take their names from

4  the functions they perform. . . . What is important is not simply that a [term] is defined in terms

5  of what it does, but that the term, as the name for structure, has a reasonably well understood

6  meaning in the art.");  *Skky*, 859 F.3d at 1019 ("[I]t is sufficient if the claim term is used in

7  common parlance or by persons of skill in the pertinent art to designate structure, . . . *even if the*

8  *term identifies the structures by their function*." (emphasis added) (citation omitted)).

9    To be sure, today's order necessarily requires repudiation of some of the reasoning found

10 in the Court's previous claim construction order.  Portions of this order may contradict portions

11 of the Court's previous claim construction order.  But with the benefit of a deeper understanding

12 of the technology at issue, additional insight about the way a POSITA would discuss circuit

13 components, and an improved grasp of Federal Circuit case law, the Court concludes that this is

14 the better construction of the term.[3]

15    Accordingly, the Court holds that "voltage-raising means that are arranged to raise the

16 voltage value of the control signal" is not a means-plus-function limitation.  The Court adopts NXP's

17 construction and construes the term to mean "a circuit that raises the voltage value of the control

18 signal."

19 D.    Other Issues

20     The Court takes this opportunity to address a few other related issues.

21    First, as will be further explained in a forthcoming order, the Court will grant the portion

22 of Impinj's motion to exclude Dr. Madisetti (Dkt. # 274) regarding NXP's '097 infringement

23

24    [3]  To avoid any doubt, this order fully replaces all reasoning concerning the "voltage-raising means" term found in the prior order.

ORDER MODIFYING CLAIM
CONSTRUCTION - 11

1  theory based on a rectifier and level shifter combination.  NXP's infringement contentions did

2  *not* disclose a rectifier and level shifter combination as satisfying the "voltage-raising means"

3  limitation.  Its infringement contentions focused nearly exclusively on a level shifter.  And

4  because the Court has now adopted NXP's preferred construction, NXP cannot justify its failure

5  to disclose its combination-based theory in its infringement contentions.  Accordingly, NXP

6  cannot rely on the rectifier and level shifter combination to satisfy this claim limitation.  The

7  parties should take this ruling into account in any future filings.

8       Second, the Court recognizes that its decision today may affect the parties and the case in

9  various ways.  After the parties have met and conferred, the Court is amenable to a telephonic

10  status conference about how, if at all, this decision affects the litigation as a whole.  The parties

11  are advised to email Courtroom Deputy Ashleigh Drecktrah if they wish to arrange for a

12  telephonic conference.

13  **IV.**

14  **CONCLUSION**

15       For the reasons above, the Court modifies its construction of the "voltage-raising means"

16  term of the '097 Patent.  The Court does not construe the term as a means-plus-function term,

17  and interprets it to mean "a circuit that raises the voltage value of the control signal."

18       Dated this 6th day of March, 2023.

19  

20  John H. Chun
    United States District Judge

21

22

23

24

ORDER MODIFYING CLAIM
CONSTRUCTION - 12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NXP USA, INC., and NXP B.V.,

                Plaintiffs,

      v.

IMPINJ, INC.,

                Defendant.

CASE NO. 2:20-cv-01503-JHC

ORDER RE: CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

# I

## INTRODUCTION[1]

    Plaintiffs NXP USA, Inc. and NXP B.V. (collectively, "NXP") brought this patent-infringement action against Defendant Impinj, Inc., alleging infringement of a group of patents relating to radio frequency identification ("RFID") technology and electric circuit design.

    The parties cross-move for partial summary judgment on infringement (and non-infringement), validity (and invalidity), and damages. *See* Dkt. ## 282, 319, 343 (NXP's motion,

---

[1] The Court previously filed a sealed version of this order. *See* Dkt. # 380. The Court then asked the parties to indicate which portions, if any, of the order must be redacted to protect confidential and proprietary business information. Dkt. # 381. After hearing from the parties, *see* Dkt. # 407, the Court hereby publishes this redacted version of the order.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 1

Impinj's response, and NXP's reply); Dkt. ## 294, 332, 355 (Impinj's motion, NXP's response, and Impinj's reply).[2]

The motions seek summary judgment of infringement (and non-infringement) of U.S. Patent Number 7,257,092 (the '092 Patent) and U.S. Patent Number 7,795,951 (the '951 Patent). Along with these common issues, NXP's motion seeks a judgment about the validity of U.S. Patent Number 7,347,097 (the '097 Patent) and the availability of acceptable, non-infringing alternatives for purposes of damages. Impinj's motion seeks summary judgment of non-infringement of the '097 Patent and seeks summary judgment of invalidity for the '092 Patent.

For the reasons below, the Court GRANTS each motion in part and DENIES each motion in part. The Court RESERVES ruling on NXP's damages argument to consider it along with the damages issues raised in other motions.

## II

### BACKGROUND

A.    Technology Background

RFID is a type of contactless wireless communication that uses electromagnetic frequencies to transmit identification information. *See generally* Dkt. # 220 (technology tutorial). RFID systems are used, for example, in retail stores for tracking merchandise and in warehouses for tracking inventory. *Id.* at 6. They are even used in U.S. passports and in various medical technologies. *Id.* RFID systems typically include a "data carrier" (or "tag"), which can attach to an object, and a "communication station" (or "reader"), which receives information from the data carrier through radio waves. The data carrier wirelessly transmits data to the

---

[2] The Court generally refers to the sealed version of each filing throughout this order. The unsealed versions (which contain page numbers that correspond to the sealed versions) can be found at the following docket entries: Dkt. ## 277, 316, 340 (NXP's motion, Impinj's response, and NXP's reply); Dkt. ## 284, 325, 347 (Impinj's motion, NXP's response, and Impinj's reply).

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 2

communication station, which the reader uses to identify the object. *Id.* at 7. The data carrier often contains circuitry and a transmission means like an antenna. *Id.* at 8. Data carriers also typically have some form of memory that stores information. *Id.*

B.     The Patents

Three patents remain at issue.[3]

1.     The '092 Patent

The '092 patent describes techniques for communicating between a "communication station" and a "data carrier." '092 Patent at 1:5–8. Prior art methods used a two-step process for communication between a data carrier and a communication station. The communication station would first conduct an "inventorization procedure" during which the communication station would identify all the data carriers within its range. *Id.* at 1:10–38. After the inventorization procedure, the data carrier would transmit "useful data" to the communication station upon request. *Id.* at 1:38–47. The "disadvantage" of this two-step method was that "it [took] a relatively long time" for the "useful data" to become usable by the communication station. *Id.* at 1:42–44.

The '092 Patent purports to improve upon the prior art by using a communication procedure in which the "identification data block" and the "useful data" are transmitted simultaneously. *Id.* at 11:7–17 ("[T]he invention is distinguished in that not only are parts of the identification data blocks IDB transmitted into the communication station 1 in the course of carrying out an inventorization procedure, but that during the inventorization procedure the specific useful data n×UDB desired and/or required in the communication station 1 are also

---

[3] NXP's initial complaint asserted infringement of eight of patents. Dkt. # 1. The parties narrowed their dispute to six patents (Dkt. # 176 at 2 & n.1), and the Court's order granting summary judgment of non-infringement to Impinj on three patents (Dkt. ## 242, 248) further narrowed this action to the three patents still at issue.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 3

simultaneously transmitted."); Dkt. # 135 at 14.  This simultaneous transmission shortens the time it takes for the communication station to obtain the "useful data" stored in the data carriers. '092 Patent, 3:51–59.

    2.    The '951 Patent

    Some circuits within RFID tags operate using little power because they receive power only through the wireless signal transmitted to them.  *See* Dkt. # 220 at 13.  Some circuit components, however, benefit from higher voltages, while others benefit from lower voltages. *Id.*; '951 Patent, 1:10–24.  Therefore, many circuits contain "voltage multiplier circuits" to modify the voltage.  Dkt. # 220 at 13.  The purpose of a voltage multiplier is to increase or decrease a supply voltage to a desired level.  Dkt. # 149 at 13.

    The '951 Patent describes a particular voltage multiplier circuit that "advantageously" enables multiplication of the voltage to a range of different voltages, including voltages both above and below the supply voltage.  '951 Patent at 1:11–24, 1:49–63.  The invention "control[s]" the generated voltage amplitude, producing a "regulated" voltage as it moves through the circuit components.  *Id.* at 2:2–6.

    The voltage multiplier described by the '951 Patent has several "multiplier stages."  *Id.* at 2:16–17.  The voltage multiplier also includes a "feedback bias control circuit" that is coupled to receive the output of the voltage multiplier stages.  *Id.* at 4:17–44, 6:1–33, Abstract.  The feedback bias control circuit helps control or regulate the voltage multiplier by providing a "feedback bias control signal," which is then fed to "regulated clocks" and to an "input level regulator."  *Id.* at 3:60–61, 3:23 ("input level regulator" with "a feedback bias control input").  The input level regulator outputs a signal to the first multiplier stage.  *Id.* at 3:22–32.  The input level regulator "advantageously enables regulation of a voltage to a range of voltage levels" including voltages equal to or lower than the supply voltage.  *Id.* at 3:24–28.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 4

3.      The '097 Patent

Many data carriers contain storage systems used to store information temporarily.  These carriers can, for example, temporarily store an indication of successful communication with a communication station.  Dkt. # 137 at 21.  The information is stored and represented "by a value of an information voltage that arises at the capacitor."  '097 Patent at 1:45–47.  The '097 Patent purports to solve a problem identified in the prior art: The information voltage would continuously decline due to "unavoidable leakage currents in the circuit."  *Id.* at 1:62–2:1.  This decline in voltage would lead to an "unsatisfactory situation" because the information was "no longer able to be evaluated after only a short period of time."  *Id.* at 2:2–7.

The '097 Patent purports to solve this problem.  The invention described by the '097 Patent provides "a substantially longer period of time during which the stored information can be ascertained with high reliability."  *Id.* at 2:34–36.  This also allows the information to remain accessible if a brief supply-voltage failure occurs.  *Id.* at 2:35–42.  The patent achieves this in part by adding a "voltage-raising means" to the "information-voltage generating means."  *Id.* at 2:13–23; *see also* Dkt. # 135 at 17.

The specification describes the invention in more detail.  It states that the carrier first receives a wireless signal, which is used to form a supply voltage.  '097 Patent at 3:27–35.  The circuit produces a "control signal CS" that is "at most equal to the value of the supply voltage."  *Id.* at 3:62–63.  The circuit contains "information-voltage generating means" that receive the control signal CS and uses the control signal CS to produce an "information voltage UI."  *Id.* at 3:63–66.  The information-voltage generating means further consist of "voltage-raising means," "voltage-limiting means," and a "charging-current generating stage."  *Id.* at 4:15–29.

C.      Procedural History

Following a *Markman* hearing and briefing from the parties, the Court issued a claim

construction order on November 4, 2022.  Dkt. # 247.  On January 12, 2023, the parties

submitted the motions for summary judgment at issue.  *See* Dkt. ## 282, 294.  The Court held

oral argument on both motions on February 28, 2023.  Dkt. # 370.  On March 6, 2023, the Court

issued a sua sponte order modifying its construction of the "voltage-raising means" term found in

the '097 Patent.  Dkt. # 375.

### III

### LEGAL STANDARDS

Issues in a patent case may be resolved at summary judgment.  "Summary judgment is

appropriate when the moving party demonstrates that 'there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law.'"  *Spigen Korea Co. v.*

*Ultraproof, Inc.*, 955 F.3d 1379, 1383 (Fed. Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).  A

genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating a

motion for summary judgment, "[t]he court must afford all reasonable inferences and construe

the evidence in the light most favorable to the non-moving party."  *Vita-Mix Corp. v. Basic*

*Holding, Inc.*, 581 F.3d 1317, 1323 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 255).

Infringement (or non-infringement) can be decided at summary judgment when there are

no genuine disputes of fact.  To prove infringement, the patentee "must establish by a

preponderance of the evidence that one or more claims . . . read on the accused device[s]."  *Cross*

*Med. Prod., Inc. v. Medtronic Sofamore Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).

"Where the parties do not dispute any relevant facts regarding the accused product . . ., but

disagree over possible claim interpretations, the question of literal infringement collapses into

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 6

claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997). Infringement is "properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001). But if a reasonable jury could conclude that the accused device does not practice every limitation of a claim, summary judgment is inappropriate.

Similarly, patent validity can be decided at summary judgment when there is no genuine dispute of fact. "Under the patent statutes, a patent enjoys a presumption of validity, which can be overcome only through clear and convincing evidence." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). Accordingly,

> a moving party seeking to *invalidate* a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise. Alternatively, a moving party seeking to have a patent held *not invalid* at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent.

*Id.* (emphasis added).

## IV

### ISSUES RELATING TO THE '092 PATENT

The parties raise two issues specific to the '092 Patent. First, Impinj argues that the '092 Patent is obvious given the prior art and is thus invalid. Dkt. # 294 at 19–28. Second, both parties cross-move for summary judgment on infringement. Dkt. ## 282 at 9–18, 294 at 5–10. The Court addresses each issue in turn.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 7

A.     Additional Background: The '092 Patent

The '092 Patent describes a method of communication between an RFID communication

station (or "reader") and an RFID data carrier (or "tag"). While prior art techniques transmitted

"identification data" and then other useful data separately, the '092 Patent describes a system in

which identification data and other "useful data" are transmitted simultaneously. The patented

system accelerates the communication process, allowing the communication station to receive

data from the data carrier faster. '092 Patent at 1:38–52.

Claim 1 of the '092 Patent is representative. It states:

> A method of communicating between a communication station (1) and at least
> one data carrier (2 (DC)), Which data carrier (2 (DC)) comprises a characteristic
> identification data block (IDB) and useful data (UD), by said method an
> inventorization procedure is carried out, the inventorization procedure may
> consist of successive procedure runs and consists of at least one procedure run,
> and after the inventorization procedure terminates, at least one part of the
> identification data block (IDB) of the at least one data carrier (2 (DC)) is known
> in the communication station (1), and by which method a transmission of specific
> useful data (n x UDB) is carried out from the at least one data carrier (2 (DC)) to
> the communication station (1) such that during the implementation of the
> inventorization procedure at least one part of a block region (NKP-IDB) of the
> identification data block (IDB) not yet known in the communication station (1)
> and, in addition, said specific useful data (n x UDB) are transmitted from the at
> least one data carrier (2 (DC)) to the communication station (1).

*Id.* at 17:47–65. For present purposes, it is important to observe that claim 1 requires that the tag

return two types of data to the reader: (1) an "identification data block (IDB)" and (2) "specific

useful data (n x UDB)." This data must be transmitted to the data carrier "during the

implementation of the inventorization procedure." *Id.* at 17:59–60.

During claim construction, the Court construed two terms in the '092 Patent that relate to

the issues at hand. First, the Court construed "characteristic identification data block (IDB)" to

mean "identification data stored in memory." Dkt. # 247 at 12–16. The Court noted that

"[w]hen broken down, the term refers to (1) a block (2) of data (3) used for identification." *Id.*

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 8

at 13. The Court did not limit the identification data to a particular kind of identification data, like a serial number. Second, the Court construed "specific useful data (n×UDB)" to mean "some, but not all, useful data (UD)." *Id.* at 16–20. The parties seemingly agree that a given data block is either part of the identification data block or is part of the identification data block, but that the two categories are mutually exclusive. *See, e.g.*, Dkt. ## 283-1 at 8, 319 at 7, 332 at 10.

B.     Validity of the '092 Patent

Impinj asks the Court to hold that the asserted claims of the '092 Patent are obvious, and thus invalid. Dkt. # 294 at 19–28. According to Impinj, two prior art references—the ISO/IEC 15693-3 protocol and U.S. Patent No. 6,963,270 ("Gallagher")—render the '092 Patent obvious. *Id.* at 19. Impinj also notes that the United States Patent and Trademark Office (USPTO) has granted ex parte reexamination of the '092 Patent. *See* Dkt. # 285-7 (USPTO decision granting ex parte reexamination); Dkt. # 294 at 20. But the USPTO has not issued a final decision, and neither party has asked the Court to stay proceedings pending action by the USPTO.

For the reasons below, the Court concludes that, at this point, factual questions remain that preclude summary judgment.

1.     Obviousness Legal Standard

"Obviousness is a question of law based on underlying facts." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047 (Fed. Cir. 2016) (en banc). These underlying factual determinations include: "(1) the scope and content of prior art; (2) differences between prior art and claims; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness." *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1193 (Fed. Cir. 2014) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)); *see also ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018). These four factors—known as the *Graham* factors—are always

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 9

relevant to the obviousness inquiry. *Apple*, 839 F.3d at 1048. Other related factual questions include "[w]hat the prior art teaches, whether a person of ordinary skill in the art would have been motivated to combine references, and whether a reference teaches away from the claimed invention." *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1374 (Fed. Cir. 2021) (quoting *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017)). If a patent is obvious under 35 U.S.C. § 103, it is invalid.[4]

"A determination of obviousness requires finding that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so." *Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1365 (Fed. Cir. 2022) (citation and quotation marks omitted). "This requires 'identify[ing] a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.'" *Id.* (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). "The obviousness inquiry does not merely ask whether a skilled artisan could combine the references, but instead asks whether they would have been motivated to do so." *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020) (citation and quotation marks omitted). "Fundamental differences between the references are central to this motivation to combine inquiry." *Id.* "A motivation to combine may be found

---

[4] The requirement that a patent be nonobvious comes from 35 U.S.C. § 103:

> A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

35 U.S.C. § 103 (2006). The pre-America Invents Act (AIA) version of the statute applies because the '092 Patent was filed before the statute's effective date of March 16, 2013. *Warner Chilcott Co., LLC v. Teva Pharms. USA, Inc.*, 642 F. App'x 996, 1000 & n.2 (Fed. Cir. 2016).

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 10

explicitly or implicitly in market forces; design incentives; the interrelated teachings of multiple patents; any need or problem known in the field of endeavor at the time of invention and addressed by the patent; and the background knowledge, creativity, and common sense of the person of ordinary skill." *ZUP*, 896 F.3d at 1371.

Accordingly, "[a] party asserting that a patent is obvious 'must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.'" *PAR Pharm.*, 773 F.3d at 1193 (quoting *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012) (quotation marks omitted)); *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) ("Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements. . . ."); *Dome Pat. L.P. v. Lee*, 799 F.3d 1372, 1380 (Fed. Cir. 2015) ("If all elements of a claim are found in the prior art, as is the case here, the factfinder must further consider the factual questions of whether a person of ordinary skill in the art would be motivated to combine those references, and whether in making that combination, a person of ordinary skill would have had a reasonable expectation of success.").

But the Supreme Court has cautioned that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. . . . If a person of ordinary skill in the art can implement a predictable variation § 103 likely bars its patentability." *KSR*, 550 U.S. at 416. The Supreme Court has emphasized that the obviousness inquiry is "flexible" and requires application of common sense. *Id.* at 416, 420.

Finally, an issued patent is presumed to be valid. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007). And "[b]ecause a patent is presumed to be valid, 35 U.S.C. § 282, the evidentiary burden to show facts supporting a conclusion of invalidity, which rests on the accused infringer, is one of clear and convincing evidence." *Id.* "[S]ince we must presume a patent valid, the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence." *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1381–82 (Fed. Cir. 2013) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007)). "This burden of proof never shifts to the patentee." *Id.*; *see also Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013) ("[T]he burden of persuasion remains with the challenger during litigation because every issued patent is entitled to a presumption of validity.").

2.    The Prior Art

Impinj argues that two prior art references—the ISO/IEC 15693-3 protocol and U.S. Patent No. 6,963,270 ("Gallagher")—render the '092 Patent obvious. Dkt. # 294 at 21. Neither party disputes that these two references qualify as "prior art" for obviousness purposes. Dkt. # 294 at 20.

The ISO/IEC 15693-3 standard is mentioned in the '092 Patent itself. *See* '092 Patent at 1:20–22. According to the '092 Patent, the ISO/IEC 15693-3 standard discloses many limitations in the Patent's claims. For example, the ISO/IEC 15693-3 standard discloses techniques for communicating between a "communication station" and "data carrier," performing "inventorization," and transmitting "identification data" and "useful data." '092 patent at 1:5–47. According to the '092 Patent, a "method having the abovementioned process steps is described in the ISO/IEC 15693-3 standard, and is therefore known." *Id.* at 1:20–22. But in variants of the known ISO/IEC 15693-3 standard, the transmission of specific useful data

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 12

1    is "performed after the inventorization procedure." *Id.* at 1:38–42.  The '092 Patent purports to

2    improve on this known method by transmitting the identification data and the specific useful data

3    *at the same time*.  *See id.* at 11:7–17.

4        Impinj concedes that the ISO/IEC 15693-3 standard does not disclose a communication

5    protocol in which identification data and useful data are transmitted simultaneously.  *See, e.g.*,

6    Dkt. # 355 at 12.  But Impinj says that Gallagher discloses a simultaneous transmission protocol.

7    So between the two, Impinj says, the prior art fully teaches all claim limitations.

8        The Gallagher Patent—filed in 1999—is directed to RFID technology.  *See* Dkt. # 285-10

9    (copy of Gallagher patent).  Gallagher discloses an RFID reader that identifies multiple RFID

10   tags (or "transponders") using an "an "anticollision protocol for simultaneously reading multiple

11   RFID tags located in a field of an interrogating antenna or RFID reader and individually

12   identifying the tags through an arbitration process."  *Id.* at 2:27–31.  One feature of Gallagher is

13   the "fast read request," which provides for "fast reading of critical data."  *Id.* at 2:42–45.

14   According to the patent, "[t]he RFID reader or interrogator broadcasts commands to all

15   transponders present in the detection field."  *Id.* at 4:58–59.  Each tag responds to the request by

16   sending a "fast read response" that includes "its ID, and other data including tag parameters and

17   fast read field data."  *Id.* at 5:4-6.  Gallagher summarizes that the "FRR [Fast Read Response] =

18   Preamble + Transmission Counter + Parity + Tag Parameters + *Transponder ID* + *Fast Read*

19   *Field* + CRC."  *Id.* at 9:3–5 (emphasis added).  Gallagher also says that "[a]fter a transponder

20   completes transmission of its ID and, optionally, its fast read field, the reader sends commands

21   called matching codes to the transponder to direct the transponder to either perform a read or

22   write transaction, or to go into an inactive mode."  *Id.* at 5:12–16.  The purpose of this fast read

23   request system is to "minimize[] communication overhead."  *Id.* at 2:42–45.

24

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 13

3.    Invalidity Analysis

The Court concludes that at this juncture, when viewed in the light most favorable to NXP, the evidence and reasonable inferences therefrom raise factual issues that preclude a determination of obviousness.  Accordingly, the Court declines to invalidate the '092 Patent at this stage.

*First*, a reasonable jury could conclude that Gallagher does not adequately teach the simultaneous transmission of both identification data and *specific* useful data.  *See Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 910 (Fed. Cir. 2022) ("The question of what a reference teaches and whether it describes every element of a claim is a question for the finder of fact.  Thus, summary judgment that a reference does not teach or suggest a particular claim element should be granted only if no reasonable juror could find the reference provides the necessary disclosure." (citation and quotation marks omitted)).

The Court construed "specific useful data (n×UDB)" to mean "some, but not all, useful data (UD)."  Dkt. # 247 at 16.  Gallagher seems to disclose some form of simultaneous transmission of identification and other data.  But as detailed by NXP's expert, Dr. Madisetti (Dkt. # 333-8 at 12–13), it is not clear that Gallagher discloses simultaneous transmission of identification data along with a *subset* (some, but not all) of the useful data.  How a subset of all useful data is transmitted appears to be an important feature of the '092 Patent: The specification described an embodiment in which *specific* useful data is transmitted using a "useful data start block," a "request data block," and "the number n of useful data blocks."  '092 Patent at 10:9–15.

Impinj responds that it "does not need to contend that Gallagher discloses 'specific useful data'" because the ISO/IEC 15693-3 standard discloses the "specific useful data" limitation.  Dkt. # 294 at 23.  According to Impinj, "Gallagher discloses that 'useful data' is transmitted in

the fast read field along with the tag's identifier during inventory." *Id.* Based on the briefing

before it, and drawing all reasonable inferences in favor of NXP, the Court disagrees. Even if

the ISO/IEC 15693-3 standard would have taught a POSITA one way to send some, but not all,

useful data, it does not necessarily follow that a POSITA could readily and straightforwardly

modify Gallagher to do the same. The parties do not present much explanation about this point.

And even if Gallagher does disclose simultaneous transmission of some, but not all, useful data,

Impinj does not explain whether the '092 Patent's approach to this problem is the same as the

Gallagher approach or the ISO/IEC 15693-3 standard approach. Without further explanation, the

Court cannot confidently conclude that Gallagher teaches the "specific useful data" limitation.[5]

*Second*, according to NXP, the ISO/IEC 15693-3 standard and Gallagher use radically

different communication protocols, meaning a POSITA would not think to combine them—or,

implicitly, that it would be difficult or counterintuitive to combine them. Dr. Madisetti opined:

> The anticollision procedure of ISO/IEC 15693-3 is markedly different from the
> anticollision procedure of Gallagher. A person of ordinary skill in the art would
> not look to combine Gallagher, which uses transmission cycles of fixed length
> and wake-up slots determined by the bit sequences of a tag ID, with ISO/IEC
> 15693-3, which uses slots determined by EOF delimiters sent by the VCD and a
> determination of when to transmit a response based on comparing a mask
> received from the VCD with the VICC UID.

Dkt. # 285-11 at 42; *id.* at 39–43 (explaining the differences between the two anticollision

protocols). Dr. Madisetti further opined that "[m]odifying the operation of the standard by

importing features from a reference that approaches collisions in a substantially different

approach would change the principle of operation of the standard." Dkt. # 333-8 at 13.

---

[5] Because the Court concludes that there is at least a dispute of fact as to whether Gallagher
discloses the simultaneous transmission of "specific useful data," the Court finds it unnecessary to
address Impinj's argument (Dkt. # 294 at 26–27) that the prior art discloses "processing means," as the
phrase is used in claims 7 and 11 of the '092 Patent.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 15

Crediting this expert opinion as true, a reasonable jury could conclude that a POSITA would not be motivated to combine the two references. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1359 (Fed. Cir. 2017) (motivation to combine and the likelihood of successful combination are questions of fact). A reasonable jury could conclude that adapting Gallagher's simultaneous transmission protocol to work with the ISO/IEC 15693-3 standard would be unduly difficult or would not lead to success.

To be sure, the Court recognizes that this is a close question based on the arguments presented, and that several of NXP's other arguments do not pass muster. For example, it is immaterial, contrary to NXP's arguments (Dkt. # 332 at 26–28), that Gallagher describes the simultaneous transmission protocol as "optional." *See* Gallagher, at 5:12 ("After a transponder completes transmission of its ID and, *optionally*, its fast read field . . ." (emphasis added)). It matters only what Gallagher discloses.

Nor does Gallagher "teach away" from simultaneous transmission, as NXP suggests (Dkt. # 332 at 26–28). True, Gallagher discloses a "*tag-talk-first mode* of operation, wherein the transponder sends its data immediately upon power up, *hence eliminating all communication overhead*." Gallagher at 3:6–10 (emphasis added). According to NXP, this would have led a POSITA away from the fast-read simultaneous transmission protocol because the tag-talk-first mode produces even less "communication overhead." But "[a] reference that merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the claimed invention does not teach away." *Meiresonne*, 849 F.3d at 1382 (citation and quotation marks omitted). A teaching expressing a "general preference for an alternative" does not teach away from the patent. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009).

And NXP does not address any secondary considerations of nonobviousness in its brief. So the Court declines to consider any.[6]

Still, given the presumption of validity, the requirement that a challenger produce clear and convincing evidence of obviousness, and the factual issues described above, the Court cannot conclude that the '092 Patent is invalid as obvious at this juncture.

C.      Infringement of the '092 Patent

Both parties cross-move for summary judgment on the '092 Patent. Dkt. # 282 at 9–18 (NXP's motion); Dkt. # 294 at 5–10 (Impinj's motion). NXP seeks summary judgment of direct infringement of claim 1, while Impinj seeks summary judgment of non-infringement of all claims in the '092 Patent. The central dispute concerns whether Impinj's products simultaneously return both an "identification data block" and "specific useful data" to the reader as required by the '092 Patent's claims. For the reasons below, the Court concludes that disputes of material fact preclude granting either party's motion for summary judgment on this issue.

1.      Background on the Accused Products

The accused products implement the "Gen2 protocol," an industry standard protocol for RFID communications. Dkt. # 283-4 at 6–7, 11–21. The Gen2 protocol requires that a tag's memory be separated into distinct memory blocks: Reserved memory, "EPC" (Electronic

---

[6] Additionally, NXP argues that Impinj failed to set forth a "prima facie case of invalidity" because neither Impinj's motion nor Impinj's expert report conducted a term-by-term analysis of whether the prior art discloses each limitation. Dkt. # 332 at 22–24. In its reply brief, Impinj explained that it inadvertently filed an incomplete version of Dr. Kenney's report. Dkt. # 355 at 10–11. Impinj further explained that the error has been corrected (Dkt. # 334), that NXP has had a copy of the complete report since November 2022, and that NXP suffered no prejudice from the mistaken filing. Dkt. # 355 at 10–11. The Court agrees with Impinj that this filing error does not itself justify denying Impinj's motion. And more importantly, NXP does not seriously contend that the prior art *did not* disclose the other, non-discussed claim limitations. The '092 Patent itself seemingly admits that—aside from the simultaneous transmission of specific useful data and identification data—the other claim limitations were well known in the art. *See* '092 Patent at 1:20–22 ("A method having the abovementioned process steps is described in the ISO/IEC 15693-3 standard, and is therefore known.").

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Product Code) memory, "TID" memory, and User memory.  Dkt. # 283-4 at 14.  "TID" is defined as "Tag-identification or Tag identifier, depending on context."  Dkt. # 285-1 at 21.  TID memory must contain "sufficient information for an Interrogator to uniquely identify the custom commands and/or optional features that a Tag supports."  *Id.* at 52.  TID memory "may also contain Tag- and manufacturer-specific data (for example, a Tag serial number)."  *Id.* at 52.

Each of the accused tag chips are Gen2 compliant.  Dkt. # 283-4 at 6.  But the accused products also contain what Impinj labels its "FastID" feature.  Under the general Gen2 protocol, once a tag has been identified or selected, the tag "still requires a couple of commands to get the TID."  Dkt. # 283-8 at 2.  According to Impinj's own materials, FastID "short-cycle[s] the process of getting the TID."  *Id.*  With FastID, the tags "backscatter both their EPC and TID as part of their response to an ACK command from the reader."  *Id.*  In other words, the FastID system transmits both the EPC and TID data simultaneously.  *See* Dkt. # 283-1 at 4 (Dr. Kenney stating that "[u]nder the Gen2 Specification, the sequence for accessing a TID requires a sequence of commands [], and FastID allows the TID to be read with fewer commands than that provided by the standard").  Impinj touted the "EPC+TID" feature of FastID as "2-3 times faster than previous methods."  Dkt. # 281-13 at 6.  An illustration of the comparison between a system with and without FastID is found below:

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 18

**CONFIDENTIAL MATERIAL REDACTED**



Dkt. # 283-8 at 2.

    2.    Infringement Analysis

The main dispute concerns whether Impinj's products simultaneously return both an "identification data block" and "specific useful data" to the reader as required by the '092 Patent's claims. While the parties agree that the "EPC" is part of the "identification data block" (Dkt. ## 282 at 15, 283-1 at 7), they dispute whether "TID" data is part of the "identification data block" or is "specific useful data."

NXP argues that the EPC is the "identification data block" and that TID data is "specific useful data." Dkt. # 282 at 14–25. NXP says that it is the EPC that is used to identify the tag during inventorization, not the TID data. *See id.* at 15–16 ("[T]he undisputed evidence shows that the Gen2 inventorization procedure does not use TID information to identify a tag within a population of tags—instead a tag is uniquely identified in the inventory process upon receipt of the tag's EPC."). If so, NXP says, Impinj directly infringes claim 1 because the accused

products rely on a method that simultaneously transmits a "characteristic identification data block" and "useful data" to the reader.

Impinj disagrees. *See* Dkt. ## 319 at 6–11, 294 at 5–10.  Impinj argues that its FastID products do not return "specific useful data," and thus do not satisfy every limitation of claim 1. Impinj argues that TID data is part of the "identification data block," not "specific useful data." Impinj therefore says that because TID data is part of the identification data block, the accused products using FastID do not simultaneously transmit both identification data and specific useful data, and thus do not infringe.[7]

The parties' dispute largely (but not entirely) turns on the proper interpretation of the claims.  NXP believes that to qualify as part of the "identification data block," the data must be used by the reader *during inventorization* to *uniquely identify* the tag, while Impinj says that the claim language contains no such limitation.

Though a somewhat close question, the Court believes NXP has the better argument: The "identification data block" described in the '092 Patent refers only to identification data used for identifying a tag during an inventorization-like procedure.

The specification and the history of the '092 Patent support this interpretation.  The '092 Patent purports to improve upon a known method.  In that known method, a reader first identified a tag during inventorization based on a tag's identification data, and then provided additional data in later communications.  *See, e.g.*, '092 Patent at 1:38–42 (describing a variant of the ISO/IEC 15693-3 standard in which transmission of specific useful data is "performed after the inventorization procedure.").  In other words, step one of the prior-art method involved inventorization in which a reader uniquely identified a tag using identification data.  Step one of

---

[7] Aside from TID data, neither party briefs whether any other data in the accused tags could constitute "specific useful data."

the prior-art method presumably did not involve sending any information that might identify the tag, even if that information had nothing to do with the reader's need to uniquely identify the tag with which it was communicating.  Step two of the prior art method then allowed additional data to be transmitted to the reader.

Against this backdrop, the "identification data block" described in the '092 Patent refers to the same type of identification data as transmitted during step one of the prior-art method: the identification data used by the reader to identify the tag during inventorization.  The '092 Patent's purported innovation is combining steps one and two of the prior art method, and the most natural reading of the claims is that the identification data described within refers to the same identification data used during step one of the prior-art method.

If the term were construed to describe any identifying data, whether or not such data is used during inventorization for identification purposes, the typology developed by the patentee would make little sense.  The patent divides all possible data into two discrete categories: (1) identification data (in the form of an "identification data block") and (2) other "useful data."  It would be odd to divide the data in this way—creating a firm distinction between identifying data and all other data—unless the "identification data block" is somehow important to the invention (for example, because it is used to identify the tag during inventorization, like step one of the prior-art method).  Otherwise, why distinguish between identification data and other data at all? To draw a rough analogy: If a patent described an invention in which "blue balloons" and "all other balloons" are held together using a clamping device, one would reasonably assume that blue balloons are distinctive or important to the invention itself.

And a tag might carry a wide array of "identification data" that could be used in vastly different ways.  It is easy to imagine that much of the data on an RFID tag could be characterized as "identifying" in some way—the location coordinates of a tag could "identify" a tag in a

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 21

warehouse, or the "access level" of an employee's badge helps identify the employee. Drawing on an example from the accused products, Impinj states that it uses TID data—which is arguably a type of "identifying" data—"for tracing the IC or tag during manufacturing and throughout its lifetime and for tracing the item to which the tag is attached." Dkt. # 291 at 2. Impinj also states that both Impinj and its customers use TID data for various purposes—Impinj maintains a database of all TID data and uses that database to track sales and shipping history. *Id.* But it does not necessarily follow that *any* identification data is part of the "identification data block," even if that identification data plays no role in the communication/inventorization process. The mere fact that a user relies on TID data at some later time to identify a tag does not mean that it is part of the "identification data block."

To be sure, Impinj is correct that the claim language does not expressly state that "identification data block" refers only to identification data during inventorization. Impinj says that the plain meaning of "characteristic identification data block" is simply identification data that is characteristic of the tag. And the Court must be careful not to import additional limitations into the claim language. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) (It is a "well-established principle that a court may not import limitations from the written description into the claims.").

But the Court concludes that "identification data block" refers to identifying data used to uniquely identify the tag to the reader during an inventorization-like procedure. In light of the purported novelty of the '092 Patent—combining the discrete steps of identifying the tag and transmitting other data into one, simultaneous transmission—a POSITA would interpret the phrase "identification data block" to refer only to the data used to identify the tag during an inventorization-like procedure, not any data used to identify in an abstract sense.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 22

Given this claim construction, the Court must next consider whether TID data is part of the "identification data block" or is instead "specific useful data." If TID data is part of the "identification data block," then Impinj argues that the accused products do not return any "specific useful data," meaning that the accused products do not satisfy every limitation of the claim. The Court finds that there is at least a dispute of fact as to whether TID data is part of the "identification data block" or is instead "specific useful data." *See Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 724 (Fed. Cir. 2002) ("The "comparison [between an accused product and the Court's claim construction] is a question of fact.").

As an initial matter, in light of the Court's clarification of its construction, several of Impinj's arguments become immaterial. For example, it does not matter if TID data contains a "serial number" or otherwise contains data that could be labeled as "identifying" data. If this data is not used to identify the tag to the reader, it is not part of the characteristic identification data block. For the same reason, it does not matter if "TID" stands for "Tag-identification or Tag identifier, depending on context." Dkt. # 285-1 at 21; *see also Union Paper-Bag Mach. Co. v. Murphy*, 97 U.S. 120, 125 (1877) ("[I]n determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it."). And it does not matter that Impinj or Impinj's customers may use TID data for some identifying function (say, tracking the products in a database or monitoring sales and shipping history). Because TID data is not being used during inventorization in the processes Impinj describes, it does not matter whether TID data is used to identify the tags in an abstract sense.

That said, the Court cannot grant either party's motion for summary judgment because factual disputes remain.

First, the Court remains uncertain whether the EPC *always* identifies the tag to the reader during inventorization, and whether TID data *never* identifies the tag to the reader during inventorization. NXP says that this is the case. *See, e.g.*, Dkt. # 282 at 15–16 ("[T]he undisputed evidence shows that the Gen2 inventorization procedure does not use TID information to identify a tag within a population of tags—instead a tag is *uniquely identified* in the inventory process upon receipt of the tag's EPC."); *id.* at 16 ("[I]n the context of Gen2, a 'specific tag' is 'uniquely identified' when the reader knows the EPC of that tag."). As NXP explains (citing testimony of Impinj's representative, Mr. Oliver), "an inventory session between the reader and a tag would include the first red query, the RN16 communication in green, the ACK in red, and then the EPC reply in green to the ACK . . . that is what we would call a singulation of a tag, *because the tag has been uniquely identified*." Dkt. #282 at 16.

But Impinj at least suggests that the EPC is *not* always used to uniquely identify the tag during inventorization. For example, Impinj says that "the EPC uniquely identifies a tag only if a 'serialized' EPC is used (*i.e.*, a unique serial number for the underlying product), as opposed to a generic product identifier." Dkt. # 319 at 10 n.3. Impinj also says that there "is nothing in the Gen2 protocol that provides that readers must use the EPC to identify the tags in the first place." *Id.* And Impinj says that the EPC can be modified by customers. Dkt. # 317 at 1. If true, the Court is uncertain about how the EPC uniquely identifies the tag to readers.

Second, there is a material dispute of fact about how *Impinj* (not its customers) use the EPC and TID data. NXP's motion seeks summary judgment of direct infringement of claim 1. Claim 1 is a method claim. And "[m]ethod claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006). Accordingly, NXP must show that the accused devices "*actually perform* [the] method" or that Impinj—not Impinj's customers—

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 24

**CONFIDENTIAL MATERIAL REDACTED**

"practices every step of the patented method." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219, 1221 (Fed. Cir. 2014).

Impinj notes that while it has performed some FastID testing in the United States, that testing "has *not* been done with a true EPC." Dkt. # 319 at 11. Instead, ████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ *Id.* This creates a dispute of fact about the way Impinj uses its tags and whether it uses the EPC, TID data, or some other data to identify the tags.

Accordingly, the Court denies both motions for summary judgment of infringement (and non-infringement) of the '092 Patent.

**V**

**ISSUES RELATING TO THE '951 PATENT**

The parties cross-move for summary judgment as to infringement of the '951 Patent. *See* Dkt. # 282 at 18–25 (NXP's motion, seeking a judgment of direct infringement); Dkt. # 294 at 10–16 (Impinj's motion, seeking a judgment of non-infringement). For the reasons below, the Court grants Impinj's motion for a judgment of non-infringement and denies NXP's motion.

A.     Additional Background: The '951 Patent

The '951 Patent describes a voltage multiplier circuit in which the voltage is "regulated." The voltage multiplier modifies the supply voltage to the desired level. Dkt. ## 220 at 13*;* 149 at 13. The '951 Patent describes a particular voltage multiplier circuit that "advantageously" enables multiplication of the voltage to a range of different voltages, including voltages both above and below the supply voltage. '951 Patent at 1:11–24, 1:49–63. The invention "control[s]" the generated voltage amplitude, producing a "regulated" voltage as it moves through the circuit components. *Id.* at 2:2–6.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 25

**CONFIDENTIAL MATERIAL REDACTED**

Claim 1 of the '951 Patent (which for present purposes is representative of other claims) describes a voltage multiplier with several multiplier stages. The last multiplier stage provides a signal to a "feedback bias control circuit," which "generates a feedback signal . . . *based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage.*" '951 Patent at 10:50–59 (emphasis added). When broken down, the claim requires a feedback bias control circuit that generates a feedback signal by comparing two voltages: (1) "a voltage *proportional* to" the voltage at the output of the second multiplier stage, and (2) a "reference voltage." During claim construction, the Court construed "proportional" to mean a "constant ratio to another value that can be adjusted at different times." Dkt. # 247 at 49.

B.    Infringement of the '951 Patent

The central dispute is whether the feedback circuitry within Impinj's accused products rely on a "proportional" voltage to generate the feedback signal.

NXP argues that the accused products satisfy each element of claim 1. NXP says that the accused products contain a feedback bias control circuit with a ████████ Dkt. # 282 at 21. NXP also says that the "output of the second clocked multiplier stage" is ████████████ ████████████████████████████████████████████████████ *Id.* at 21. And it says that there is a reference voltage ██████ *Id.* Putting it all together, NXP says that ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ *Id.*

Impinj responds that ██████ *not* proportional to ██ under the Court's construction (or any other reasonable construction of "proportional"). Dkt. ## 319 at 11–18, 294 at 10–16.

**CONFIDENTIAL MATERIAL REDACTED**

The Court agrees with Impinj.  Based on the explanations provided by the parties, no reasonable jury could conclude that ████ voltage is "proportional" to the output ████. It appears that there is no meaningful, correlative relationship between the two voltages, much less a proportional one. ████████████████████████████████████ ████████████████ As Impinj explains, ████████████████████████ ████████████████████ Dkt. # 319 at 15.  Instead, the ████ node remains at ████████████████████████████████ ████████████████ Dkt. # 283-1 at 22–24; Dkt. # 295-3 at 130 ████████████████████████████████████████ ████████████████; *id.* at 148.

For example, during the initial ████████ period, the ████████████████, while the ████████████████████████████. Dkt. # 319 at 15–16.  In the illustration below, a ████████████████ (the blue line in the bottom graph) increases during the ████████ period, while the ████ (the purple line in the second graph) ████████████████ ████████████



ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 27

**CONFIDENTIAL MATERIAL REDACTED**

Dkt. # 295-3 at 146. This is not a proportional relationship. NXP has not meaningfully rebutted this characterization of the accused products.

Proportionality requires, at minimum, a relationship between two variables. There does not appear to be a correlative relationship between ███████ that satisfies this claim limitation.

NXP argues that even if there is no proportional voltage during the initial ███████ period, the accused products still infringe at ███████ *See* Dkt. # 343 at 7–8 ███████ ███████████████████████████████████████████████████ ███████████████████ This, NXP says, creates "proportionality" because both the ███████████████ become relatively steady and unchanging, creating a "constant" ratio between the two voltages. *See, e.g.*, Dkt. # 291 at 4. And the Federal Circuit has explained that "an accused device that sometimes, but not always, embodies a claim[] nonetheless infringes." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (internal quotations omitted).

But the accused products do not satisfy the "proportional" limitation, even at ███████. While the two values may temporarily form a "proportion" or ratio at ███████ (because they are constant), it does not necessarily follow that the two values are *proportional*. As described above, the common-sense understanding of "proportional" requires a relationship between variables. If two variables were treated as proportional simply because neither is changing, then any two variables would be proportional—at least momentarily—regardless of the relationship between them.

NXP does not explain how there is a proportional relationship between the ███████ at ███████ under that common-sense understanding of the term. NXP does not, for example, say that if the ███████████████████████████████████████

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 28

1 ████████████████████████████████████████████. Nor does NXP say

2 that ████████████████████████████████ *See* Dkt. # 355 at 6

3 ██████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ████████████████████. NXP's theory—that two variables are proportional simply because

6 neither happens to be changing—defies the common-sense understanding of the word.

7 Accordingly, there does not appear to be a proportional relationship between the █████████

8 ████████.

9      NXP also argues that at ███████████████████████████████

10 ██████████████████████████████████████████████████████

11 ████████████████████████, thus satisfying the Court's construction for the

12 term 'proportional.'" Dkt. # 282 at 21. Dr. Kenney, Impinj's expert, admits that ████████

13 ████████████████████████████████████████████████

14 ████████████████████████████ Dkt. # 283-1 at 23–24. But the █████

15 █████████████ *is* part of the circuit. *See id.* And it is the ██████████████

16 ████████████████████████ *See id.* Thus, even if there is proportional voltage created

17 by the ██████████████████████████████████████

18 ████████████████████████████████████

19      Moreover, even if there are momentary periods during which the █████████ form a

20 proportional relationship (say, because the ████████████████████████),

21 such fleeting proportionality would not seem to satisfy the function of the proportional voltage in

22 the '951 Patent. The proportional voltage in the '951 Patent is used to provide the regulation

23 circuit with information about the output of the charge pumps. If the ██████████ happened to

24 be proportional for a few milliseconds, but then were not proportional moments later, it is hard to

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 29

**CONFIDENTIAL MATERIAL REDACTED**

understand how the [REDACTED] proportion could provide information about the output voltage level to the feedback circuit.

Finally, this conclusion tracks the way Impinj's accused products appear to function. According to Dr. Kenney, [REDACTED]

[REDACTED]

[REDACTED] Dkt. # 283-1 at 23.  In other words, Impinj's accused products are designed to [REDACTED], while the '951 Patent is directed to controlling the output voltage.

Accordingly, because the accused products do not satisfy the "proportional" limitation (a requirement of every claim in the '951 Patent), they do not infringe.  The Court grants Impinj's motion for a judgment of non-infringement of the '951 Patent and denies NXP's motion. Because the Court finds that Impinj's accused products do not infringe because they lack the "proportional" feature described in the claims of the '951 Patent, the Court declines to address Impinj's alternative argument based on the term "coupled" in claims 9, 13, 15, and 16.  Dkt. # 294 at 14–16.

## VI

### ISSUES RELATING TO THE '097 PATENT

The parties raise two issues relating to the '097 Patent.  First, NXP moves for summary judgment that the '097 Patent is valid given two prior art references.  Dkt. # 282 at 25–26. Second, Impinj moves for summary judgment of non-infringement of the '097 Patent because it says that its accused devices do not contain a "voltage-raising means."  Dkt. # 294 at 16–19.  The Court grants NXP's motion and denies Impinj's motion.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 30

A.      Additional Background: The '097 Patent

The '097 Patent describes an improved approach to storing information on a tag.  The invention described by the '097 Patent provides "a substantially longer period of time during which the stored information can be ascertained with high reliability."  '097 Patent at 2:34–36.

The '097 Patent discloses "information-voltage generating means" that produce an "information voltage."  *Id.* at 1:1–18.  Claim 1 (which is representative for present purposes) describes a data carrier containing "information-voltage generating means that are arranged to receive a control signal . . . and that are arranged to generate the information voltage by using the control signal."  *Id.* at 8:66–9:3.  Claim 1 also states that the data carrier is "characterized in that the information-voltage generating means have voltage-raising means that are arranged to raise the voltage value of the control signal."  *Id.* at 9:3–5.

The Court construed the "information-voltage generating means" term as a means-plus-function term subject to section 112, ¶ 6.  Dkt. 247 at 33.  The Court determined that the claimed function is "generating an information voltage by receiving and using a control signal that is of a voltage value that is at most equal to the value of the supply voltage."  *Id.*  And the Court determined the corresponding structure is "a charging-current generating stage, voltage-raising means, and voltage-limiting means" and equivalents.  *Id.* at 33.

The Court also construed the term "voltage-raising means that are arranged to raise the voltage value of the control signal."  The Court initially construed the term as a means-plus-function term subject to section 112, ¶ 6.  Dkt. # 247 at 33–39.  The Court stated that the function was "raising the voltage value of the control signal," and the corresponding structure was "a charge pump or the float-based structure described at 2:43–48 of the '097 Patent" and equivalents thereof.  *Id.*  But the Court modified that construction in a subsequent order.  Dkt. # 375.  After developing a deeper understanding of the technology at issue and Federal Circuit

case law, the Court found it necessary to modify that construction. The Court modified its construction to hold that the term is *not* a means-plus-function term, and that the term should be construed to mean "a circuit that raises the voltage value of the control signal." *Id.* at 8–9.

B.     Validity of the '097 Patent

NXP moves for summary judgment that the '097 Patent is valid given two prior art references.[8] Dkt. # 282 at 25–26. In his report, Dr. Kenney (Impinj's expert), relied on at least two prior art references—U.S. Patent Number 5,933,386 ("Walker") and U.S. Patent Number 6,147,605 ("Vega")—to suggest that several claims in the '097 Patent were anticipated or obvious, and thus invalid. *See* Dkt. # 281-1 at 4 (public version of Dr. Kenney's report); Dkt. # 283 at 4 (sealed version of Dr. Kenney's report). NXP argues that neither Impinj nor Dr. Kenney identify a "charging-current generating stage" (which is part of the corresponding structure for "information-voltage generating means," as construed by the Court) within Walker or Vega. Dkt. # 282 at 25–26; *see also* Dkt. # 283 at 82–86 (Dr. Kenney's discussion of Walker); *id.* at 74–81 (Dr. Kenney's discussion of Vega).

Dr. Kenney's report does not identify which component or components in Walker or Vega disclose a "charging-current generating stage" (or equivalent). Aside from a statement acknowledging the Court's construction, Dr. Kenney does not otherwise mention a "charging-current generating stage." Impinj's brief discusses several components, such as a "write decoder (216)," "controller (218)," "charge pump (223)," and various forms of memory. Dkt. # 319 at 19. But Impinj never directly states that any of these components represent a "charge-current

---

[8] At oral argument, NXP clarified that it was not seeking a blanket judgment of validity, but rather only a judgment that the '097 Patent is not anticipated or obvious given the two specified prior art references, Walker and Vega.

generating stage" or equivalent.[9]  Nor does Impinj's brief explain *how* any of the identified

components serve as a "charging-current generating stage" or an equivalent.  *Cf. DSS Tech.*

*Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1376 (Fed. Cir. 2018) ("conclusory statements and

unspecific expert testimony" do not support obviousness finding (citation omitted)).  And Impinj

does not suggest that the '097 Patent is obvious despite the failure of Vega and Walker to

disclose such a structure (say, based on the doctrine of inherency).

As Impinj explained in its claim construction briefing, the "function" of the "charging-

current generating stage" is "creating the information voltage."  Dkt. # 135 at 20.  Neither Dr.

Kenney's report nor Impinj's brief explains which structure(s) in Walker or Vega "create[] the

information voltage."  Moreover, the specification of the '097 Patent describes an embodiment

of a charging-current generating stage "implemented in the form of a first n-channel field effect

transistor."  '097 Patent at 4:3–4.  While the Court did not limit the corresponding structure to a

particular *type* of charging-current generating stage, Impinj does not explain how any of the

identified structures perform like any of the embodiments found in the '097 Patent.  Merely

listing technical components without explaining how they serve the same function as the claim

limitation is not sufficient.  *See Biotec Biologische Naturverpackungen GmbH & Co. KG v.*

*Biocorp, Inc.*, 249 F.3d 1341, 1353 (Fed. Cir. 2001) ("It is not the trial judge's burden to search

through lengthy technologic documents for possible evidence.").

Accordingly, the Court agrees with NXP: Impinj has not established a material dispute of

fact as to whether Walker or Vega disclose a "charging-current generating stage."  But the Court

emphasizes the narrowness of its holding.  The Court is *not* saying that the '097 Patent is valid:

---

[9] Impinj says that "[i]mplicit in NXP's argument is that it does not believe the prior art structures identified by Dr. Kenney are 'charging-current generating stage.'"  Dkt. # 319 at 20.  But Impinj never says that NXP's argument is *wrong*, or that any of the identified structures actually serve as a charging-current generating stage or an equivalent.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 33

**CONFIDENTIAL MATERIAL REDACTED**

Other references could disclose a charging-current generating stage, or the patent could be obvious for other reasons. The Court is only saying that Impinj has not established the presence of a "charging-current generating stage" in Walker or Vega. And because the Court has modified its construction of the "voltage-raising means" term, the Court is not foreclosing the possibility that Walker, Vega, or any other reference renders that limitation (or any other limitation) obvious.

C.       Non-Infringement of the '097 Patent

Impinj moves for summary judgment of non-infringement of the '097 Patent. Dkt. # 294 at 16–19. Impinj argues that the accused products lack the claimed "voltage-raising means" as construed by the Court. *Id.*

As noted above, the Court initially construed the "voltage-raising means" term as a means-plus-function term. The parties briefed the issue accordingly. But since then, the Court has modified its construction of the term. Dkt. # 375. The Court no longer construes the term as a means-plus-function term and instead interprets it to mean "a circuit that raises the voltage value of the control signal." *Id.* at 8–9. Thus, the parties' briefing does not directly address whether the accused products satisfy the Court's new construction.

That said, based on the parties' explanation of the accused products, the Court concludes that a reasonable jury could find that the accused products do, in fact, contain a "voltage-raising means." NXP's infringement contentions alleged that a "███████" in the accused products satisfies the "voltage-raising means" limitation.[10] Dr. Madisetti stated during his deposition that

███████████████████████████████████████████████████████████████████ Dkt. # 333-1

---

[10] As previewed in a prior order (Dkt. # 375 at 11–12), and as will be explained more fully in a forthcoming order, the Court will not allow NXP to present its infringement theory that a █████████ ████████ *combination* satisfies the voltage-raising means limitation. NXP's infringement contentions did not disclose this combination-based theory, and instead focused on a ████████ theory.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 34

**CONFIDENTIAL MATERIAL REDACTED**

at 3.  And as conceded by Dr. Kenney (Impinj's expert), a ██████████████████████████

████████████████████████████████████████████████████████████████  Dkt.

# 327-1 at 9;  *see also id.* ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████.

       Accordingly, the Court denies Impinj's motion.  A reasonable jury could conclude that a

████████ satisfies the voltage-raising means term—that is, a reasonable jury could conclude

that the ██████ is "a circuit that raises the voltage value of the control signal."

## VII

### ACCEPTABLE NON-INFRINGING ALTERNATIVES FOR PURPOSES OF DAMAGES

       NXP moves for partial summary judgment that Impinj cannot meet its burden of proof to

show the "availability and acceptability of any non-infringing alternatives" for damages

purposes.  Dkt. # 282 at 27–29.  This issue closely relates to at least one other pending motion:

Impinj's motion to exclude expert David A. Haas.  *See* Dkt. ## 287, 296.  That motion also

discusses whether either NXP entity is entitled to lost profits .

       Because the issues are related, the Court defers ruling on this portion of NXP's motion.

The Court will address all damages-related issues in a forthcoming order.

## VIII

### CONCLUSION

For the reasons above, the Court:

(1) DENIES Impinj's motion as to invalidity of the '092 Patent.

(2) DENIES NXP's motion and DENIES Impinj's motion as to infringement of the '092
Patent.

(3) DENIES NXP's motion and GRANTS Impinj's motion as to infringement of the '951
Patent.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 35

(4) GRANTS NXP's motion as to validity of the '097 Patent.[11]

(5) DENIES Impinj's motion as to non-infringement of the '097 Patent.

(6) RESERVES ruling on NXP's motion as to availability of acceptable, non-infringing alternatives for purposes of damages.

Dated this 28th day of March, 2023.

John H. Chun
John H. Chun
United States District Judge

---

[11] But only on the narrow grounds stated within this order.

ORDER RE: CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT - 36

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NXP USA, INC., and NXP B.V.,<br><br>Plaintiffs,<br><br>v.<br><br>IMPINJ, INC.,<br><br>Defendant. | CASE NO. 2:20-cv-01503-JHC<br><br>ORDER GRANTING MOTION FOR RECONSIDERATION AND SUMMARY JUDGMENT FOR IMPINJ AS TO THE '092 PATENT |

On May 15, 2023, the Court denied Impinj's renewed motion for summary judgment as to the '092 Patent.  Dkt. # 469.  The Court reasoned that almost all the "TID" data—94 of the TID data's 96 bits—is part of the claimed "identification data block."  *Id.* at 11–13.  But the Court held that two bits—a "Security (S) indicator" bit and a "File (F) indicator" bit—could plausibly constitute "useful data" instead.  *Id.*  The Court concluded that "this presents a factual question for resolution by a jury.  A jury will have to decide whether the TID data—as a whole, or a subset of it—more closely resembles 'identification data stored in memory' or 'useful data.'"  *Id.* at 13.

On May 23, 2023, Impinj moved for reconsideration.  *See* Dkt. # 483.  The Court ordered NXP to provide a response (Dkt. # 484), and NXP timely provided a response.  *See* Dkt. # 493.

ORDER GRANTING MOTION FOR RECONSIDERATION AND SUMMARY JUDGMENT FOR IMPINJ AS TO THE '092 PATENT - 1

The Court GRANTS the motion for reconsideration and GRANTS Impinj's motion for summary judgment of non-infringement as to the '092 Patent. The Court will provide its complete reasoning in a forthcoming order but offers the following observations.

First, while the Court initially concluded that there remained a question of fact as to whether the Security and File bits are part of the identification data block or are useful data, the question really boils down to one of claim construction. *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997) ("Where the parties do not dispute any relevant facts regarding the accused product . . ., but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment.").

Second, in the context of the '092 Patent, infringement analysis should not be undertaken on an atom-by-atom, bit-by-bit basis. Instead, the proper unit of analysis is a given data *block*, as required by the claims. The presence of one or two bits that may not strictly serve an identification purpose[1] does not negate the overall identifying character of the TID data *block*, which consists almost entirely of identification data. And indeed, as the Court understands it, even the *EPC* memory block contains some data that is not strictly identifying. *See, e.g.*, Dkt. # 285-1 at 47–48 (listing various "indicator" bits stored in EPC memory); Dkt. # 483 at 5. Accordingly, Impinj's accused products do not transmit any "specific useful data," and thus do not satisfy that element of the claims.

Third, the '092 Patent expressly contemplates that the "identification data block" can contain "special data" that are "useful or absolutely necessary for other applications" but are "not

---

[1] But the File and Security bits also provide some identifying information about the nature of the tag. These bits "*uniquely identify* the custom commands and/or optional features that a tag supports." Dkt. # 285-1 at 52 (emphasis added).

ORDER GRANTING MOTION FOR
RECONSIDERATION AND SUMMARY
JUDGMENT FOR IMPINJ AS TO THE '092
PATENT - 2

1    in any way necessary for specific applications of the data carrier." '092 Patent at 17:11–18; *see*

2    *also* Dkt. # 247 at 15.  Thus, even if the Security and File bits should be analyzed separately, and

3    even if those bits are not deemed to be identification data, they could still constitute "special

4    data" and be part of the "identification data block."  The "special data" of the '092 Patent is but

5    one of countless ways in which the patent is muddled, providing limited clarity to the public

6    about the metes and bounds of its claims.

7        Accordingly, the Court GRANTS Impinj's motion for reconsideration (Dkt. # 483) and

8    GRANTS Impinj's motion for summary judgment of non-infringement as to the '092 Patent.

9    The Court will provide its complete reasoning in a forthcoming order.  The Court STRIKES

10   Impinj's motion to construe additional claim terms (Dkt. # 490) as moot.

11       Dated this 27th day of May, 2023.

12

13

14                                        John H. Chun
                                          United States District Judge

15

16

17

18

19

20

21

22

23

24   ORDER GRANTING MOTION FOR
     RECONSIDERATION AND SUMMARY
     JUDGMENT FOR IMPINJ AS TO THE '092
     PATENT - 3

# UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| NXP USA, INC., and NXP B.V.<br><br>　　　　　　　　　Plaintiffs,<br>　v.<br><br>IMPINJ, INC.<br><br>　　　　　　　　Defendant | **JUDGMENT IN A CIVIL CASE**<br><br>CASE NUMBER 2:20-cv-01503-JHC |

☒　**Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒　**Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

THE COURT ORDERS:

(1) Based on the jury's responses on the jury verdict form (Dkt. ## 566, 567), the Court enters judgment of non-infringement and no invalidity as to U.S. Patent No. 7,374,097.

(2) The Court granted summary judgment of non-infringement to Impinj, Inc. as to U.S. Patent No. 7,257,092 (Dkt. # 505, including additional forthcoming reasoning provided by memorandum opinion); U.S. Patent No. 7,795,951 (Dkt. ## 380, 414); U.S. Patent No. 7,456,489 (Dkt. ## 242, 248); U.S. Patent No. 7,538,444 (Dkt. ## 242, 248); and U.S. Patent No. 8,415,769 (Dkt. ## 242, 248).

Dated June 27, 2023.

<div style="margin-left: 40%;">

Ravi Subramanian
Clerk of Court


/s/Ashleigh Drecktrah
Deputy Clerk

</div>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NXP USA, INC., and NXP B.V.,

                    Plaintiffs,

      v.

IMPINJ, INC.,

                  Defendant.

CASE NO. 2:20-cv-01503-JHC

MEMORANDUM OPINION RE:
SUMMARY JUDGMENT – THE '092
PATENT

As stated in the Court's May 27, 2023, order (Dkt. # 505), the Court issues this memorandum opinion to provide the balance of its reasoning to support its grant of summary judgment to Impinj, Inc. as to U.S. Patent No. 7,257,092 (the '092 Patent).

# I

## BACKGROUND

A.    The '092 Patent

The '092 Patent describes techniques for communicating between a "communication station" (RFID reader) and a "data carrier" (RFID tag). '092 Patent at 1:5–8. Prior art methods used a two-step process for communication between a data carrier and a communication station. The RFID system would first conduct an "inventorization procedure" during which the communication station would identify all the data carriers within its range. *Id.* at 1:10–38. After

the inventorization procedure, the data carrier would transmit "useful data" to the communication station upon request. *Id.* at 1:38–47. The "disadvantage" of this two-step method was that "it [took] a relatively long time" for the "useful data" to become usable by the communication station. *Id.* at 1:42–44.

The '092 Patent purports to improve upon the prior art by using a communication procedure in which the "identification data block" and "useful data" are transmitted together. *Id.* at 11:7–17 ("[T]he invention is distinguished in that not only are parts of the identification data blocks IDB transmitted into the communication station 1 in the course of carrying out an inventorization procedure, but that during the inventorization procedure the specific useful data n×UDB desired and/or required in the communication station 1 are also simultaneously transmitted."); Dkt. # 135 at 14. This simultaneous transmission shortens the time it takes for the communication station to obtain the "useful data" stored in the data carriers. '092 Patent, 3:51–59.

Claim 1 of the '092 Patent is representative. It states:

A method of communicating between a communication station (1) and at least one data carrier (2 (DC)), which data carrier (2 (DC)) comprises a characteristic identification data block (IDB) and useful data (UD), by said method an inventorization procedure is carried out, the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB) of the at least one data carrier (2 (DC)) is known in the communication station (1), and by which method a transmission of specific useful data (n×UDB) is carried out from the at least one data carrier (2 (DC)) to the communication station (1) such that during the implementation of the inventorization procedure at least one part of a block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (1) and, in addition, said specific useful data (n×UDB) are transmitted from the at least one data carrier (2 (DC)) to the communication station (1).

*Id.* at 17:47–65. It is important to observe that claim 1 requires that the tag return two types of data to the reader: (1) at least part of an "identification data block (IDB)" and (2) "specific useful

data (n×UDB)." This data must be transmitted to the data carrier "during the implementation of the inventorization procedure," such that at least one part of each data type is "known" to the reader by the time the "inventorization procedure terminates." *Id.* at 17:53–65.

B. The Accused Products

Impinj's accused products implement the "Gen2 protocol," an industry standard protocol for RFID communications. Dkt. # 283-4 at 6–7, 11–21. The Gen2 protocol requires that a tag's memory be separated into four distinct memory blocks: (1) "Electronic Product Code" (EPC) memory, (2) "TID" memory, (3) Reserved memory, and (4) User memory. Dkt. # 283-4 at 14.

First, EPC memory contains a code which "identifies the object to which the Tag is or will be attached." Dkt. # 285-1 at 45. Second, "TID" is defined as "Tag-identification or Tag identifier, depending on context." Dkt. # 285-1 at 21. TID memory must contain "sufficient information for an Interrogator to uniquely identify the custom commands and/or optional features that a Tag supports." *Id.* at 52. TID memory "may also contain Tag- and manufacturer-specific data (for example, a Tag serial number)." *Id.* Third, Reserved memory "shall contain the kill and and/or access passwords [of the tag]." *Id.* at 45. Fourth, User memory "allows user data storage," configured as "one or more files." *Id.* at 52, 45. A graphic representation of theGen2 protocol's memory is provided below:

1

2

3

4

5

6

7

8

9



Figure 6.19: Logical memory map

10   *Id.* at 45.

11   In the default Gen2 protocol, there is an "Inventory" process, which involves

12   "[i]dentifying individual tags from the chosen population."  *Id.* at 23.  In the default Gen2

13   inventory process, (1) a reader issues a command to initiate an inventory round, (2) one or more

14   selected tags from the chosen population respond by "backscattering" a random number (the

15   "RN16"), (3) the reader acknowledges the tag's RN16 by parroting back the RN16 provided by

16   the tag; (4) the reader requests the Electronic Product Code (EPC) from one of the responding

17   tags, and (5) the tag responds by "backscattering" its EPC.  *See generally* Dkt. ## 285-1 at 139,

18   59–60; 282 at 12; 421 at 5–6.  The tag is then able to transmit other information (like data in

19   User memory) to the reader.  This default Gen2 inventory process is illustrated below:

20

21

22

23

24

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 4



Figure E.1: Example of Tag inventory and access

Dkt. # 285-1 at 139.

The accused tags are Gen2 compliant. Dkt. # 283-4 at 6. But the accused products modify the default Gen2 protocol through what Impinj calls its "FastID" feature. In the default Gen2 inventory procedure, the only data transmitted during inventorization from tag memory is the tag's EPC. The process "still requires a couple of commands" for the reader to learn the tag's TID. Dkt. # 283-8 at 2. According to Impinj's marketing materials, however, the FastID "short-cycle[s] the process of getting the TID." *Id.* With FastID, the tags "backscatter both their EPC and TID as part of their response to an ACK command from the reader." *Id.* In other words, the FastID system transmits both EPC data and TID data simultaneously. *See* Dkt. # 283-1 at 4 (Impinj's expert, Dr. Kenney, stating that "[u]nder the Gen2 Specification, the sequence for accessing a TID requires a sequence of commands [], and FastID allows the TID to be read with fewer commands than that provided by the standard"). Impinj touted the "EPC+TID"

feature of FastID as "2–3 times faster than previous methods."  Dkt. # 281-13 at 6.  An illustration of the comparison between a system with and without FastID is found below:



Dkt. # 283-8 at 2.  The accused tags only send EPC data and TID data during inventorization.

C.      Procedural History

        The '092 Patent has traveled a long and circuitous path in this litigation.

        During claim construction, the Court construed two terms in the '092 Patent that relate to the issues at hand.  First, the Court adopted *NXP*'s proposed construction and construed "characteristic identification data block (IDB)" to mean "identification data stored in memory."  Dkt. # 247 at 12–16.  The Court noted that "[w]hen broken down, the term refers to (1) a block (2) of data (3) used for identification."  *Id.* at 13.  Second, the Court construed "specific useful data (n×UDB)" to mean "some, but not all, useful data (UD)."  *Id.* at 16–20.  The parties stipulated early in this litigation that "useful data (UD)" means "data stored in memory, not including the characteristic identification data block (IDB)," and that the two categories are mutually exclusive.  Dkt. # 128 at 1; *see also* Dkt. ## 283-1 at 8, 319 at 7, 332 at 10.

The parties then cross-moved for summary judgment.  Dkt. ## 284, 294 (Impinj's motion); Dkt. ## 277, 282 (NXP's motion).  The Court denied both motions as to the '092 Patent.  Dkt. # 380 at 17–25.  In doing so, the Court at least implied that the term "identification data block" carries a more specific meaning than provided in its initial claim construction order.  The Court stated that the "identification data block" of the '092 Patent refers to uniquely identifying data *used* by the reader during inventorization.  *Id.*  In light of this shift in construction, the Court granted Impinj an opportunity to file a renewed motion for summary judgment with additional non-infringement arguments.  *See* Dkt. # 416 (order granting leave to file renewed motion); Dkt. ## 421, 430 (renewed motion); Dkt. # 433 (NXP's opposition to renewed motion).

The Court initially denied Impinj's renewed motion for summary judgment.  Dkt. # 469.  But in doing so, the Court took another stab at interpreting the amorphous '092 Patent.  The Court stated:

> Upon further reflection, the Court finds its implicitly modified construction went too far: Based in part on a misunderstanding of the term "inventorization," the Court implicitly construed the claims to require that the "identification data block" refer to identification data stored in memory *used by the reader* during inventorization.  But the Court does not believe the claim language requires such a limitation.  Accordingly, the Court reverts to its initial construction of the term: "identification data stored in memory."

*Id.* at 8.  The Court further reasoned:

> At bottom, the claim requires two things: that (1) "at least one part of the identification data block" and (2) "specific useful data" are "known" in the communication station "after the inventorization procedure terminates."  '092 Patent at 17:51–63.  It does not require that the identification data block be "used" in any particular way during (or after) the inventorization procedure.  Nor does it require that the *reader* (rather than the system as a whole) use the identification data to uniquely identify a tag.

*Id.* at 9; *see also id.* at 8–11.

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 7

**Appx159**

The Court therefore settled on a final construction of "identification data block," construed to mean "identification data stored in memory."[1]  Based on that construction, the Court was all but satisfied that the accused products did not infringe the '092 Patent because they transmit only identification data during inventorization, not "specific useful data."  The EPC undoubtedly qualifies as part of the "identification data block," and almost all of the "TID" memory block (defined as "Tag-identification or Tag identifier, depending on context," Dkt. # 285-1 at 21) similarly qualifies.  But the Court denied Impinj's renewed motion for summary judgment based on concerns about two (of 96) bits of TID data—the "File" (F) and "Security" (S) indicator bits—that were not as straightforwardly "identifying" as the rest of the TID memory block.  *Id.* at 12–13.

Impinj then moved for reconsideration (Dkt. # 483) of the Court's order, and NXP provided a response (Dkt. # 493).  The Court granted Impinj's motion for reconsideration and, accordingly, granted Impinj summary judgment of non-infringement as to the '092 Patent.  Dkt. # 505.  In the order granting reconsideration, the Court provided some reasoning for its conclusion.  *Id.*  But given the Court's busy docket at the time (including several pending motions and a looming trial date on another patent in this case), the Court stated that it would provide its complete reasoning by separate order at a later date.  *Id.*

## II

### LEGAL STANDARDS

"Summary judgment is appropriate when the moving party demonstrates that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[1] Accordingly, the Court's complete reasoning for its final construction of the term can be found at Dkt. # 247 at 12–16 (initial claim construction order), Dkt. # 469 at 8–11 (order on renewed motion for summary judgment), and within this order.

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 8

law.'" *Spigen Korea Co. v. Ultraproof, Inc.*, 955 F.3d 1379, 1383 (Fed. Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, "[t]he court must afford all reasonable inferences and construe the evidence in the light most favorable to the non-moving party." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 255). Infringement (or non-infringement) can be decided at summary judgment when there are no genuine disputes of fact. To prove infringement, the patentee "must establish by a preponderance of the evidence that one or more claims . . . read on the accused device[s]." *Cross Med. Prod., Inc. v. Medtronic Sofamore Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005). "Where the parties do not dispute any relevant facts regarding the accused product . . ., but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997). Infringement is "properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001)

### III

#### DISCUSSION

Impinj is entitled to summary judgment of non-infringement as to the '092 Patent.

Claim 1 of the '092 Patent (which is representative) requires that a tag return two types of data to a reader: (1) at least part of the "identification data block (IDB)" and (2) "specific useful data (n×UDB)." '092 Patent at 17:54–65. This data must be transmitted to the data carrier "during the implementation of the inventorization procedure," such that at least one part of each

data type is "known" to the reader by the time the "inventorization procedure terminates." *Id.* at 17:53–65.  The parties agree that a given data block is either part of the "identification data block" or is "useful data," and that the two categories are mutually exclusive.  *See, e.g.*, Dkt. ## 128 at 1 (stipulating that "useful data (UD)" means "data stored in memory, not including the characteristic identification data block (IDB)"), 283-1 at 8, 319 at 7, 332 at 10.

The parties dispute whether Impinj's accused tags transmit both categories of data—part of the "identification data block (IDB)" and "specific useful data (n×UDB)"—during inventorization.  Using Impinj's "FastID" feature, the accused tags "backscatter both their EPC and TID as part of their response to an ACK command from the reader."  Dkt. # 283-8 at 2. Infringement hinges on how the EPC memory block and TID memory block are characterized: Are they part of the "identification data block," or are they instead "specific useful data"?

The parties do not dispute that the EPC is part of the "identification data block."  And for good reason: As defined by the Gen2 protocol, the EPC "identifies the object to which the Tag is or will be attached."  Dkt. # 285-1 at 45.  This is plainly identification data stored in memory transmitted during inventorization, and thus qualifies as part of the "identification data block."[2]

The more difficult question (and the subject of much of this litigation) is whether the TID memory block is part of the "identification data block" or is instead "specific useful data."  NXP asserts that TID memory (or a subset thereof) constitutes "specific useful data."  According to NXP, the accused products transmit both data from EPC memory (the claimed "identification data block") and TID memory (the claimed "specific useful data"), so the accused products

---

[2] In one of NXP's "alternative" infringement theories, NXP asserted that *EPC* memory constitutes "specific useful data" and that *TID* memory serves as the "identification data block"—the opposite of its primary infringement theory.  Dkt. # 293-3 at 4.  The Court held that this theory was not timely disclosed and that NXP could not rely on it.  Dkt. # 569 at 3.  But even if timely disclosed, the theory makes little sense.  It is difficult to imagine a block of data that better fits within the "identification data block" category than the product code found in the EPC.

infringe.  Impinj contends that TID memory is not "specific useful data," but is instead part of the "identification data block."  And because only data from the "identification data block" is transmitted during inventorization (data from EPC and TID memories), Impinj says that the accused products do not infringe.

The Court agrees with Impinj.  The Court concludes that TID memory is part of the "identification data block," which the Court construed to mean "identification data stored in memory."[3]  Dkt. ## 247 at 12–16, 469 at 8.  Because the accused tags transmit data only from the "identification data block" and do not transmit any "specific useful data," they fail to satisfy each limitation of the '092 Patent.

The Gen2 protocol defines "TID" as "Tag-identification or Tag identifier, depending on context."  Dkt. # 285-1 at 21.  This description suggests that TID memory carries identification data.  The Gen2 protocol states that TID memory "may [] contain Tag- and manufacturer-specific data (for example, a Tag serial number)."  *Id*. at 52.  TID memory must contain an 8-bit "class identifier" and must contain "sufficient identifying information . . . for an Interrogator to uniquely identify the custom commands and/or optional features that a Tag supports."  *Id.* at 45.  In one version of TID memory, the TID memory block contains "an 8-bit manufacturer identifier . . . a 48-bit Tag serial number (assigned by the Tag manufacturer)," and "the composite 64-bit TID . . . is unique among all classes of Tags."  *Id.*  at 52.  In another version, a large portion of TID memory is "defined" in reference to the "GS1 EPC Tag Data Standard."  *Id.*  And TID memory is typically "permalocked" by the tag manufacturer, which allows the serial number contained within TID memory to serve as a fixed means for identifying the tag.  *Id.*  Testimony by Franz Amtmann—the named inventor of the '092 Patent and NXP employee—similarly

---

[3] The Court adopted this interpretation during claim construction at the urging of *NXP*.

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 11

suggests that TID memory is part of the "identification data block."  *See* Dkt. # 285-2 at 4 ("Q. . . . Are you familiar with the term 'TID,' T-I-D? A. TID, yes. Q. What is a TID? A. Tag identification data. Q. . . . Is a TID an identifier? A. You are talking about T-I-D? Q. Yes, sir. A. Yes, it's an identifier of a tag, yeah."); *see also id.* at 5–6 ("Q. Okay. And then what does it mean for the EPC and TID to be 'part of the RAIN RFID unique tracking identifier'? A. It means that the EPC, where we have no control about the user-wise entities, but at least the EPC, the TID, we guarantee that you have a unique tracking identifier of the whole label.").

Plainly, then, TID memory contains not only identification data, but *uniquely identifying* identification data.  TID memory stands for "Tag-identification or Tag identifier"; it contains a serial number and other identifying information; it uniquely identifies the commands and features of the tag; and it is permalocked by the tag manufacturer, providing a constant identifier. Indeed, the EPC and TID memories are far more alike than different.  While EPC memory contains a user-programmable *product* identifier and TID memory contains a manufacturer-locked *tag* identifier, both are *identifiers*.  TID memory contains "identification data stored in memory," and is thus part of the "identification data block."

The Court also observes that the '092 Patent built on certain "prior art" discussed in the patent.  The '092 Patent describes the "ISO/IEC 15693-3 standard" as a "known" method in the field.  '092 Patent at 1:20.  In the ISO/IEC 15693-3 standard, there is both a "unique identifier" (UID) and more general "VICC memory."  See generally Dkt. # 285-9 at 9, 13.  The '092 Patent arguably built on the typology of the ISO/IEC 15693-3 standard: "identification data block" roughly corresponds to the ISO/IEC 15693-3 standard's UID, and "useful data" roughly corresponds to the ISO/IEC 15693-3 standard's VICC memory.  See also Dkt. # 247 at 15 (relying on the ISO/IEC 15693-3 standard—at NXP's urging—during claim construction).

The Court previously determined that whether a given Gen2 memory block (e.g., TID memory) is more analogous to the ISO/IEC 15693-3 standard's UID or VICC memory presents a question of fact. Dkt. # 469 at 8. While the Court continues to believe that this inquiry presents a factual question, analogizing to the ISO/IEC 15693-3 standard nevertheless provides compelling evidence that TID memory is part of the "identification data block." The ISO/IEC 15693-3 standard discloses a 64-bit UID that includes a 48-bit serial number, an 8-bit manufacturer code, and 8 bits of data labeled "E0." Dkt. # 285-9 at 9. The TID memory block similarly contains an 8-bit manufacturer identifier and a 48-bit tag serial number (among other things). It is tough to ignore the similarities between TID memory and the ISO/IEC 15693-3 standard's UID.

NXP argues that in the default Gen2 protocol, it is the EPC that is sent during inventorization and relied on to identify the tags. NXP says that TID memory, by contrast, is but another form of data that can be transmitted after inventorization. But how the default Gen2 protocol's inventorization process operates is not particularly relevant. Nor is it relevant, given the Court's construction, whether a reader *relies* on the EPC during inventorization, or whether *end users* rely on the EPC or TID as the primary means of identification.[4] As described in the Court's previous order (Dkt. # 469 at 8–11), the claims simply do not require that a reader or an end user "use" the identification data block exclusively for any given purpose. The claims require only that the identification data becomes "known" to the reader during an inventorization

---

[4] Even if the claims were read to require reliance by the reader, as alluded to in the Court's prior order, it is not clear that the reader in the default Gen2 protocol truly *relies* on the EPC (and the EPC alone) to identify the tag as NXP asserts. Rather, it appears that the reader learns the identity of the tag (that is, with which tag it is communicating) through transmission of a random, 16-digit "RN16" value. If so, then any differences between the EPC and TID memory blocks further dissipate. While the default Gen2 protocol elects to provide only one type of identification data during inventorization (EPC data), there is no reason why Impinj's inventorization process could not send two types of identification data (EPC data and TID data).

process.  So the relevant inquiry must focus on (1) the nature of data transmitted (that is, whether it is identification data) and (2) whether the data becomes "known" to the reader during an inventorization process.

Equipped with the FastID feature, Impinj's products transmit both EPC and TID data to the reader during an inventorization process.  Both the EPC and TID data provide identifying information (even if different types of identifying information) and become "known" to the reader through inventorization.  The transmission of the EPC may provide identifying information to the RFID system; but nothing stops the RFID system from obtaining *more* identification data through transmission of the tag-identification information (like the tag serial number) found within TID memory.  Both the EPC and TID memories are part of the "identification data block."

But the Court previously expressed concern about whether the *entire* TID memory block could be classified as part of the "identification data block."  Dkt. # 469 at 12–13.  In several of NXP's alternative infringement theories, NXP pointed to two bits of TID memory (of 96 total bits) which NXP said are "specific useful data" and are not part of the "identification data block."  Dkt. # 293-3 at 3–4.  First, TID memory contains a "Security (S) indicator" bit, which indicates "whether a Tag supports the Authenticate and/or Challenge commands."  Dkt. # 285-1 at 52.  Second, TID memory contains a "File (F) indicator" bit, which indicates "whether a Tag supports the FileOpen command." [5]  *Id.*  NXP says that these two bits are "specific useful data," rendering the tags infringing.

---

[5] In its motion for reconsideration, Impinj argues that its tags do not meaningfully use either the Security bit or File bit.  Impinj says that "the F bit is always zero because none of the accused ICs have ever supported the FileOpen command," and that the "S bit is zero on all (but possibly one) accused [tag]."  Dkt. # 483 at 6.  But Impinj has not explained why this is relevant.  If the indicator bit is "0," it is still indicating something: that the tag does not support a certain command or feature.

Upon reconsideration, the Court concludes that the presence of the File and Security bits do not render the accused tags infringing. The two bits at issue *are* identifying and properly fit within the definition of "identification data block." These bits "*uniquely identify* the custom commands and/or optional features that a tag supports." Dkt. # 285-1 at 52 (emphasis added). They serve a fundamentally identifying purpose: identifying tag functionality to benefit the inventorization process. The bits tell the RFID system information about the tag: They explain whether the tag can support the Authenticate, Challenge, and FileOpen commands.

The File and Security bits are therefore fundamentally different than, say, the "User" memory block of the Gen2 standard. While the File and Security bits may look different from a serial number, they still serve a similar identifying function by providing information about the nature of the tags and the operation of the tags to the RFID system. By contrast, the open-ended User memory block allows the user to store all sorts of information unrelated to tag functionality and tag inventorization. *Id.* at 45, 52 ("User memory allows user data storage."). It is the User memory block—not TID memory—that more closely resembles "useful data" in the '092 Patent. The File and Security bits are therefore "identifying" and properly fall within the "identification data block." This alone suffices to grant Impinj's motion for summary judgment.

But *even if* the File and Security bits in TID memory are not deemed to be identifying in the strictest sense (though they are), the presence of two bits within TID memory does not destroy the identifying character of TID memory *as a whole*. First, the claims describe an "identification data *block*." *See* '092 Patent at 17:55 (emphasis added). Accordingly, the proper inquiry is whether the *block* carries identification data. As described above, the TID memory block serves such an identifying purpose: The Gen2 Protocol describes TID memory as a "Tag identifier" that contains information like a serial number. Dkt. # 285-1 at 21, 52. Considered as a block, TID memory is part of the "identification data block" even if it contains File and

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 15

**Appx167**

Security bits.  There is no reason to believe that the infringement inquiry should be undertaken on a bit-by-bit, atom-by-atom basis.  The proper unit of analysis is not so granular.

Second, the '092 Patent contemplates that the "identification data block" can contain *some* limited data that is not strictly identifying.  The specification describes "special data []" included in an identification data block."  '092 Patent at 17:11–12.  This "special data" is "not in any way necessary for specific applications of the data carrier," but is still "included in an identification data block" because it is "useful or absolutely necessary for other applications." *Id.* at 17:12–16.  Even if the Security and File bits are deemed "non-identifying," the identification data block's "special data" would allow for inclusion of these bits: They are "useful" or "necessary" for "other applications."

Third, if the File and Security bits are not themselves "identifying" in the strictest sense of the word, they are, at minimum, ancillary to identification.  Unlike the open-ended memory found in the User memory block (which could contain any information desired by the user), the File and Security bits are helpful to the inventorization/identification process itself: They tell the RFID system whether the tag can support the Authenticate, Challenge, and FileOpen commands (and thus the type of tag).

Simply put, it is hard to imagine that a POSITA would read the '092 Patent to cover any tag that transmits even a single bit of data during inventorization that is not "identifying" in the purest sense of the term.  An "identification data block" (like the TID memory block) does not lose its identifying character if a single bit is out of place.  And the File and Security indicators are not mere random bits of data: These bits are identifying in their own right because they "uniquely identify" the functionality of the tags and assist with inventorization.  Dkt. # 285-1 at 52.

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 16

**Appx168**

If transmission of a single stray "non-identifying" bit during inventorization could trigger infringement, absurd results could follow. If this theory were correct, the '092 Patent would seemingly capture almost any RFID system that needs to transmit some ancillary, "non-identifying" data during inventorization. Indeed, under such an interpretation, even the *Gen2 protocol itself* would infringe the '092 Patent. Under the Gen2 protocol, the EPC memory block (which surely qualifies as part of the "identification data block") can contain various "indicators" analogous to the File and Security indicator bits found in TID memory. For example, EPC memory must contain a "StoredPC" (Dkt. # 285-1 at 46), which in turn can include a "User-memory indicator" (indicating whether the tag "is capable of allocating memory to File_0"), an "XPC_W1 indicator" (indicating whether the tag "implement[s] XPC_W1"), and a "numbering system identifier toggle" (indicating whether the application is "referred to as a GS1 EPCglobal™ Application"). Dkt. # 285-1 at 47–48. If a product infringes when a single bit is transmitted during inventorization that does not identify a tag, then the Gen2 protocol itself—which includes EPC memory with various "indicators"—would infringe because the tag's transmission of the EPC alone would simultaneously transmit an "identification data block" and "useful data." There is no reason to believe that the '092 Patent should be read to prohibit any product that happens to transmit a single bit of arguably non-identifying information alongside the rest of its identification data block.[6]

---

[6] If, however, the patent were read to mean that the "identification data block" cannot contain even a single bit of arguably non-identifying information, then the Court would likely be required to revisit the meaning of "useful data."

The parties stipulated early in this litigation that "useful data" refers to "data stored in memory, not including the characteristic identification data block (IDB)" (Dkt. # 128 at 1), so any given bit of data must either be part of the "identification data block" or be "useful data." As Impinj points out, however, the parties did so when NXP had disclosed only one infringement theory, in which the *entire* TID memory block is treated as a single block. Dkt. # 490 at 9. Only later did NXP disclose its "two-bit" theory.

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 17

The '092 Patent is a muddled document.  As the Court's numerous attempts at interpretation make clear, the boundaries of "identification data block" and "useful data" are amorphous (to name but two confusing elements of the patent).  In an overly stylized and simplified hypothetical RFID system, the '092 Patent's typology might make sense: There might be one memory block consisting of *only* a single identifier in the form of a serial number (and *nothing* else), and a separate block of memory that contains *any* other data.  But when applied to real-world applications like the accused products, the '092 Patent provides far less certainty about its coverage.

Notwithstanding the patent's ambiguity, the Court concludes that no reasonable jury could find for NXP.  The entire TID memory block—including the File and Security bits—is part of the "identification data block" because it is "identification data stored in memory." Accordingly, the Court grants summary judgment of non-infringement to Impinj.

## IV

### CONCLUSION

For the reasons stated within this memorandum opinion, the Court grants summary judgment for Impinj as to the '092 Patent.

---

If transmission of a single non-identifying bit during inventorization renders a tag infringing, then the '092 Patent must allow for data that is neither in the "identification data block" nor is "useful data." Otherwise, the patent would presumably capture nearly every RFID system.

Dated this 7th day of July, 2023.

John H. Chun
United States District Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NXP USA, INC., and NXP B.V., | CASE NO. 2:20-cv-01503-JHC |
| Plaintiffs, | SEALED ORDER DENYING NXP'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, A NEW TRIAL |
| v. | |
| IMPINJ, INC., | |
| Defendant. | |

# I

## INTRODUCTION

After a six-day trial, a jury found that Impinj did not infringe claims 1 and 4 of U.S.

Patent Number 7,347,097 (the '097 Patent).  Notwithstanding the verdict, NXP now moves for

judgment as a matter of law (JMOL) as to infringement, or in the alternative, a new trial on

infringement.  Dkt. ## 597, 598.  For the reasons below, the Court DENIES the motion.

# II

## BACKGROUND

A.    The '097 Patent

Many RFID data carriers (commonly known as RFID tags) store information temporarily

(like an indication of successful communication with an RFID reader).  Dkt. # 137 at 21.  As

SEALED ORDER DENYING NXP'S MOTION
FOR JUDGMENT AS A MATTER OF LAW, OR
IN THE ALTERNATIVE, A NEW TRIAL - 1

described in the '097 Patent, the information is stored and represented "by a value of an information voltage that arises at the capacitor." '097 Patent at 1:45–47. But in the "known" data carriers found in the prior art, the information voltage would be "lower than the voltage value of the control signal" and would continuously decline due to "unavoidable leakage currents in the circuit." *Id.* at 1:62–2:1. This decline in voltage would lead to an "unsatisfactory situation" because the information was "no longer able to be evaluated after only a short period of time." *Id.* at 2:2–7.

The '097 Patent purports to solve this problem. The invention described by the '097 Patent provides "a substantially longer period of time during which the stored information can be ascertained with high reliability." *Id.* at 2:34–36. The invention allows the information voltage to "assume substantially the value of the supply voltage virtually irrespective of the transistor threshold voltage or the value of the control-signal voltage." *Id.* at 2:26–28. It also "gives the advantage that the entire difference in voltage between a reference potential and the supply voltage can be used to represent the information, thus giving a maximum possible signal-to-noise-voltage ratio." *Id.* at 2:29–33. These benefits are made possible by what the patent calls "voltage-raising means," which are "arranged to raise the value of the control-signal voltage." *Id.* at 2:16–17, 2:21–22.

NXP presented two claims to the jury during its infringement argument: independent claims 1 and 4.

Claim 4 describes a circuit within a data carrier, which "data carrier is arranged to receive a signal in a non-contacting manner." *Id.* at 9:16–18. The wirelessly received signal is used to "generate a supply voltage." *Id.* at 9:18. The circuit comprises "storage means that are arranged to store information capacitively." *Id.* at 9:19–20. That information is "represented by a value of an information voltage UI arising at the storage means." *Id.* at 9:21–10:1. Claim 4 further

states that the circuit comprises "information-voltage generating means that are arranged to receive a control signal, which control signal is of a voltage value that is at most equal to the value of the supply voltage, and that are arranged to generate the information voltage by using the control signal." *Id.* at 10:2–6. The information-voltage generating means "have voltage-raising means that are arranged to raise the value of the control signal." *Id.* at 10:7–9.

Claim 1 describes essentially the same circuit but adds one element. While claim 4 describes a circuit *within a data carrier*, claim 1 covers the data carrier itself (including the circuit). *Compare id.* at 9:15 (claim 4, covering "[a] circuit for a data carrier"), *with id.* at 8:58–59 (claim 1, covering "[a] data carrier . . . that has an electrical circuit").

B.    Claim Construction

The Court has construed two terms in the '097 Patent.

First, the Court construed the "information-voltage generating means" term as a means-plus-function term subject to 35 U.S.C. § 112, ¶ 6 (now codified at 35 U.S.C. § 112(f)). Dkt. # 247 at 33. The Court determined that the claimed function is "generating an information voltage by receiving and using a control signal that is of a voltage value that is at most equal to the value of the supply voltage." *Id.* And the Court determined the corresponding structure is "a charging-current generating stage, voltage-raising means, and voltage-limiting means" and equivalents. *Id.* at 33.

Second, the Court construed the "voltage-raising means" term. The Court initially construed the phrase "voltage-raising means that are arranged to raise the voltage value of the control signal" as a means-plus-function term subject to section 112, ¶ 6. Dkt. # 247 at 33–39. The Court stated that the function was "raising the voltage value of the control signal," and the corresponding structure was "a charge pump or the float-based structure described at 2:43–48 of the '097 Patent" and equivalents thereof. *Id.*

But the Court then sua sponte modified that construction. Dkt. # 375. The Court held that the term is not subject to section 112, ¶ 6, and that the term should be construed to mean "a circuit that raises the voltage value of the control signal." *Id.* at 8–9. The Court concluded that a person of ordinary skill in the art (POSITA) would understand the "voltage-raising means" term as "referring to sufficiently definite structure": "the class of *circuit components* (tangible structure) used to raise the voltage within a circuit." *Id.* at 9. In doing so, the Court adopted the construction advanced by NXP during the initial round of claim construction. Dkt. # 137 at 24.

When Impinj moved for reconsideration of the Court's modified claim construction (Dkt. # 393), the Court recognized that "the arguments [] Impinj presents in its motion for reconsideration are reasonable" and that "it is a difficult question whether 'voltage-raising means' should be interpreted . . . under § 112, ¶ 6," Dkt. # 405 at 6–7. But the Court stuck to its modified construction and denied the motion for reconsideration. *Id.* at 7.

C.    Summary Judgment Motions

Impinj moved for summary judgment of non-infringement as to the '097 Patent. Dkt. ## 284, 294 at 16–19. The Court denied Impinj's motion, concluding that a reasonable jury could find that the accused "level shifter" could satisfy the "voltage-raising means" limitation under the Court's modified construction of the term.[1] Dkt. # 414 at 34–35.

Because Impinj's initial summary judgment motion was based on the Court's earlier construction of the "voltage-raising means" term, the Court granted Impinj an opportunity to file a second motion for summary judgment. Dkt. # 416; *see also* Dkt. ## 424, 430 (Impinj's second

---

[1] NXP initially tried to argue that the combination of a "rectifier" and "level shifter" satisfies the voltage-raising means term. But the Court held that "[t]he rectifier/level shifter combination was not timely disclosed in NXP's infringement contentions. Neither Dr. Madisetti nor NXP may not rely on a rectifier/level shifter combination to satisfy the 'voltage-raising means' term." Dkt. # 477 at 6. So NXP was limited to arguing that the level shifter alone satisfies the voltage-raising means limitation.

SEALED ORDER DENYING NXP'S MOTION
FOR JUDGMENT AS A MATTER OF LAW, OR
IN THE ALTERNATIVE, A NEW TRIAL - 4

motion for summary judgment). The Court denied that motion, holding that a reasonable jury could find that the accused products infringe the patent, and that disputes of fact preclude summary judgment of invalidity. *See* Dkt. ## 506, 570.

Around the same time, the Court granted Impinj's motions for summary judgment of non-infringement as to two other patents, U.S. Patent Number 7,795,951 (Dkt. ## 380, 414) and U.S. Patent Number 7,257,092 (Dkt. ## 505, 580, 590). And earlier in the case, the Court granted Impinj's motion for summary judgment of non-infringement as to three so-called "wafer" patents, U.S. Patent Numbers 7,456,489, 7,538,444, and 8,415,769.[2] Dkt. ## 242, 248. This left only one patent for trial: the '097 Patent.

D.     Trial on the '097 Patent

A jury trial began on June 9, 2023. Over the course of a six-day trial, the parties presented evidence and arguments to the jury about both infringement and validity. As to infringement, NXP argued that the accused products[3] directly infringe claim 4 of the '097 Patent and indirectly infringe (via contributory or induced infringement) claim 1 of the '097 Patent. Impinj responded to NXP's infringement arguments by arguing, among other things, that the accused products do not satisfy the "voltage-raising means" and "voltage-limiting means" elements found in the claims.

On the final day of trial, June 21, 2023, the Court instructed the jury (Dkt. # 555), the parties presented their closing arguments, and the jury began deliberating. By mid-afternoon the next day, the jury reached a verdict. Dkt. # 579 at 8. The jury unanimously found that Impinj

---

[2] NXP's initial complaint asserted infringement of eight patents. Dkt. # 1. But the parties later narrowed their dispute to the six patents described above after decisions by the Patent Trial and Appeal Board regarding two of the asserted patents. *See* Dkt. # 176 at 2 & n.2 (joint status report); Dkt. # 594 at 6 n.1.

[3] To simplify trial, the parties stipulated that Impinj's "Monza R6" product family is representative of all Impinj products accused of infringement in this case. Dkt. # 528.

does not infringe claims 1 or 4 of the '097 Patent and that claims 1 and 4 of the '097 Patent are not invalid as obvious.  Dkt. ## 566, 567 (verdict form).

Before closing arguments, NXP moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  Dkt. # 546.  The Court denied that motion by oral ruling.  Dkt. ## 578 at 140; 554.  NXP now renews its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), and in the alternative, requests a new trial under Federal Rules of Civil Procedure 50(b) and 59.  Dkt. ## 597, 598.

### III

### LEGAL STANDARDS

A.      Judgment as a Matter of Law

"Under Ninth Circuit law," a district court may grant a motion for judgment as a matter of law only when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1291 (Fed. Cir. 2023) (quoting *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014); *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002)).  "The trial court can overturn the jury and grant [a Rule 50] motion only if . . . there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (citations omitted).  "A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014).

B.      New Trial

A motion for a new trial may be granted only when "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound

discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999); *see also* Fed. R. Civ. P. 59(a). "[A] district court may not grant or deny a new trial merely because it would have arrived at a different verdict." *4.0 Acres of Land*, 175 F.3d at 1139. "Where multiple theories could support the verdict, sufficient evidence as to any of one of them will defeat a motion for new trial." *Newton v. Equilon Enterprises, LLC*, 411 F. Supp. 3d 856, 865 (N.D. Cal. 2019).

## IV

### DISCUSSION

The jury returned a verdict of non-infringement as to claims 1 and 4 of the '097 Patent. Notwithstanding the verdict, NXP argues that it is entitled to judgment as a matter of law, or in the alternative, a new trial. Dkt. ## 597, 598.

A.     Judgment as a Matter of Law

1.     Substantial Evidence Supports the Jury's Verdict

NXP argues that it is entitled to judgment as a matter of law on infringement. Dkt. # 598 at 5–16. It says that no reasonable jury could conclude that the accused products do not satisfy each of the claim elements. *Id.* The Court disagrees.

A reasonable jury could have found that the accused "level shifter" does not satisfy the "voltage-raising means" limitation. The Court instructed the jury that the term "voltage-raising means" refers to a "a circuit that raises the voltage value of the control signal." Dkt. # 555 at 17. The Court did not further instruct—and NXP did not request—that the jury be told what it means to "raise" the voltage value of the control signal. A reasonable jury could have found that the accused level shifter does not "raise" the control signal's voltage within the word's conventional meaning. The jury could have found that the level shifter simply toggles between different logic

states or switches between different currents, rather than boosting, amplifying, multiplying, adding voltage to, or *raising* a particular signal.

Impinj presented testimony that a level shifter does not truly "raise" voltage and that a POSITA would not understand a level shifter to be a voltage-raising circuit. Dr. James Stevenson Kenney said that the level shifter "never raises the voltage. It simply switches in a new voltage." Dkt. # 574 at 166; *see also id.* at 209 ("[I]n the way it's level shifted, you're simply switching the power supply, VDD-RAMP, onto the output of DTG. It's not raising it in the same way the patent describes."); *id.* at 209–10 ("It's a circuit that translates between two different logic levels. And it never raises VDD—it can never produce a voltage higher than VDD_RAMP. So it's not boosting anything. It's just using a different power supply."). Theron Stanford similarly testified that "[t]here is no raising of any voltage WEN or otherwise in that circuit." Dkt. # 576 at 72. Ron Oliver agreed that a level shifter "cannot" "add voltage to a pre-existing signal such that the output is a sum of voltages," and that "[a] level shifter just selects one of the two power supplies and directs that to its output." *Id.* at 53; *see also id.* ("Q. Just to be clear, can [the level shifter] take the WEN signal and add some voltage to the WEN signal and then output a voltage that is a sum of the WEN signal and something [that is] added? A. No, the level shifter cannot do that."). He also testified that he was "not aware of a level shifter ever being referred to as a voltage raising circuit." Dkt. # 575 at 134.

Under NXP's infringement theory, the "WEN" signal in Impinj's products serves as the claimed "control signal" that has its voltage raised. But Impinj argued to the jury that while the WEN signal is an input to the level shifter, the level shifter outputs a different signal: DTG. Dkt. # 607 at 9–11. Impinj says, and a reasonable jury could have believed, that the WEN signal was not really *raised*. Rather, the circuit outputs a *different* signal at the level shifter, swapping in the DTG signal in place of the WEN signal. Impinj presented evidence that WEN and DTG are

SEALED ORDER DENYING NXP'S MOTION
FOR JUDGMENT AS A MATTER OF LAW, OR
IN THE ALTERNATIVE, A NEW TRIAL - 8

different signals, that they are labeled differently in Impinj's schematics, and that Impinj employees did not refer to the WEN signal as the same signal as the DTG signal. *See, e.g.*, Dkt. # 576 at 65 (Stanford testifying that "[p]rior to this case, I have never heard anyone say that WEN and DTG are the same signal."); *see also* Dkt. # 578 at 185 (closing argument). To be sure, NXP cites testimony that WEN and DTG are, in fact, the same signal. Dkt. # 598 at 7–8. But how the products work and whether the two signals are the same present factual questions that the jury could have resolved in favor of Impinj. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010) (infringement is a question of fact).[4]

The accused level shifter operates much differently than the voltage-raising circuit described in the patent. A reasonable jury could have reasonably found that the level shifter does not add voltage to the control signal, "raise" it, or boost its voltage like the patent describes, but simply toggles between logic levels "1" and "0," switching in one signal for another.

In addition, a reasonable jury could have found that the accused "clamping circuit" does not satisfy the "voltage-limiting means" limitation.

The term "voltage-limiting means" appears in several dependent claims of the patent. *See, e.g.*, '097 Patent at 9:12–14. But under the Court's construction of independent claims 1 and 4, a voltage-limiting means is a necessary component of all claims of the '097 Patent.

---

[4] In its order denying Impinj's second motion for summary judgment, the Court held that this different-signals argument could not support summary judgment. Dkt. # 506 at 5–6. But in reviewing a motion for summary judgment, the Court needed to view the evidence in the light most favorable to the non-movant, NXP, and determine whether a reasonable jury could find for the nonmoving party. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323 (Fed. Cir. 2009). From that perspective, the Court concluded that factual questions about the accused products precluded summary judgment. Dkt. # 506 at 5–6. But when presented with a motion for judgment as a matter of law, the Court reviews the jury's verdict from the opposite perspective, asking whether "the evidence, construed in the light most favorable to the nonmoving party [Impinj], permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Ironburg Inventions*, 64 F.4th at 1291 (citation omitted). In any event, the Court's conclusion in its prior order was tentative because the Court found the "briefing on this issue from both parties to be rather unclear." Dkt. # 506 at 6 n.1.

Claims 1 and 4 require the presence of an "information-voltage generating means." '092 Patent at 8:66, 10:2. The Court construed the "information-voltage generating means" term as a means-plus-function term subject to section 112, ¶ 6. Dkt. 247 at 33. The Court determined that the claimed function is "generating an information voltage by receiving and using a control signal that is of a voltage value that is at most equal to the value of the supply voltage." *Id.* The Court determined that the corresponding structure is "a charging-current generating stage, voltage-raising means, and voltage-limiting means" because the specification lists these three components as comprising the information-voltage generating means. *Id.* at 33. To satisfy the "information-voltage generating means" element, then, a product must contain a voltage-limiting means.

The Court did not construe the "voltage-limiting means" term. Neither party requested that the Court construe that term during claim construction. And while Impinj asked the Court to construe the term in its proposed jury instructions (Dkt. # 497-1 at 36), the Court did not do so. So the term is given its ordinary meaning. Dkt. # 555 at 17.

But however the term is construed, a reasonable jury could have found that the accused clamp circuit does not satisfy this limitation. The plain language of the patent's claims requires that the information-voltage generating means (and thus the voltage-limiting means) "receive a control signal." '097 Patent at 10:2–3. The specification similarly suggests that the voltage-limiting means "receive the control signal CS′ of raised voltage and to emit a control signal CS2″ of limited voltage." '092 Patent at 4:20–25. In other words, the voltage-limiting means described in the patent acts directly on the raised control signal, directly limiting the voltage of the control signal if the voltage-raising means boosts the voltage too high.

Impinj presented testimony suggesting that the accused clamp circuit does not directly act on the control signal—WEN or possibly DTG—as the voltage-limiting means do in the patent.

Rather, the clamp circuit is applied to the *supply* voltage, VDD_RAMP.  Impinj presented evidence that the clamp circuit is designed to keep VDD_RAMP and VDD_RECT from diverging too much.  Dkt. # 575 at 166–67.  As Ron Oliver stated, the clamp circuit "couldn't have any effect on [WEN]," "is completely independent of VDD_REG," and "can't directly affect DTG."  *Id.* at 167–68.  To be sure, Oliver conceded that the clamping circuit could have an *indirect* effect on DTG because the VDD_RAMP supply voltage—on which the clamping circuit operates—can affect the DTG signal.  *Id.* at 168.  But in the patent, the voltage-limiting means do not indirectly affect the control voltage by altering the supply voltage.  The voltage-limiting means described in the '097 Patent directly "receive" and act on the raised control signal.  *See* '097 Patent at 8:66–67 (information-voltage generating means—which contain the voltage-limiting means—is "arranged to *receive* a control signal" (emphasis added)), 10:2–3, 4:20–25.  This fulfills the element's purpose of limiting the raised control signal if it becomes too high.  A reasonable jury could have found that the accused clamp circuit does not satisfy the voltage-limiting means element.

As a final matter, NXP says that Impinj improperly referenced the specification of the patent, not the claim language as construed by the Court.  Dkt. # 598 at 10–14.  The Court recognizes that "infringement is to be determined by comparing the asserted claim to the accused device, not by comparing the accused device to the figures of the asserted patent."  *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002).  Testimony by Impinj's witnesses toed the line, perhaps placing undue emphasis on figure 2 of the patent and on the "charge pump" disclosed in the specification.  But claims are to be read "in the context of the entire patent."  *Sequoia Tech. LLC v. Dell, Inc.*, 66 F.4th 1317, 1324 (Fed. Cir. 2023).  The specification provides context for the claims, which was relevant to whether the accused level shifter "raises" the voltage in the manner contemplated by the '097 Patent.

SEALED ORDER DENYING NXP'S MOTION
FOR JUDGMENT AS A MATTER OF LAW, OR
IN THE ALTERNATIVE, A NEW TRIAL - 11

2.    Alternative Claim Constructions

A jury unanimously found that Impinj did not infringe the '097 Patent. Based on the Court's construction of various terms in the patent and the plain meaning of other terms, the jury could have reasonably found that the accused level shifter does not "raise" the control signal, that a level shifter is not known as a voltage-raising circuit, or that the voltage-limiting means does not limit the control signal.

But throughout this case, Impinj has urged plausible alternative constructions of the "voltage-raising means" term. The Court need not reconsider any claim construction issues at this stage because the jury's verdict is supported by substantial evidence. But if substantial evidence did not support the jury's verdict under the construction provided, in the alternative, Impinj would be entitled to judgment in its favor if either of two alternative constructions were adopted.

*First*, Impinj argues in its opposition brief that the voltage-raising means in the '097 Patent must be capable of raising the control signal *above* the supply voltage. Dkt. # 607 at 6–8; *see also* Dkt. # 430 at 6–8 (Impinj's summary judgment motion presenting similar arguments about the meaning of the "voltage-raising means" term). The claims state that the voltage-raising means must raise the voltage of the control signal, and that the control signal "is of a voltage value that is *at most equal to the value of the supply voltage*." '097 Patent at 10:4–5 (emphasis added). If the voltage-raising means can be equal to the supply voltage ("at most equal to"), it follows, Impinj says, that the voltage-raising means must be capable of raising the voltage value above the control signal—otherwise, the "voltage-raising means" would be unable to do any voltage-raising. Impinj says that a contrary interpretation would read "at most equal to" out of the claims. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed.

Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Impinj also points to a specification in which the control signal is raised to a voltage above the supply voltage.  *See, e.g.*, '097 Patent at 2:50–51 (describing a "voltage raising means" that are implemented to "raise the voltage value of the control signal *by* the value of the supply voltage" (emphasis added)); *id.* at 7:23–25 ("[T]he value of the voltage of the control signal CS is raised by means of the voltage raising means 8 to *twice* the value of the supply voltage V." (emphasis added)).  Impinj notes that if the object of the invention is to get the information voltage to assume "substantially the value of the supply voltage," *id.* at 2:24–27, then the voltage-raising means must raise the voltage above the supply voltage to compensate for threshold voltage drops.  *See id.* at 1:55–57 (describing that in the prior art, the information voltage "is reduced from the value of the control signal voltage by an amount equal to a characteristic transistor threshold voltage"); *id.* 2:27–28 (in the claimed invention, allowing the information voltage to assume the supply voltage "virtually irrespective of the transistor threshold voltage").

Impinj says that the claims should not be read in a vacuum, but instead must be construed "in the context of the entire patent."  *See Sequoia Tech.*, 66 F.4th at 1324; *id.* at 1326 ("[A] patent's express purpose of the invention informs the proper construction of claim terms." (citation and quotation marks omitted)).  And in context, Impinj says that the only plausible reading of the claims is that the voltage-raising means must be able to raise the control signal above the supply voltage.  The "known data carrier" found in the prior art—on which the '097 Patent purportedly improved—contained a "control signal [] of a voltage value that is at most equal to the value of the supply voltage."  '097 Patent at 1:14–16; *see also id.* at 1:59–60 (in the prior art, the "digital control signal is of a voltage value that is at most equal to the value of the

supply voltage"). If the prior art data carriers contained control signals of a value up to the supply voltage, the '097 Patent's inclusion of a voltage-raising means seems unnecessary unless its purpose is to raise the control signal *above* the value of the supply voltage. Even Ewald Bergler, the named inventor of the '097 Patent, agreed that the control signal in the known data carrier "could be as high as the supply voltage," and that this control signal "existed in the prior art." Dkt. # 573 at 17. Impinj also asked Franz Amtmann whether, "[b]efore the '097 patent, was it known to apply a control signal to a transistor like 7A where the voltage on the control signal was at the supply voltage?" *Id.* at 88. Amtmann agreed, responding that "if it was at the supply voltage, this was state of the art." *Id.* He also agreed with Impinj's characterization that "this invention is to raise it above the supply voltage," *id.*, and agreed that the "solution [provided by the '097 Patent] requires raising the voltage of the control signal above the supply voltage," *id.* at 84.

While the Court declined to adopt such a construction before trial (*see* Dkt. ## 506, 570 at 5–6), this construction has appeal. The patent primarily contemplates a voltage-raising circuit capable of truly boosting the control signal using the supply voltage—that is, *adding* voltage to the control signal—not a toggle-like level shifter. The patent purports to improve upon a known data carrier that already had a control signal at the supply voltage. And under such a construction, Impinj would be entitled to judgment in its favor: the accused level shifter does not produce a voltage above the supply voltage. *See, e.g.*, Dkt. # 576 at 63 ("Q. And can that level shifter output any voltage that's greater than the highest voltage of its inputs? A. No. The level shifter can only output at most the highest voltage of its inputs."); Dkt. # 573 at 186–87 (NXP's expert, Dr. Vijay Madisetti, reluctantly agreeing that the control signal—WEN or possibly DTG—is "at" the supply voltage VDD_RAMP, but not above it); *see also* Dkt. # 432 at 3

Case 2:24-cv-01303-JCC   Document 146   Filed 08/08/24   Page 219 of 263

(unrebutted evidence at summary judgment that the accused level shifter "is unable to generate an output voltage greater than the voltage of its inputs"); Dkt. # 431 at 62 (same).

*Second*, the Court initially construed "voltage-raising means" as a means-plus-function term subject to section 112, ¶ 6. Dkt. 247 at 33. But the Court later amended its construction and held that the term was not a means-plus-function term. Dkt. # 375. The Court concluded that the term refers to "a circuit that raises the voltage value of the control signal," and instructed the jury with this construction. *Id.* at 8–9 (order); Dkt. # 555 at 17 (jury instructions). But the Court recognized that "it is a difficult question whether 'voltage-raising means' should be interpreted . . . under § 112, ¶ 6." Dkt. # 405 at 6–7; *see also id.* at 6 ("The Court recognizes that there are plenty of strong counterarguments to its conclusion—one need only look at the Court's initial claim construction to find a few.").

And if the term is construed as a means-plus-function term, then Impinj would be entitled to judgment in its favor because the accused level shifter is not "identical or equivalent to the corresponding structure in the specification," which the Court previously held was charge pump or float-based structure.[5] *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006). The accused level shifter is not "identical" to a charge pump. *Id.* And to prove equivalence, a party must show that the "accused products perform substantially the same function, in substantially the same way, achieving substantially the same result as the claims." *Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 924 (Fed. Cir. 2021). Even assuming that the level shifter performs a voltage-raising function, the accused level shifter would not achieve the voltage-raising function in "substantially the same way" to achieve "substantially the same result" as a charge pump. *Id.* As Impinj explained in its summary

---

[5] NXP did not contend that the level shifter was identical or equivalent to a float-based structure, instead focusing on equivalence with a charge pump. *See* Dkt. # 332 at 18–22.

judgment briefing, a level shifter could raise a voltage, if at all, only by "outputting values at a supply voltage." Dkt. # 294 at 19. By contrast, a charge pump "increases voltage . . . by using capacitors to 'pump' an input voltage such that the output voltage is greater than the supply voltage." *Id.* And a level shifter cannot achieve substantially the same result as a charge pump: "A level shifter . . . cannot, as a charge pump can, increase voltage above the supply voltage." *Id.* If the term is construed as a means-plus-function term, Impinj would be entitled to judgment in its favor.

\*     \*     \*

Instructed with a construction of the "voltage-raising means" term most favorable to NXP (and, in fact, advanced by NXP), a jury unanimously found that Impinj does not infringe the '097 Patent. Based on that construction, the jury could have reasonably found that the accused level shifter does not raise the control signal in the manner contemplated by the patent, that a level shifter is not known as a voltage-raising circuit, or that the voltage-limiting means does not limit the control signal. And if "voltage-raising means" is construed (1) to require a circuit that boosts the control signal voltage above the supply voltage, or (2) to be a means-plus-function term, then Impinj would also be entitled to judgment in its favor. Under any plausible construction of "voltage-raising means," Impinj is entitled to judgment of non-infringement. Put simply, the accused level shifter operates much differently than the voltage-raising means described throughout the '097 Patent.

B.      New Trial

In the alternative, NXP requests a new trial under Federal Rules of Civil Procedure 50(b) and 59. Dkt. # 598 at 16–17. None of its arguments persuade the Court, so the Court denies NXP's request for a new trial.

SEALED ORDER DENYING NXP'S MOTION
FOR JUDGMENT AS A MATTER OF LAW, OR
IN THE ALTERNATIVE, A NEW TRIAL - 16

**Appx187**

First, NXP says that the verdict is "contrary to the clear weight of the evidence," so a new trial is appropriate. Dkt. # 598 at 16 (quoting *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has 'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molsi*, 481 F.3d at 729 (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (alterations in original). The Court concludes that the verdict is not contrary to the clear weight of the evidence. As described above, there was sufficient evidence to support the jury's verdict. Impinj presented sufficient evidence that the accused level shifter does not "raise" the voltage of the control signal in the manner contemplated by the patent and that the accused clamp circuit does not directly limit the control signal as required by the patent.

Second, NXP says that Impinj impermissibly elicited certain testimony from Impinj employee Ron Oliver, who was not disclosed as an expert witness. Dkt. # 598 at 16–17. NXP says that Impinj impermissibly asked Oliver whether he had "ever heard of a level shifter being called a voltage raising means or voltage raising circuit," to which Oliver responded that he was "not aware of a level shifter ever being referred to as a voltage raising circuit." Dkt. # 575 at 134. But the Court understood Impinj's question and Oliver's answer as pertaining to a question of fact within Oliver personal knowledge. *See* Fed. R. Evid. 701(a) (allowing lay opinion testimony if, among other things, it is "rationally based on the witness's perception"). Impinj's question about Oliver's recollection was a factual question about what Oliver perceived, not a question requiring a responsive *opinion* developed through scientific, technical, or specialized knowledge. *See* Fed. R. Evid. 702. Oliver did not analyze the patent's language (or the Court's constructions) from the perspective of a POSITA or directly opine on infringement. In any

SEALED ORDER DENYING NXP'S MOTION
FOR JUDGMENT AS A MATTER OF LAW, OR
IN THE ALTERNATIVE, A NEW TRIAL - 17

1   event, at trial, NXP did not object on Rule 701 or 702 grounds, but rather objected that the

2   proposed testimony would be "getting to a construed claim term." Dkt. # 575 at 134. While it is

3   true that the question referenced a term from the patent, the Court did not view the question or

4   Oliver's answer as contradicting the Court's construction or disputing its meaning, so the Court

5   overruled the objection. *Id.*

6          NXP also argues that Oliver impermissibly testified about "what the patent discloses as

7   the 'voltage-raising means.'" Dkt. # 598 at 17 (citing Dkt. # 576 at 53–55). To be sure, Oliver

8   stated that the '097 Patent includes a "voltage raising means" term, that the specification

9   describes the voltage-raising means "as a charge pump," and that the "charge pump that's

10  described in the patent is very similar to the charge pumps that I've worked on in the past." Dkt.

11  # 576 at 54–55. But "[e]ven assuming this strayed into the realm of undisclosed expert opinion,

12  [NXP] has failed to show that any error in admitting it was prejudicial." *Ironburg Inventions*, 64

13  F.4th at 1294 (discussing testimony by a witness not disclosed as an expert about how the

14  accused products met each element of the patent); *see also* Fed. R. Civ. P. 61 (discussing

15  harmless error). Oliver's testimony did not meaningfully differ from the expert opinions offered

16  by Dr. Kenney about the patent and did not mislead the jury about the patent's content.

17         Third, NXP says that Impinj improperly placed Oliver and other Impinj employees "on

18  equal footing with NXP's expert," perhaps implying to the jury that they were qualified as

19  experts. Dkt. # 598 at 17. During closing arguments, for example, Impinj stated that "the three

20  [Impinj] engineers that [] came in here are more experts on this circuit than anybody," Dkt. # 578

21  at 211, and that Impinj brought "three witnesses that work for Impinj" to discuss infringement,

22  while NXP brought "only one expert [witness]," *id.* at 184–85. These statements, NXP says,

23  improperly imbued Impinj's witnesses with the "expert" imprimatur. Dkt. # 598 at 17.

24

SEALED ORDER DENYING NXP'S MOTION
FOR JUDGMENT AS A MATTER OF LAW, OR
IN THE ALTERNATIVE, A NEW TRIAL - 18

NXP did not object to these comments at trial. *See generally* Dkt. # 578; Fed. R. Evid. 103(a)(1)(A). But regardless, these statements were not improper. Impinj did not say that its witnesses were the foremost experts on circuits generally, on patent law, or even on the '097 Patent. Rather, Impinj made the rather unremarkable observation that Impinj's own employees know more about the functioning of Impinj circuitry than nearly anyone else. While it might have been preferable for Impinj to use a word other than "expert" to describe the witnesses, the Court cannot say that the use of this term was impermissible, or if it was, that it was harmful enough to justify a new trial. *See* Fed. R. Civ. P. 61; *Hardeman v. Monsanto Co.*, 997 F.3d 941, 968 (9th Cir. 2021). Similarly, while Impinj's statement about the number of witnesses was not particularly persuasive, the Court does not believe it was misleading or improper so as to justify a new trial. And in any event, the Court instructed the jury that "[t]he weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves." Dkt. # 555 at 8. The jury instruction adequately cured any potential prejudice stemming from the implication that Impinj's three witnesses should be credited over NXP's witness.

NXP has not met its burden to show that a new trial is warranted.

## V

### CONCLUSION

For the reasons above, the Court DENIES NXP's motion for judgment as a matter of law, and in the alternative, a new trial. Dkt. ## 597, 598.

The Court provisionally files this order under seal. Within 14 days, the parties are DIRECTED to file a joint statement indicating any redactions, if any, that should be included in the public version of the order.

Dated this 31st day of August, 2023.

_John H. Chun_

John H. Chun
United States District Judge



US007257092B2

(12) **United States Patent**
Amtmann

(10) **Patent No.:** **US 7,257,092 B2**
(45) **Date of Patent:** **Aug. 14, 2007**

(54) **METHOD OF COMMUNICATING BETWEEN A COMMUNICATION STATION AND AT LEAST ONE DATA CARRIER**

(75) Inventor: **Franz Amtmann**, Graz (AT)

(73) Assignee: **NXP B.V.**, Eindhoven (NL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1109 days.

(21) Appl. No.: **10/095,401**

(22) Filed: **Mar. 11, 2002**

(65) **Prior Publication Data**

US 2002/0131453 A1    Sep. 19, 2002

(30) **Foreign Application Priority Data**

Mar. 13, 2001   (EP)   .................................. 01890073

(51) **Int. Cl.**
*H04B 7/005* (2006.01)

(52) **U.S. Cl.** ........................ **370/278**; 370/381; 370/329

(58) **Field of Classification Search** ................ 370/204, 370/389, 278, 282, 252, 328, 329, 349, 381, 370/456, 561; 455/524, 432.1, 432; 714/752; 375/140, 145; 704/203; 713/193; 710/10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,246,875 B1 * | 6/2001 | Seazholtz et al. ........ 455/432.1 |
| 6,725,056 B1 * | 4/2004 | Moles et al. ................. 455/524 |
| 2002/0112172 A1 * | 8/2002 | Simmons ................... 713/193 |
| 2003/0131302 A1 * | 7/2003 | Nobelen .................... 714/752 |

* cited by examiner

*Primary Examiner*—John Pezzlo
(74) *Attorney, Agent, or Firm*—Peter Zawilski

(57) **ABSTRACT**

In a method of communicating between a communication station (**1**) and at least one data carrier (**2** (DC)) comprising an information data block (IDB) and useful data (UD=N× UDB), an inventorization procedure with successive procedure runs is carried out at least one part of a block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (**1**) and, in addition, specific useful data (n×UDB) are transmitted from each data carrier (**2** (DC)) to the communication station (**1**) in the implementation of the inventorization procedure, such that after termination of the inventorization procedure at least one part of the identification data block (IDB) of each data carrier (**2** (DC)) and the associated specific useful data (n×UDB) are known in the communication station (**1**).

**22 Claims, 6 Drawing Sheets**





FIG. 1



FIG. 2



## FIG. 3



request command correspond to "Inventory + Transmit"

## FIG. 4



FIG. 5



FIG. 6

assume seven ( 7 ) data carriers ( DCs ) with following IDBs:

```
0 0 0 0 0 0 0 0 0 0 0 0 1837 = 0 . . . 01837
0 0 0 0 0 0 0 0 0 0 0 0 2842 = 0 . . . 02842
0 0 0 0 0 0 0 0 0 0 0 0 2832 = 0 . . . 02832
0 0 0 0 0 0 0 0 0 0 0 0 9532 = 0 . . . 09532
0 0 0 0 0 0 0 0 0 0 0 0 1532 = 0 . . . 01532
0 0 0 0 0 0 0 0 0 0 0 0 49A2 = 0 . . . 049A2
0 0 0 0 0 0 0 0 0 0 0 0 68A2 = 0 . . . 068A2
```

RDB1 ( mask size = 0, mask value = empty )

time slots are determined by the first 4 bits of the IDBs →
in hexadecimal notation @ = 7 and @ = 2

TPR1

@ = 7
no collision

@ = 2
DCs send 0 . . . 0284 + n x UDB and
0 . . . 0283 + n x UDB and
0 . . . 0953 + n x UDB and
0 . . . 0153 + n x UDB and
0 . . . 049A + n x UDB and
0 . . . 68A + n x UDB
but collision

DC with
IDB = 0 . . . 01837
sends:
0 . . . 01837 + n x UDB

RDB2 ( mask size = 4, mask value = 2 )

time slots are determined by the second 4 bits of the IDBs →
in hexadecimal notation @ = 3 and @ = 4 and @ = A

TPR2

@ = 4
no collision

@ = 3
DCs send
0 . . . 028 + n x UDB
and
0 . . . 095 + n x UDB
and
0 . . . 015 + n x UDB
but collision

@ = A
DCs send
0 . . . 049 + n x UDB
and
0 . . . 068 + n x UDB
but collision

DC with
IDB = 0 . . . 02842
sends:
0 . . . 028 + n x UDB

TPW

see FIG. 8
top part

see FIG. 8
bottom part

t

FIG. 7



FIG. 8

US 7,257,092 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHOD OF COMMUNICATING BETWEEN A COMMUNICATION STATION AND AT LEAST ONE DATA CARRIER

The invention relates to a method of communicating between a communication station and at least one data carrier, and to a communication station, a station circuit, a data carrier, a data carrier circuit which are suitable for carrying out such a method. A substantial fact concerning the method in discussion here consists in that an inventorization procedure is carried out which may consist of successive procedure runs, which consists of at least one such procedure run, and by means of which, after its termination, of data carriers present in a communication region of the communication station at least one part of an identification data block stored in such a data carrier is known in the communication station, and in that a transmission of specific useful data to the communication station is carried out by such a data carrier.

A method having the abovementioned process steps is described in the ISO/IEC15693-3 standard, and is therefore known. In a variant of this known method, the first step is to carry out an inventorization procedure, which usually consists of a plurality of procedure runs and in which so many procedure runs are carried out until the identification data blocks stored in the data carriers, also denoted serial numbers, of all data carriers present in a communication region of the communication station are known in the communication station, after which an interrogation command is communicated during a further additional section of the known method by the communication station to each inventorized, i.e. identified data carrier, the result of the command being that the useful data stored and consequently included in the relevant data carrier and determined in this case by the interrogation command, said useful data being a specific number of useful data blocks, are transmitted to the communication station. The actual transmission of the specific useful data desired and/or required in the communication station, i.e. the desired useful information, is therefore performed after the inventorization procedure in the known method, and this is accompanied by the general disadvantage that the duration of the method as a whole is relatively long, i.e. it takes a relatively long time until the useful information stored in a plurality of data carriers is available in the communication station in an acceptable and unmistakable way.

The invention has for its object to eliminate the problems set forth above and to implement an improved method, an improved communication station, an improved station circuit, an improved data carrier, and an improved data carrier circuit.

In order to achieve the object set forth above, features according to the invention are provided in the case of a method in accordance with the invention, such that a method in accordance with the invention can be characterized as follows:

A method of communicating between a communication station and at least one data carrier, which data carrier comprises an identification data block characteristic of it and useful data, by which method an inventorization procedure is carried out, which inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and owing to which inventorization procedure after its termination at least one part of the identification data block of the at least one data carrier is known in the communication station, and by which method a transmission

of specific useful data is carried out from the at least one data carrier to the communication station such that during the implementation of the inventorization procedure at least one part of a block region of the identification data block not yet known in the communication station and, in addition, said specific useful data are transmitted from the at least one data carrier to the communication station.

In order to achieve the object set forth above, features according to the invention are provided in the case of a communication station in accordance with the invention such that a communication station in accordance with the invention can be characterized as follows:

A communication station for communicating with at least one data carrier, which data carrier comprises an identification data block characteristic of it and useful data, which communication station comprises inventorization means for carrying out an inventorization procedure, which inventorization means are designed for carrying out successive procedure runs in an inventorization procedure, and in which inventorization means at least one part of the identification data block of the at least one data carrier is known after termination of an inventorization procedure, and which communication station comprises processing means for processing specific useful data included in the at least one data carrier, transmitted to the communication station, and received in the communication station, wherein the communication station is designed for processing at least one part of a block region, not yet known in the communication station, of the identification data block of the at least one data carrier and, in addition, specific useful data of the at least one data carrier during the carrying out of an inventorization procedure.

In order to achieve the object set forth above, features according to the invention are provided in the case of a station circuit in accordance with the invention such that a station circuit in accordance with the invention can be characterized as follows:

A station circuit for a communication station for communicating with at least one data carrier, which data carrier comprises an identification data block characteristic of it and useful data, which station circuit comprises inventorization means for carrying out an inventorization procedure, which inventorization means are designed for carrying out successive procedure runs in an inventorization procedure, and in which inventorization means at least one part of the identification data block of the at least one data carrier is known after termination of an inventorization procedure, and which station circuit comprises processing means for processing specific useful data included in the at least one data carrier, transmitted to the station circuit, and received in the station circuit, wherein the station circuit is designed for processing at least one part of a block region, not yet known in the communication station, of the identification data block of the at least one data carrier and, in addition, the specific useful data of the at least one data carrier during the carrying out of an inventorization procedure.

In order to achieve the object set forth above, features according to the invention are provided in the case of a data carrier in accordance with the invention such that a data carrier in accordance with the invention can be characterized as follows:

A data carrier for communicating with a communication station, in which data carrier it is possible to store an identification data block characteristic of it and useful data, and which data carrier is designed for carrying out an inventorization procedure, which inventorization procedure may consist of successive procedure runs and consists of at

US 7,257,092 B2

3

least one procedure run, and owing to which inventorization procedure after its termination at least one part of the identification data block, included in the data carrier after its storage, of the data carrier is known in the communication station, and which data carrier comprises output means for outputting to the communication station specific useful data included in the data carrier after their storage, wherein the data carrier is designed for outputting at least one part of a block region, not yet known in the communication station, of the identification data block of the data carrier included in the data carrier after its storage and, in addition, specific useful data of the data carrier included in the data carrier after their storage during the carrying out of the inventorization procedure.

In order to achieve the object set forth above, features according to the invention are provided in the case of a data carrier circuit in accordance with the invention such that a data carrier circuit in accordance with the invention can be characterized as follows:

A data carrier circuit for a data carrier for communicating with a communication station, in which data carrier circuit it is possible to store an identification data block characteristic of it and useful data, and which data carrier circuit is designed for carrying out an inventorization procedure, which inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and owing to which inventorization procedure after its termination at least one part of the identification data block, included in the data carrier circuit after its storage, of the data carrier circuit is known in the communication station, and which data carrier circuit comprises output means for outputting specific useful data, included in the data carrier circuit after their storage, to the communication station, wherein the data carrier circuit is designed for outputting at least one part of a block region of the identification data block, not yet known in the communication station, of the data carrier circuit included in the data carrier circuit after its storage, and, in addition, specific useful data of the data carrier circuit, included in the data carrier circuit after their storage during the carrying out of the inventorization procedure.

An improved method, an improved communication station, an improved station circuit, an improved data carrier, and an improved data carrier circuit are obtained by means of the provision of the features in accordance with the invention in a way which is very simple and can be implemented both with the aid of a hard-wired logic circuit and with the aid of a programmable circuit, a very important improvement consisting in that a method in accordance with the invention has a method duration substantially shorter than the method duration of the known method, which is very advantageous for achieving as short as possible a communication time between a communication station and a plurality or a multiplicity of data carriers, because this ensures that the useful information from a multiplicity of data carriers is known in the communication station even in the case of a short communication duration and can therefore be processed and evaluated in the communication station.

It has proved to be particularly advantageous in the case of a method, a communication station, a station circuit, a data carrier, and a data carrier circuit in accordance with the invention when, additional features (e.g., various inventorization methods involving the entire block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station) and, in addition, the specific useful data (n×UDB) are transmitted from the at least one

4

data carrier (2 (DC)) to the communication station (1), as discussed herein, are provided. This is advantageous for achieving a good compromise between, on the one hand, as short as possible a communication duration and, on the other hand, a high inventorization accuracy or identification accuracy.

It has, however, proved to be particularly advantageous in the case of a method, a communication station, a station circuit, a data carrier, and a data carrier circuit in accordance with the invention when, additional features (e.g., the entire identification data block and, in addition, the specific useful data are transmitted from the at least one data carrier to the communication station), as discussed herein, are provided. Such a design constitutes a good compromise between a short communication duration and a design that can be realized and/or programmed as simply as possible.

It has further proved to be very advantageous in the case of a method, a communication station, a station circuit, a data carrier, and a data carrier circuit in accordance with the invention when, additional features (e.g., the specific useful data (n×UDB) are transmitted in time after the data (NKP-IDB) from the identification data block (IDB)), as discussed herein, are provided. Such a solution is advantageous because a simple logic implementation suffices in this solution, and because a particularly high identification accuracy is ensured. However, it may be mentioned at this juncture that it is also possible for the specific useful data to be transmitted from a data carrier to the communication station before the data from the identification data block.

In a solution in which the specific useful data are transmitted after the data from the identification data block, a time interval may lie between the transmission of the data from the identification data block and the transmission of the specific useful data, and this may be advantageous for some applications, for example whenever after checking of the data from the identification data block or after establishing what is termed a collision with reference to the data transmission from at least two data carriers to the communication station, the envisaged subsequent transmission of the specific useful data is to be deliberately suppressed. However, it has proved to be particularly advantageous when the specific useful data are transmitted immediately subsequent to the data from the identification data block, because as short as possible a communication duration is obtained in this way.

It has proved, furthermore, to be very advantageous when in the case of a method in accordance with the invention the features in accordance with claim 6 are additionally provided. This solution offers the advantage that the time required in an inventorization procedure for processing the procedure run becomes increasingly shorter, because the length of the block region of the identification data block of each data carrier not yet known in the communication station becomes smaller as the number of completed procedure runs increases.

These and further aspects of the invention will be clarified in the following description of an embodiment and are explained with reference to this embodiment.

The invention will be described in more detail below with reference to an embodiment illustrated in the drawings, to which, however, the invention is not limited.

FIG. 1 is a diagrammatic block diagram of a part, essential in the present context, of a communication station and a station circuit in accordance with an embodiment of the invention.

US 7,257,092 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

FIG. **2** is a block diagram of a part, essential in the present context, of a data carrier and a data carrier circuit in accordance with an embodiment of the invention.

FIG. **3** is a diagram of signals, moments and time intervals which occur in the case of a method in accordance with the invention.

FIG. **4** is a diagram of the composition of a request data block which is used in the method in accordance with the invention.

FIG. **5** is a diagram of an identification data block which is stored in a data carrier in accordance with the invention.

FIG. **6** is a diagram representing an example of a mask such as may occur in the method in accordance with the invention.

FIGS. **7** and **8** each show diagrammatically part of a sequence of the method in accordance with the invention wherein an inventorization of seven data carriers is carried out.

A communication station **1** is illustrated in FIG. **1**. The communication station **1** is provided and designed for communicating with at least one data carrier **2**. Such a data carrier **2** is illustrated in FIG. **2** and will be described in further detail below. It may already be mentioned here that the data carrier **2** contains an identification data block IDB characteristic of this data carrier **2** and useful data UD, these useful data UD being included in the form of N useful data blocks UDB in the data carrier **2**.

The communication station **1** comprises a station circuit **3** which is formed in the present case by a microcomputer, but which may alternatively be formed by a hard-wired logic circuit. The station circuit **3** comprises a clock signal generator **4** capable of generating a clock signal CLK. The station circuit **3** further comprises inventorization means **5** which are provided and designed for carrying out an inventorization procedure. In this case, the inventorization means **5** are designed for carrying out successive procedure runs in an inventorization procedure. After termination of such an inventorization procedure, at least one part of the identification data block IDB of each data carrier **2** is known in the inventorization means **5**, the design being made in the case described here with reference to FIGS. **1** and **2** such that after the termination of an inventorization procedure the entire identification data block of each data carrier **2** is known in the inventorization means **5** and is stored in the inventorization means **5**, specifically by each data carrier **2** which was in communicative connection with the communication station **1** in the inventorization procedure.

The inventorization means **5** comprise request generation means **6** which are designed for generating request data blocks RDBn and time slot marks TSMs. A time slot counter **7** and mask generating means **24** are included in the request generation means **6**. Furthermore, the inventorization means **5** comprise collision detecting means **8** with the aid of which a "collision" can be detected, such a collision being understood to imply that data that cannot be distinguished uniquely from one another are received simultaneously from at least two data carriers **2** in the communication station **1**. If the collision detecting means **8** establish no collision, they are designed such that they relay a block region NKP-IDB, not yet known in the communication station **1**, of a data carrier **2** to identification data block regeneration means **9** of the inventorization means **5**, and relay specific useful data n×UDB to useful data processing means **10** of the inventorization means **5**. If the collision detecting means **8** do establish a collision, they will suppress such relaying to the identification data block regeneration means **9** and the useful data processing means **10**.

The identification data block regeneration means **9** are provided and designed for generating each time one complete identification data block IDB of each data carrier **2** which was in collision-free communicative connection with the communication station **1**. For this purpose, on the one hand the identification data block regeneration means **9** are fed said block region NKP-IDB, not yet known in the communication station **1**, of the identification data block IDB of each data carrier **2**, and on the other hand the identification data block regeneration means **9** are additionally fed the block region KP-IDB, already known in the communication station **1**, of the identification data block IDB of each data carrier **2**, specifically from the request regeneration means **6**, in which request regeneration means **6** the block region KP-IDB, already known in the communication station **1**, of the identification data block IDB of each data carrier **2** is known.

The inventorization means **5** further comprise combination means **11** to which both the entire identification data block IDB of each data carrier **2** generated by the identification data block regeneration means **9** and the specific data n×UDB of each data carrier **2** transmitted from each data carrier **2** to the communication station **1** can be fed. The data fed are processed in the combination means **11**, both the relevant identification data block IDB and the specified useful data n×UDB being stored for each data carrier **2** which has been in communicative connection with the communication station **1**, specifically in a way uniquely attuned to one another. The data included in these combination means **11** can be fed by the combination means **11** via a data connection **12**, for example, a so-called host computer.

The station circuit **3** further includes coding means **13** and decoding means **14** to which the clock signal CLK can be fed. The coding means **13** are provided and designed for coding the data or signals fed to the coding means **14** in an uncoded way, i.e. also for coding the request data blocks RDBn and the time slot marks TSM, which are output in this case by the request generation means **6** of the inventorization means **5**. The decoding means **14** are provided and designed for decoding data and signals fed to them in a coded way. Decoded data output by the decoding means **14**, for example an identification data block IDB or a block region NKP-IDB of an identification data block IDB not yet known in the communication station **1** or specific useful data n×UDB can be fed to the collision detecting means **8** of the inventorization means **5**.

The communication station **1** further includes a modulator **15** which is connected on the one hand to the coding means **13** and on the other hand to a carrier signal generator **16**, which carrier signal generator **16** is fed the clock signal CLK, and which carrier signal generator **16** generates a carrier signal CS, which is fed to the modulator **15**, on the basis of the clock signal CLK. Amplitude modulation of the carrier signal CS can be carried out by the modulator **15** as a function of the data output in coded form from the coding means **13**. Connected to the modulator **15** is a first amplifier stage **17** of the communication station **1**, by means of which an amplified modulated signal can be generated which is fed to matching means **18**, which matching means **18** ensure that the modulated signals fed to them are relayed to station transmission means **19**. The station transmission means **19** comprise a station transmission coil TC and further electrical components (not illustrated). The modulated signals fed to the station transmission means **19** and their station transmission coil TC can be transmitted thereby to the data carriers **2** present in a communication region of the com-

US 7,257,092 B2

7

munication station **1**. This transmission is performed in an inductive way in the case described here. It should be noted that this transmission may alternatively be performed by a capacitive or radio-frequency method.

The station circuit **3** is designed as an integrated circuit. In this case, it may also further comprise the components **15**, **16**, **17**, **20**, **21**, **22** and **23**.

The station transmission means **19** are provided not only for transmitting signals from the communication station **1** to the data carriers **2**, but also for carrying out transmission from the data carriers **2** to the communication station **1**. In this case, signals, load-modulated in this case, received by the station transmission means **19** are fed via the matching means **18** to an input filter stage **20** provided in the communication station **1**. The input filter stage **20** is provided for filtering out undesired signal components. Connected to the input filter stage **20** is a demodulator **21** by means of which the signals generated in the data carriers **2** by load modulation and transmitted to the communication station **1** can be demodulated. Connected to the demodulator **21** is a further filter stage **22** which ensures filtering of the demodulated signals. Connected to the further filter stage **22** is a second amplifier stage **23** of the communication station **1**, which ensures amplification of the demodulated and filtered signals. Said decoding means **14** of the station circuit **3** are connected to the second amplifier stage **23**.

Before examining the data carrier **2** illustrated in FIG. **2** in more detail, the design of the request data blocks RDBn will first be examined in more detail, specifically with reference to FIG. **4**. As may be seen from FIG. **4**, each request data block RDBn consists of a request command and a mask which consists of an item of information about the mask length in bits (mask size) and an item of information about the content or the value of the mask (mask value), and of an item of useful data address information UD-ADR, which consists of an item of information about a useful data start block and an item of information as to the number n of useful data blocks (number n of blocks).

Furthermore, the structure of the identification data block IDB of each data carrier **2** may be explained in preparation with reference to FIG. **5**. As may be seen from FIG. **5**, the identification data block IDB consists of all of sixty four (64) bits, which are arranged in sixteen (16) groups of four (4) bits each, the first four (4) bits lying in the region of the least significant bit LSB, and in this case the first four (4) bits are followed by the second four (4) bits and thereafter by the third four (4) bits. FIG. **5** further provides an example for the first four (4) bits and the second four (4) bits where the first four (4) bits are "0001", and the second four (4) bits are "1000".

In further preparation, an example of a mask will be discussed with reference to FIG. **6**. The least significant component of an identification data block IDB is illustrated in FIG. **6**, the eight (8) least significant bits corresponding to a mask which has a mask length (mask size) of eight (8) bits and a mask value of "32", the mask value being specified in hexadecimal form or notation.

It should further be noted with reference to FIG. **6** that it is laid down in a communication protocol valid in the case described here for the communication station **1** and each data carrier **2** that the communication between the communication station **1** and the data carriers **2** is performed in the course of each procedure run of an inventorization procedure within a total of sixteen (16) time slots T, and that the number of that time slot T in which a data carrier **2** must come into communicative connection with the communication station **1** is fixed in each case by the four (4) bits coming

8

before the bits fixed by the size of a mask, of the identification data block IDB of each data carrier **2**. In the example illustrated in FIG. **6**, the time slot T in which the data carrier **2**, which includes the bits illustrated in FIG. **6** in its identification data block IDB, must come into communicative connection with the communication station **1** is therefore determined by the third four (4) bits, which are "1110" in the specified example, the result being that the relevant data carrier **2** in the fifteenth time slot of a procedure run will enter into communicative connection with the communication station **1**, which fifteenth time slot has the designation T**14**, this being so because the time slot numeration between the first time slot and the sixteenth time slot is given by T**0**, T**1**, T**2**, T**3** to T**14** and T**15**, as may be seen from FIG. **3**.

It may be explained at this point with reference to FIG. **3** that FIG. **3** depicts the method in accordance with the invention for the purpose of communication between the communication station **1** and at least one data carrier **2** in the form of three timing diagrams. The lowermost timing diagram here refers to the total time duration TPW (whole procedure) of the method in accordance with the invention, i.e. the inventorization procedure. The reference in the middle timing diagram is to the time periods TPR**1**, TPR**2** and TPR**3** of three procedure runs within the whole procedure of the method, i.e. the inventorization procedure, the time period TPR**1** being valid for the first procedure run, and the time period TPR**2** being valid for the second procedure run, and the time period TPR**3** being valid for the third procedure run.

It may be seen from the first timing diagram that the first procedure run begins with the time period TPR**1** at an instant TOB'. At this instant TOB', a first request data block RDB**1** is output by the communication station **1** to all data carriers **2**. The request data block RDB**1** ends at the instant TOE'. After a given time delay TA after the end of the first request data block RDB**1**, a first time window T**0**' starts. A time slot mark TSM with which a second time slot T**1**' starts occurs at the end of the first time window T**0**'. The same procedure is repeated in a further sequence, such that a further time slot mark TSM starts a third time slot T**2**', just as the fifteenth time slot T**14**' and the sixteenth time slot T**15**' are started by subsequent time slot marks TSM. After the elapse of the sixteenth time slot T**15**' within the first procedure run with the time period TPR**1**, the second request data block RDB**2** is output in the instant TOB" after the elapse of a time delay period TB. After the end TOE" of the second request data block RDB**2**, the time delay period TA elapses again until the first time slot T**0**" automatically occurs within the second procedure run with the time period TPR**2**. The further time slots T**1**", T**2**", . . . T**15**" are started again by time slot markings TSM. The same process as described above also occurs in the course of the third procedure run with the time period TPR**3** and the further procedure runs.

As was noted above, the data carrier **2** is illustrated in FIG. **2**. The data carrier **2** comprises data carrier transmission means **25** which include a data carrier transmission coil **26**. The data carrier transmission means **25** are connected to a connection terminal **27** of a data carrier circuit **28**. The data carrier circuit **28** is formed in the present case by an integrated circuit here.

The data carrier circuit **28** comprises four means which are connected to the connection terminal **27**, specifically DC voltage generating means **29**, clock signal regenerating means **30**, demodulation means **31**, and modulation means **32**.

The DC voltage generating means **29** are provided and designed for generating a supply DC voltage V by using the

9

signals received by means of the data transmission means
**25**. The supply voltage V is fed to all those constituents of
the data carrier circuit **28** for whose function this supply DC
voltage V is required, something which is, however, not
illustrated in FIG. **2** for the sake of simplicity.

The clock signal regenerating means **30** are provided and
designed for regenerating the clock signal CLK. The clock
signal regenerating means **30** regenerate the clock signal
CLK also from the signals received by means of the data
transmission means **25**. In the case of the data carrier **2**, the
regenerated clock signal CLK may be fed to decoding means
**33** and coding means **34**, as well as to a microcomputer **35**.

The demodulation means **31** serve to demodulate modu-
lated signals received by means of the data transmission
means **25**. For this purpose, the demodulation means **31**
carry out an amplitude demodulation and output the
demodulated signals to the decoding means **33**, which
decoding means **33** are provided and designed for decoding
the demodulated signals. The decoding means **33** output
decoded signals, for example also the request data blocks
RDBn and the time slot marks TSM.

The modulation means **32** are provided and designed for
load modulation of the carrier signal CS generated in the
communication station **1**, which carrier signal CS is trans-
mitted, if data is to be transmitted to the communication
station **1**, to the respective data carrier **2** in an unmodulated
way by the station transmission means **19** and the data
carrier transmission means **25**, it then being possible to carry
out load modulation of the unmodulated carrier signal CS in
the data carrier **2**. Coded signals can be fed to the modulation
means **32** by means of the coding means **34**. In this case,
uncoded signals or data can be fed to the coding means **34**,
for example the identification data block IDB of the data
carrier **2** or else the block region NKP-IDB, not yet known
in the communication station **1**, of the identification data
block IDB or specific useful data n×UDB.

The data carrier **2** or the data carrier circuit **28** comprises
the microcomputer **35** mentioned above. It is also possible
to provide a hard-wired logic circuit instead of the micro-
computer **35**. A multiplicity of means and functions are
fulfilled by the microcomputer **35**, but of these only those
means and functions are examined here which are important
in the present context. The same also holds for the station
circuit **3** of the communication station **1**, which circuit is
formed by a microcomputer.

The microcomputer **35** comprises command detection
means **36**, mask detection means **37**, block detection means
**38**, time slot detection means **39**, and data processing means
**40**.

The command detection means **36** serve for detecting the
request command included in a request data block RDBn,
which has the consequence in the case described here that
inventorization, i.e. an exact identification of each data
carrier **2** and, simultaneously with this inventorization, a
transmission of specific useful data n×UDB from each data
carrier **2** to the communication station **1** are performed. The
request command therefore constitutes a synonym for
"inventorize" and "transmit". Consequently, the request
command can be specified simply by the reference symbol
combination I+T, as is done in FIG. **2** at the output of the
command detection means **36**. A program run required for
carrying out the necessary runs is started in the microcom-
puter **35** by means of the request command I+T.

The mask detection means **37** are designed for detecting
and evaluating the mask contained in the request data blocks
RDBn. Depending on the detected mask, the mask detection
means **37** have the effect that a block region NKP-IDB, fixed

10

by the respective mask and not yet known in the commu-
nication station **1**, of the identification data block IDB is read
out from a memory **41** present in the data carrier **2** or in the
data carrier circuit **28** of the data carrier **2** via a connection
**42** and is entered into the microcomputer **35**, whereby it is
fed to the data processing means **40**.

The block detection means **38** are designed for detecting
the useful data address information UD-ADR included in the
request data blocks RDBn. The useful data start block
included in a request data block RDB and the number n of
useful data blocks are detected by the block detection means
**38**, the result being that the block detection means **38** ensure
that, beginning with the determined start block, a total of n
useful data blocks UDB, i.e. n×UDB of the time slot mark
useful data, entered into the microcomputer **35**, and fed to
the data processing means **40** in the microcomputer **35**, from
among the useful data UD stored in the memory **41**, which
are stored in the form of N useful data blocks UDB, i.e.
N×UDB.

The time slot detection means **39** are designed for detect-
ing the respective time slot T. The time slot detection means
**39** detect the beginning of the respective first time slot T0′
or T0″ etc. with the aid of the time period TA which elapses
after the end of the occurrence of the respective request data
block RDBn. The further time slots T are detected by the
time slot detection means **39** by means of the time slot mark
TSM occurring at the beginning of the respective time slot
T. Depending on the detected time slot T, the time slot
detection means **39** output to the data processing means **40**
time slot data TSD which characterize the respective time
slot T, with a prescribed delay, so as to achieve a waiting
time in which transient phenomena can decay. In addition,
an item of information MI is fed from the mask detection
means **37** via the respective detected mask to the time slot
detection means **39**. As a function of the information MI fed
from the mask detection means **37** to the time slot detection
means **39** via the respective detected mask, the time slot
detection means **39** read out in each case from the identifi-
cation data block IDB via the connection **42** those four (4)
bits which lie in front of the respective mask and which
determine the time slot in which the relevant data carrier **2**
must enter into communicative connection with the com-
munication station **1**. As soon as the time slot detection
means **39** have established the activation of the time slot in
which the data carrier **2** must enter into communicative
connection with the communication station **1**, the time slot
detection means **39** output the relevant time slot data TSD to
the data processing means **40** with the delay mentioned, the
result of which is that the data buffered in the data process-
ing means **40**, i.e. the part NKP-IDB buffered in the data
processing means **40** and not yet known in the communi-
cation station **1**, of the identification data block IDB as well
as the specific useful data blocks n×UDB are read out from
the data processing means **40** and relayed to the coding
means **34**, something which will result in modulation by the
modulation means **32** and transmission to the communica-
tion station **1** in a later stage.

In the communication station **1** of FIG. **1** and the data
carrier of FIG. **2**, a design is advantageously selected such
that in the case of a method in accordance with the invention
of communicating between the communication station **1** and
the data carrier **2**, only the block region NKP-IDB of the
identification data block IDB not yet known in the commu-
nication station **1** and simultaneously the specific useful data
n×UDB are transmitted from the data carrier **2** to the
communication station **1** during the implementation of the
inventorization procedure. In the method in accordance with

US 7,257,092 B2

11

the invention, in other words those parts of the identification data block IDB of a data carrier 2 which are already known in the communication station 1 are no longer transmitted from the relevant data carrier 2 for the communication station 1, something which is in no way required, since this relates to redundant information which is already available in any case in the communication station 1. Furthermore, the method in accordance with the invention is distinguished in that not only are parts of the identification data blocks IDB transmitted into the communication station 1 in the course of carrying out an inventorization procedure, but that during the inventorization procedure the specific useful data n×UDB desired and/or required in the communication station 1 are also simultaneously transmitted, the result being that, seen as a whole, a total communication duration suffices which is shorter by comparison with known methods. In order to render the advantages just mentioned easier to understand, a method in accordance with the invention will be explained below with the aid of an example, reference being made to FIGS. 7 and 8 for the sake of explanation.

In the upper part of FIG. 7, it is assumed that a total of seven data carriers 2 (DC) are located in the communication region of the communication station 1. It is further assumed in this case that these seven data carriers 2 (DC) include the identification data blocks IDB listed below, specifically:

    0000000000001837
    0000000000002842
    0000000000002832
    0000000000009532
    0000000000001532
    00000000000049A2
    00000000000068A2

The above-listed data of the identification data blocks IDB, each of which consists of a total of sixty four (64) bits, are specified in hexadecimal form or notation.

The identification data blocks IDB listed above can be specified in hexadecimal notation, but in abbreviated form as follows:

    0 . . . 01837
    0 . . . 02842
    0 . . . 02832
    0 . . . 09532
    0 . . . 01532
    0 . . . 049A2
    0 . . . 068A2

At the beginning of the communication method in which an inventorization procedure is carried out, the first request data block RDB1 is generated by the communication station 1 and output at all seven data carriers 2 (DC). The first request data block RDB1 includes the request command and also the useful data address information, something which is, however, not specified in FIG. 7. However, it is specified in FIG. 7 that the first request data block RDB1 includes a mask with a mask size=0 and no mask value. This mask is determined by the mask generating means 24. In this case, the time slot T in which the respective ones of the seven data carriers 2 (DC) must communicate with the communication station 1 is given by the first four (4) bits of its identification data block IDB, thus by its serial number. That is to say, in the present example, that the time slots T are determined in hexadecimal notation by @=7 and @=2. Consequently, a communication with the communication station 1 occurs in the time slots which are determined by @=7 and @=2 in the first procedure run with the time duration TPR1. In the time slot given by @=2, a total of six of the seven data carriers

12

2 (DC) communicate with the communication station 1, the data carrier 2 (DC) with the identification data block IDB=0 . . . 02842 transmitting the data 0 . . . 0284+n×UDB to the communication station 1. In a similar way, the data carrier 2 (DC) with the identification data block IDB=0 . . . 02832 transmits the data 0 . . . 0283+n×UDB to the communication station 1. In a similar way, the data carrier 2 (DC) with the identification data block IDB=0 . . . 09532 transmits the data 0 . . . 0953+n×UDB to the communication station 1. In a similar way, the data carrier 2 (DC) with the identification data block IDB=0 . . . 01532 transmits the data 0 . . . 0153+n×UDB to the communication station 1. In a similar way, the data carrier 2 (DC) with the identification data block IDB=0 . . . 049A2 transmits the data 0 . . . 049A+n×UDB to the communication station 1. In a similar way, the data carrier 2 (DC) with the identification data block IDB=0 . . . 068A2 transmits the data 0 . . . 068A+n× UDB to the communication station 1. It follows that a collision will occur in the time slot given by @=2, the result being that the collision detection means 8 detect the occurrence of this collision and ensure that an item of control information NPR is output to the request generating means 6, whereby a second procedure run is started, specifically after expiry of the first procedure run with the duration TPR1.

It may be mentioned at this juncture that the identification data blocks IDB or the parts NKP-IDB of the identification data blocks IDB are always transmitted from the data carriers 2 to the communication station 1 starting from the least significant bit LSB.

During the first procedure run with the duration TPR1, data is transmitted from the data carrier 2 (DC) with the identification data block IDB=0 . . . 01837 to the communication station 1 in the time slot given by @=7, no collision occurring in the case of this data transmission. In the case of the data transmission from the data carrier 2 (DC) with the identification data block IDB=0 . . . 01837 to the communication station 1, the data 0 . . . 0183+n×UDB are transmitted to the communication station 1, after which this data carrier 2 (DC) is inventorized with the aid of the data. As may be seen, it follows that of the entire identification data block IDB=0 . . . 01837 only the part NKP-IDB=0 . . . 0183 of the data carrier 2 (DC) with the identification data block IDB=0 . . . 01837 not yet known in the communication station 1 is transmitted to the communication station 1, whereas the part "7" of the identification data block IDB=0 . . . 01837 is no longer transmitted to the communication station 1. This is not required because the time slot sequence of the time slots T is determined in the communication station 1, and it is therefore known in the communication station 1 that the data carrier 2 (DC) with the identification data block IDB=0 . . . 01837 can only have answered in the time slot fixed by @=7, and therefore the combination, determining the time slot, must form the corresponding part of the identification data block IDB at four (4) bits given by @=7, which means in the case just described that this is the least significant half byte (nibble) of the identification data block IDB=0 . . . 01837, i.e. @=7.

Those data carriers 2 (DC) which—as described above— have transmitted data to the communication station 1 in the time slot given by @=2 also have not transmitted the least significant half byte (nibble) @=2 of their identification data block IDB to the communication station 1.

The second procedure run with the duration TPR2 is subsequently started, it being ensured in a known way in advance that the data carrier 2 (DC) with the identification data block IDB=0 . . . 01837 can no longer participate in the

13

second procedure run with the duration TPR2. As a consequence of this, only six data carriers 2 (DC) still participate in the second procedure run with the duration TPR2.

The second procedure run with the duration TPR2 is started by the second request data block RDB2. Included again in this second request data block RDB2 are the request command and the useful data address information, but no further details are given on this in FIG. 7. Included in the second request data block RDB2 is a mask whose mask size is four (4) bits, the mask value in hexadecimal notation being equal to "2". The mask value "2" results from the value @=2 and is fixed, just like the mask size, by the mask generating means 24. In this case, the time slots in which the six data carriers 2 (DC) still remaining and still to be inventorized must communicate with the communication station 1 are determined in each case by the second four (4) bits of their identification data block IDB. In the example given here, this means that the time slots T are determined in hexadecimal notation by @=3 and @=4 and @=A.

No collision occurs in the time slot given by @=4, which results in the data carrier 2 (DC) with the identification data block IDB=0 . . . 02842 transmitting the data 0 . . . 028+n×UDB to the communication station 1 and being inventorized in the communication station 1 on the basis of these data. As may be seen, the data carrier 2 with the identification data block IDB=0 . . . 02842 transmits only the part NKP-IDB=0 . . . 028 of its identification data block IDB=0 . . . 02842 not yet known in the communication station 1 to the communication station 1. There is consequently no need to transmit the part "42" of its identification data block IDB=0 . . . 02842 to the communication station 1, because it is already known in the communication station 1 from the procedure run previously carried out with the duration TPR1 that the data carrier 2 (DC) with the identification data block IDB=0 . . . 02842 has communicated in the time slot fixed by @=2, and that the data carrier 2 (DC) with the identification data block IDB=0 . . . 02842 has answered in the time slot fixed by @=4 in the procedure run that has just expired with the duration TPR2. This means, in other words, that the two least significant half bytes (nibbles) of its identification data block IDB=0 . . . 02842 can only be "42" in hexadecimal notation. It is therefore unnecessary for these two least significant half bytes (nibbles) to be transmitted to the communication station 1.

During the second procedure run with the duration TPR2, one collision occurs in each of the time slots given by @=3 and @=A, i.e. because the three data carriers 2 (DC) with the identification data blocks IDB=0 . . . 02832, IDB=0 . . . 09532, and IDB=0 . . . 01532 communicate simultaneously in the time slot fixed by @=3, and because the two data carriers 2 (DC) with the identification data blocks IDB=0 . . . 049A2 and IDB=0 . . . 068A2 communicate simultaneously in the time slot fixed by @=A. As may be seen from FIG. 7, in the case of the communication of five data carriers 2 each participating in one collision, these data carriers 2 likewise transmit only the part NKP-IDB, not yet known in the communication station 1, of their identification data block IDB to the communication station 1, specifically the parts 0 . . . 028, 0 . . . 095, 0 . . . 015, 0 . . . 049 and 0 . . . 068.

The occurrence of the collisions in the time slots given by @=3 and @=A is detected in the communication station 1 by the collision detecting means 8, as a result of which further procedure runs are triggered, specifically owing to the fact that the collision detecting means 8 output a relevant item of information NPR to the request generating means 6. As may

14

be seen from the top part of FIG. 8, this results in a third procedure run with the time period TPR3 being started.

The third request data block RDB3, the request command and useful data address information of which are not examined in FIG. 8, is generated at the beginning of this third procedure run with the time period TPR3. The third request data block RDB3 includes a mask whose mask size is eight (8) bits and whose mask value is "32" in hexadecimal notation. The mask value "32" results from the two values @=2 and @=3, and is fixed just like the mask size by the mask generating means 24. In this case, the time slots in which the three data carriers 2 (DC) participating in the third procedure run with the duration TPR3 must communicate with the communication station 1 are determined by the third four (4) bits of their identification data blocks IDB; i.e. the time slots are given by @=8 and @=5 in hexadecimal notation.

In the time slot given by @=8, only the data carrier 2 (DC) with the identification data block IDB=0 . . . 02832 communicates with the communication station 1, so no collision occurs and this data carrier 2 (DC) communicates to the communication station 1 only the data NKP-IDB=0 . . . 02+n×UDB not yet known in the communication station 1, and is inventorized on the basis of this data. In this case, the communication of the part KP-IDB=832 of the identification data block IDB=0 . . . 02832 already known in the communication station 1 is saved, which is possible because it is known in the communication station 1 that the data carrier 2 (DC) with the identification data block IDB=0 . . . 02832 has communicated in the time slot given by @=2 in the first procedure run with the duration TPR1, in the time slot given by @=3 in the second procedure run with the duration TPR2, and in the time slot given by @=8 in the third procedure run that is now running with the duration TPR3.

In the third procedure run with the duration TPR3, a collision will occur anew in the time slot fixed by @=5, and this, in turn, is detected by the collision detecting means 8 and results in a fourth procedure run with the duration TPR4.

The fourth request data block RDB4 is generated at the beginning of the fourth procedure run with the duration TPR4. Included in this fourth request data block RDB4 is a mask whose mask size is twelve (12) bits and whose mask value is "532" in hexadecimal form. The mask value "532" results from the values @=2, @=3, and @=5 of those time slots in which the two data carriers 2 (DC) with the identification data blocks IDB=0 . . . 09532 and IDB=0 . . . 01532 have previously communicated with the communication station 1, but without success, because a collision occurred in each case. In this case, the time slots in which the two data carriers 2 (DC) participating in the fourth procedure run with the duration TPR4, must communicate with the communication station 1 are given by the fourth four (4) bits of their identification data blocks IDB, that is to say by @=9 and @=1 in hexadecimal notation.

No collision occurs in this case both in the time slot given by @=1 and in the time slot given by @=9. In this case, the identification data block IDB of the data carrier 2 (DC) with the identification data block IDB=0 . . . 01532 communicates to the communication station 1 and utilizes for inventorization only the part NKP-IDB=0 . . . 0 not yet known in the communication station 1, and the specific useful data n×UDB. In a similar way, the data carrier 2 (DC) with the identification data block IDB=0 . . . 09532 no longer communicates the part "9532" to the communication station 1 at all, but only the preceding part NKP-IDB=0 . . . 0 of its identification data block IDB=0 . . . 09532 and the specific

US 7,257,092 B2

**15**

useful data blocks nxUDB. This concludes the fourth procedure run with a duration TPR**4**.

However, it is already known in the communication station **1**, specifically from the second procedure run with the time period TRP**2**, that a collision has occurred in the time slot fixed by @=A during the second procedure run with the duration TPR**2**. A further procedure run, specifically a fifth procedure run with the duration TPR**5** is therefore started. At the beginning of this fifth procedure run, the fifth request data block RDB**5** is generated and output by the communication station **1**. The fifth request data block RDB**5** includes a mask which has a mask size of eight (8) bits and a mask value of "A2" in hexadecimal notation. The mask value "A2" is given by the values @=2 and @=4, which correspond to those time slots in which a collision has occurred in the first procedure run with the duration TPR**1** and the second procedure run with the duration TPR**2** respectively. The mask value "A2" and the mask size are fixed by the mask generating means **24**. In this case, the time slots in which the two data carriers **2** (DC), not yet inventorized, with the identification data blocks IDB=0 . . . 049A2 and IDB=0 . . . 068A2 must communicate with the communication station **1**, are given by the values @=9 and @=8 in hexadecimal notation. In the fifth procedure run with the duration TPR**5**, no collision occurs either in the time slot given by the value @=8 or in the time slot given by the value @=9. Consequently, the data carrier **2** (DC) with the identification data block IDB=0 . . . 068A2 now communicates to the communication station **1** only the parts KP-IDB= 0 . . . 06 lying in front of the part KP-IDB=8A2 of its identification data block IDB=0 . . . 068A2 and the specific useful data blocks nxUDB. In a similar way, the data carrier **2** (DC) with the identification data block IDB=0 . . . 049A2 now communicates to the communication station **1** only the parts NKP-IDB=0 . . . 04 lying in front of the part KP-IDB=9A2 of its information data block IDB=0 . . . 049A2 and the specific useful data blocks nxUDB, such that it is then still also possible to inventorize the two last data carriers **2** (DC).

In the method described above, all seven data carriers **2** (DC) are inventorized in an unequivocally identified way after a total of five procedure runs. It merely remains to add with reference to this inventorization that the respective unknown parts NKP-IDB of the identification data blocks IDB of the seven participating data carriers **2** (DC) are fed to the identification data block regenerating means **9**, which identification data block regenerating means **9** are additionally fed the parts KP-IDB, already known in the communication station **1**, of the identification data blocks IDB by the request generating means **6** and the mask generating means **24** thereof, whereupon the identification data block regenerating means **9** ensure regeneration of the entire identification data block IDB of each inventorized data carrier **2** (DC). After the completed regeneration of the entire identification data block IDB of a data carrier **2** (DC), the regenerated identification data block IDB is fed to the combination means **11**, whereupon the regenerated identification data block IDB of a data carrier **2** (DC) is combined with the specific useful data nxUDB read out from this data carrier **2** (DC) in the combination means **11**. After this combination, the regenerated information data block IDB and the useful data nxUDB belonging to this identification data block IDB are stored.

As may be seen from the preceding description, it is necessary in the method described above for each data carrier **2** (DC) to have available the information as to which part NKP-IDB of its identification data block IDB is not yet

**16**

known in the communication station **1**, and which part NKP-IDB of its identification data block IDB of the relevant data carriers **2** (DC) is therefore to be transmitted to the communication station **1**. In the example described above, this is performed by utilizing a mask transmitted from the communication station **1** to each data carrier **2** (DC), by utilizing knowledge as to the time slots T in which data transmission has taken place, and by utilizing the fact that a collision has or has not occurred or not in a time slot T. It may be mentioned at this juncture that this mode of procedure constitutes only one of several possibilities, and that other modes of procedure are also possible, for example that each data carrier **2** (DC) receives information within the framework of a permanently defined transmission protocol as to which parts NKP-IDB of its identification data block IDB are not yet known in the communication station **1**. The required information may be made available automatically in accordance with an arrangement fixed by means of a communications protocol, there then being no need to send a mask from the communication station **1** to the data carrier **2** (DC).

In the case of the method described above, the specific useful data nxUDB transmitted from each data carrier **2** (DC) to the communication station **1** are fixed in that each request data block RDB includes an item of request information which, in the case described, is given by the specification of a useful data start block and the specification of a specific number n of useful data blocks. However, it is also possible to select a design in which no request for useful data is made by the communication station **1**, but in which automatically either all the useful data stored in a data carrier **2** (DC), or automatically a specific selection of useful data blocks UDB are transmitted from each data carrier **2** (DC) to the communication station **1**.

In the explanation of the method with reference to FIGS. **7** and **8**, it is always only nxUDB of the specific useful data that are referred to, but this does not mean that all the data carriers **2** (DC) transmit the same useful data to the communication station **1**.

In the method described above, the part NKP-IDB of the identification data block IDB of a data carrier **2** (DC) not yet known in the communication station **1** is always transmitted in conjunction with the useful data requested in the present case. This need not necessarily be the case, because it is possible in a modification of the above method to provide, after the transmission of the not yet known part NKP-IDB of the identification data block IDB from a data carrier **2** (DC) to the communication station **1**, a short waiting time which is provided in order to suppress a subsequent transmission of requested or automatically fixed useful data if a collision is established during the transmission of the not yet known part NKP-IDB of the identification data block IDB of a data carrier **2** (DC).

In a method in accordance with the invention, it is possible during each procedure run to transmit to the communication station **1** not only the part NKP-IDB of the identification data block IDB of a data carrier **2** (DC) not yet known in the communication station **1**, but also always to transmit the entire identification data block IDB, the result then still being the significant advantage that the identification data block IDB and the associated specific useful data nxUDB of a data carrier **2** (DC) are transmitted from the relevant data carrier **2** (DC) to the communication station **1** in one transmission operation.

In the method described above, the entire not yet known block region NKP-IDB of the identification data block IDB of a data carrier **2** (DC), i.e. the entire unknown part

**17**

NKP-IDB of the identification data block IDB of a data carrier **2** (DC), is always transmitted from the relevant data carrier **2** (DC) to the communication station **1**. It may be expressly stated here that this is not absolutely necessary. In a method in accordance with the invention, it is also possible to proceed such that it is not the entire as yet unknown part NKP-IDB of an identification data block IDB of a data carrier **2** (DC) that is transmitted to the communication station **1**, but only part of the entire unknown part NKP-IDB of an identification data block IDB, and this is possible, for example, without disadvantages whenever special data are included in an identification data block IDB which are not in any way necessary for specific applications of the data carrier **2** (DC), which are nevertheless stored in the data carrier **2** (DC) because they are useful or absolutely necessary for other applications, and for which special data from the identification data block IDB it is possible to omit the transmission to the communication station **1**. However, in a method in accordance with the invention it is possible to transmit only a part of the entire as yet known part NKP-IDB of an identification data bock IDB from a data carrier **2** (DC) to the communication station **1**, because in this method the aim is chiefly to achieve a particularly short total communication duration, which aim admittedly impairs security with reference to unique identification and/or inventorization, but this may be quite acceptable in many applications.

It still remains to mention that what is termed a time slot mode is implemented in the method described above. Such a time slot mode is also frequently designated the time diversity mode. It is to be expressly pointed out that a frequency-diversity mode or a code-diversity mode may also be applied instead of such a time-diversity mode, the communication then being carried out for the purpose of distributing a plurality of data carriers **2** (DC) in the former case between a plurality of data carriers **2** (DC) and a communication station **1** on the basis of different carrier frequencies and communication being carried out in the latter case between a plurality of data carriers **2** (DC) and a communication station **1** on the basis of different coding forms.

It may also be mentioned that time windows may have a time duration independent of the data transmission requirements, the result of this being that if no data at all are transmitted in a time window—this relevant time window is terminated without delay after a very short detection time period.

The invention claimed is:

**1.** A method of communicating between a communication station (**1**) and at least one data carrier (**2** (DC)), which data carrier (**2** (DC)) comprises a characteristic identification data block (IDB) and useful data (UD), by said method an inventorization procedure is carried out, the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB) of the at least one data carrier (**2** (DC)) is known in the communication station (**1**), and by which method a transmission of specific useful data (n×UDB) is carried out from the at least one data carrier (**2** (DC)) to the communication station (**1**) such that during the implementation of the inventorization procedure at least one part of a block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (**1**) and, in addition, said specific useful data (n×UDB) are transmitted from the at least one data carrier (**2** (DC)) to the communication station (**1**).

**2.** A method as claimed in claim **1**, wherein during the implementation or the inventorization procedure the entire

**18**

block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (**1**) and, in addition, the specific useful data (n×UDB) are transmitted from the at least one data carrier (**2** (DC)) to the communication station (**1**).

**3.** A method as claimed in claim **2**, wherein during the implementation of the inventorization procedure the entire identification data block and, in addition, the specific useful data are transmitted from the at least one data carrier to the communication station.

**4.** A method as claimed in claim **1**, wherein the specific useful data (n×UDB) are transmitted in time after the data (NKP-IDB) from the identification data block (IDB).

**5.** A method as claimed in claim **1**, wherein the specific useful data (n×UDB) are transmitted immediately after the data (NKP-IDB) from the identification data block (IDB).

**6.** A method of communicating between a communication station (**1**) and at least one data carrier (**2** (DC)), which data carrier (**2** (DC)) comprises a characteristic identification data block (IDB) and useful data (UD), by said method an inventorization procedure is carried out, the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB) of the at least one data carrier (**2** (DC)) is known in the communication station (**1**), and by which method a transmission of specific useful data (n×UDB) is carried out from the at least one data carrier (**2** (DC)) to the communication station (**1**) such that during the implementation of the inventorization procedure at least one part of a block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (**1**) and, in addition, said specific useful data (n×UDB) are transmitted from then at least one data carrier (**2** (DC)) to the communication station (**1**), wherein the length of the block region (NKP-IDB) of the identification data block (IDB) of a data carrier (**2** (DC)) not yet known in the communication station (**1**) is a function of the number of procedure runs carried out, and wherein this length becomes smaller as the number of procedure runs carried out rises.

**7.** A communication station (**1**) for communicating with at least one data carrier (**2** (DC)), which data carrier (**2** (DC)) comprises a characteristic identification data block (IDB) and useful data (UD), which communication station (**1**) comprises inventorization means (**5**) for carrying out an inventorization procedure, which inventorization means (**5**) are designed for carrying out successive procedure runs in an inventorization procedure, and in which inventorization means at least one part of the identification data block (IDB) of the at least one data carrier (**2** (DC)) is known after termination of an inventorization procedure, and which communication station (**1**) comprises processing means (**10, 11**) for processing specific useful data (n×UDB) included in the at least one data carrier (**2** (DC)), transmitted to the communication station (**1**), and received in the communication station (**1**), wherein the communication station (**1**) is designed for processing at least one part of a block region (NKP-IDB) of the identification data block (IDB) of the at least one data carrier (**2** (DC)) not yet known in the communication station (**1**) and, in addition, specific useful data (n×UDB) of the at least one data carrier (**2** (DC)) during the implementation of an inventorization procedure.

**8.** A communication station (**1**) as claimed in claim **7**, wherein the communication station (**1**) is designed for processing the entire block region (NKP-IDB) of the identification data block (IDB) of the at least one data carrier (**2** (DC)) not yet known in the communication station (**1**) and,

US 7,257,092 B2

19

in addition, the specific useful data (n×UDB) of the at least one data carrier (2 (DC)) during the implementation of an inventorization procedure.

**9.** A communication station as claimed in claim **8,** wherein the communication station is designed for processing the entire identification data block of the at least one data carrier and, in addition, the specific useful data of the at least one data carrier during the implementation of an inventorization procedure.

**10.** A communication station (**1**) as claimed in claim **7,** in wherein the communication station (**1**) is designed for processing first the data (NKP-IDB) from the identification data block (IDB) of the at least one data carrier (**2** (DC)) and, thereafter, the specific useful data (n×UDB) of the at least one data carrier (**2** (DC)).

**11.** A station circuit (**3**) for a communication station (**1**) for communicating with at least one data carrier (**2** (DC)), which data carrier (**2** (DC)) comprises a characteristic identification data block (IDB) and useful data (UD), which station circuit (**3**) comprises inventorization means (**5**) for carrying out an inventorization procedure, which inventorization means (**5**) are designed for carrying out successive procedure runs in an inventorization procedure, and in which inventorization means at least one part of the identification data block (IDB) of the at least one data carrier (**2** (DC)) is known after termination of an inventorization procedure, and which station circuit (**3**) comprises processing means (**10**, **11**) for processing specific useful data (n×UDB) included in the at least one data carrier (**2** (DC)), and transmitted to the station circuit (**3**), and received in the station circuit (**3**), wherein the station circuit (**3**) is designed for processing at least one part of a block region (NKP-IDB), not yet known in the communication station (**1**), of the identification data block (IDB) of the at least one data carrier (**2** (DC)) and, in addition, the specific useful data (n×UDB) of the at least one data carrier (**2** (DC)) during the carrying out of an inventorization procedure.

**12.** A station circuit (**3**) as claimed in claim **11,** wherein the station circuit (**3**) is designed for processing the entire block region (NKP-IDB) of the identification data block (IDB) of the at least one data carrier (**2** (DC)) not yet known in the station circuit (**3**) and, in addition, the specific useful data (n×UDB) of the at least one data carrier (**2** (DC)) during the implementation of an inventorization procedure.

**13.** A station circuit as claimed in claim **12,** wherein the station circuit is designed for processing the entire identification data block of the at least one data carrier and, in addition, the specific useful data of the at least one data carrier during the implementation of an inventorization procedure.

**14.** A station circuit (**3**) as claimed in claim **11,** wherein the station circuit (**3**) is designed for processing first the data (NKP-IDB) from the identification data block (IDB) of the at least one data carrier (**2** (DC)), and thereafter the specific useful data (n×UDB) of the at least one data carrier (**2** (DC)).

**15.** A data carrier (**2** (DC)) for communicating with a communication station (**1**), in said data carrier (**2** (DC)) a characteristic identification block (IDB) and useful data (UD) are stored, and said data carrier (**2** (DC)) is designed for carrying out an inventorization procedure, the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB), included in the data carrier (**2** (DC)) after the at least one part of the identification data

20

block's storage, of the data carrier (**2** (DC)) is known in the communication station (**1**), and which data carrier (**2** (DC)) comprises output means (**40**, **34**, **32**, **25**) for outputting to the communication station (**1**) specific useful data (n×UDB) included in the data carrier (**2** (DC)) after the specific useful data's storage, wherein the data carrier (**2** (DC)) is designed for outputting at least one part of a block region (NKP-IDB), not yet known in the communication station (**1**) of the identification data block (IDB) of the data carrier (**2** (DC)) included in the data carrier (**2** (DC)) after the identification data block's (IDB) storage, in addition, specific useful data (n×UDB) of the data carrier (**2** (DC)) included in the data carrier (**2**(DCC)) after the specific useful data's (n×UDB) storage.

**16.** A data carrier (**2** (DC)) as claimed in claim **15,** wherein the data carrier (**2** (DC)) is designed for outputting the entire block region (NKP-IDB), not yet known in the communication station (**1**), of the identification data block (IDB), included in the data carrier (**2** (DC)) after the identification data block's (IDB) storage, of the data carrier (**2** (DC)) and, in addition, specific useful data (n×UDB), included in the data carrier (**2** (DC)) after the specific useful data's (n×UDB) storage, of the data carrier (**2** (DC)) during the implementation of the inventorization procedure.

**17.** A data carrier as claimed in claim **16,** wherein the data carrier is designed for outputting the entire identification data block, included in the data carrier after the entire identification data block's storage, of the data carrier and, in addition, specific useful data, included in the data carrier after the specific useful data's storage, of the data carrier during the implementation of the inventorization procedure.

**18.** A data carrier (**2** (DC)) as claimed in claim **15,** wherein the data carrier (**2** (DC)) is designed for outputting first the data (NKP-IDB) from the identification data block (IDB), included in the data carrier (**2** (DC)) after the identification data block's (IDB) storage, of the data carrier (**2** (DC)) and thereafter the specific useful data (n×UDB), included in the data carrier (**2** (DC)) after the specific useful data's (n×UDB) storage, of the data carrier (**2**(DC)).

**19.** A data carrier circuit (**28**) for a data carrier (**2** (DC)) for communicating with a communication station (**1**), said data carrier circuit (**28**) is arranged for storing a characteristic identification data block (IDB) and useful data (UD), and said data carrier circuit (**28**) is designed for carrying out an inventorization procedure, said inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB), included in the data carrier circuit (**28**) after the identification data block's (IDB) storage, of the data carrier circuit (**28**) is known in the communication station (**1**), and which data carrier circuit (**28**) comprises output means (**40**, **34**, **32**) for outputting specific useful data (n×UDB), included in the data carrier circuit (**28**) after the specific useful data's (n×UDB) storage, to the communication station (**1**), wherein the data carrier circuit (**28**) is designed for outputting at least one part of a block region (NKP-IDB), not yet known in the communication station (**1**), of the identification data block (IDB) of the data carrier circuit (**28**) included in the data carrier circuit (**28**) after the identification data block's (IDB) storage and, in addition, specific useful data (n×UDB) of the data carrier circuit included in the data carrier circuit (**28**) after the specific useful data's storage.

**20.** A data carrier circuit (**28**) as claimed in claim **19,** wherein the data carrier circuit (**28**) is designed for outputting the entire block region (NKP-IDB), not yet known in

US 7,257,092 B2

21

the communication station (**1**), of the identification data block (IDB), included in the data carrier circuit (**28**) after the identification data block's (IDB) storage, of the data carrier circuit (**28**) and, in addition, specific useful data (n×UDB), included in the data carrier circuit (**28**) after the specific useful data's (n×UDB) storage, of the data carrier circuit (**28**) during the implementation of the inventorization procedure.

**21**. A data carrier circuit as claimed in claim **20**, wherein the data carrier circuit is designed for outputting the entire identification data block, included in the data carrier circuit after the entire data block's storage, of the data carrier circuit and, in addition, specific useful data, included in the data carrier circuit after the specific useful data's (n×UDB)

22

storage, of the data carrier circuit during the implementation of the inventorization procedure.

**22**. A data carrier circuit (**28**) as claimed in claim **19**, wherein the data carrier circuit (**28**) is designed for outputting first the data (NKP-IDB) from the identification data block (IDB), included in the data carrier circuit (**28**) after the identification data block's (IDB) storage, of the data carrier circuit (**28**), and thereafter the specific useful data (n×UDB), included in the data carrier circuit (**28**) after the specific useful data's (n×UDB) storage, of the data carrier circuit (**28**).

*    *    *    *    *



US007374097B2

(12) **United States Patent** (10) **Patent No.:** **US 7,374,097 B2**

Bergler (45) **Date of Patent:** **May 20, 2008**

(54) **DATA CARRIER FOR STORING INFORMATION REPRESENTED BY AN INFORMATION VOLTAGE**

(75) Inventor: **Ewald Bergler**, Weiz (AT)

(73) Assignee: **NXP B.V.**, Eindhoven (NL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 650 days.

(21) Appl. No.: **10/516,981**

(22) PCT Filed: **May 16, 2003**

(86) PCT No.: **PCT/IB03/02103**

§ 371 (c)(1),
(2), (4) Date: **Dec. 3, 2004**

(87) PCT Pub. No.: **WO03/105078**

PCT Pub. Date: **Dec. 18, 2003**

(65) **Prior Publication Data**

US 2005/0174829 A1 Aug. 11, 2005

(30) **Foreign Application Priority Data**

Jun. 7, 2002 (EP) ................................. 02100673

(51) **Int. Cl.**
*G06K 19/06* (2006.01)

(52) **U.S. Cl.** ...................................... **235/492**; 235/487

(58) **Field of Classification Search** ................ 235/492, 235/487; 340/572.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,856,788 A | | 1/1999 | Walter et al. |
| 5,973,975 A | * | 10/1999 | Raad ........................... 365/207 |
| 6,115,319 A | | 9/2000 | Kinoshita et al. |
| 6,147,825 A | * | 11/2000 | Alini et al. ................... 360/51 |
| 6,294,997 B1 | * | 9/2001 | Paratore et al. .......... 340/572.1 |

FOREIGN PATENT DOCUMENTS

WO WO 02 41650 5/2000

* cited by examiner

*Primary Examiner*—Lisa M Caputo
(74) *Attorney, Agent, or Firm*—Peter Zawilski

(57) **ABSTRACT**

In a data carrier (**1**) that is arranged to receive a signal (S) in a non-contacting manner, there is provided a circuit (**2**) that is arranged, by using the signal (S), to generate a supply voltage (V) for parts of the circuit (**2**), the circuit (**2**) having a storage stage (**5**) that is arranged to store information capacitively, the information being represented by a value of an information voltage (UI) arising at the storage stage (**5**), and the circuit (**2**) having an information-voltage generating stage (**6**) that is arranged to receive a control signal (CS), which control signal (CS) is of a voltage value that is at most equal to the value of the supply voltage (V), and that is arranged to generate the information voltage (UI) by using the control signal (CS), wherein the information-voltage generating stage (**6**) has a voltage-raising stage (**8**) that is arranged to raise the value of the voltage of the control signal (CS).

**7 Claims, 2 Drawing Sheets**





Fig.1

Fig.2



Fig.3

Fig.4

US 7,374,097 B2

1

# DATA CARRIER FOR STORING INFORMATION REPRESENTED BY AN INFORMATION VOLTAGE

The invention relates to a data carrier that is arranged to receive a signal in a non-contacting manner and that has an electrical circuit, to which circuit the signal can be fed and which circuit is arranged to generate a supply voltage for parts of the circuit by using the signal, which circuit comprises storage means that are arranged to store information capacitively, the information being represented by a value of an information voltage arising at the storage means, and which circuit comprises information-voltage generating means that are arranged to receive a control signal, which control signal is of a voltage value that is at most equal to the value of the supply voltage, and that are arranged to generate the information voltage by using the control signal.

The invention further relates to a circuit for a data carrier, which data carrier is arranged to receive a signal in a non-contacting manner, to which circuit the signal can be fed and which circuit is arranged to generate a supply voltage for parts of the circuit by using the signal, which circuit comprises storage means that are arranged to store information capacitively, the information being represented by a value of an information voltage arising at the storage means, and which circuit comprises information-voltage generating means that are arranged to receive a control signal, which control signal is of a voltage value that is at most equal to the value of the supply voltage, and that are arranged to generate the information voltage by using the control signal.

A data carrier of the kind described in the first paragraph above and a circuit of the kind described in the second paragraph above are known from the published draft ISO/ IEC CD 18000 of the ISO/IEC 18000 standard that is currently being produced.

The known data carrier that has the known circuit and that is arranged to receive, in a non-contacting manner, a signal emitted by a read/write station, it being possible for a supply voltage for parts of the circuit to be generated by the circuit by using the signal, has storage means that are formed by a capacitor and that are arranged to store communication-related information relating to communication between the data carrier and the read/write station, in which case the communication-related information is intended to be capable of evaluation for a period of time. The information is represented by a value of an information voltage that arises at the capacitor. Also provided are an n-channel field effect transistor that forms an information-voltage generating means, and a current source, these two items being arranged in series with one another and being connected between the capacitor and the supply voltage, it being possible by means of them and by using a digital control signal that can be fed to the control electrode of the transistor for the capacitor to be charged to a value of the information voltage that is reduced from the value of the control signal voltage by an amount equal to a characteristic transistor threshold voltage that is present between a point of connection of the transistor to the capacitor and the control electrode of the transistor. The digital control signal is of a voltage value that is at most equal to the value of the supply voltage.

With the known data carrier, there is the problem that, at the time when it is generated, the value of the information voltage is lower than the voltage value of the control signal and that, following the generation of the information voltage, there is a continuous decline in the value of the latter because the capacitor is constantly being discharged by

2

unavoidable leakage currents in the circuit. This produces the unsatisfactory situation that, as a function of the supply voltage available at the time when the information voltage was generated and as a function of the size of the leakage currents, the information stored by means of the capacitor is no longer able to be evaluated after only a short period of time.

It is an object of the invention to remedy the problems detailed above in a data carrier of the kind described in the first paragraph above and in a circuit of the kind described in the second paragraph above and to provide an improved data carrier and an improved circuit.

To achieve the above object, provision is made, in accordance with the invention, in a data carrier of the kind described in the first paragraph above, for the information-voltage generating means to have voltage-raising means that are arranged to raise the value of the control-signal voltage.

To achieve the above object, provision is made, in accordance with the invention, in a circuit of the kind described in the second paragraph above, for the information-voltage generating means to have voltage-raising means that are arranged to raise the value of the control-signal voltage.

What is achieved in an advantageous manner by the provisions made in accordance with the invention is that the information voltage arising at the storage means can assume substantially the value of the supply voltage virtually irrespective of the transistor threshold voltage or the value of the control-signal voltage. This also gives the advantage that the entire difference in voltage between a reference potential and the supply voltage can be used to represent the information, thus giving a maximum possible signal-to-noise-voltage ratio for evaluating the information. Particularly when there are leakage currents present, this gives a substantially longer period of time during which the stored information can be ascertained with high reliability, which means that the stored information can still be evaluated even after a brief supply-voltage failure and, by the use of the information, communication between a read-write station and the data carrier can continue even after a supply-voltage failure of this kind without the communication connection having to be completely re-made.

In the case of the solutions according to the invention, provision may for example be made for the voltage-raising means to be formed by a voltage source that can be operated to float in relation to a reference potential of the circuit by which the value of the control-signal voltage can be raised by a desired amount. It has however proved particularly advantageous if the voltage raising means are implemented in the form of a charge pump that is arranged to raise the voltage value of the control signal by the value of the supply voltage. This gives the advantage that, using the supply voltage, a reliable increase can be made in the value of the control-signal voltage in a manner that is as simple and inexpensive as possible to put into practice.

In the case of the solutions according to the invention, it has also proved advantageous if the information-voltage generating means have voltage-limiting means that are arranged to limit the raising of the voltage value of the control signal. This gives the advantage that, when the value of the control-signal voltage is raised, the voltage value that arises is only such a one as the information-voltage generating means can use to generate the information voltage without any problems.

These and other aspects of the invention are apparent from and will be elucidated with reference to the embodiment described hereinafter.

US 7,374,097 B2

**3**

IN THE DRAWINGS

FIG. **1** is a diagrammatic block circuit diagram of one embodiment of data carrier according to the invention.

FIG. **2** is a view similar to FIG. **1** showing a first detail of the data carrier according to the invention shown in FIG. **1**.

FIG. **3** is a view similar to FIG. **1** showing a second detail of the data carrier according to the invention shown in FIG. **1**.

FIG. **4** shows a circuit implementing the second detail of the data carrier according to the invention shown in FIG. **1**.

Shown in FIG. **1** is a data carrier **1** that is arranged for non-contacting communication with a communication station that is not shown in FIG. **1**. For this purpose the data carrier **1** is arranged to receive a signal S from the communication station in a non-contacting manner, the signal being formed by a high-frequency carrier wave so that the data carrier **1** can be supplied with energy by means of signal S. It is also possible for enquiry information to be communicated from the communication station to the data carrier **1** by means of the signal S, in which case the signal is an amplitude modulation of the carrier wave. It is further possible for answer information to be communicated from the data carrier **1** to the communication station by means of signal S, in which case the signal is a load modulation able to be produced by the data carrier **1**.

The data carrier **1** has an electrical integrated circuit **2**. The circuit **2** has components of transmit/receive means **3** that are arranged to receive the signal S. For this purpose the transmit/receive means **3** have a transmission coil configuration (not shown in FIG. **1**) that is coupled to the circuit **2**, thus enabling the signal S to be fed to the circuit **2**. The transmit/receive means **3** are further arranged, by using the signal S, to generate a supply voltage V relative to a reference potential GND for parts of the circuit. The transmit/receive means **3** are further arranged to demodulate the received signal S, which is modulated in this case, and to emit enquiry data RD that is communicated by means of the modulated signal S received. The transmit/receive means **3** are further arranged to receive answer data AD and, for the purpose of transmitting the answer data AD, to load modulate the received signal S, that is unmodulated in this case.

The circuit **2** also has data-processing means **4** that are implemented by means of a microprocessor, which microcomputer also has a memory. The data-processing means **4** are arranged to receive the enquiry data RD and to process the enquiry data RD and, as a function of the enquiry data RD, to generate the answer data AD and to emit the answer data AD to the transmit/receive means **3**.

The circuit **2** further has storage means **5** that are arranged to store information capacitively, the information being represented by a value of an information voltage UI that arises at the storage means **5**. Unlike the information stored by the memory of the microprocessor, the information stored by the storage means **5** is intended to be available merely for a period of time and to temporarily indicate a communication status occurring during a communication. The storage means **5** are implemented in the form of a storage capacitor **5**A shown in FIG. **2**.

The circuit **2** further has information-voltage generating means **6** that are arranged to receive a control signal CS, which control signal CS is of a voltage value UCS that is at most equal to the value of the supply voltage V. The information-voltage generating means **6** are further arranged to generate the information voltage UI by using the control signal CS. For this purpose, the information-voltage generating means **6** have a charging-current generating stage **7**

**4**

that is arranged to generate and emit a charging current for the storage means **5**. As shown in FIG. **2**, the charging-current generating stage **7** is implemented in the form of a first n-channel field effect transistor **7**A whose source terminal is connected to the storage capacitor **5**A. The charging-current generating stage **7** further has a current source **7**B that is arranged to generate the charging current for the storage capacitor **5**A and that is connected in series with the first n-channel field effect transistor **7**A between said first n-channel field effect transistor **7**A and the supply voltage V. The information voltage UI can be picked off relative to the reference potential GND at a point P in the circuit situated between the information-voltage generating means **6** and the storage means **5**.

The information-voltage generating means **6** further have voltage-raising means **8** that are arranged to receive the control signal CS and to raise the value UCS of the voltage of the control signal CS. The voltage-raising means **8** are further arranged to emit a control signal CS' of raised voltage. The information-voltage generating means **6** further have voltage-limiting means **9** that are arranged between the voltage-raising means **8** and the charging-current generating stage **7** and that are arranged to receive the control signal CS' of raised voltage and to emit a control signal CS" of limited voltage, which control signal CS" represents the control signal CS, to the charging-current generating stage **7** or rather to the gate terminal of the first n-channel field effect transistor **7**A.

As shown in FIG. **2**, the voltage-raising means **8** are implemented in the form of a charge pump **10**, which charge pump **10** has a charge-pump capacitor **11**, a first switch **12** and a second switch **13**. The control signal CS can be fed to the two switches **12** and **13**. The two switches **12** and **13** are shown in a rest position in FIG. **2**. The charge-pump capacitor **11** is connected between the supply voltage V and the reference potential GND, as a result of which the voltage applied to the charge-pump capacitor **11** assumes the value of the supply voltage V. If the control signal CS is received, the two switches **12** and **13** are arranged to switch over from their rest state to an active state, as is indicated in FIG. **2** by broken lines. With the switches **12** and **13** in this active state, the charge-pump capacitor **11** is connected between the voltage-limiting means **9** and the data-processing means **4**, which means that the voltage value UCS can be raised by the value of the supply voltage V at the input to the voltage-limiting means **9**. The two switches **12** and **13** are implemented in the form of field effect transistors. The voltage-limiting means **9** are implemented in the form of a diode configuration (not shown in FIG. **2**), thus enabling the voltage value of the control signal CS' of raised voltage to be limited to a value compatible with use in the charging-current control stage **7**.

This gives the advantage that the supply voltage V available can be used in the optimum way to generate the information voltage UI.

The data carrier **1** shown in FIG. **1** further has evaluation means **14** to which the information voltage UI arising at the point P in the circuit can be fed and that, with the help of a comparison voltage UC, are arranged to evaluate the information voltage UI for the information that is represented by said information voltage UI. The evaluation means **14** are arranged to receive the comparison voltage UC. For the purpose of generating the comparison voltage UC, the data carrier **1** has comparison-voltage generating means **15** that are implemented separately from the evaluation means **14** and that are arranged to generate the comparison voltage UC and emit it to the evaluation means **14**.

US 7,374,097 B2

5

The evaluation means **14** are implemented in the form of a difference amplifier stage **16** as schematically indicated in FIG. **3**. The difference amplifier stage **16** has a first input **16**A at which the information voltage UI can be fed to it. The difference amplifier stage **16** further has a second input **16**B at which the comparison voltage UC can be fed to it. The difference amplifier stage **16** further has a first output **16**C from which the difference amplifier stage **16** can emit the information stored by means of storage means **5** in the form of information data ID. The information data ID represents a first logic state if the value of the information voltage UI is higher than the value of the comparison voltage UC and the information data ID represents a second logic state if the value of the information voltage UI is lower than the value of the comparison voltage UC. The difference amplifier stage **16** further has a third input **16**D at which it is arranged to receive a controlling test signal TS. The difference amplifier stage **16** further has a second output **16**E, at which second output **16**E the difference amplifier stage **16** is arranged to emit a voltage representing the information voltage U**1**. The circuit **2** has a test terminal T connected to the second output **16**E, from which the voltage representing the information voltage UI can be picked off. Hence the evaluation means **14** are arranged to make the information voltage UI available at terminal T in a way that can be controlled by means of the test signal TS.

The difference amplifier stage **16** is shown in detail in FIG. **4**. The difference amplifier stage **16** is implemented in the form of a first p-channel field effect transistor **17** and a second p-channel field effect transistor **18**, with the control electrode of the first p-channel field effect transistor **17** forming the first input **16**A and the control electrode of the second p-channel field effect transistor **18** forming the second input **16**B. The source terminals of the two p-channel field effect transistors **17** and **18** are connected together and form the second output **16**E. Between the two p-channel field effect transistors **17** and **18** and the supply voltage V is connected a current source **21**. The drain terminals of the two p-channel field effect transistors **17** and **18** are connected to a current mirror, which current mirror is implemented in the form of a second n-channel field effect transistor **19** and a third n-channel field effect transistor **20**. A third switch **22** is connected between the reference potential GND and the drain terminal of the first p-channel field effect transistor **17**. A fourth switch **23** is connected between the reference potential and the source terminal of the second n-channel field effect transistor **19**. A fifth switch **24** is connected between the reference potential GND and the source terminal of the third n-channel field effect transistor **20**. The three switches **22**, **23** and **24** are shown in their rest state. The three switches **22**, **23** and **24** are implemented in the form of further field effect transistors (not shown in FIG. **4**) and, when the test signal TS is present, which test signal TS sets the three switches **22**, **23** and **24** to their active state, the difference amplifier stage **16** can be de-activated, by means of the switches **22**, **23** and **24**, from evaluating the information voltage UI, as a result of which a representation of the information voltage UI becomes available at the same time at the second output **16**E. This gives the advantage that the information voltage UI, or rather its waveform over time, can be measured from outside the circuit **2** for test purposes. In the absence of the controlling test signal TS, the three switches **22** to **24** are controlled to their rest state, and the voltage difference arising between the first input **16**A and the second input **16**B is available amplified, by so-called "open-loop amplification", at the first output **16**C in the form of the information data ID.

6

The comparison-voltage generating means **15** are arranged to take account of a value of the supply voltage V by virtue of the fact that the value of the comparison voltage UC that can be generated and emitted by the comparison-voltage generating means **15** is proportional to the value of the supply voltage V. This gives the advantage that there is a relationship between the value of the information voltage UI and the value of the comparison voltage UC that does actually allow them to be compared with one another. The comparison-voltage generating means **15** are further arranged to generate the comparison voltage UC in a programmable manner. For this purpose, the comparison-voltage [sic ]generating means **15** are arranged to receive a programming signal PS that can be generated and emitted by the data-processing means **4**. This gives the advantage that the value of the comparison voltage UC can be varied in a programmable manner, which enables the period of validity of an item of information stored by means of the storage means **5** to be acted on because, if the value of the comparison voltage UC is relatively high, any degradation of the information voltage UI caused by leakage currents will come into play at an earlier point in time than would be the case if the value of the comparison voltage were lower in relative terms.

In what follows, the operation of the data carrier **1** will now be elucidated by reference to a first example of an application of the data carrier **1** of FIG. **1**.

In this example of an application it is assumed that the communication-related information that is to be stored for a period of time by means of the storage means **5** is to represent a communication status for a data carrier **1** that occurs in the event of an anti-collision communication, which status is used internally in the data carrier **1** and serves to indicate that successful communication has already taken place between the data carrier **1** and the communication device. An anti-collision communication of this kind is needed when there are a plurality of data carriers **1** present within a communication area of a communication device at the same time and the communication device first has to determine the data carrier **1** with which communication can be performed, with unique serial numbers stored in the data carriers **1** being used to identify the data carriers **1**.

Each of the data carriers **1**, which is situated in a virtually static position in the communication area of the communication device, first receives the unmodulated signal S, as a result of which a supply voltage V for the circuit **2** is generated by means of the transmit/receive means **3**, thus enabling data to be processed in the data-processing means **4**. The first thing this does is to cause the programming signal PS, which signal is intended for programming the comparison-voltage generating means **15** to generate a comparison voltage UC, to be generated and emitted to the comparison-voltage generating means **15**. The programming signal PS causes the comparison-voltage generating means **15** to generate a comparison voltage UIC whose value is equal to 0.25 times the value of the supply voltage V.

The communication device first puts out, by means of the signal S, a so-called GROUP SELECT command. This command is received by the transmit/receive means **3** in each data carrier **1** and is emitted to the data-processing means **4** in the form of enquiry data RD. Answer data AD is then emitted by the data-processing means **4** to the transmit/receive means **3**, which answer data AD represents the serial number of the data carrier **1**.

The eventuality may occur in this case that a plurality of data carriers **1** answer virtually simultaneously and in so doing produce load modulations of the signal S that corre-

US 7,374,097 B2

**7**

spond to their respective serial numbers, in which case the communication device is then unable to receive a valid serial number and emits a FAIL command. In the data carriers **1**, the enquiry data RD representing the FAIL command is then processed by the data-processing means **4** and, on the basis of a random number for example, then causes the data carriers **1** to emit their serial numbers to the communication device in different time ranges, as a result of which it is possible for the communication station to recognize each serial number unambiguously.

The serial number received by the communication device is used to read out the answer data AD from the data carrier **1**, a READ WITH SERIAL NUMBER command being sent to the data carrier **1** for this purpose, in which case only the data carrier **1** whose internally stored serial number matches the serial number received communicates answer data AD to the communication device.

It is precisely in this data carrier **1** that the control signal CS is generated by means of the data-processing means **4** and is emitted to the information-voltage generating means **6**, the value of the voltage of the control signal CS being equal to the value of the voltage of the supply voltage V. In the information-voltage generating means **6**, the value of the voltage of the control signal CS is raised by means of the voltage-raising means **8** to twice the value of the supply voltage V. The control signal CS' of raised voltage that is obtained in this way is fed to the voltage-limiting means **9**, by means of which the value of the control signal CS' of raised voltage is limited to a value which is equal to the value of the supply voltage V increased by 0.7 volts. The voltage-limited control signal CS'' obtained in this way is fed to the first n-channel field effect transistor **7A** in the charging-current generating stage **7** and drives it to the conducting state. The storage capacitor **5A** is then charged by means of the charging current fed from the current source **7B** until such time as the value of the information voltage UI arising at point P in the circuit is virtually identical to the value of the supply voltage V because the value of the voltage of the voltage-limited control signal CS'' is higher than the value of the supply voltage V by 0.7 volts, or in other words by exactly the gate-source threshold voltage of the first n-channel field effect transistor **7A**. Hence, in the case of this data carrier **1**, the information that successful communication has taken place with a communication station using the serial number of the data carrier **1** has been stored by means of the storage means **5** using the full value available of the supply voltage V.

However, because all the other data carriers **1** present are also endeavoring to achieve this status, the anti-collision communication is carried out again until successful communication has taken place with all the data carriers **1** using their respective serial numbers. In the process, when the GROUP SELECT command is again received, the information data emitted by the evaluation means is first queried in the data carrier **1** and there is no further participation in an anti-collision communication if the information data ID indicates that the value of the information voltage UI is higher than the value of the comparison voltage UC.

The information represented by means of the information voltage UI is available temporarily after it has been generated, because it is subject to degradation caused by the leakage currents in circuit **2**. However, during this "life" of the information, the supply voltage can even drop below a critical value required for the supply of the data-processing means **4**, which may happen in the course of the communication if for example the data carrier **1** is briefly screened off from the signal S or if there is a frequency hopping

**8**

process, without the information being lost or becoming invalid during the life. Selecting a figure of 0.25 times the value of the supply voltage V as a value for the comparison voltage UC ensures that even when there are a relatively large number of data carriers **1** within the communication area the life of the stored information will be long enough to outlast successful communication with all the data carriers **1**.

It should be mentioned at this point that after successful communication with all the data carriers **1** the communication device puts out an INITIALIZE command that causes the information stored by means of the storage means **5** to be deleted in all the data carriers **1** situated in the communication area of the communication device, which is done in conventional fashion by means of a deleting transistor (not shown in FIG. **1**) by means of which the storage capacitor **5A** is discharged.

In what follows, the operation of the data carrier **1** will now be elucidated by reference to a second example of an application of the data carrier **1** of FIG. **1**.

In this example of an application, it is assumed that a data carrier **1** is in each case situated on a product and that a plurality of such products are being moved on a conveyor belt at relatively high speed through two communication areas, belonging to two different communication devices, which areas are arranged one behind the other in the direction of movement and do not overlap one another.

In this case too an anti-collision communication has to be carried out if there are a plurality of data carriers **1** present in a communication area at the same time. However, to avoid the situation that, when there is information stored in a data carrier **1** by means of the information voltage UI that successful communication has already taken place with the first communication device, this information will still be valid when the communication area of the second communication device is passed through, a comparison voltage UC whose value is equal to 0.75 times the value of the supply voltage V is generated by means of the programming signal on entry into the first communication area, that belonging to the first communication device.

This is a simple way of ensuring that the life of the information is sufficiently short to ensure that, even if the INITIALIZE command is not received by the data carrier **1**, the value of the information voltage UI will be below the value of the comparison voltage UC on entry into the communication area of the second communication device. This ensures that the data carrier **1** cannot pass through the communication area of the second communication device without proper communication, i.e. anti-collision communication where required, taking place with it.

It should also be mentioned that the storage means may have a number of storage locations and that a number of information-voltage generating means and evaluation means equal to the number of storage locations may be provided.

It should be further mentioned that the signal may be phase-modulated or frequency-modulated.

The invention claimed is:

**1**. A data carrier that is arranged to receive a signal in a non-contacting manner and that has an electrical circuit, to which circuit the signal can be fed and which circuit is arranged, by using the signal, to generate a supply voltage for parts of the circuit, which circuit comprises storage means that are arranged to store information capacitively, the information being represented by a value of an information voltage arising at the storage means, and which circuit comprises information-voltage generating means that are arranged to receive a control signal, which control signal

US 7,374,097 B2

**9**

is of a voltage value that is at most equal to the value of the supply voltage, and that are arranged to generate the information voltage by using the control signal, characterized in that the information-voltage generating means have voltage-raising means that are arranged to raise the voltage value of the control signal.

**2**. A data carrier as claimed in claim **1**, characterized in that the voltage-raising means are implemented in the form of a charge pump that is arranged to raise the voltage value of the control signal by the value of the supply voltage.

**3**. A data carrier **1** as claimed in claim **1**, characterized in that the information-voltage generating means have voltage-limiting means that are arranged to limit the raising of the voltage value of the control signal.

**4**. A circuit for a data carrier, which data carrier is arranged to receive a signal in a non-contacting manner, to which circuit the signal can be fed and which circuit is arranged, by using the signal, to generate a supply voltage for parts of the circuit, which circuit comprises storage means that are arranged to store information capacitively, the information being represented by a value of an infor-

**10**

mation voltage UI arising at the storage means, and which circuit comprises information-voltage generating means that are arranged to receive a control signal, which control signal is of a voltage value that is at most equal to the value of the supply voltage, and that are arranged to generate the information voltage by using the control signal, characterized in that the information-voltage generating means have voltage-raising means that are arranged to raise the value of the voltage of the control signal.

**5**. A circuit as claimed in claim **4**, characterized in that the voltage-raising means are implemented in the form of a charge pump that is arranged to raise the voltage value of the control signal by the value of the supply voltage.

**6**. A circuit as claimed in claim **4**, characterized in that information-voltage generating means have voltage-limiting means that are arranged to limit the raising of the voltage value of the control signal.

**7**. A circuit as claimed in claim **4**, characterized in that the circuit is implemented in the form of an integrated circuit.

\*    \*    \*    \*    \*



US007795951B2

(12) **United States Patent**

Choy

(10) **Patent No.:** **US 7,795,951 B2**

(45) **Date of Patent:** **Sep. 14, 2010**

(54) **HIGH-DYNAMIC RANGE LOW RIPPLE VOLTAGE MULTIPLIER**

(75) Inventor: **Jon S. Choy**, Austin, TX (US)

(73) Assignee: **Freescale Semiconductor, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 17 days.

(21) Appl. No.: **11/948,005**

(22) Filed: **Nov. 30, 2007**

(65) **Prior Publication Data**

US 2009/0140795 A1    Jun. 4, 2009

(51) **Int. Cl.**
 *G05F 1/10*    (2006.01)
 *G05F 3/02*    (2006.01)
(52) **U.S. Cl.** ...................................... **327/536**; 327/537
(58) **Field of Classification Search** .................. 327/536
 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,486,728 B2 | 11/2002 | Kleveland | |
| 6,794,927 B2 | 9/2004 | Bedarida et al. | |
| 6,909,319 B2 * | 6/2005 | Wang et al. | ................. 327/536 |
| 6,927,441 B2 | 8/2005 | Pappalardo et al. | |
| 7,046,076 B2 | 5/2006 | Daga et al. | |
| 7,064,600 B1 | 6/2006 | Ming et al. | |
| 7,116,155 B2 | 10/2006 | Pan | |
| 7,173,477 B1 | 2/2007 | Raghavan | |
| 7,176,747 B2 | 2/2007 | Lee et al. | |
| 7,215,181 B2 | 5/2007 | Hahn et al. | |
| 2007/0069801 A1 * | 3/2007 | Ragone et al. | ............... 327/536 |

OTHER PUBLICATIONS

Lee, Jae-Youl et al.; "A Regulated Charge Pump With Small Ripple Voltage and Fast Start-Up"; IEEE Journal of Solid State Circuits; Feb. 2006; pp. 425-432; vol. 41, No. 2; IEEE.
Cabrini, A. et al.; "High-efficiency regulator for on-chip charge pump voltage elevators"; Electronic Letters; Aug. 17, 2006; 2 pp; vol. 42, No. 17.
Pelliconi, Roberto et al.; "Power Efficient Charge Pump in Deep Submicron Standard CMOS Technology"; Proceedings of the 27th European Solid-State Circuits Conference; Sep. 18-21, 2001; pp. 73-76.

* cited by examiner

*Primary Examiner*—Lincoln Donovan
*Assistant Examiner*—Daniel Rojas
(74) *Attorney, Agent, or Firm*—Daniel D. Hill

(57) **ABSTRACT**

A voltage multiplier (**10**) including a first clocked multiplier stage (**12**) having an input and an output and a second clocked multiplier stage (**14**, **16**) having an input and an output is provided. The voltage multiplier further includes an input level regulator (**18**) coupled to the input of the first multiplier stage. The voltage multiplier further includes a feedback bias control circuit (**32**) coupled to the input of the first multiplier stage, wherein the feedback bias control circuit is further coupled to receive the output (**50**) of the second multiplier stage, and wherein the feedback bias control circuit generates a feedback signal (**58**) affecting an output of the input level regulator based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage.

**19 Claims, 4 Drawing Sheets**



Case: 24-1121    Document: 14    Page: 252    Filed: 03/08/2024



FIG. 1



*FIG. 2*



*FIG. 3*



*FIG. 4*

US 7,795,951 B2

1

# HIGH-DYNAMIC RANGE LOW RIPPLE VOLTAGE MULTIPLIER

## BACKGROUND

1. Field

This disclosure relates generally to integrated circuits, and more specifically, to high dynamic range low ripple voltage multipliers.

2. Related Art

Flash memory devices require many different internal voltages to be generated within the memory device. Some voltages comprise voltages less than the supply voltage, also referred to as sub-supply voltages, and are generated, for example, by linear regulators. Other voltages are greater than the supply voltage and are generated by charge pumps (also referred to as voltage multipliers). However, an undesirable large number of components are required as a result of the providing many different internal voltages with the corresponding regulators and pumps. In addition, impedance degradation is a problem that occurs with charge pumps operated over a large output voltage range. Furthermore, undesirable voltage ripple is produced via linear regulators for generating sub-supply voltages.

Accordingly, there is a need for an improved method and apparatus for overcoming the problems in the art as discussed above.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and is not limited by the accompanying figures, in which like references indicate similar elements. Elements in the figures are illustrated for simplicity and clarity and have not necessarily been drawn to scale.

FIG. 1 is a block diagram view of a high dynamic range low ripple voltage multiplier according to one embodiment of the present disclosure;

FIG. 2 is a block diagram view of a voltage multiplier according to an embodiment of the present disclosure;

FIG. 3 is a graphical presentation view of output voltage versus time for the voltage multiplier according to the embodiments of the present disclosure; and

FIG. 4 is a block diagram view of a voltage multiplier according to another embodiment of the present disclosure.

## DETAILED DESCRIPTION

The voltage multiplier according to the embodiments of the present disclosure is advantageously suited to meet a number of voltage generation needs within an integrated circuit. While most multiplier circuits generate a multiplier factor of greater than one (i.e., >1), the voltage multiplier according to the embodiments of the present disclosure advantageously enables generation by the same voltage multiplier of (i) a multiplier of less than one (i.e., <1, for example (0.5)) and a multiplier of greater that one (i.e., >1). In one embodiment, the voltage multiplier is capable of a multiplier range from less than one to more than one by a multiplier factor of three (3×). As a result, one voltage generator supplies many different voltages and loads for a given integrated circuit, for example, one or more types of FLASH memory devices.

In addition, the voltage multiplier circuit according to the embodiments of the present disclosure enables generation of a wide range of voltages with relatively small ripple. Previous known circuits for generating voltages that are below the supply are generally generated by down regulating the supply voltage through a linear regulator. The voltage multiplier of the present disclosure solves the problem in a new way by controlling the generated voltage amplitude, and as a result the current that goes through the pumping capacitors is regulated. The embodiments of the present disclosure advantageously provide a voltage multiplier with high dynamic range, low ripple voltage, and an elevator charge pump.

FIG. 1 is a block diagram view of a high dynamic range low ripple voltage multiplier 10 according to one embodiment of the present disclosure. Voltage multiplier 10 includes a number of multiplier stages, designated by reference numerals 12, 14, and 16. Voltage multiplier 10 also includes an input level regulator 18, a number of regulated clock circuits 20, 22, 24, 26, 28, and 30, and a feedback bias control circuit 32.

Reference numerals 12 and 14 indicate first and second voltage multiplier stages, respectively. Reference numeral 16 indicates an $N^{th}$ multiplier stage, where N is an integer. As illustrated, the second multiplier stage 14 is separated from the $N^{th}$ multiplier stage 16 by a series of dots ". . ." that are indicative of one or more multiplier stages which may be present between the two illustrated stages. Note that while only three (3) multiplier stages are illustrated in FIG. 1, the number of multiplier stages is determined according to the requirements of a given voltage multiplier application. In one embodiment, the multiplier stages comprise symmetrical multiplier stages. In a further embodiment, the multiplier stages comprise identical multiplier stages. Still further, in another embodiment, the multiplier stages can comprise non-identical multiplier stages. Furthermore, the voltage multiplier stages can comprise one of (i) positive voltage multiplier stages for multiplying positive voltages and (ii) negative voltage multiplier stages for multiplying negative voltages.

The first multiplier stage 12 includes an input 34 and an output 36. In one embodiment, first multiplier stage 12 comprises a symmetrical multiplier stage which includes (i) a first portion that is (a) pre-charged during a first clock phase and (b) pumped during a second clock phase, and (ii) a second portion that is (a) pumped during the first clock phase and (b) pre-charged during the second clock phase. The first phase clock is provided via a regulated clock signal on signal line 38 and the second clock phase is provided via a regulated clock signal on signal line 40.

The second multiplier stage 14 includes an input 36 and an output 42. The input of the second multiplier stage is coupled to the output of the first multiplier stage, and thus both have been designated by the reference numeral 36 for simplicity. In one embodiment, second multiplier stage 14 comprises a symmetrical multiplier stage which includes (i) a first portion that is (a) pre-charged during a first clock phase and (b) pumped during a second clock phase, and (ii) a second portion that is (a) pumped during the first clock phase and (b) pre-charged during the second clock phase. The first phase clock is provided via a regulated clock signal on signal line 44 and the second clock phase is provided via a regulated clock signal on signal line 46.

The $N^{th}$ multiplier stage 16 includes an input 48 and an output 50. Output 50 of the $N^{th}$ multiplier stage 16 also represents the voltage multiplier output of voltage multiplier 10. The input of the $N^{th}$ multiplier stage is coupled to the output of a previous multiplier stage. For an embodiment including only three multiplier stages, input 48 would couple to output 42 of the second multiplier stage 14. In one embodiment, the $N^{th}$ multiplier stage 16 comprises a symmetrical multiplier stage which includes (i) a first portion that is (a) pre-charged during a first clock phase and (b) pumped during a second clock phase, and (ii) a second portion that is (a) pumped

US 7,795,951 B2

**3**

during the first clock phase and (b) pre-charged during the second clock phase. The first phase clock is provided via a regulated clock signal on signal line **52** and the second clock phase is provided via a regulated clock signal on signal line **54**.

As illustrated in FIG. **1**, the embodiment comprises symmetrical multiplier stages, each multiplier stage being coupled to two regulated clock circuits. That is, two regulated clock circuits are provided per multiplier stage. Each regulated clock circuit is configured to provide a given phase of the regulated clock to the corresponding multiplier stage. In addition, it should be noted that the number of regulated clock circuits used for providing a given phase of the regulated clock to one or more of the multiplier stages can be selected according to the load current requirements of a given multiplier stage or stages. If load current requirements allow, a single regulated clock circuit could be shared among one or more multiplier stages for providing a given phase of the regulated clock. In other words, there may be embodiments in which the number of regulated clock circuits for a given phase is less than the number of multiplier stages.

Input level regulator **18** includes a voltage supply input **56**, a feedback bias control input **58**, and a regulated voltage output on signal line **34**. Input level regulator **18** advantageously enables regulation of a voltage to a range of voltage levels, the range of voltage levels including levels equal to the supply voltage (=$V_{SUPPLY}$) and lower than the supply voltage (<$V_{SUPPLY}$). In one embodiment, input level regulator **18** is configured to provide a regulated voltage on signal line **34** in response to the supply voltage on input **56** and the feedback bias control signal on signal line **58**, as will be discussed further herein.

Regulated clock circuit **20** comprises a supply voltage clock (CLK) input, a supply voltage ($V_{SUPPLY}$) input, an input for receiving a feedback bias control signal **58**, and a regulated clock output on signal line **38**. In one embodiment, the regulated clock output on signal line **38** comprises a first phase clock of the regulated clock signal. Regulated clock circuit **22** comprises a clock (CLK) input, a supply voltage ($V_{SUPPLY}$) input, an input for receiving a feedback bias control signal **58**, and a regulated clock output on signal line **40**. In one embodiment, the regulated clock output on signal line **40** comprises a second phase clock of the regulated clock signal. For regulated clock circuits **20** and **22**, the CLK input has a peak level at $V_{SUPPLY}$.

Regulated clock circuit **24** comprises a supply voltage clock (CLK) input, a supply voltage ($V_{SUPPLY}$) input, an input for receiving a feedback bias control signal **58**, and a regulated clock output on signal line **44**. In one embodiment, the regulated clock output on signal line **44** comprises a first phase clock of the regulated clock signal. Regulated clock circuit **26** comprises a supply voltage clock (CLK) input, a supply voltage ($V_{SUPPLY}$) input, an input for receiving a feedback bias control signal **58**, and a regulated clock output on signal line **46**. In one embodiment, the regulated clock output on signal line **46** comprises a second phase clock of the regulated clock signal. For regulated clock circuits **24** and **26**, the CLK input has a peak level at $V_{SUPPLY}$.

Regulated clock circuit **28** comprises a supply voltage clock (CLK) input, a supply voltage ($V_{SUPPLY}$) input, an input for receiving a feedback bias control signal **58**, and a regulated clock output on signal line **52**. In one embodiment, the regulated clock output on signal line **52** comprises a first phase clock of the regulated clock signal. Regulated clock circuit **30** comprises a supply voltage clock (CLK) input, a supply voltage ($V_{SUPPLY}$) input, an input for receiving a feedback bias control signal **58**, and a regulated clock output on

**4**

signal line **54**. In one embodiment, the regulated clock output on signal line **54** comprises a second phase clock of the regulated clock signal. For regulated clock circuits **28** and **30**, the CLK input has a peak level at $V_{SUPPLY}$.

As illustrated in FIG. **1**, the embodiment comprises symmetrical multiplier stages, each multiplier stage being coupled to two regulated clock circuits. That is, two regulated clock circuits are provided per multiplier stage. In addition, it should be noted that the number of regulated clock circuits used for providing a given phase of the regulated clock to one or more of the multiplier stages can be selected according to the requirements of a given the multiplier stage or stages. Furthermore, the phase provided by one regulated clock circuit of a first multiplier stage may be different from the phase provided by another regulated clock circuit of the first multiplier stage or of a second multiplier stage.

Referring still to FIG. **1**, feedback bias control circuit **32** includes an input coupled to $V_{OUT}$ **50**, a reference voltage input ($V_{REF}$) **60**, a sampling level control input **62**, and a feedback bias control output on signal line **58**. Feedback bias control circuit **32** is configured for providing the feedback bias control output on signal line **58** in response to $V_{OUT}$ **50**, reference voltage input ($V_{REF}$) **60**, and sampling level control input **62**. Reference voltage input ($V_{REF}$) **60** can include a variable reference voltage, wherein the variable reference voltage advantageously enables the voltage multiplier output $V_{OUT}$ **50** to have a capability for generating a greater number of different voltage output levels.

For example, feedback bias control circuit **32** can include a divider network (capacitive or resistive) to enable a given number (for example, three (3)) of sample ratio levels to be generated. Assuming, $V_{REF}$ is variable between a number of reference voltage levels (for example, four (4)), then the total number of output levels for $V_{OUT}$ will equal twelve (12, 3×4). Accordingly, the number of levels of output voltage $V_{OUT}$ **50** of voltage multiplier **10** is controlled by (i) the number of levels of reference voltage $V_{REF}$ and (ii) the number of sample ratio levels of the divider network of feedback bias control circuit **32**, as will be discussed further herein. The magnitude of the output voltage $V_{OUT}$ **50** of voltage multiplier **10** is determined by the number of multiplier stages (**12,14,16**). Sampling level control input **62** is configured to control a sampling ratio of the divider network within the feedback control circuit **32**, as will also be discussed further herein.

FIG. **2** is a block diagram view of a voltage multiplier **10** according to an embodiment of the present disclosure. As discussed with reference to FIG. **1**, the first multiplier stage **12** includes input **34** and output **36**. In the embodiment as shown in FIG. **2**, first multiplier stage **12** includes capacitors **70** and **71**, NMOS devices **72** and **74**, and PMOS devices **76** and **78**, cross-coupled together in a known multiplier stage configuration. That is, an isolated $P_{WELL}$ (not shown) of NMOS devices **72** and **74** is electrically coupled to the input **34** of multiplier stage **12**. In addition, an isolated $N_{WELL}$ (not shown) of PMOS devices **76** and **78** is electrically coupled to the output **36** of multiplier stage **12**. Accordingly, first multiplier stage **12** comprises a symmetrical multiplier stage which includes (i) a first portion corresponding to capacitor **70** that is (a) pre-charged through NMOS device **72** during a first clock phase and (b) pumped through PMOS device **76** during a second clock phase, and (ii) a second portion corresponding to capacitor **71** that is (a) pumped through PMOS device **78** during the first clock phase and (b) pre-charged through NMOS device **74** during the second clock phase. The first phase clock is provided via regulated clock signal on signal line **38** and the second clock phase is provided via a regulated clock signal on signal line **40**.

US 7,795,951 B2

5

Multiplier stages **14** and **16** are similar to multiplier stage **12**. That is, multiplier stages **14** and **16** include corresponding capacitors (**80,90**) and (**81,91**), NMOS devices (**82,92**) and (**84,94**), and PMOS devices (**86,96**) and (**88,98**), cross-coupled together in a known multiplier stage configuration. In addition, an isolated $P_{WELL}$ (not shown) of NMOS devices (**82,92**) and (**84,94**) are electrically coupled to the corresponding inputs **36** and **48** of a corresponding multiplier stage. The isolated $P_{WELL}$ (not shown) of NMOS devices are isolated Deep $N_{WELL}$ (not shown) and it is coupled to the output of their stages **42** and **50** respectively. In addition, an $N_{WELL}$ (not shown) of PMOS devices (**86,96**) and (**88,98**) are electrically coupled to the corresponding outputs **42** and **50** of a corresponding multiplier stage. Furthermore, multiplier stages **14** and **16** operate in a similar manner as multiplier stage **12**, and thus not described in further detail herein.

As discussed with reference to FIG. **1**, input level regulator **18** includes a voltage supply input **56**, a feedback bias control input **58**, and a regulated voltage output on signal line **34**. As shown in FIG. **2**, input level regulator **18** includes a PMOS device **100** configured for operating as a common-source amplifier. In such a configuration, input level regulator **18** provides a regulated voltage output on signal line **34** in response to the supply voltage $V_{SUPPLY}$ on input **56** and the feedback bias control signal on signal line **58**.

With reference still to FIG. **2**, in one embodiment, regulated clock circuit **20** includes an inverter with the inverter's supply being regulated by a common source amplifier. The inverter comprises PMOS device **104** and NMOS device **105**. The common-source amplifier comprises PMOS device **102**. Regulated clock circuit **20** operates in response to the clock (CLK), the supply voltage ($V_{SUPPLY}$), and the feedback bias control signal on signal line **58** for outputting the regulated clock output on signal line **38**. In one embodiment, the regulated clock output on signal line **38** comprises a first phase clock of the regulated clock signal.

Regulated clock circuit **22** includes first and second inverters, wherein the second inverter's supply is regulated by a common source amplifier. The first inverter **109** supply is characterized by a peak level that is the same as the clock (CLK) input. The second inverter comprises PMOS device **108** and NMOS device **110**. The common-source amplifier comprises PMOS device **106**. Regulated clock circuit **22** operates in response to the clock (CLK), the supply voltage ($V_{SUPPLY}$), and the feedback bias control signal **58** for outputting the regulated clock output on signal line **40**. In one embodiment, the regulated clock output on signal line **40** comprises the second phase clock of the regulated clock signal.

Regulated clock circuits (**24,28**) and (**26,30**) are similar to regulated clock circuits **20** and **22**, respectively. That is, regulated clock circuits (**24,28**) include corresponding components, in particular, an inverter comprising PMOS device (**114,124**) and NMOS device (**115,125**) and a common-source amplifier comprising PMOS device (**112,122**), respectively, coupled together in similar configurations as in regulated clock circuit **20**. Regulated clock circuits (**26,30**) include corresponding components, in particular, a first inverter (**119,129**, a second inverter comprising PMOS device (**118,128**) and NMOS device (**120,130**) and a common-source amplifier comprising PMOS device (**116,126**), respectively, coupled together in similar configurations as in regulated clock circuit **22**. In addition, regulated clock circuits (**24,28**) and (**26,30**) operate in a similar manner as does regulated clock circuits **20** and **22**, respectively, and thus are not described in further detail herein.

6

In FIG. **2**, feedback bias control circuit **32** includes an input coupled to $V_{OUT}$ **50**, a reference voltage input ($V_{REF}$) **60**, a sampling level control input **62**, and a feedback bias control output on signal line **58**. Feedback bias control circuit **32** is configured for providing the feedback bias control output signal on signal line **58** in response to $V_{OUT}$ **50**, reference voltage input ($V_{REF}$) **60**, and sampling level control input **62**. In addition, reference voltage input ($V_{REF}$) **60** can include a variable reference voltage, wherein the variable reference voltage advantageously enables the voltage multiplier output $V_{OUT}$ **50** to have a capability for generating a greater number of different voltage output levels.

In addition, as shown in the embodiment of FIG. **2**, feedback bias control circuit **32** includes a high gain amplifier **132** and a resistive divider network **134**. $V_{REF}$ **60** is coupled to an inverting input of high gain operational amplifier **132** and the resistive divider network **134** is coupled to the non-inverting input of the high gain amplifier **132**. The feedback bias control signal **58** is coupled to the output of the high operational gain amplifier **132**. As shown, resistive divider network **134** comprises a number of resistive elements, for example, four resistive elements (**136,138,142,144**) coupled in series with one another. Resistive divider network **134** thus enables three (3) sample ratio levels to be generated. While only three (3) sample ratio levels are described and discussed, the embodiments of the present disclosure can include a smaller number of sample ratio levels or a greater number of sample ratio levels, according to the requirements of a given voltage multiplier application. Thus, assuming, $V_{REF}$ is variable between a number of reference voltage levels (for example, four (4)), then the total number of output levels for the feedback bias control signal **58**, and thus for $V_{OUT}$, will equal twelve (12, 3×4).

Sampling level control input **62** is configured to control a sampling ratio of the divider network **134** within the feedback control circuit **32**. In particular, feedback control circuit further includes switching element **146**. In one embodiment, switching element **146** includes two (2) switches (**148,150**). The first switch **148** is normally open and coupled across resistive element **136**. The second switch **150** is normally open and coupled across resistive elements **136** and **138**. In one embodiment, sampling level control input **62** comprises a two bit input control signal and is configured to control activation of switching element **146**, in particular first and second switches **148** and **150**, respectively, for obtaining a desired sampling ratio of the divider network **134**.

Accordingly, the number of levels of output voltage $V_{OUT}$ **50** of voltage multiplier **10** is controlled by (i) the number of levels of reference voltage $V_{REF}$ and (ii) the number of sample ratio levels of the divider network of feedback bias control circuit **32**, per the feedback bias control signal **58**. In addition, the magnitude of the output voltage $V_{OUT}$ **50** of voltage multiplier **10** is determined by the number of multiplier stages (**12,14,16**). Furthermore, sampling level control input **62** controls a sampling ratio of the divider network **134** within the feedback control circuit **32**.

FIG. **3** is a graphical presentation view **160** of output voltage versus time for the voltage multiplier **10** according to the embodiments of the present disclosure. Graph **160** illustrates values of output voltage $V_{OUT}$ versus time for various generated output levels L1, L2, L3, L4, . . . , $L_{M-1}$, and $L_M$, wherein M is an integer equal to the number of reference voltage levels multiplied by the number of sample ratios. In particular, graph **160** illustrates the impact of changing a sampling ratio (via sampling level control **62**) and/or in conjunction using different reference voltage $V_{REF}$ (variable reference voltage **60**) levels. In addition, undesirable ripple is minimal irregard-

US 7,795,951 B2

**7**

less of the output voltage level being generated. One example
of ripple is indicated by reference numeral **162** on level $L_M$.

FIG. **4** is a block diagram view of a voltage multiplier **170**
according to another embodiment of the present disclosure.
The voltage multiplier **170** of FIG. **4** is similar to voltage
multiplier **10** of FIGS. **1** and **2** with differences being dis-
cussed in the following. Voltage multiplier **170** includes a
number of multiplier stages, designated by reference numer-
als **172**, **174**, and **176**. Voltage multiplier **170** also includes an
input level regulator **181**, a number of regulated clock circuits
**20**, **224**, and **28**, and a feedback bias control circuit **32**.

The first multiplier stage **172** includes input **34**, output **36**,
capacitor **178** and diode **180**. In this embodiment, the first
multiplier stage **172** comprises a non-symmetrical multiplier
stage. In operation, capacitor **178** is (a) pre-charged during a
first clock phase (e.g., provided by clock **20**) and (b) pumped
during a second clock phase (e.g., provided by clock **224**).
The first phase clock is provided via a regulated clock signal
from clock circuit **20** on signal line **38**. Regulated clock
circuit **20** operates in response to the clock (CLK), the supply
voltage ($V_{SUPPLY}$), and the feedback bias control signal **58** for
outputting the regulated clock output on signal line **38**. In one
embodiment, the regulated clock output on signal line **38**
comprises a first phase clock of the regulated clock signal.

The second multiplier stage **174** includes input **36**, output
**42**, capacitor **182** and diode **184**. In this embodiment, the
second multiplier stage **174** comprises a non-symmetrical
multiplier stage. In operation, capacitor **182** is (a) pre-
charged during a second clock phase (e.g., provided by clock
**224**) and (b) pumped during a first clock phase (e.g., provided
by clock **28**). The second phase clock is provided via a regu-
lated clock signal from clock circuit **224** on signal line **244**. In
particular, regulated clock circuit **224** includes a first inverter
**213**, a second inverter comprising PMOS device **214** and
NMOS device **215**, and a common-source amplifier compris-
ing PMOS device **212**, coupled together in similar configu-
ration as in regulated clock circuit **22**, discussed earlier
herein. Regulated clock circuit **224** operates in response to
the clock (CLK), the supply voltage ($V_{SUPPLY}$), and the feedback
bias control signal **58** for outputting the regulated clock out-
put on signal line **244**. In one embodiment, the regulated
clock output on signal line **244** comprises a second phase
clock of the regulated clock signal.

The third multiplier stage **176** includes input **48**, output **50**
(corresponding to $V_{OUT}$), capacitor **186** and diode **188**. In this
embodiment, the third multiplier stage **176** comprises a non-
symmetrical multiplier stage. In operation, capacitor **186** is
(a) pre-charged during a first clock phase and (b) pumped
during a second clock phase. The first phase clock is provided
via a regulated clock signal from clock circuit **28** on signal
line **52**. Regulated clock circuit **28** operates, as discussed
earlier herein, in response to the clock (CLK), the supply
voltage ($V_{SUPPLY}$), and the feedback bias control signal **58** for
outputting the regulated clock output on signal line **52**. In one
embodiment, the regulated clock output on signal line **52**
comprises a first phase clock of the regulated clock signal.

With reference still to FIG. **4**, input level regulator **181**
includes a voltage supply input **56**, a feedback bias control
input **58**, diode **101**, and a regulated voltage output on signal
line **34**. Input level regulator **181** includes a PMOS device **100**
configured for operating as a common-source amplifier. In
such a configuration, input level regulator **181** provides a
regulated voltage on signal line **34** through diode **101** in
response to the supply voltage $V_{SUPPLY}$ on input **56** and the
feedback bias control signal on signal line **58**. Diode **101**
functions to prevent reverse current flow during pumping
(i.e., the second clock phase) of the first multiplier stage **174**.

**8**

By now it should be appreciated that there has been pro-
vided a voltage multiplier comprising: a first clocked multi-
plier stage having an input and an output; a second clocked
multiplier stage having an input and an output; an input level
regulator coupled to the input of the first multiplier stage; and
a feedback bias control circuit coupled to the input level
regulator. The feedback bias control circuit is further coupled
to receive the output of the second multiplier stage, wherein
the feedback bias control circuit generates a feedback signal
affecting an output of the input level regulator based on a
comparison between a voltage proportional to a voltage at the
output of the second clocked multiplier stage and a reference
voltage.

In one embodiment, the feedback bias control circuit is
further coupled to a generator of a clock coupled to the first
clocked multiplier stage, such that the feedback signal affects
a magnitude of the clock coupled to the first clocked multi-
plier stage. In another embodiment, the feedback bias control
circuit is further coupled to a generator of a clock coupled to
the second clocked multiplier stage, such that the feedback
signal affects a magnitude of the clock coupled to the second
clocked multiplier stage. In yet another embodiment, the first
clocked multiplier stage is identical to the second clocked
multiplier stage. In a still further embodiment, the first
clocked multiplier stage is different from the second clocked
multiplier stage.

In another embodiment, the feedback bias control circuit
comprises one of a switched resistor-divider or a switched
capacitor-divider to generate the voltage proportional to the
voltage at the output of the second clocked multiplier stage.
The feedback bias control circuit further comprises an opera-
tional amplifier for comparing the voltage proportional to the
voltage at the output of the second clocked multiplier stage
and the reference voltage. The one of the switched resistor-
divider and the switched-capacitor divider is configured to
dynamically change a value of the voltage proportional to the
voltage at the output of the second clocked multiplier stage in
response to at least one control signal.

According to one embodiment of the present disclosure, a
voltage multiplier comprises: a first clocked multiplier stage
having an input and an output; a second clocked multiplier
stage having an input and an output, wherein the output of the
first clocked multiplier stage is coupled to the input of the
second multiplier stage; a first regulated clock coupled to the
first control input of the first multiplier stage; a second regu-
lated clock coupled to the second control input of the first
multiplier stage; a third regulated clock coupled to the first
control input of the second multiplier stage; a fourth regulated
clock coupled to the second control input of the second mul-
tiplier stage; a feedback bias control circuit coupled to the
input level regulator, wherein the feedback bias control cir-
cuit is further coupled to receive the output of the second
multiplier stage, and wherein the feedback bias control circuit
generates a feedback signal affecting an output of the input
level regulator based on a comparison between a voltage
proportional to a voltage at the output of the second clocked
multiplier stage and a reference voltage, wherein the feed-
back bias control circuit is further coupled to the first regu-
lated clock, such that the feedback signal affects an output
voltage of the first regulated clock, wherein the feedback bias
control circuit is further coupled to the second regulated
clock, such that the feedback signal affects an output voltage
of the second regulated clock, wherein the feedback bias
control circuit is further coupled to the third regulated clock,
such that the feedback signal affects an output voltage of the
third regulated clock, and feedback bias control circuit is
further coupled to the fourth regulated clock, such that the

**Appx226**

US 7,795,951 B2

**9**

feedback signal affects an output voltage of the fourth regulated clock. In another embodiment, the first clocked multiplier stage is identical to the second clocked multiplier stage. In still another embodiment, the first clocked multiplier stage is different from the second clocked multiplier stage. In a yet further embodiment, each of the first clocked multiplier stage and the second clocked multiplier stage comprises a pair of cross-coupled transistors and two pumping capacitors.

In one embodiment, the feedback bias control circuit comprises one of a switched resistor-divider or a switched capacitor-divider to generate the voltage proportional to the voltage at the output of the second multiplier stage. The feedback bias control circuit further comprises an operational amplifier for comparing the voltage proportional to the voltage at the output of the second clocked multiplier stage and the reference voltage. In addition, the one of the switched resistor-divider or the switched-capacitor divider is configured to dynamically change a value of the voltage proportional to the voltage at the output of the second clocked multiplier stage in response to at least one control signal.

According to another embodiment, a voltage multiplier comprises a first clocked multiplier stage having an input, a control input, and an output; a second clocked multiplier stage having an input, a control input, and an output, wherein the output of the first clocked multiplier stage is coupled to the input of the second multiplier stage; a first regulated clock coupled to the control input of the first multiplier stage; a second regulated clock coupled to the control input of the second multiplier stage; an input level regulator, wherein the input level regulator comprises a transistor having a first current electrode coupled to a supply voltage, a second current electrode coupled to the input of the first multiplier stage, and a control electrode coupled to receive a feedback signal; and a feedback bias control circuit coupled to provide the feedback signal to the control electrode of the transistor. The feedback bias control circuit is further coupled to receive the output of the second multiplier stage, and wherein the feedback bias control circuit generates the feedback signal affecting an output of the input level regulator based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage.

In another embodiment, the feedback bias control circuit is further coupled to the first regulated clock and the second regulated clock, such that the feedback signal affects an output voltage of the first regulated clock and an output voltage of the second regulated clock. In yet another embodiment, the feedback bias control circuit comprises one of a switched resistor-divider or a switched capacitor-divider to generate the voltage proportional to the voltage at the output of the second clocked multiplier stage. In a still further embodiment, each of the first clocked multiplier stage and the second clocked multiplier stage comprises a diode and a pumping capacitor.

Because the apparatus implementing the present invention is, for the most part, composed of electronic components and circuits known to those skilled in the art, circuit details will not be explained in any greater extent than that considered necessary as illustrated above, for the understanding and appreciation of the underlying concepts of the present invention and in order not to obfuscate or distract from the teachings of the present invention.

Although the invention has been described with respect to specific conductivity types or polarity of potentials, skilled artisans appreciated that conductivity types and polarities of potentials may be reversed.

**10**

Moreover, the terms "front," "back," "top," "bottom," "over," "under" and the like in the description and in the claims, if any, are used for descriptive purposes and not necessarily for describing permanent relative positions. It is understood that the terms so used are interchangeable under appropriate circumstances such that the embodiments of the invention described herein are, for example, capable of operation in other orientations than those illustrated or otherwise described herein.

Although the invention is described herein with reference to specific embodiments, various modifications and changes can be made without departing from the scope of the present invention as set forth in the claims below. For example, the embodiments of the present disclosure can be advantageously applied to MRAM devices, Embedded NVM devices, Embedded SRAM devices, and the like. Accordingly, the specification and figures are to be regarded in an illustrative rather than a restrictive sense, and all such modifications are intended to be included within the scope of the present invention. Any benefits, advantages, or solutions to problems that are described herein with regard to specific embodiments are not intended to be construed as a critical, required, or essential feature or element of any or all the claims.

The term "coupled," as used herein, is not intended to be limited to a direct coupling or a mechanical coupling.

Furthermore, the terms "a" or "an," as used herein, are defined as one or more than one. Also, the use of introductory phrases such as "at least one" and "one or more" in the claims should not be construed to imply that the introduction of another claim element by the indefinite articles "a" or "an" limits any particular claim containing such introduced claim element to inventions containing only one such element, even when the same claim includes the introductory phrases "one or more" or "at least one" and indefinite articles such as "a" or "an." The same holds true for the use of definite articles.

Unless stated otherwise, terms such as "first" and "second" are used to arbitrarily distinguish between the elements such terms describe. Thus, these terms are not necessarily intended to indicate temporal or other prioritization of such elements.

What is claimed is:

**1**. A voltage multiplier comprising:

a first clocked multiplier stage having an input and an output;

a second clocked multiplier stage having an input and an output;

an input level regulator having an input coupled to receive a supply voltage, a control input, and an output coupled to the input of the first multiplier stage; and

a feedback bias control circuit coupled to the control input of the input level regulator, wherein the feedback bias control circuit is further coupled to receive the output of the second multiplier stage, and wherein the feedback bias control circuit generates a feedback signal for regulating an output voltage at the output of the input level regulator to a continuous range of voltage levels based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage.

**2**. The voltage multiplier of claim **1**, wherein the feedback bias control circuit is further coupled to a generator of a clock coupled to the first clocked multiplier stage, such that the feedback signal affects a magnitude of the clock coupled to the first clocked multiplier stage.

**3**. The voltage multiplier of claim **1**, wherein the feedback bias control circuit is further coupled to a generator of a clock coupled to the second clocked multiplier stage, such that the

US 7,795,951 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

feedback signal affects a magnitude of the clock coupled to the second clocked multiplier stage.

**4.** The voltage multiplier of claim **1**, wherein the feedback bias control circuit comprises one of a switched resistor-divider or a switched capacitor-divider to generate the voltage proportional to the voltage at the output of the second clocked multiplier stage.

**5.** The voltage multiplier of claim **4**, wherein the feedback bias control circuit further comprises an operational amplifier for comparing the voltage proportional to the voltage at the output of the second clocked multiplier stage and the reference voltage.

**6.** The voltage multiplier of claim **4**, wherein the one of the switched resistor-divider and the switched-capacitor divider is configured to dynamically change a value of the voltage proportional to the voltage at the output of the second clocked multiplier stage in response to at least one control signal.

**7.** The voltage multiplier of claim **1**, wherein the first clocked multiplier stage is identical to the second clocked multiplier stage.

**8.** The voltage multiplier of claim **1**, wherein the first clocked multiplier stage is different from the second clocked multiplier stage.

**9.** A voltage multiplier comprising:

a first clocked multiplier stage having an input and an output;

a second clocked multiplier stage having an input and an output, wherein the output of the first clocked multiplier stage is coupled to the input of the second multiplier stage;

an input level regulator having an input for receiving a supply voltage, an output coupled to provide an output voltage to the input of the first clocked multiplier stage, and a control input;

a first regulated clock coupled to a first control input of the first multiplier stage;

a second regulated clock coupled to a second control input of the first multiplier stage;

a third regulated clock coupled to a first control input of the second multiplier stage;

a fourth regulated clock coupled to a second control input of the second multiplier stage;

a feedback bias control circuit coupled to the control input of the input level regulator, wherein the feedback bias control circuit is further coupled to receive the output of the second multiplier stage, and wherein the feedback bias control circuit generates a feedback signal for regulating the output voltage of the input level regulator to a continuous range of voltage levels based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage, wherein the feedback bias control circuit is further coupled to the first regulated clock, such that the feedback signal affects an output voltage of the first regulated clock, wherein the feedback bias control circuit is further coupled to the second regulated clock, such that the feedback signal affects an output voltage of the second regulated clock, wherein the feedback bias control circuit is further coupled to the third regulated clock, such that the feedback signal affects an output voltage of the third regulated clock, and feedback bias control circuit is further coupled to the fourth regulated clock, such that the feedback signal affects an output voltage of the fourth regulated clock.

**10.** The voltage multiplier of claim **9**, wherein the feedback bias control circuit comprises one of a switched resistor-

divider or a switched capacitor-divider to generate the voltage proportional to the voltage at the output of the second multiplier stage.

**11.** The voltage multiplier of claim **10**, wherein the feedback bias control circuit further comprises an operational amplifier for comparing the voltage proportional to the voltage at the output of the second clocked multiplier stage and the reference voltage.

**12.** The voltage multiplier of claim **10**, wherein the one of the switched resistor-divider or the switched-capacitor divider is configured to dynamically change a value of the voltage proportional to the voltage at the output of the second clocked multiplier stage in response to at least one control signal.

**13.** The voltage multiplier of claim **9**, wherein the first clocked multiplier stage is identical to the second clocked multiplier stage.

**14.** The voltage multiplier of claim **9**, wherein the first clocked multiplier stage is different from the second clocked multiplier stage.

**15.** The voltage multiplier of claim **9**, wherein each of the first clocked multiplier stage and the second clocked multiplier stage comprises a pair of cross-coupled transistors and two pumping capacitors.

**16.** A voltage multiplier comprising:

a first clocked multiplier stage having an input, a control input, and an output;

a second clocked multiplier stage having an input, a control input, and an output, wherein the output of the first clocked multiplier stage is coupled to the input of the second multiplier stage;

a first regulated clock coupled to the control input of the first clocked multiplier stage;

a second regulated clock coupled to the control input of the second clocked multiplier stage;

an input level regulator, wherein the input level regulator comprises a transistor having a first current electrode coupled to receive a supply voltage, a second current electrode coupled to the input of the first clocked multiplier stage, and a control electrode coupled to receive a feedback signal; and

a feedback bias control circuit coupled to provide the feedback signal to the control electrode of the transistor, wherein the feedback bias control circuit is further coupled to receive the output of the second clocked multiplier stage, and wherein the feedback bias control circuit generates the feedback signal for regulating an output voltage of the input level regulator to a continuous range of voltage levels based on a comparison between a voltage proportional to a voltage at the output of the second clocked multiplier stage and a reference voltage.

**17.** The voltage multiplier of claim **16**, wherein the feedback bias control circuit is further coupled to the first regulated clock and the second regulated clock, such that the feedback signal affects an output voltage of the first regulated clock and an output voltage of the second regulated clock.

**18.** The voltage multiplier of claim **16**, wherein the feedback bias control circuit comprises one of a switched resistor-divider or a switched capacitor-divider to generate the voltage proportional to the voltage at the output of the second clocked multiplier stage.

**19.** The voltage multiplier of claim **16**, wherein each of the first clocked multiplier stage and the second clocked multiplier stage comprises a diode and a pumping capacitor.

\* \* \* \* \*

**CERTIFICATE OF COMPLIANCE**

The forgoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally spaced typeface and includes 13,998 words.

Date:  March 8, 2024

Respectfully submitted,

/s/ *Jennifer L. Swize*

Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3939
jswize@jonesday.com

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The forgoing filing contains one figure under seal because it depicts a proprietary configuration of components marked confidential.  This figure does not exceed the maximum number of 15 words permitted by Federal Circuit Rule 25.1(d)(1)(A).

Date:  March 8, 2024                    Respectfully submitted,

/s/ *Jennifer L. Swize*
Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3939
jswize@jonesday.com